Laurence M. Rosen (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID RAMOS, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>COMERICA INCORPORATED, CURTIS C. FARMER, and JAMES J. HERZOG,<br><br>Defendants. | No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>CLASS ACTION</u><br><br>JURY TRIAL DEMANDED |

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

Plaintiff David Ramos ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, public filings, wire and press releases published by and regarding Comerica Incorporated ("Comerica" or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Comerica securities between February 9, 2021 and May 29, 2023, inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

4.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged

1

misstatements entered and the subsequent damages took place in this judicial district.

5.     In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants (defined below), directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.     Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased Comerica securities during the Class Period and was economically damaged thereby.

7.     Defendant Comerica is a financial services company.

8.     In January 2008, the United States Department of the Treasury selected the Company as the issuing bank for the federal Direct Express program. Under this program, the federal government uses the Express Debit product to issue electronic payments (such as Social Security or veteran's benefits) to individuals who do not have bank accounts.

9.     As part of its administration of the Direct Express program, Comerica must adhere to the terms of its contract with the United States government (the "Federal Contract"), including that all operations relating to the Direct Express contract must be in the United States or an American territory, in addition to other applicable laws and regulations. In particular, the Company must adhere to Regulation E. As per the Federal Reserve, Regulation E "provides a basic framework that establishes the rights, liabilities, and responsibilities of participants in electronic fund transfer systems such as automated teller machine transfers, telephone bill-payment services, point-of-sale (POS) terminal transfers in stores, and preauthorized transfers from or to a consumer's account (such as direct deposit

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

and social security payments)." Regulation E provides for consumer protections in the event of a fraud involving electronic fund transfers by placing certain requirements on institutions that facilitate fund transfers, and covers a variety of transfers including issuing debit cards to recipients of federal funds.

10.     The Company is incorporated in Delaware, considers California to be a "primary U.S. location", and has a major office located at 601 South Figueroa Street, Suite 100, Los Angeles, CA 90017. The Company's stock trades on the New York Stock Exchange under the ticker symbol "CMA."

11.     Defendant Curtis C. Farmer ("Farmer") has served as the Company's Chief Executive Officer ("CEO") since April 2019. He has also serves as Chairman of the Board of Directors (the "Board") since January 1, 2020, and additionally serves as President.

12.     Defendant James J. Herzog ("Herzog") has served as the Company's Chief Financial Officer ("CFO") and Senior Executive Vice President since February 2020.

13.     Defendants Farmer and Herzog are collectively referred to herein as the "Individual Defendants."

14.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

3

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

15.     The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

16.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Comerica under *respondeat superior* and agency principles.

17.     Defendant Comerica and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

## Materially False and Misleading Statements Issued During the Class Period

18.     On February 9, 2021, the Company filed with the SEC its Annual Report on Form 10-K for the year ended December 31, 2020 (the "2020 Annual Report"). Attached to the 2020 Annual Report were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Farmer and Herzog attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

19.     The 2020 Annual Report included the following disclosure regarding its reliance on other Companies as vendors:

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

**Comerica relies on other companies to provide certain key components of its delivery systems, and certain failures could materially adversely affect operations.**

Comerica faces the risk of operational disruption, failure or capacity constraints due to its dependency on third party vendors for components of its delivery systems. Third party vendors provide certain key components of Comerica's delivery systems, such as cloud-based computing, networking and storage services, payment processing services, recording and monitoring services, internet connections and network access, clearing agency services, card processing services and trust processing services. *While Comerica conducts due diligence prior to engaging with third party vendors and performs ongoing monitoring of vendor controls, it does not control their operations. Further, while Comerica's vendor management policies and practices are designed to comply with current regulations, these policies and practices cannot eliminate this risk*. In this context, any vendor failure to properly deliver these services could adversely affect Comerica's business operations, and result in financial loss, reputational harm, and/or regulatory action.

(Emphasis added).

20.     This statement was materially false and misleading because by the time the 2020 Annual Report was filed, the Company was aware that, among other issues with vendors, personally identifiable information on veterans, social Security and disability recipients who received money under the Direct Express program were routinely shared and handled by i2c Inc. ("i2c"), a Company vendor, from its office in Lahore, Pakistan—in violation of the Federal Contract, which requires operations to be conducted within the United States.

21.     The 2020 Annual Report included the following disclosure on fraud:

**Comerica may incur losses due to fraud.**
Fraudulent activity can take many forms and has escalated as more tools for accessing financial services emerge, such as real-time payments. Fraud schemes are broad and continuously evolving. Examples include but are not limited to:  debit card/credit card fraud, check fraud, mechanical devices attached to ATM machines, social

5

engineering and phishing attacks to obtain personal information, impersonation of our clients through the use of falsified or stolen credentials, employee fraud, information theft and other malfeasance. Increased deployment of technologies, such as chip card technology, defray and reduce aspects of fraud; however, criminals are turning to other sources to steal personally identifiable information in order to impersonate the consumer to commit fraud. Many of these data compromises have been widely reported in the media. Further, as a result of the increased sophistication of fraud activity, Comerica continues to invest in systems, resources, and controls to detect and prevent fraud. This will result in continued ongoing investments in the future.

22.     This statement was materially false and misleading because it only discussed fraud in general terms rather than as a pressing issue as it related to the Direct Express program. By the time the 2020 Annual Report was filed, Company executives were raising internal concerns regarding potential Company violations of Regulation E due to inadequate fraud prevention and responses relating to the Direct Express program.

23.     The 2020 Annual Report included the following disclosure on the Company's reputational risk:

**Damage to Comerica's reputation could damage its businesses**
Reputational risk is an increasing concern for businesses as customers are interested in doing business with companies they admire and trust. Such risks include compliance issues, operational challenges, or a strategic, high profile event. Comerica's business is based on the trust of its customers, communities, and entire value chain, which makes managing reputational risk extremely important.  News or other publicity that impairs Comerica's reputation, or the reputation of the financial services industry generally, can therefore cause significant harm to Comerica's business and prospects. Further, adverse publicity or negative information posted on social media websites regarding Comerica, whether or not true, may result in harm to Comerica's prospects.

24.     This disclosure was materially false and misleading because it discussed reputational risk in general terms, rather than disclosing that the

Company was at a heightened risk of reputational damage because of, among other issues, the Company's noncompliance with the Federal Contract due to a vendor conducting operations out of an office in Lahore, Pakistan rather than, as was required, in the United States.

25.     On April 28, 2021, July 29, 2021, and October 29, 2021, the Company filed with the SEC its quarterly reports on Form 10-Q for the periods that ended on March 31, 2021 (the "1Q21 Report"), June 30, 2021 (the "2Q21 Report") and September 30, 2021 (the "3Q21 Report"). Attached to the 1Q21, 2Q21, and 3Q21 Reports were signed certifications pursuant to SOX signed by Defendants Farmer and Herzog attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

26.     The 1Q21, 2Q21, and 3Q21 Reports incorporated by reference the materially false and misleading risk disclosures from its 2020 Annual Report.

27.     Then, on February 16, 2022, the Company filed with the SEC its Annual Report on Form 10-K for the year ended December 31, 2021 (the "2021 Annual Report"). Attached to the 2021 Annual Report were signed certifications pursuant to SOX signed by Defendants Farmer and Herzog attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

28.     The 2021 Annual Report included the following disclosure regarding its reliance on other companies as vendors:

**Comerica relies on other companies to provide certain key components of its delivery systems, and certain failures could materially adversely affect operations.**

Comerica faces the risk of operational disruption, failure or capacity constraints due to its dependency on third party vendors for

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

components of its delivery systems. Third party vendors provide certain key components of Comerica's delivery systems, such as cloud-based computing, networking and storage services, payment processing services, recording and monitoring services, internet connections and network access, clearing agency services, card processing services and trust processing services. While Comerica conducts due diligence prior to engaging with third party vendors and performs ongoing monitoring of vendor controls, it does not control their operations. Further, while Comerica's vendor management policies and practices are designed to comply with current regulations, these policies and practices cannot eliminate this risk. In this context, any vendor failure to properly deliver these services could adversely affect Comerica's business operations, and result in financial loss, reputational harm, and/or regulatory action.

29.    This statement was materially false and misleading because, as discussed in paragraph 20, at the time this report was filed with the SEC, the Company knew that it was not in compliance with the Federal Contract because a Company vendor was conducting certain operations from Lahore, Pakistan rather than, as was required, in the United States.

30.    The 2021 Annual Report included the following disclosure regarding fraud:

**Comerica may incur losses due to fraud.**

Fraudulent activity can take many forms and has escalated as more tools for accessing financial services emerge, such as real-time payments. Fraud schemes are broad and continuously evolving. Examples include but are not limited to: debit card/credit card fraud, check fraud, mechanical devices attached to ATM machines, social engineering and phishing attacks to obtain personal information, impersonation of our clients through the use of falsified or stolen credentials, employee fraud, information theft and other malfeasance. Increased deployment of technologies, such as chip card technology, defray and reduce aspects of fraud; however, criminals are turning to other sources to steal personally identifiable information in order to impersonate the consumer to commit fraud. Many of these data compromises have been widely reported in the media. Further, as a result of the increased sophistication of fraud activity, Comerica

8

continues to invest in systems, resources, and controls to detect and prevent fraud. This will result in continued ongoing investments in the future.

31.    This statement was materially false and misleading because, as discussed in paragraph 22, the Company knew that fraud against recipients of federal funds through the Direct Express program was a serious issue. Further, Company executives had internally raised concerns about its lack of legal compliance with Regulation E due to its inadequate fraud prevention and responses.

32.    The 2021 Annual Report included the following disclosure on the Company's reputational risk:

**Damage to Comerica's reputation could damage its businesses.**
Reputational risk is an increasing concern for businesses as customers are interested in doing business with companies they admire and trust. Such risks include compliance issues, operational challenges, or a strategic, high profile event. Comerica's business is based on the trust of its customers, communities, and entire value chain, which makes managing reputational risk extremely important. News or other publicity that impairs Comerica's reputation, or the reputation of the financial services industry generally, can therefore cause significant harm to Comerica's business and prospects. Further, adverse publicity or negative information posted on social media websites regarding Comerica, whether or not true, may result in harm to Comerica's prospects.

33.    This disclosure was materially false and misleading because it discussed reputational risk in general terms, rather than disclosing that the Company was at a heightened risk of reputational damage because of, among other issues, the Company's noncompliance with the Federal Contract due to a vendor conducting operations out of an office in Lahore, Pakistan rather than, as was required, in the United States.

34.    Then, on April 27, 2022, July 28, 2022, and October 28, 2022, the Company filed with the SEC its quarterly reports for the periods that ended on

9

March 31, 2022 (the "1Q22 Report"), June 30, 2022 (the "2Q22 Report"), and September 30, 2022 (the "3Q22 Report"). Attached to the 1Q22, 2Q22, and 3Q22 Reports were signed certifications pursuant to SOX signed by Defendants Farmer and Herzog attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

35.     The 1Q22, 2Q22, and 3Q22 Reports incorporated by reference the materially false and misleading risk disclosures from its 2021 Annual Report.

36.      Then, on February 14, 2023, the Company filed with the SEC its Annual Report on Form 10-K for the year ended December 31, 2022 (the "2022 Annual Report"). Attached to the 2022 Annual Report were signed certifications pursuant to SOX signed by Defendants Farmer and Herzog attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

37.     The 2022 Annual Report contained the following risk disclosure regarding its reliance on other Companies as vendors:

**Comerica relies on other companies to provide certain key components of its delivery systems, and certain failures could materially adversely affect operations.**

Comerica faces the risk of operational disruption, failure or capacity constraints due to its dependency on third party vendors for components of its delivery systems. Third party vendors provide certain key components of Comerica's delivery systems, such as cloud-based computing, networking and storage services, cash services, payment processing services, recording and monitoring services, internet connections and network access, clearing agency services, card processing services and trust processing services. ***While Comerica conducts due diligence prior to engaging with third party vendors and performs ongoing monitoring of vendor controls, it does not control their operations. Further, while Comerica's vendor***

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

*management policies and practices are designed to comply with current regulations, these policies and practices cannot eliminate this risk*. In this context, any vendor failure to properly deliver these services could adversely affect Comerica's business operations, and result in financial loss, reputational harm, and/or regulatory action.

(Emphasis added.)

38.     This statement was materially false and misleading because, as discussed in paragraph 20, at the time this report was filed with the SEC, the Company knew that it was not in compliance with the Federal Contract because a Company vendor was conducting certain operations from Lahore, Pakistan rather than, as was required, in the United States.

39.     The 2022 Annual Report included the following disclosure relating to fraud:

**Comerica may incur losses due to fraud.**

Fraudulent activity can take many forms and has escalated as more tools for accessing financial services emerge, such as real-time payments. Fraud schemes are broad and continuously evolving. Examples include but are not limited to: debit card/credit card fraud, check fraud, mechanical devices attached to ATM machines, social engineering and phishing attacks to obtain personal information, impersonation of clients through the use of falsified or stolen credentials, employee fraud, information theft and other malfeasance. Increased deployment of technologies, such as chip card technology, defray and reduce aspects of fraud; however, criminals are turning to other sources to steal personally identifiable information in order to impersonate the consumer to commit fraud. Many of these data compromises have been widely reported in the media. Further, as a result of the increased sophistication of fraud activity, Comerica continues to invest in systems, resources, and controls to detect and prevent fraud. This will result in continued ongoing investments in the future.

40.     This statement was materially false and misleading because, as discussed in paragraph 22, the Company knew that fraud against recipients of federal funds through the Direct Express program was a serious issue. Further,

11

Company executives had internally raised concerns about its lack of legal compliance with Regulation E due to its inadequate fraud prevention and responses.

41.     The 2022 Annual Report contained the following disclosure on the Company's reputational risk:

> **Damage to Comerica's reputation could damage its businesses.**
> Reputational risk is an increasing concern for businesses as customers are interested in doing business with companies they admire and trust. Such risks include compliance issues, operational challenges, or a strategic, high profile event. Comerica's business is based on the trust of its customers, communities, and entire value chain, which makes managing reputational risk extremely important. News or other publicity that impairs Comerica's reputation, or the reputation of the financial services industry generally, can therefore cause significant harm to Comerica's business and prospects. Further, adverse publicity or negative information posted on social media websites regarding Comerica, whether or not true, may result in harm to Comerica's prospects.

42.     This disclosure was materially false and misleading because it discussed reputational risk in general terms, rather than disclosing that the Company was at a heightened risk of reputational damage because of, among other issues, the Company's noncompliance with the Federal Contract due to a vendor conducting operations out of an office in Lahore, Pakistan rather than, as was required, in the United States.

43.     Then, on April 28, 2023, the Company filed with the SEC its quarterly report on Form 10-Q for the period ended March 31, 2023 (the "1Q23 Report"). Attached to the 1Q23 Report were signed certifications pursuant to SOX signed by Defendants Farmer and Herzog attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

44.     The 1Q23 Report incorporated by reference the materially false risk disclosures from the 2022 Annual Report.

45.     The statements contained in ¶¶ 18-21, 23, 25-28, 30, 32, 34-37, 39, 41, and 43 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Comerica failed to provide meaningful oversight over the vendors to whom it contracted out day-to-day operations of the Direct Express program, a system through which it is contracted to provide federal benefits on debit cards to millions of Americans without bank accounts; (2) as a result of violations in the day-to-day operations of Direct Express, including handling fraud disputes and allowing sensitive data to be handled out of a vendor's office in Pakistan, Comerica was not in compliance with the Federal Contract, and knew it was not in compliance; (3) Comerica knew and failed to disclose that it was in potential violation of Regulation E due to inadequate fraud prevention in the Direct Express program and responses to instances of fraud, and; (4) as a result, Defendants' statements about its business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## **THE TRUTH BEGINS TO EMERGE**

46.     On May 29, 2023, after trading hours, *American Banker* released an article entitled "Comerica in 'serious violation' of Treasury's Direct Express program." The article discussed significant issues with i2c and Conduent Inc., two vendors to whom Comerica contracts out the day-to day operations of Direct Express, a federal government program which deposits "roughly $3 billion a month

13

electronically on prepaid cards to millions federal government beneficiaries who do not have a bank account." The article stated, in pertinent part:

> Comerica Bank officials privately acknowledged significant compliance failures in their operation of a Treasury Department program that provides federal benefits on prepaid cars to millions of unbanked Americans, according to internal documents obtained by American Banker.
>
> *A Comerica executive said the Dallas bank faced a "serious contract violation" for allowing fraud disputes and data on Direct Express cardholders to be handled out of a vendor's office in Lahore, Pakistan, the documents show*.
>
> *Personally identifiable information on veterans, Social Security and disability recipients were routinely shared and handled by i2c Inc., a vendor based in Redwood City, Calif., with an office in Lahore, Pakistan—in violation of the government contract, the Comerica executive said. The Treasury's agreement with the bank states that all services provided "shall be performed in the United States or its territories."*
>
> Paul Lawrence, who served as under secretary for benefits in the Department of Veterans Affairs from 2018 to 2021, said he was in "complete shock and disgust" after being told of the information contained in the internal Comerica documents.
>
> *"All of these government contracts basically say you have to be in the U.S. and the program has to be run by U.S. citizens," Lawrence, a longtime government consultant, said in an interview. "This has all the makings for a really, really bad situation."*
>
> The internal documents, in addition to court documents filed in a class action last year, paint a broader picture of the $91.2 billion-asset Comerica's strategy and third-party oversight of Treasury's Direct Express program, which serves 4.5 million Americans.
>
> Comerica has been mired in litigation and yearslong disputes over Direct Express, which it has operated under a contract with the

14

Treasury since 2008. Direct Express deposits roughly $3 billion a month electronically on prepaid cards to millions of federal government beneficiaries who do not have a bank account. The program is part of a government effort to reduce potential fraud and costs by weaning people off paper checks.

Comerica has contracted out the day-to-day operations of Direct Express to two vendors: i2c and Conduent Inc., a publicly-traded conglomerate based in Florham Park, N.J.

***The internal documents include a 2020 email from a Comerica executive, who described sweeping violations of Regulation E, which governs how a financial institution addresses errors reported by consumers including for theft or fraud***. Nora Arpin, Comerica's then-senior vice president and director of government electronic solutions, said the bank was in breach of its Treasury contract but that it was unable to get its third-party vendor to make changes.

"***Management for Reg E dispute processing is in Lahore which means that cardholder information is being shared with/sent to Lahore, which is a serious contract violation,***" Arpin wrote.

\*      \*      \*

David P. Weber, a clinical assistant professor of accounting at Salisbury University and a former supervisory counsel and enforcement chief at the Federal Deposit Insurance Corp., said the bank would need to inform its regulator about the activities of third-party service providers.

"***It was a clear violation of the contract Comerica held with the Department of the Treasury to locate the vendor in a foreign country when part of the consideration for them being awarded this federal contract was to use American employees and vendors,***" said Weber, who served as special counsel for enforcement for more than 10 years at the Office of the Comptroller of the Currency.

"***Separate and aside from contract fraud, it is inappropriate for a federally-insured depository institution to locate third-party service provider activities in a foreign nation without informing their regulator, and locating the operations in a country in which there are questions about rule of law, which would make supervisory and***

15

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

*exam activities as well as protections of American consumers questionable."*

The bank previously had been criticized by the Federal Reserve Bank of Dallas in a "matters requiring attention" order a year earlier, which described "weaknesses" in Comerica's risk monitoring of Direct Express, according to court documents. Examiners said Conduent, the bank's primary vendor, did not provide cardholders reporting fraud on their cards with information on how to receive a provisional credit, documents show.

Comerica was paid $151 million in 2020 to operate Direct Express, and received roughly $770 million in total gross revenue over a six-year period, from 2015 to 2020, to run the program, Albert Taylor, a Comerica senior vice president and director of National Bankcard Services, said in court documents.

*     *     *

**Inadequate fraud reporting**
***In a key internal 2020 email, Arpin, the former Comerica executive, listed 13 bullet points describing the practices of i2c.*** Among the bank's "serious concerns," she wrote:

- "We are having significant difficulty getting adequate fraud reporting."
- "We can't get the Call Center statistics we need."
- "Reg E adjudication is an issue"
- "Fraud prevention is a serious issue"
- "Reporting in general is an issue – we aren't getting the reporting that the [Treasury's Bureau of] Fiscal Services requires."

Cardholders have complained for years about fraud, poor customer service and high fees in the Direct Express program.

Last year, a federal judge certified a class action against Comerica and Conduent brought by Direct Express cardholders who claimed their accounts were drained of thousands of dollars from 2015 to 2022 due to fraud. The class action, filed in the U.S. District Court for the Western District of Texas, alleges that Comerica and Conduent denied refunds to cardholders who alleged fraud on their accounts.

The court documents, combined with internal documents that American Banker received anonymously in the mail, provide a better understanding of Comerica's private and public responses to various inquiries.

***Comerica executives were repeatedly warned about vendor oversight, potential breaches of the Treasury contract and deficiencies in the bank's compliance management system, said sources familiar with the matter who asked that they remain anonymous out of fear of retaliation. In-house lawyers escalated their concerns to the bank's senior leadership, including Susan Joseph, Comerica's head of compliance; Jay Oberg, senior executive vice president and chief risk officer; and Peter L. Sefzik, senior executive vice president and chief banking officer***.

\*       \*       \*

In August 2018, Sen. Elizabeth Warren, D-Mass., launched an investigation into Direct Express after cardholders complained about not being reimbursed for fraud. In a letter to the Veterans Administration, Warren said fraudsters had used "stolen data to impersonate benefit recipients, made fraudulent purchases, and drained the prepaid cards of the federal benefits."

Comerica's Executive Chairman Ralph W. Babb responded to Warren by stating that Comerica has taken appropriate steps to root out fraud.

Comerica "follows all laws and regulations including the [Federal Financial Institutions Examination Council] guidelines for supplier oversight," Babb said in a 21-page response in October 2018.

**'Reg E Lite'**

Yet, within a month of Sen. Warren's inquiry, a Comerica lawyer tried to convince a Texas bank examiner that Regulation E does not apply to the bank or to federal government beneficiaries, the internal documents show.

The Comerica lawyer was responding to a query from the Texas Department of Banking by claiming that the bank was not fully

17

required to abide by the Electronic Fund Transfer Act, which is implemented by Regulation E. The regulation sets strict timelines for banks to resolve errors including investigating fraud and reimbursing harmed consumers with provisional credit when money is stolen.

***"Program customers only get 'Regulation E Lite,' benefits,"*** a Comerica executive in the bank's legal department wrote in 2018. That lawyer described "why [the] program's customers are not entitled to all of the provisions and benefits of Regulation E."

In the email, the Comerica lawyer wrote that "...neither the Federal Electronic Funds Transfer nor its Regulation E applies to the Comerica Bank under the Program as a 'financial institution."

Comerica argued that the Treasury, not the bank, was considered to be the financial institution for Direct Express, "which is why we generally state that Program customers are only entitled to 'Regulation E lite' benefits."

By August 2019, Joseph, the head of compliance, had forwarded the email about 'Reg E Lite," to another Comerica lawyer.

Comerica submitted a glossy, 67-page application to the Treasury in early 2019 in which ***it described the vendor, i2c, "as a leader in transaction processing, security, fraud prevention and innovation."***

In 2020, Treasury renewed Comerica's contract after i2c was hired to handle new cardholders. The agreement with the Treasury was signed by Babb, who retired in 2019. Babb was succeeded by Curt C. Farmer, Comerica's chairman and CEO.

Experts say banks have a general obligation to act in good faith when dealing with customers.

***Weber, the accounting professor and former regulator, said the bank's legal and compliance obligations far exceed Regulation E. He also called into question Comerica's third-party risk management and operational risk standards.***

18

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

*"The unbanked people already are more vulnerable than ordinary bank customers because they don't have the skill set or financial acumen to know what their rights are, and it's compounded when they are victims of fraud,"* Weber said. *"At the end of the day, federally insured depository institutions are required to have appropriate third-party risk management processes in place, and it isn't new to prepaid cards or benefits."*

Weber noted that Bank of America was hit with a $225 million consent order last year for failing to investigate fraud claims in unemployment benefits.

*"The idea in a perfect world is that somehow the third-party vendor can do it faster and cheaper than the bank because they think they're not obligated to follow the same rules,"* said Weber, who analyzes counterproductive work behavior. *"It's an operational risk issue if the third-party doesn't have the policies, procedures and controls to identify systemic issues."*

**VA finds a way out**

*The myriad problems in the Direct Express program, which Comerica manages, forced the Veterans Administration to devote resources to helping veterans find an alternative*. By 2019, the VA helped create the Veterans Benefit Banking Program, a consortium of banks and credit unions that offer free checking accounts so veterans can receive their monthly payments via direct deposit.

*"We made a super-conscientious effort to get veterans off Direct Express because the bad experiences were just gut-wrenching,"* said Lawrence, the VA's under secretary for benefits.

Steve Lepper, a retired U.S. Air Force Major General who is president and CEO of the Association of Military Banks of America, a trade group, worked with the VA to create the program.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

*"The complaints the VA was getting finally pushed them to the point where we needed to create an alternative to the Direct Express program,"* Lepper said. *"Veterans were apoplectic about all of the problems that they were experiencing with the Direct Express program and, of course, Comerica was responsible for all of the management of the program — including the fraud investigation and resolution processes."*

Roughly 240,000 veterans have migrated away from Direct Express and now have bank accounts with direct deposit, Lepper said. About 80,000 unbanked or underbanked veterans still receive their benefits on Direct Express prepaid cards or paper checks.

Lepper credited J.B. Simms, an author and private investigator in Brighton, Tenn., who recently published a book titled, "Comerica, Conduent and the U.S. Treasury Betrayed Veterans and Other Victims." Simms says he first discovered fraudulent charges on his Direct Express account in January 2017 and a second time later that year. He then sought to help other veterans recover money that was stolen due to fraud, including those in which veterans' claims were denied.

**Alleged violations**

Simms and others say Comerica's failure to address problems with Direct Express should get a public airing.

*"The Direct Express cardholders are the most vulnerable population of all Social Security recipients, and most do not have bank accounts and lack the sophistication to challenge any authority,"* said Simms. He is one of just eight named plaintiffs in the case.

Another plaintiff, Harold McPhail, a Vietnam veteran, reported that $30,000 was stolen from his Direct Express account in 2018. But he died before getting a resolution, said his daughter Martisha McPhail, who said Conduent initially denied her father's fraud claim.

20

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

Some Social Security recipients who reported fraud have lost hope that they will ever be reimbursed for thousands of dollars they say was stolen off their prepaid cards. Some said they have not been notified of the class action or any efforts by the bank to reimburse them.

Mike Colburn, a retired Las Vegas businessman, alleged that $5,500 was stolen from his Direct Express account in 2018. Colburn said he was unable to make his mortgage payment and had to borrow money from relatives to avoid defaulting. He ultimately was reimbursed $500 by Conduent but was never able to get all of his money back.

"I gave up on talking to that bank," Coburn said. ***They don't return phone calls, they don't return emails and Conduent accused me of stealing the money from myself.***

After money was allegedly stolen from his Direct Express account, Colburn called the Social Security Administration to sign up for paper checks. Now his monthly Social Security check comes with an insert stating that he is breaking the law for not using Direct Express, he said.

Cardholders allege in the class action that they were not given provisional credit when errors were reported and were not sent the results of investigations in a timely manner. Regulation E requires that a financial institution investigate fraud within 10 days of being notified by a cardholder, but the bank can take up to 45 days to investigate if they provide provisional credit in the amount of the alleged error.

"Nobody could get through to the call center and most of the time people never filed a claim because they got locked out of their accounts," said Jackie Densmore, a plaintiff in the class action, who is a caregiver for her brother-in-law, Derek Densmore, a disabled Marine. She alleged $800 was stolen from his Direct Express card in 2018 and described hours spent trying to get through to Conduent on the phone and being told to submit a claim in writing.

"There are all these people out there who were never able to complete a fraud packet and actually file a claim," Densmore said.

21

The vendor had run into problems before with government oversight. Conduent was fined by the Consumer Financial Protection Bureau in 2019 for unfair student loan practices, and in 2017 for sending incorrect information to credit reporting agencies. In 2019, Conduent, which at the time was owned by Xerox Corp., agreed to a $235 million settlement with the Texas attorney general for Medicaid-related claims.

Densmore also switched to paper checks for her brother-in-law, who has post-traumatic stress disorder. Symptoms resurface every month, she said, when he sees the insert from Social Security that states: "Notice of noncompliance. You are required by law to convert your paper check to direct deposit or the Direct Express card."

"Every month we relive the nightmare from five years ago," she said. "Since Derek has a medical condition, I have to explain to him every month about the situation that we have gone through with Direct Express and that he is allowed to get a paper check."

**What's next for Comerica customers?**

***Court documents show that in May 2019 alone, Comerica received 15,712 fraud disputes, according to Taylor, Comerica's director of National Bankcard Services.*** Taylor said in court documents that Comerica did not have any data to identify cardholders that reported fraud, and the bank didn't keep track of money refunded or denied for fraud.

The supervisory letter from the Federal Reserve Bank of Dallas in early 2019 identified potential consumer harm, program deficiencies and customer service issues in Comerica's handling of Direct Express. Specifically, examiners at the Dallas Fed said that Conduent's call centers were not trained in Regulation E and did not tell cardholders who reported fraud that they could receive provisional credit as part of the process of filing a dispute.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

"Only those callers who specifically asked for instructions or inquired about the provisional credit process received any guidance," the Dallas Fed stated in the supervisory letter sent to Joseph, Comerica's head of compliance.

In addition, Conduent required that cardholders provide documents and a written statement but did not state that cardholders had 10 days to do so or they may not receive provisional credit.

"While [an] explanation of provisional credit is not a regulatory requirement, the recurring consumer complaints regarding provisional credit indicate consumers are adversely affected," the Dallas Fed stated.

It also noted more systemic problems in the collection of data.

"There is no root cause analysis of complaints to identify systemic issues and trends that warrant immediate correction," according to the supervisory letter. "Comerica must establish a method of identifying root causes of complaints originating at Conduent and track complaints with serious allegations or high compliance risk, such as [unfair, deceptive acts and practices.]"

**A problem of incentives**

In its bid for the Treasury contract, Comerica said it is "committed to delivering a low-cost solution, while providing ready access to funds and protecting both the Direct Express cardholder and the overall program."

Comerica receives fees, interchange revenue and annual payments from the Treasury that rose to $151 million in 2020, the most recent data available, according to court documents. Of that total, Conduent received $105 million in 2020 from Comerica, Mitch Raymond, a senior director in account management at Conduent, said in court documents.

Comerica also benefits from an estimated $3 billion a month in low-cost, non-interest-bearing deposits from the Direct Express program,

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

sources familiar with the program said. The deposits boost the bank's liquidity at little cost and can be leveraged, allowing the bank to lend to more customers, sources said.

Last year, Comerica disclosed that the Consumer Financial Protection Bureau is investigating some of its business practices. The Texas bank stated in a regulatory filing in February 2022: "Remedies in these proceedings or settlements may include fines, penalties, restitution or alterations in the corporation's business practices and may result in increased operating expenses or decreased revenues."

Weber, the former FDIC enforcement chief, said that regulators typically take into account whether information exists to indicate that a bank "is willfully in noncompliance with the law." To deter misconduct, regulators may factor into a civil money penalty whether a bank's executives and board directors believed a potential fine would be lower than the cost of compliance.

"It's a mixture of misplaced financial incentives combined with failing to have appropriate board and management oversight over different operational areas of the bank," said Weber, who also served as a former assistant inspector general for investigations at the Securities and Exchange Commission. "When evidence indicates that individual officers or directors have made decisions to allow misconduct and violations of the law to occur, it is well past time to not only hold the bank accountable but to hold the individual officers and directors and the entire board personally accountable."

Simms, one of the plaintiffs in the class action, lays the blame for the problems on shoddy third-party oversight by the Treasury.

***"The Bureau of Fiscal Service, as a part of the U.S. Treasury, allowed Comerica Bank to continue violating federal banking laws and endorsed the contract with Comerica knowing inaccurate information was submitted by Comerica to obtain the contract,"*** Simms said, citing the OIG reports.

Lepper, who helped create the alternative option for veterans, said he didn't understand why the most vulnerable citizens were not getting the attention of Comerica top executives.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

"Why didn't they make the obvious improvements to their program to avoid all of this?" Lepper said.

(Emphasis added).

47.     On this news, the price of Comerica stock declined by $1.40 per share compared to the prior closing price, or 3.59%, to close at $37.59 on May 30, 2023, on high trading volume. The next day, the price of Comerica stock declined another $1.49, or 3.96%, to close at $36.10 on May 31, 2023.

48.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

49.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired the Company's securities publicly traded on NYSE during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

50.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

51.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

52.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

53.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of the Company;
- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;
- whether the Defendants caused the Company to issue false and misleading filings during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false filings;
- whether the prices of the Company securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

• whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

54. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

55. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

• the Company's shares met the requirements for listing, and were listed and actively traded on NYSE, an efficient market;

• as a public issuer, the Company filed periodic public reports;

• the Company regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

• the Company's securities were liquid and traded with moderate to heavy volume during the Class Period; and

• the Company was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

56. Based on the foregoing, the market for the Company's securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the shares, and

Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

57.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## COUNT I

### For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder Against All Defendants

58.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

59.     This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

60.     During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

61.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

62. Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

63. Individual Defendants, who are the senior officers of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or any other of the Company's personnel to members of the investing public, including Plaintiff and the Class.

64. As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

66.    Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

66.    As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

67.    By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of the Company's securities during the Class Period.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

68.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

69.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about the Company's false financial statements.

70.    As officers of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's' financial condition and results of operations, and to correct promptly

30

1   any public statements issued by the Company which had become materially false

2   or misleading.

3       71.     Because of their positions of control and authority as senior officers,

4   the Individual Defendants were able to, and did, control the contents of the various

5   reports, press releases and public filings which the Company disseminated in the

6   marketplace during the Class Period concerning the Company's results of

7   operations. Throughout the Class Period, the Individual Defendants exercised their

8   power and authority to cause the Company to engage in the wrongful acts

9   complained of herein. The Individual Defendants therefore, were "controlling

10  persons" of the Company within the meaning of Section 20(a) of the Exchange

11  Act. In this capacity, they participated in the unlawful conduct alleged which

12  artificially inflated the market price of the Company's securities.

13      72.     By reason of the above conduct, the Individual Defendants are liable

14  pursuant to Section 20(a) of the Exchange Act for the violations committed by the

15  Company.

16                          **PRAYER FOR RELIEF**

17      **WHEREFORE**, Plaintiff, on behalf of himself and the Class, prays for

18  judgment and relief as follows:

19      (a)     declaring this action to be a proper class action, designating Plaintiff

20  as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of

21  the Federal Rules of Civil Procedure and designating Plaintiff's counsel as Lead

22  Counsel;

23      (b)     awarding damages in favor of Plaintiff and the other Class members

24  against all Defendants, jointly and severally, together with interest thereon;

25      (c)     awarding Plaintiff and the Class reasonable costs and expenses

26  incurred in this action, including counsel fees and expert fees; and

27

28

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

(d)     awarding Plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: 8/21/2023

**THE ROSEN LAW FIRM, P.A.**
/s/ Laurence M. Rosen
Laurence M. Rosen (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

32