POMERANTZ LLP
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Counsel for the Nova Scotia Health Employees' Pension Plan and Proposed Lead Counsel for the Class*

[Additional Counsel on Signature Page]

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID RAMOS, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>COMERICA INCORPORATED, CURTIS C. FARMER, and JAMES J. HERZOG,<br><br>Defendants. | Case No. 2:23-cv-06843-SB-JPR<br><br><u>CLASS ACTION</u><br><br>FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><u>DEMAND FOR JURY TRIAL</u> |

# TABLE OF CONTENTS


I. NATURE OF THE ACTION ....................1
II. JURISDICTION AND VENUE ....................6
III. PARTIES ....................6
IV. NON-PARTY CONFIDENTIAL WITNESSES ....................7
V. SUBSTANTIVE ALLEGATIONS ....................12
A. Comerica's Business & Operations ....................12
1. Comerica's Business Operations ....................12
2. The Direct Express Program Is Important To Comerica ....................14
3. Pre-Class Period Direct Express Program Problems ....................17
4. Comerica Promised Improvements In Applying For Renewal ....................19
5. Comerica Is Renewed As The Direct Express Financial Agent ....................22
B. Undisclosed, Material, Negative Facts ....................25
C. Materially False and Misleading Statements & Omissions ....................39
1. Business Operations Fraud ....................39
1. Business Operations Fraud ....................39
2. Reported Results Fraud ....................92
3. Internal Controls Fraud ....................127
D. The Truth Begins To Emerge ....................133
E Additional Facts Probative Of Scienter ....................139
1. Defendants' Knowledge Or Reckless Disregard Of Red Flags ....................139
2. Motive And Opportunity To Commit The Fraud ....................140
3. Comerica Raised Funds During The Fraud ....................149
4. The Fraud Implicated Core Operations ....................149
5. The Individual Defendants Signed, Were Quoted In, Or SOX-Certified The Alleged Misstatements ....................150

6. The Fraud Violated Comerica's Code Of Conduct ................151

7. Insider Resignations and Employment Status Changes..........154

VI. NO SAFE HARBOR ........................................................................156

VII. THE CLAIMS ARE TIMELY ......................................................157

VIII. LOSS CAUSATION / ECONOMIC LOSS ....................................158

IX. PRESUMPTION OF RELIANCE ..................................................160

X. LEAD PLAINTIFF'S CLASS ACTION ALLEGATIONS ........................162

COUNT I.............................................................................................. 165

COUNT II ............................................................................................ 169

PRAYER FOR RELIEF ........................................................................ 171

DEMAND FOR TRIAL BY JURY ........................................................ 171

1. Lead Plaintiff the Nova Scotia Health Employees' Pension Plan ("Lead Plaintiff"), individually and on behalf of all other persons similarly situated, by Lead Plaintiff's undersigned attorneys, for Lead Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Lead Plaintiff and Lead Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Lead Plaintiff's attorneys, which included, among other things, a review of the Defendants' public statements and publicly available documents, presentations and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Comerica Incorporated ("Comerica"), analysts' reports and advisories and other press coverage about Comerica, Comerica's stock chart, Comerica's corporate website, data obtained through news services such as Bloomberg and Yahoo! Finance, interviews with certain witnesses as discussed herein, and information readily obtainable on the Internet. Lead Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

2. This is a federal securities class action on behalf of a class consisting of all persons other than Defendants and other excluded parties (identified below)

who purchased or otherwise acquired Comerica common stock between January 7, 2020, and May 29, 2023, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against Comerica and its Chief Executive Officer, Defendant Curtis C. Farmer, and its Chief Financial Officer, Defendant James J. Herzog.

3. This lawsuit concerns Comerica's lucrative U.S. government contract to serve as the financial agent overseeing the Direct Express program, which pays $3 billion monthly to Social Security recipients, veterans, and others in the form of Master Card debit cards. Comerica reaps large sums in direct government payments, fees charged to cardholders, and the revenues it generates through the additional liquidity of the larger deposit base afforded by the Direct Express funds. Its actions as financial agent and those of its contractors, Conduent and i2c, are subject to applicable laws and rules, including Regulation E, which imposes important consumer protections, and its U.S. government contract imposed other requirements, including that the work on the Direct Express program and the accessing of cardholder data needed to occur within the United States.

4. Unbeknownst to investors, Comerica, i2c, and Conduent mishandled fraud complaints by cardholders, routinely rejecting valid allegations of fraud and

denying or delaying payments to victimized cardholders of the funds taken from their Direct Express card accounts. Moreover, i2c relied upon employees based in Lahore, Pakistan, to process fraud complaints, work that required them to access sensitive cardholder data outside the U.S. These facts are well-documented by the statements of 10 confidential witnesses (CWs), who are former employees of Comerica, i2c, and Conduent. They are corroborated by reporting by the *American Banker* that later revealed the misconduct.

5. Notwithstanding this concealed information, Defendants' public misstatements created a false and misleading impression for investors that Comerica was operating the Direct Express program in line with its contractual obligations, and thus the bank benefited from the card fee income generated by Direct Express and the noninterest-bearing deposits concomitant therewith. On a January 21, 2020 earnings call, Defendant Farmer told analysts "***the U.S. Treasury recently announced that we will continue to be the exclusive financial intermediary for the Direct Express government benefits card program for another five years. The economics of this program include attractive retail deposits that we continue to grow, and our ability to leverage a third-party platform for processing and servicing.***" On a July 21, 2020 earnings call, Defendant Farmer told analysts "With regard to noninterest income, we saw growth of 4% quarter-over-quarter ***with our strong card franchise being a major contributor***." In its 2020 Corporate

Responsibility Report, published to its website on August 23, 2021, Comerica stated "***the Direct Express® card protects vulnerable cardholder funds and is one of the most secure prepaid cards in the industry.***" In investor presentations, including one published to its website on November 8, 2021, Comerica emphasized the benefits of the program, as it stated, "***Card Fee Income Up 15% YTD from 2020 due to government stimulus and higher activity,***" and touted Comerica as the ***"#3 prepaid card issuer in the US***" and its status as the "***exclusive provider of prepaid debit cards for U.S. Treasury DirectExpress Program.***" And in earnings calls Comerica routinely discussed the benefits of its high proportion of noninterest-bearing deposits, including on an October 19, 2022 earnings call when Defendant Herzog told analysts "***Our mix remains favorable at 57% noninterest-bearing, reflecting the relationship and operational nature of our deposits.***" On that same call, Defendant Herzog said "***This was a little bit of a surprise to us, too, for the mix to actually improve towards the higher noninterest-bearing.***"

6. On May 29, 2023, an *American Banker* article revealed Comerica's serious contractual and regulatory violations in connection with the Direct Express program. First, despite agreeing that all services in connection with the program would be performed in the United States, the *American Banker* article revealed that a vendor hired to perform the day-to-day operations of the program, i2c Inc. was handling fraud disputes by Direct Express cardholders in its office in Lahore,

Pakistan, in violation of Regulation E. The *American Banker* article also revealed that senior Comerica executives understood that i2c handling claims out of Pakistan was both a contractual and regulatory violation, but i2c "doesn't have plans to fix those issues." The *American Banker* article not only revealed the underlying breach of the FAA, it revealed serious concerns about i2c's performance in general, including Comerica not getting adequate fraud reporting, call center statistics, or other items required by the Treasury's Bureau of Fiscal Services; Comerica executives were also concerned that "fraud prevention is a serious issue." While Direct Express cardholders have had problems with the program and Comerica's handling of it for years, the *American Banker* article showed that the problems continued and underscored their gravity. Documents shared anonymously with Ms. Berry revealed that a Comerica lawyer tried to convince a Texas bank examiner that Regulation E did not apply to the bank or to federal government beneficiaries; instead, program customers only get "Regulation E Lite" benefits.

7. On this news, the price of Comerica stock declined by $1.40 per share, or 3.59%, on high trading volume, to close at $37.59 on May 30, 2023. The next day, the price of Comerica stock declined another $1.49 per share, or 3.96%, on high trading volume, to close at $36.10 on May 31, 2023. Lead Plaintiff and the other Class members suffered losses as a result, which this lawsuit seeks to recover.

## II. JURISDICTION AND VENUE

8. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

9. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C. §78aa).

10. Venue is proper in this Judicial District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b). Defendants conduct business in this Judicial District, and a significant portion of Defendants' actions, and the subsequent damages, took place within this Judicial District.

11. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III. PARTIES

12. Lead Plaintiff, as set forth in its prior-filed Certification (ECF 15-3), which is incorporated by reference herein, and the attached updated Certification filed herewith, purchased Comerica common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of Defendants' fraud, as alleged herein.

13. Defendant Comerica is incorporated in Delaware, considers California to be a "primary U.S. location," and has a major office located at 601 South Figueroa Street, Suite 100, Los Angeles, CA 90017. Comerica trades stock in an efficient market on the New York Stock Exchange ("NYSE") under the ticker symbol "CMA."

14. Defendant Curtis C. Farmer ("Farmer") has served as Comerica's Chief Executive Officer ("CEO") since April 2019. He has also served as Chairman of the Board of Directors since January 1, 2020, and additionally serves as President.

15. Defendant James J. Herzog ("Herzog") has served as Comerica's Chief Financial Officer ("CFO") and Senior Executive Vice President since February 2020.

16. Defendants Farmer and Herzog are collectively referred to herein as the "Individual Defendants."

17. Defendant Comerica and the Individual Defendants collectively referred to herein as "Defendants."

## IV. NON-PARTY CONFIDENTIAL WITNESSES

18. CW1 was a VP of Global Product Management – Card Issuing at i2c from December 2021 to April 2022. CW1 worked remotely and at i2c's

headquarters in Redwood City, California. CW1 reported to i2c President Jim McCarthy.

19. CW2 worked at Comerica Bank from March 2013 to November 2021 as an AVP Business Continuity Consultant (March 2013 – March 2018), then a VP – Risk Analyst (April 2018 – November 2021). CW2 worked at the bank's administrative offices in Auburn Hills, Michigan and most recently reported to Dawn Sawka, who oversaw cybersecurity risk for third-party vendors and whose risk group, in turn, reported to Ron Rechlin, VP – Manager Information Security Risk and Technology Services. CW2 worked on Business Continuity and Disaster Recovery plans and assessments for third-party vendors. Starting in April 2018, CW2's work was put under the umbrella of the cybersecurity group, and CW2 was tasked with helping Comerica close out Matters Requiring Attention (MRAs) regarding oversight of 150+ vendors, including Conduent.

20. CW3 worked at Comerica from September 2012 to September 2021, as an Information Security Senior Risk Analyst – Vice President (September 2012 – September 2016), Information Security Risk Expert – Vice President (September 2016 – March 2018), Cybersecurity Risk Senior Manage – Risk Management and Third-Party Risk Management (March 2018 – September 2021). CW3 was based at the bank's offices in Auburn Hills, Michigan. As a Cybersecurity Risk Senior Manager, CW3 oversaw Comerica's team of third-party risk analysts and their

manager who conducted risk assessments of third-party vendors doing work for the bank, both as part of onboarding an regularly thereafter – including vendors who did work on the Direct Express program for Comerica.

21. CW4 worked at i2c from August 2018 to October 2023, as a Customer Service Representative (August 2018 to September 2020) and a Chargeback Analyst (September 2020 to October 2023), in i2c's call center in Omaha, Nebraska. As a Customer Service Representative, CW4 answered calls from Direct Express cardholders looking for general account information and assistance with their cards, such as checking balances, charges, and debits from accounts and reporting fraud complaints. As a Chargeback Analyst, CW4 processed paperwork and customer documents and filed provisional credits in fraud complaints.

22. CW5 worked at i2c in its Omaha, Nebraska callback center from March 2020 to March 2023 as a Customer Service Representative (March 2020 to July 2020), Chargeback Analyst and Financial Operations Analyst (July 2020 to July 2022), Senior Chargeback Analyst and Financial Operations Analyst (July 2022 to March 2023). While in chargebacks, CW5 reported to Catherine Johnson, Chargeback Manager. As a Customer Service Representative, CW5 took incoming calls from Direct Express cardholders and handled basic inquiries and tasks, such as checking account balances and transactions. As a Chargeback Analyst, CW5 processed disputes and fraud allegations from cardholders, from a queue of cases

within a dispute management system CW5 provided by Master Card that permits communication with merchants about disputed charges, including submission of information from the cardholder and the merchant, which CW5 reviewed to determine if a charge was valid. As a Senior Chargeback Analyst, CW5 assigned cases to chargeback analysts, set their schedules, and offered assistance on specific cases. During CW5's time in chargebacks, CW5 also worked in the Financial Operations Department as a FinOps Analyst working on "returns" of money from a cardholder's account (*e.g.*, to pay over to things like Social Security or child support) and on "acuity," which involved submitting a cardholder's balance on the Social Security website.

23. CW6 was a Chargeback Analyst at i2c from May 2021 to September 2022 working at the company's San Antonio call center and reporting to a supervisor named Von, who in turn reported to Kinsi Tracy, a Chargeback Manager located at i2c's Omaha call center, who reported to Sean Wint, the Global Head of Fraud Operations at i2c.

24. CW7 worked at i2c from October 2019 to October 2021 as a Customer Service Representative (October 2019 – March 2020) and a Chargeback Analyst (March 2020 – October 2021). CW7 worked remotely and reported to Kinsi Tracy, a Chargeback Manager located at i2c's Omaha call center. As a Customer Service Representative, CW7 took incoming cardholder calls and assisted with basic

requests, such as account balances and transaction information. As a Chargeback Analyst, CW7 worked cardholder dispute cases, from an assigned group of cases, and determined if the cardholder was due a credit for a transaction. CW7 logged disputed into the system, ensured the cardholder information matched the account information, and uploaded the complaint to the Master Card dispute processing system. Where complaints were about a merchant, CW7 sent the dispute file to the merchant for a response. Thereafter, CW7 would review and determine if the charge was legitimate. CW7 also worked on providing provisional credit to cardholders when disputes were filed.

25. CW8 was the Manager of Fraud and Chargeback Operations at i2c from August to December 2020, reporting to Global Head of Chargebacks Angie Anderson. CW8's job was to hire new employees and ensure they were trained to process disputes and chargebacks. CW8 functioned for a short time as a manager of the chargebacks team.

26. CW9 worked at i2c from August 2018 to August 2021 at the company's Omaha call center, first as a Customer Service Senior Manager until late 2020 or early 2021, when CW9 was asked to fill in as interim Head of Global Chargebacks until leaving the company. While in customer service, CW9 reported to VP of Operations Pam Guinn. While in chargebacks, CW9 reported to EVP Global Client Success Peg Johnson. As a Customer Service Senior Manager, CW9 oversaw

customer service representatives in i2c's Omaha call center, who took incoming calls from Direct Express cardholders and assisted them with basic requests like providing account balances and transaction information. As interim Head of Global Chargebacks, CW9 oversaw the dispute processing and chargeback employees in Omaha and regularly communicated with Comerica about the work.

27. CW10 worked in the Customer Advocacy Group at Conduent from June 2021 to July 2022. CW10 was located at the San Antonio office and reported to Senior Supervisor Veronica McCray. Prior to CW10's tenure at Conduent, CW10 worked as an Escalation Specialist in customer service at i2c in is San Antonio call center, reporting to Ann Graham. At Conduent, CW10 worked in a Customer Advocacy Group and investigated Direct Express cardholder complaints of alleged fraud that escalated to high levels. At i2c, CW10 spoke with Direct Express cardholders who were unsatisfied with the help received from i2c's lower-level customer service representatives and who asked to speak with a manager.

## V. SUBSTANTIVE ALLEGATIONS

### A. Comerica's Business & Operations

#### 1. *Comerica's Business Operations*

28. Defendant Comerica, founded in August 1849 as Detroit Savings Fund Institute, is a Delaware corporation with its headquarters in Dallas Texas, and offices located in seventeen states including California, one of Comerica's "primary

U.S. locations." Comerica maintains a major branch at 601 S Figueroa Street, Los Angeles, CA 90017. It is publicly traded on NYSE under the ticker symbol "CMA."

29. Comerica is aligned into three major business segments (plus Finance): (i) the Commercial Bank, (ii) Wealth Management, and most relevant for this lawsuit, (iii) the Retail Bank. These business segments are differentiated based on the type of customer and the related products and services provided. The Direct Express program at issue is aligned under the Commercial Bank business segment which Comerica claims meets the needs of small and middle market businesses, multinational corporations and governmental entities by offering various products and services including commercial loans and lines of credit, deposits, cash management, payment solutions, card services, capital market products, international trade finance, letters of credit, foreign exchange management services and loan syndication services. Comerica directly or indirectly owns all outstanding common stock of Comerica Bank, a Texas banking association.

30. Within the Commercial Bank segment, Comerica divides its various income sources primarily into interest income and noninterest income. Interest income largely consists of interest and fees on loans issued by Comerica. Revenue from contracts with customers comprises the noninterest income earned by Comerica in exchange for service provided to its customers. Under the Commercial Bank segment, Comerica breaks out its noninterest income into card fees, service

charges on deposit accounts, commercial loan servicing fees, and capital markets income. During the Class Period, the Commercial Bank accounted for most of Comerica's net income.

### *2. The Direct Express Program Is Important To Comerica*

31. An important contributor to Comerica's Commercial Bank segment is the Direct Express Debit MasterCard ("Direct Express") program, which contributes to both interest income and noninterest income.

32. In 2008, the United States Department of the Treasury ("Treasury"), Bureau of the Fiscal Service ("Fiscal Service") established the Direct Express program to assist elderly and disabled Americans and veterans receive their benefit payments electronically using a prepaid debit card. Treasury selected Comerica in 2008 to serve as the program's financial agent to distribute monthly benefit payments to recipients enrolled in Direct Express. Comerica and Fiscal Service entered into a financial agency agreement ("FAA"), effective January 3, 2008. After two one-year extensions in 2013-2014, Comerica's contract was renewed for a five-year term effective January 2015, and again in January 2020 extending Comerica's deal through January 2, 2025.

33. More than 4.5 million individuals receive their Social Security, veterans, and other benefit payments electronically to their Direct Express prepaid debit card. Direct Express deposits with Comerica roughly $3 billion per month

electronically, and for many cardholders, their federal benefit is their sole source of income and is essential for them to meet their basic living needs. From 2008 to March 2019, Comerica claimed to have opened more than 8 million accounts and loaded over $239 billion in benefits payments onto cards delivered to recipients.

34. Comerica reaps extensive financial benefits from the Direct Express program in at least three ways.

(a) First, Comerica receives direct payments from Treasury to run the program. While the financial terms of the most recent FAA are not public, according to the *American Banker*, Comerica received $151 million in direct payments in 2020.

(b) Second, Comerica's SEC filings report direct income associated with the Direct Express program and related activities involving the Direct Express Debit Mastercards as "card fees," a subcategory of noninterest income attributable to the Commercial Bank business segment. Comerica's March 2019 application to renew its role as financial agent of the Direct Express program and the December 2019 (discussed below) included a litany of card fees and revenue sources, including an ATM withdrawal fee of $0.85 per transaction (after one free per card) and projected 280 million transactions over the ensuing 5-year period, which would mean up to $252 million in such fees. Other fees include a $2.00 fee for new enrollments, $0.75 / month for paper statements, $1.50 / transfer to transfer funds to a U.S. personal

banking account, a$0.85 Walmart Cash Out Option, $4.00 for replacement cards (after one free), $13.50 to expedite delivery of a replacement card, $3.00 plus 3% of the amount withdrawn for ATM withdrawals outside the U.S., 3% of the purchase amount charges for merchant purchases outside the U.S., and a $50 Legal Process fee for deceased cardholders.

(c) Third, Comerica also benefits from the increased liquidity associated with the roughly $3 billion a month in low-cost, non-interest-bearing deposits that the Direct Express program funnels to Comerica from the U.S. government, which as of March 2019 included over 20 benefit payments from nine non-Treasury Agencies. The Fiscal Service maintains a fiduciary account at Comerica that receives direct deposit of the federal funds on behalf of the recipients; within it, individual cardholder accounts, which do not bear interest directly, are maintained, FDIC insured, and linked to the recipients' Direct Express debit cards. The steady, resulting liquidity enhances Comerica's deposits base and can be loaned out to customers at no interest cost to the bank. Comerica's SEC filings refer to these payments as noninterest-bearing deposits attributable to the Commercial Bank. The noninterest-bearing deposits are then used to generate interest income, *e.g.* through mortgage lending, which is again attributable to the Commercial Bank. Comerica augments this component of the Direct Express program by accepting state-

disbursed Supplemental SSI Payments for at least six states: Wisconsin, Pennsylvania, Michigan, Massachusetts, Rhode Island, and New York.

### 3. *Pre-Class Period Direct Express Program Problems*

35. Prior to the Class Period, Comerica struggled to prevent fraud in connection with the Direct Express program.

36. In August 2017, Comerica introduced the Cardless Benefit Access Service feature to all Direct Express cardholders which allowed a cardholder who did not have a physical card to request money transfer to a MoneyGram location to be picked up by the cardholder. Shortly thereafter, Treasury received reports that criminals used cardholder data and personally identifiable information to impersonate Direct Express cardholders which allowed them to exploit the program and empty some cardholder beneficiary accounts. As a result, in August 2018, Comerica suspended the Cardless Benefit Access Service. Comerica reported after its own investigation that it did not find evidence of a data breach at Comerica, its service providers, or any data management system. Instead, cardholders were vulnerable from the start because their personally identifiable information was stolen from non-related entities and Comerica's fraud-prevention systems were not robust enough to satisfactorily prevent or reduce the risks.

37. Senator Elizabeth Warren responded to complaints of fraud affecting Direct Express beneficiaries by conducting her own investigation into the

program's failings. In response to that investigation, Comerica itself identified 480 cases of fraud associated with the Cardless Benefit Access Service resulting in a confirmed loss of $459,998.75 starting in August 2017. Comerica went on to say that the targeted fraud was identified in mid-2018 and thereafter Comerica trained its customer service representatives to ask for additional verifiers for use of the Cardless Benefit Access Service. Despite that purported training, in August 2018, Comerica experienced 244 more fraud cases of this kind, more than all previous months combined. Post-identification, Comerica did not inform the Social Security Administration or the Veterans Administration; neither became aware of the fraud until Comerica suspended the service in August 2018.

38. In 2019 Direct Express cardholders brought a class action consumer lawsuit in connection with Comerica's response to the fraud: *Carnley v. Conduent Business Services*, *LLC*, Case No. 1:19-cv-01075 (W.D. Tex.). The suit alleges that Comerica Inc., Comerica Bank, and Conduent Business Services ("Conduent"), a Comerica subcontractor based in New Jersey that manages the Direct Express call center and processes claim disputes, misrepresented the Direct Express debit card program as completely safe despite awareness that the cards were vulnerable to fraud and were bound to systems rife with fraudulent transactions and that they denied refunds to cardholders who alleged fraud on their account. As of late December 2023, the case is closed by a sealed court order.

39. On June 18, 2018, the Treasury Office of Inspector General ("OIG") initiated an audit to review corrective actions taken by the Fiscal Service to address prior OIG report recommendations related to the FAA with Comerica. On July 29, 2019, the OIG released an Interim Audit Update titled "Matters for Consideration Prior to Fiscal Service's Selection of the Direct Express Debit Card Program Financial Agent" ("Interim Audit Update"), which stated that it was provided because OIG believed it important for Fiscal Service's "consideration prior to the selection of the financial agent expected to be announced later this summer." The Interim Audit Update suggested that, if Comerica was selected, its compensation should be cut due to poor performance.

**4. *Comerica Promised Improvements In Applying For Renewal***

40. On March 8, 2019, Comerica submitted its application to the U.S. Department of Treasury, Bureau of Fiscal Service to be renewed as the financial agent for the Direct Express program, which Comerica described s the world's largest government prepaid benefits disbursement program.

41. Comerica's application said it was partnering with two vendors, Conduent and i2c, Inc. ("i2c"), to administer the Direct Express program, which reached over 474 million financial transactions in 2018, by over 4 million federal benefit recipients, with nearly 100,000 new enrollments processed monthly. Describing the customer service process, it stated, "Our Mobile App, website and

IVR provide the first level of service in handling disputes by providing transaction level information for the cardholder to validate. If the cardholder still requires further inquiry into a transaction, ***the caller is forwarded to a CSR***." It said that Comerica's Customer Service Center ("CSC") network consists of four large-scale operations centers located in Texas, Kentucky, Nebraska, and Puerto Rico, which handled nearly 270 million calls and nearly 17 million customer interactions. Significantly, Comerica's application claimed, "***All of our CSCs for Direct Express are staffed by U.S. citizens or lawful permanent residents; all are based within the United States***." It claimed that Comerica employed over 600 customer service representatives (CSRs) on disbursement days and over 750 CSRs on double payment days across its four CSCs, "with additional CSCs available through trusted third party vendors to support if needed." It also accounted for situations that could not be resolved by CSRs, adding, "Other dispute related issues may require additional research and are then referred to our back office team for investigation and resolution. We have a separate team to assist cardholders through these more difficult transaction and dispute issues with a focus on first call issue resolution."

42. The application provided reassurances regarding the customer service personnel staffed to the Direct Express program, stating:

> We continue to recruit individuals who have either direct call center experience or a combination of customer service and experience in a job that requires significant interaction with the general public. Candidates must have the ability to speak clearly and concisely and to

> be able to articulate the content of required call responses. Bilingual capability is also highly valued. Additionally, as required by the Fiscal Service's (formerly, FMS) Policy on Personnel Security for Debit Card Services dated October 11, 2007, all new hires must undergo and pass a criminal background check, ***be a U.S. citizen or lawful permanent resident***, and successfully pass drug screening prior to being accepted for employment.

43. Comerica's application also touted its compliance, as a member of the Federal Reserve Bank, with security requirements of the U.S. Department of Treasury as specified in Treasury security directives, including by purportedly "***assigning and employing staff who are documented U.S. citizens or lawful permanent residents***" and "***continuously monitor[ing] our partners' security compliance, including SOC reviews, onsite visits, and self-testing***."

44. In addition, Comerica's application expressly stated, "***Full Regulation E protection applies to each cardholder account. The Direct Express program is fully compliant with Regulation E, specifically Section 205.15 of the Electronica Fund Transfer Act (EFTA), which pertain to government programs.***" It added, "***Comerica assumes all responsibility for Regulation E compliance and any payment liability or loss.***" It added that "***as part of implementing the second processor, i2c***, we have taken the time to refresh and refine how we train CSR personnel. In doing so, ***we developed training materials that are exhaustive in nature***. These materials include sessions on topics such as Job Responsibilities, Prepaid Card Industry Overview, ***Compliance*** (*e.g.* ***AML, ID Theft, etc.***),

***Regulation E***, Call Listening, CSR Soft Skills, Quality Assurance KPIs, and Mock Calls." These representations were material, given that i2c is a California-based banking and payment services vendor that has a presence in Lahore, Pakistan.

**5. *Comerica Is Renewed As The Direct Express Financial Agent***

45. Despite the pre-Class Period issues, based on the application submitted by Comerica and the representations made therein, the Fiscal Service selected Comerica as the Direct Express financial agent for an extended five-year term in a renewed FAA, effective January 2020, signaling to the market that Comerica's remedial actions and assurances to the Fiscal Service sufficed and that Comerica had resolved its past problems. In the renewed FAA, Comerica retained Conduent to handle day-to-day customer service and claim disputes operations associated with the Direct Express program for existing customers and retained i2c to handle the same services for new customers.

46. The importance to Comerica of continuing the Direct Express program cannot be overstated. While the fiscal terms of the most recent FAA are not publicly available, the *American Banker* reported that in 2020 Comerica was paid $151 million to operate Direct Express and that it had received roughly $770 million in total gross revenue from the program over a six-year period from 2015 to 2020.

47. As part of the FAA's latest renewal, the Fiscal Service entered into a new FAA with Comerica dated December 20, 2019, signed by Defendant Farmer

on behalf of Comerica, which imposed on Comerica more rigorous customer requirements and more reporting by Comerica, in line with the suggestions in the Interim Audit Update. The FAA also mandated as follows:

> ***Location of Services***. Except as prohibited by law, the Financial Agent is hereby authorized to provide Debit Card services to cardholders within and outside of the United States as necessary to facilitate the use of Debit Cards by cardholders anywhere in the world. ***All other services provided under this FAA***, including the development, operation and maintenance of systems and applications performed specifically and exclusively on behalf of the Treasury, ***shall be performed in the United States or its territories unless specifically authorized otherwise in writing***. … Except as necessary for benefit payment access, ***the Financial Agent will also ensure that all employees with access to systems, applications or other media that exclusively contain Treasury Information are United States citizens or lawful permanent residents unless specifically authorized otherwise in writing***.

48. The FAA added, "Management of Contractors. The Financial Agent is responsible for the supervision and management of any Contractor retained to assist in the performance of services under this FAA. The Financial Agent shall remove and replace any Contractor that fails to perform satisfactorily." It expressly listed Conduent and i2c as Contractors and Processors, which were subject to this provision.

49. The FAA also required the safeguarding of information, by both Comerica and its Contractors Conduent and i2c, with Comerica risking liability for violations. It stated that Comerica, as Financial Agent, faced liability to both Fiscal Service and any affected agency or individual "for any costs, expenses or damages

which result from the fraud, theft, willful misuse or negligence of the Financial Agent or its employees or Contractors with respect to the handling and maintenance of sensitive information." It also imposed duties to safeguard sensitive information on Comerica, Conduent, and i2c. For instance:

> ***Financial Agents should safeguard all sensitive information obtained or maintained by the Financial Agent or its employees or Contractors to accomplish Fiscal Service-required services***. In handling sensitive information, ***Financial Agents should, at a minimum, comply with the procedures for the protection of customer information set forth in the Federal banking agencies' "Joint Interagency Guidelines Establishing Information Security Standards,"*** as may be amended from time to time. ***The Financial Agent may disclose sensitive information only to those employees of the Financial Agent who have a legitimate need to know the information to assist in the proper performance of Fiscal Service-required services***. Furthermore, ***any Contractor used by the Financial Agent to provide services under this agreement must agree in writing to the required safeguarding obligations consistent with those of the Financial Agent***.

50. The FAA also stated, "Comerica Bank commits to adding dedicated legal counsel to the Direct Express program. Such legal counsel will have subject matter expertise in the laws and regulations which may apply to the program…."

51. One such applicable and governing regulation is Regulation E issued by the Federal Reserve as an implementation of the Electronic Fund Transfer Act, which outlines rules and procedures for electronic funds transfers and provides guidelines for sellers and issuers of electronic debit cards. Regulation E allows consumers to dispute, among other things, unauthorized or fraudulent electronic fund transfers ("EFTs") and requires banks to promptly investigate a fraudulent

transfer claim, complete its investigation within ten days (or 45 days if a provisional credit is provided in the amount of the alleged fraud), report the results to the Federal Reserve and to the consumer, and correct the error within one business day after determining an error has occurred. 12 CFR 1005.11(c)(1). The investigation must be reasonable, including a reasonable review of relevant information within the institution's own records. If the financial institution determines that the error was the result of an unauthorized EFT, consumers are not fully liable for the losses, and the institution must refund the rest. 12 CFR 1005.6.

52. Under the FAA, Conduent and i2c handle Comerica's Regulation E dispute processing when Direct Express customers report errors or issues, including potential theft or fraud of the kind that had impacted the program in 2017-2018. This setup, including the addition of i2c as an additional Contractor and Processor, was presented as ensuring compliant operations.

**B. Undisclosed, Material, Negative Facts**

53. CW1 described i2c's work with U.S. financial institutions, based on CW1's work on its partnership with American Express, which had contracted with i2c to process credit card transactions. CW1 described i2c's technology used in card transaction processing. CW1 described how when a cardholder swipes a credit or debit card to make a purchase, the information is sent from the point of purchase to i2c's cloud-based software platform, which instantly checks the cardholder's

account, determines if it has enough cash or credit to make the purchase, then authorizes or declines it. CW1 added that i2c's platform also calculates interest charges, implements late fees, and processes customer payments. CW1 made clear that most of i2c's operations are based in Lahore, Pakistan, where 200-300 employees were located, including all of i2c's tech and IT employees and specifically "all of the IT folks who worked on that [cloud-based] system." By contrast, CW1 said i2c's U.S. headquarters in Redwood City, California, where i2c's Pakistani founder and CEO Amir Wain currently works, was for executive employees only, and i2c had under 50 employees in the U.S. CW1 said no tech or IT employees worked at Redwood City, and no card transaction work was done there. CW1 said any promises by i2c to only use U.S.-based employees to process card transactions "would have surprised" CW1, because CW1 believes all that work was done in Lahore, Pakistan.

54. CW2, a Comerica VP – Risk Analyst, said that Comerica had a risk group, at least partly under the Cybersecurity risk group overseen by Dawn Sawka, that obtained the "schematics" of a third-party vendor's data centers that documented the flow of the bank's data from Comerica through the vendor's systems and databases and that identified data center locations. CW2 said that as part of an initial risk assessment of a third-party vendor, Comerica's cybersecurity and technology risk group would obtain a SOC 2 Type II report that is supposed to be an

independent audit of how the vendor manages security of its data and systems and that would be part of the vendor's risk assessment file in Comerica's digital records. CW2 confirmed that Nora Arpin, Comerica SVP of Government Electronic Services, was responsible for overseeing the Direct Express program and was aware of Comerica's hierarchy of risk committees, one of which was chaired by Kim Fraley, which are supposed to review things like third-party vendor concerns falling outside acceptable risk levels. CW2 said that certain issues involving "damage control" at Comerica were handled at the "executive, c-suite level," with a risk analyst quietly tapped to assist with an investigation while few others at that lower level would be informed. CW2 was tasked in the spring of 2018 with helping Comerica close out a 2015 federal government Matter Requiring Attention (MRA) concerning its oversight of third-party vendors, including Conduent. CW2 said that Conduent had at least one serious problem that got high-level executive attention, including monthly site visits from Ron Rechlin and other executives. CW2 said the problem involved money deposits not posting to cardholder's cards and prompted Comerica to seek a second vendor to work on the Direct Express program.

55. As a Cybersecurity Risk Senior Manager, CW3 oversaw Comerica's team of third-party risk analysts and their manager who conducted risk assessments of third-party vendors who did work on the Direct Express program for Comerica. Yet, CW3 was surprised to learn when interviewed of the 2020 internal email from

Comerica SVP of Government Electronic Solutions Nora Arpin – revealed by the *American Banker* in a May 2023 article discussed below – describing the bank's concerns about i2c's use of employees in Pakistan for the Direct Express program. CW3 confirmed that use of foreign workers on the Direct Express program would have been "a big issue" because it was a violation of the U.S. government contract, which expressly stated that the work must be done in the U.S. As a senior cybersecurity and third-party risk manager, CW3 should have been made aware of this type of high risk because it involved third-party cybersecurity and technology risks, and if Comerica's procedures were properly followed CW3's group would have been informed by the risk committees and instructed as to what steps to take. As CW3 explained, each risk division, including CW3's division regarding cybersecurity and technology, had a hierarchy of risk committees through which identified risks are escalated up to the Board of Directors. In the case of CW3's division, it was the information technology risk committee, then the technology risk committee, then the operational risk committee, which assessed risks and deemed them within or not within the bank's risk tolerance, and if not, actions would be taken to reduce the risk or make it compliant. Yet, CW3 was confident that CW3 was not made aware of this concern, has no recollection of it coming to CW3's division or the two risk committees (information technology and technology risk) with which CW3 worked, and has no recollection of hearing about a Direct Express

vendor who was doing work in Pakistan – despite the fact that the Direct Express program had special requirements and prompted sensitive attention from the risk group. CW3's lack of knowledge as to the concern over i2c using employees in Pakistan, as well as the other concerns outlined in the Arpin email reported by the *American Banker* in May 2023, makes CW3 question whether Comerica procedures concerning these risks were properly followed. CW3 added that i2c's significant operations in Pakistan should have been raised from a technological concern of where the Direct Express cardholder data would be stored and the access to that data and that a tech team would have had to grant access to such data in order for i2c employees in Pakistan to access it. CW3 also said that as part of the initial risk review and onboarding, the third-party technology risk group requested independent technological audits called SOC 2 Type II reports. CW3 does not recall any such risk review of i2c, nor of an Omaha call center opened in August 2018, which should have triggered a more in-depth onsite technology risk review because it was untested. CW3 confirmed that the bank's concerns about i2c not providing necessary data reports about fraud allegations, as described in the Arpin email, would have been a big, "significant" risk. CW3 said that Comerica used Archer, a software system designed for risk management, to store all documentation of risk reviews, which would create a document trail of risk concerns, risk assessments,

who looked at what and when, and any approvals of high-risk concerns by risk committees.

56. CW4 was among the first nine people hired for i2c's Omaha call center when it opened in 2018. CW4 said that the Omaha call center was for handling cardholder issues in the Direct Express program, and employees there worked on other i2c clients' projects only for training purposes. CW4 said that the Omaha employees were trained by people at i2c's Pakistan location. CW4 said that the transition of work to the Omaha center from Pakiston took "a couple of years, especially in the chargeback area." CW4 was one of the first additional employees at Omaha trained as chargeback analysts in September 2020. CW4 described how only two i2c employees in the Omaha center processed chargebacks, including processing provisional payments in fraud allegations, which was "not enough to handle the volume." CW4 said that fraud complaints started as soon as new Direct Express cards processed by i2c went out to customers. CW4 had heard that there was some pressure to transition the work to Omaha because of the security concern of the Pakistan employees being overseas.

57. When CW5 was asked to train as a Chargeback Analyst in or about July 2020, CW5 was aware that i2c's then-current chargeback analysts were in Pakistan. CW5 was one of about 10 Customer Service Representatives in i2c's Omaha call center asked to train as the first U.S. chargeback analysts, with the training done by

i2c's employees in Pakistan, who had been processing disputes and chargebacks there, under the head trainer in Pakistan named Hamza Butt. CW5 had heard that pressure from Comerica in 2020 had prompted i2c to begin the training and that i2c's use of employees in Pakistan violated i2c's contract with Comerica. CW5 confirmed that employees in Pakistan were still training chargeback analysts when CW5 left in March 2023. CW5 said that by that point, while the Omaha location was handling routine dispute and chargeback cases for the most part, for difficult cases, assistance from employees in Pakistan would be requested. Indeed, CW5 said, "I stopped working there in March 2023, and there was still some processing being done over there (in Pakistan). When (Omaha) had bigger issues that we couldn't solve, the managers would have daily meetings with Pakistan, and they'd go over major problems, and they (Pakistan) would look into it." CW5 said that to work on those cases, Pakistan employees were given access to the cardholder accounts. CW5 said that Pakistan employees used card reference numbers (CRNs) to do background work in the accounts, process the settlement of money in the accounts, and look into the settlement of money in the accounts. CW5 also described "daily huddle" meetings between Omaha and Pakistan employees about chargeback department activities, which were attended by Catherine Johnson, Sean Suitor, and Kinsi Tracy in Omaha. CW5 said that during these meetings, Omaha employees regularly asked

Pakistan employees for help with chargeback issues and for help with issues that arose after calls with Comerica.

58. CW6 confirmed that, even having trained the Omaha location employees to do chargeback work, i2c employees in Pakistan were still doing work on Direct Express during CW6's tenure. In roughly March 2022 (six months prior to CW6's departure), i2c told its chargeback staff that it was transitioning another part of the dispute processing work from Pakistan to U.S. employees, as discussed in a meeting that CW6 attended with CW6's managers and Sean Wint. CW6 said that, at that time, Pakistan employees were still responsible for the first stage of processing a cardholder dispute, meaning inputting it into the system to be formally processed as a dispute so work could be done on it and creating a spreadsheet of all disputes and fraud complaints, which included cardholder information, card numbers, and information about the dispute. CW6 said the spreadsheet was used to assign cases to chargeback analysts and the fraud review team in the U.S. CW6 said that from October to December 2021, CW6 participated in a special project at i2c to "re-investigate" hundreds, if not more than a thousand, fraud cases that were handled by employees in Pakistan dating back to 2019. CW6 described the project as a "red flag re-investigation" to "re-evaluate previously worked cases in which account takeover red flags were present to determine if it was adjudicated appropriately." CW6 said an account takeover (ATO) is when someone other than a cardholder has

fraudulently gained access and/or control of an account to steal money. CW6 said the list of cases was not randomly generated, but rather one where the "cases were deemed to be worked incorrectly" the first time, such that they "were suspected to have been wrong." CW6 explained that most of the cases were cardholder fraud complaints that had been deemed "non-fraud" by i2c employees in Pakistan, so that the cardholder was not compensated or credited back the money at issue. CW6 said that 90% to 95% of the cases CW6 re-reviewed had actually been fraud with evident red flags in the card transactions – such as IP addresses, transaction locations and other technical footprints – and that some of the cases revealed cardholders who had been victimized by ongoing fraud with their cards for six months or more. CW6 said that when the cardholder continued to submit complaints and to file a dispute, "it just got closed," meaning that "it was ongoing fraud, and they weren't getting help." CW6 understood that the Pakistan employees were more focused on meeting processing numbers than on fully investigating fraud complaints. CW6 said that the project resulted in cases where prior dismissals of fraud were overturned and attempts were made to belatedly return money to the cardholders, some of whom could not be found or had died, as many cardholders are from vulnerable populations like the elderly, disabled, and homeless. CW6 said the tight timeline imposed on the re-investigation project resulted in a rushed job. CW6 said that the re-investigation project involved writing a standard operating procedure for handling account

takeovers, with which CW6 assisted, and CW6 confirmed that no SOP had existed prior.

59. CW7 said that around March 2020, i2c announced that it was transitioning the dispute processing work from employees in Pakistan to employees in Omaha. CW7 was among the first group of U.S. employees trained to become Chargeback analysists, with the training done by i2c employees in Pakistan under lead Pakistani trainer Hamza Butt. CW7 stated that within a year of the transition, most day-to-day dispute processing was done by employees at i2c's Omaha or San Antonio locations. However, CW7 said that i2c's Pakistan employees stayed closely involved in the work even to the time of CW7's departure in October 2021. CW7 recalled weekly or biweekly meetings that Pakistan chargeback analysts had to sit in on, and CW7 said, "I don't think they ever fully transferred over." CW7 said that Pakistan employees were still working on cases on which U.S. employees needed help, and when CW7 spoke to Pakistan employees, they had access to cardholder accounts and could go into those accounts to see the same information that CW7 was looking at in the U.S. to address whatever issue CW7 was having. CW7 said that the chargeback department managers, Kinsi Tracy and Catherine Johnson, were meeting weekly with Comerica employees and would afterwards tell CW7 and CW7's co-workers what Comerica wanted from them. CW7 said that the system

used at i2c was able to generate reports showing how many cases were worked, how many were pending, how many were closed, how many were fraud, etc.

60. CW8 understands that i2c had told Comerica that its transition of dispute processing work from Pakistan to Omaha would be completed in mid-2020, but i2c was behind schedule when CW8 begin work in August 2020. CW8 interacted directly with Comerica personnel, including the lead point person on the Direct Express program, Deborah Srour, who was closely monitoring i2c's progress in transitioning dispute processing work to Omaha from Pakistan. CW8 said that an employee in Pakistan was the person preparing and providing data about the Direct Express program to Comerica, and that Ms. Srour spoke directly with that Pakistani employee. CW8 said, "I can confidently say Deb knew the work was in Pakistan, and they (Comerica) knew (i2c) were moving the work to Omaha. I have no doubt in my mind Deb knew." When CW8 left in December 2020, employees in Pakistan were still processing disputes and had access to cardholder accounts. CW8 said that, at that time, about 15-20 employees in Omaha had been hired and were handling disputes, but the number was insufficient to handle the full volume of disputes, which meant that the Pakistan employees were still needed to do it. CW8's efforts to build the U.S. based dispute processing team were frustrated by a lack of system access to information in cardholder accounts that only the employees in Pakistan had. CW8 explained that the ability of Omaha employees to use their computer

terminals to access more sensitive levels of account data in the Direct Express card processing system was more limited than the access level enjoyed by Pakistan employees, who could access cardholder account information and activities that Omaha employees lacked permission to access. CW8 said that Pakistan employees conducted all the training of U.S. employees. When CW8 left i2c in December 2020, it still did not have a written, finalized set of standard operating procedures (SOPs) for processing disputes in Omaha.

61. CW9 knew that i2c's contract with Comerica prohibited the use of employees outside the U.S. and that the Omaha call center was established to address that requirement. CW9 understood that Comerica was aware that most of i2c's employees were in Pakistan. CW9 said that when the Omaha call center first began operations on Direct Express in late 2018 or early 2019, i2c only had one chargeback person in Omaha, and it took six to eight months to get a second one. CW9 said that, at the same time, i2c had three to five chargeback analysts in Pakistan when it began handling Direct Express cardholder disputes. CW9 said that as card issuances increased, by 2020, i2c had 10 to 15 chargeback analysts in Pakistan processing Direct Express cardholder disputes, while in Omaha, i2c only had three chargeback analysts. CW9 said that an entire team in Lahore, Pakistan worked 12 to 14-hour days on dispute processing, the majority of which was dispute operations. CW9 said i2c took three years to create a chargeback team, with effort beginning in the summer

of 2020. CW9 said that the first Global Head of Chargebacks, Angie Anderson, left after a few months because she was unhappy with the job, leading CW9 to take it over on an interim basis, despite the fact that CW9 said "I didn't know shit about chargebacks." CW9 said that by mid-2021, most of the day-to-day work of processing disputes was done by U.S. based i2c employees, but when CW9 left in August 2021, employees in Pakistan were still working on some cases and still accessing cardholder accounts. CW9 said that Comerica did not start doing quality assurance audits of i2c's internal quality assurance audits until 2021.

62. At Conduent, CW10 worked in the nine-person Customer Advocacy Group, which was created to address the large number of customer complaints that were escalating to high levels and/or official channels like the Attorney General's Office or Consumer Financial Protection Bureau (CFPB). CW10 received a dozen or more escalated complaints each day and had about three days to complete them, by reviewing the complaint allegations, customer transaction history, alleged fraudulent transaction information, and digital footprints of the transaction. CW10 determined if each fraud claim was legitimate and wrote a detailed report of the findings, which was submitted to Comerica and maintained in Conduent's system. All of the cases that CW10 investigated were customer allegations of fraudulent activity on their cards that Conduent had previously determined did not meet the criteria for fraud, such that they were not eligible for a credit to cover the transaction

values. The complaints funneled to CW10's group came from cardholders who refused to accept Conduent's denial of fraud and continued to press, either through Conduent or other channels like the AG's Office or the CFPB, which require a response from the financial institution, or political representatives or the media. CW10 said that typically an AG or CFPB went to Comerica first, which then sent them on to Conduent. CW10 also confirmed that Comerica had access to Conduent's computer systems and were able to look in the complaint files and disputes, including the results of investigations. CW10 overturned Conduent's earlier decision denying a customer's fraud allegation between 80% and 90% of the time, meaning those cardholders were owed a credit for the value of the fraudulent transactions. In doing so, CW10 saw the notes related to the earlier denials, which often included invalid reasons for the denial or "cut and pasted" investigative notes from other files that had nothing to do with the claim, leading CW10 to understand that the prior Conduent employees, who were required to process 60 to 75 cases a day, had simply tried to close out the cases as fast as possible to meet deadlines for completion. CW10 said that, every day, about 36 complaint came from Comerica to the Conduent Customer Advocacy Group, which was required to promptly investigate and provide a response back to Comerica, which then submitted it to the AG's Office or CFPB. Consequently, CW10 said that Comerica knew the large number of customer complaints with respect to which Conduent was erroneously

denying the fraud allegations. CW10 said, "They definitely know what was going on as far as high complaint levels of high-level complaints. They knew all the complaints they were receiving."

63. These CW statements are corroborated by, and corroborative of, the *American Banker* article published in May 2023 and the sources it cites, as discussed in §V.D., *supra*.

**C. Materially False and Misleading Statements & Omissions**

64. During the Class Period, Defendants made materially false and misleading statements and omissions that can be organized into three primary threads of the alleged fraud: (i) the Business Operations Fraud; (ii) the Reported Results Fraud; and (iii) the Internal Controls Fraud.

***1. Business Operations Fraud***

65. On January 21, 2020, Comerica held an earnings call (the "1/21/2020 Earnings Call") on which Defendant Farmer and Defendant Herzog participated. In conjunction therewith Defendants published slides entitled, "Comerica Incorporated Fourth Quarter 2019 and Full-Year 2019 Financial Review" (the "1/21/2020 Earnings Presentation Slides") which Comerica filed as Exhibit 99.2 to a Form 8-K signed by Comerica's Chief Legal Officer John D. Buchanan ("Buchanan") (the "1/21/2020 Form 8-K"). In them, Defendants made materially false and misleading misstatements and omissions. In prepared remarks, Defendant

Farmer stated, "Of note, ***the U.S. Treasury recently announced that we will continue to be the exclusive financial intermediary for the Direct Express government benefits card program for another five years. The economics of this program include attractive retail deposits that we continue to grow, and our ability to leverage a third-party platform for processing and servicing***." He also stated that "***non-interest income growth***" ***was a positive contributor to Comerica's performance*** referencing the 1/21/2020 Earnings Presentation Slide 5, which stated, "***Noninterest income up over 3%***." The 1/21/2020 Earnings Presentation Slide 4 stated, "***Noninterest income growth led by strong card fees***." Defendant Farmer added that "***deposit growth was robust***" and the "***mix of the growth was favorable with over 40% coming from non-interest bearing deposits***." He further stated, "***A $10 million increase in non-interest income helped offset the more challenging rate environment***." In prepared remarks, Defendant Herzog stated, "***Non-interest income increased $10 million***" referencing the 1/21/2020 Earnings Presentation Slide 11, which stated, "***4Q19 Noninterest Income Increased $10MM, over 3%***." He added, "***Non-interest bearing deposits increased over 600 million***" referencing the 1/21/2020 Earnings Presentation Slide 7, which stated, "+***$615MM noninterest-bearing***" and "***Beneficial Deposit Mix – Commercial Noninterest-bearing 39%***." He added, "***As far as non-interest income, we expect growth of about 1% led by card [] fees***." In response to an analyst question

regarding outside processing fee revenue, Defendant Herzog stated, "very specific to the outside processing fees, so we actually do have some good core growth in a number of line items in 2021. ***One of those is card income.*** And of course, we have associated outside processing fees with that…***we just saw the strong card year, and we will have some outside processing fees associated with that.***" In response to an analyst question about expenses, he referenced "***strong non-interest income headwind***."

66. On February 5, 2020, Comerica published on its website the Comerica Incorporated Investor Presentation (the "2/5/2020 Investor Presentation"), which stated, "***47% of deposits are noninterest-bearing***" and deposits "***+$615MM noninterest-bearing***." It added, "***Beneficial Deposit Mix – Commercial Noninterest bearing 39%***." It added "***4Q19 Noninterest Income Increased $10MM, over 3%***" and "***Noninterest income growth led by strong card fees***."

67. On March 9, 2020, Comerica filed with the SEC a Form 8-K (the "3/9/2020 Form 8-K") signed by Buchanan reiterating an announcement that Defendant Herzog and Peter L. Sefzik ("Sefzik"), Executive Vice President, Business Bank would be presenting on behalf of Comerica at the RBC Capital Markets Financial Institutions Conference on March 10, 2020. Comerica also filed as Exhibit 99.1 to the 3/9/2020 Form 8-K presentation slides entitled, "RBC Capital Markets Financial Institutions Conference" dated March 10, 2020 (the "3/10/2020

RBC Presentation"), which stated, "***47% of deposits are noninterest-bearing***" and "4Q19 Deposits…***+$615MM noninterest-bearing.***" It added, "***Beneficial Deposit Mix – Commercial Noninterest bearing 39%***." It added, "***4Q19 Noninterest Income Increased $10MM, over 3%***." It added, ***Card represented 25% of Noninterest Income FY19***, ***Card Fees were up 5% from 2018 to 2019***, and "***Noninterest income growth led by strong card fees***."

68. On April 21, 2020, Comerica held an earnings call (the "4/21/2020 Earnings Call") on which Defendant Farmer and Defendant Herzog participated. In conjunction therewith, Defendants published slides entitled, "Comerica Incorporated First Quarter 2020 Financial Review" (the "4/21/2020 Earnings Presentation Slides") which Comerica filed as Exhibit 99.2 to a Form 8-K signed by Buchanan (the "4/21/2020 Form 8-K"). In them, Defendants made materially false and misleading misstatements and omissions. In prepared remarks, Defendant Farmer stated, "Following strong seasonal deposit growth in the fourth quarter, ***average deposit levels remained relatively stable***. After the typical decline in January, ***deposits increased throughout the quarter***. Relative to the first quarter last year, ***average deposits were up $2.8 billion or 5%***," referencing the 4/21/2020 Earnings Presentation Slide 4, which stated, "Key Performance Drivers 1Q20 compared to 4Q19 - ***Deposits relatively stable***." In prepared remarks, Defendant Herzog stated, "***Average [deposit] balances were relatively stable***…Typically,

deposits decline in the first quarter. In fact, first quarter deposits in each of the last four years have declined $1.5 billion or more," referencing the 4/21/2020 Earnings Presentation Slide 6, which stated, "***Average deposits relatively stable***." He added, "***We expect non-interest income to benefit from an increase in card fees with higher transaction volume*** as customers receive the government stimulus funds." He added, "We have ample access to multiple funding sources, ***with 75% of our funding coming from relationship-oriented deposits, of which nearly half are non-interest bearing deposits***," referencing the 4/21/2020 Earnings Presentation Slide 14, which stated, "Primarily Funded with Relationship Deposits – ***Noninterest-bearing Deposits 36%***." In response to an analyst question about the effect on the stimulus package on the Direct Express program, Defendant Herzog stated, "***Regarding Direct Express, in my remarks, you might recall that I mentioned that we expect card fees actually to be up in the second quarter***. So, stimulus payments being processed is a component of that. So, we have factored that in."

69. On April 29, 2020, Comerica filed with the SEC its Form 10-Q for the period ending March 31, 2020 (the "Q1 2020 10-Q"), signed by Comerica's SVP and Chief Accounting Officer Mauricio Ortiz ("Ortiz") and SOX certified by Defendants Farmer and Herzog. The Q1 2020 10-Q states, under the heading

"Outlook for Second Quarter 2020 Compared to First Quarter 2020," "***Stable noninterest income with increase in card fees***."

70. On May 13, 2020, Comerica filed with the SEC a Form 8-K (the "5/13/2020 Form 8-K") signed by Defendant Herzog and filed as Exhibit 99.1 to the 5/13/2020 Form 8-K presentation slides entitled, "Comerica Incorporated Investor Presentation" dated May 13, 2020 (the "5/13/2020 Investor Presentation"), which stated, "Key Performance Drivers 1Q20 compared to 4Q19…***Deposits relatively stable***." It added, ***Average deposits relatively stable***" and "***Beneficial Deposit Mix – Commercial Noninterest-bearing 39%***."

71. On June 8, 2020, Comerica filed with the SEC a Form 8-K (the "6/8/2020 Form 8-K") signed by Defendant Herzog reiterating an announcement that Defendant Herzog and Melinda A. Chausse ("Chausse"), Executive Vice President and Chief Credit Officer, would be presenting on behalf of Comerica at the Morgan Stanley Virtual US Financials Conference on June 9, 2020. Comerica also filed as Exhibit 99.1 to the 6/8/2020 Form 8-K presentation slides entitled, "Morgan Stanley Virtual US Financial Conference" dated June 9, 2020 (the "6/9/2020 Morgan Stanley Presentation"), which stated, "***2Q20 Update: Average Deposits Increase $6.1B***" and "***QTD average deposits reflect increases: +$4.9B noninterest-bearing deposits***" and "***Outlook for 2Q20 average deposits: [approximately] $63B+***." It added, "***Average deposits relatively stable***."

72. On July 21, 2020, Comerica issued a press release in which Defendant Farmer was quoted (the "7/21/2020 Press Release"), which was filed with the SEC as Exhibit 99.1 to a Form 8-K signed by Buchanan (the "7/21/2020 8-K"). The 7/21/2020 Press Release states, under the heading "Second Quarter 2020 Compared to First Quarter 2020 Overview," "***Deposits increased $7.5 billion, or 13 percent, to $64.3 billion***" and represents "Growth in nearly every business line, ***including an increase of $5.9 billion in noninterest-bearing deposits***." It added "***Noninterest income increased $10 million to $247 million***" and "***Reflected increases on $9 million in card fees***…" Further, it stated, under the heading "Second Quarter 2020 Compared to Second Quarter 2019 Overview," "***Deposits increased $9.3 billion, or 17 percent***" and "***Included $6.3 billion, or 24 percent, increase in noninterest-bearing deposits***." Additionally, Defendant Farmer is quoted in the press release stating, "The highlight of the quarter was significant loan and deposit growth, which drove average balances to record highs."

73. On July 21, 2020, Comerica also held an earnings call (the "7/21/2020 Earnings Call") on which Defendant Farmer and Defendant Herzog participated. In conjunction therewith Defendants published slides entitled, "Comerica Incorporated Second Quarter 2020 Financial Review" (the "7/21/2020 Earnings Presentation Slides") which Comerica filed as Exhibit 99.2 to the 7/21/2020 8-K. In them, Defendants made materially false and misleading misstatements and

omissions. In prepared remarks, Defendant Farmer stated, "***highlight of the quarter was very strong…deposit growth.***" He added, "***With regard to noninterest income, we saw growth of 4% quarter-over-quarter with our strong card franchise being a major contributor***." In prepared remarks, Defendant Herzog stated, "***Non-interest income increased $10 million*** as outlined in Slide 12," which stated, "***Noninterest Income - Strong card fees as transaction volumes increased***" and "***+9MM Card fees***." He added, "***Card fees were very strong and increased $9 million.*** He also referenced, "***large proportion of noninterest-bearing deposits***." In response to an analyst question about lower expenses, Defendant Farmer stated, "Another key differentiator would be the outside processing cost that associate with ***our improved card fees for the quarter***. ***So we did have some very good performance in card non-interest income***." The 7/21/2020 Earnings Presentation Slides stated, "2Q20 Results" included "***deposit growth***," "Key Performance Drivers 2Q20 compared to 1Q20 – ***Deposit growth primarily noninterest-bearing***…***Noninterest income included higher card fees***." It added, "***Deposits Grew 13% to Record Level***," "***Average deposits increase $7.5B - +$5.9B noninterest-bearing***," "***Beneficial Deposit Mix – Commercial Noninterest-bearing 40%***." It added, "Management Outlook 3Q20 expectation…***Average Deposits – Relatively stable***," "***Noninterest Income – Higher service charges on deposits as activity increases, More than offset by reduced activity (card)***."

74. On August 13, 2020, Comerica published on its website the Comerica Incorporated Investor Presentation (the "8/13/2020 Investor Presentation"), which stated, "2Q20 Earnings Summary - "***Noninterest Income up 4.2% Higher Card fees***," "***Deposits Grew $7.5B – Noninterest-bearing deposits up $5.9B***." It added, "2Q20 Results…Key Performance Drivers 2Q20 compared to 1Q20 - "***Deposit growth primarily noninterest-bearing***," and "***Noninterest income included higher card fees***." It added, "***Deposits Grew 13% to Record Level***," "***Beneficial Deposit Mix – Commercial Noninterest-bearing 40%***." It added, "***Noninterest Income – Strong card fees***," and "***+$9MM Card fees***."

75. On September 11, 2020, Comerica filed with the SEC a Form 8-K (the "9/11/2020 Form 8-K") signed by Buchanan reiterating an announcement that Defendant Farmer, Defendant Herzog, Chausse, and Sefzik would be presenting on behalf of Comerica at the Barclays Global Financial Services Conference on September 14, 2020. Comerica also filed as Exhibit 99.1 to the 9/11/2020 Form 8-K presentation slides entitled, "Barclays Global Financial Conference" dated September 14, 2020 (the "9/14/2020 Barclays Presentation"), which stated, "***QTD average deposits reflect: +$3.2B noninterest-bearing deposits***" and "***Outlook for 3Q20 average deposits: [approximately] $69B***." It added, "2Q20 Results" – "***deposit growth***" and "Key Performance Drivers 2Q20 compared to 1Q20…***Deposits growth primarily noninterest-bearing***…***Noninterest income***

***included higher card fees***." It added, "***Deposits Grew 13% to Record Level***," "***Average deposits increase $7.5B…+$5.9B noninterest-bearing***," "***Beneficial Deposit Mix – Commercial Noninterest-bearing 40%***." It added, "***+$9MM Card fees***."

76. On October 20, 2020, Comerica issued a press release in which Defendant Farmer was quoted (the "10/20/2020 Press Release"), which was filed with the SEC as Exhibit 99.1 to a Form 8-K signed by Buchanan (the "10/20/2020 Form 8-K"). The 10/20/2020 Press Release states, under the heading "Third Quarter 2020 Compared to Second Quarter 2020 Overview," "***Deposits increased $4.5 billion, or 7 percent, to $68.8 billion***" and represents "Growth in nearly every business line, ***including an increase of $3.2 billion in noninterest-bearing deposits***." It added "***Noninterest income increased $5 million to $252 million***" and included "***increases of $5 million in service charges on deposit accounts and $3 million in card fees***." Further, it stated, under the heading "Third Quarter 2020 Compared to Third Quarter 2019 Overview," "***Deposits increased $13.0 billion, or 23 percent***" and "***Included $9.6 billion, or 36 percent, increase in noninterest-bearing deposits***." Additionally, Defendant Farmer is quoted in the press release stating, "Our customers are acting prudently by conserving cash and adjusting their operations, which resulted in a reduction in loans and ***continued deposit growth***."

77. On October 20, 2020, Comerica also held an earnings call (the "10/20/2020 Earnings Call") on which Defendant Farmer and Defendant Herzog participated. In conjunction therewith, Defendants published slides entitled "Comerica Incorporated Third Quarter 2020 Financial Review" (the "10/20/2020 Earnings Presentation Slides"), which Comerica filed as Exhibit 99.2 to the 10/20/2020 Form 8-K. In them, Defendants made materially false and misleading misstatements and omissions. In prepared remarks, Defendant Farmer stated, "Deposits continue to show strong broad-based growth with ***average balances increasing $4.5 billion including $3.2 billion in non-interest bearing deposits***." He added, "Non-interest income increased as customer activity began to rebound including ***continued strong contribution from our card platform***." Defendant Herzog stated in prepared remarks, "***Deposits increased 7% or $4.5 billion to a new record of $68.8 billion***" while referencing 10/20/2020 Earnings Presentation Slide 5, titled "Deposits," showing that non-interest-bearing deposits increased by $3.2 billion as compared to the previous quarter figure. He said, Comerica's "***large proportion of non-interest bearing deposits***" in part "drove [Comerica's] total funding costs to only 14 basis points for the quarter." Herzog added, "***Non-Interest income increased $5 million***" while referring to 10/20/2020 Earnings Presentation Slide 12, titled "Noninterest Income," which included a chart depicting noninterest income increased to $252 million from the previous quarter figure of $247 million.

He added, "Improved economic conditions had a positive impact on…card fees. … Also card fees remained very strong ***and increased $3 million due to higher consumer volumes and merchant activity***, spurred by…changes in customer behavior related to COVID." The 10/20/2020 Earnings Presentation Slide 12 stated "***+$3MM Card Fees***." The 10/20/2020 Earnings Presentation Slide 3, titled "3Q20 Results," states under the heading "Key Performance Drivers," "Deposit growth broad-based & primarily noninterest-bearing" and "***Noninterest income included*** growth in deposit service charges, … & ***continued strong card fees***." Slide 3 included a chart representing that noninterest income increased to $252 million in Q3 2020 as compared to $247 million in Q2 2020. 10/20/2020 Earnings Presentation Slide 16, titled "Key Strengths," touted Comerica's revenue opportunities, including its "***High-caliber, robust Cash Management suite, including Card programs***."

78. On October 30, 2020, Comerica filed with the SEC its Form 10-Q for the period ending September 30, 2020 (the "Q3 2020 10-Q"), signed by Ortiz and SOX certified by Defendants Farmer and Herzog. The Q3 2020 10-Q stated "***Average deposits increased $1.9 billion, reflecting increases in all deposit categories.***"

79. On November 2, 2020, Comerica published on its website the Comerica Incorporated Investor Presentation (the "11/2/2020 Investor Presentation"), in which Defendant Farmer was quoted. The 11/2/2020 Investor

Presentation stated, "3Q20 Earnings Summary - ***Deposits reach new record***," "***Deposits Grew $4.5B – Noninterest-bearing grew $3.2B***." It added, "3Q20 Results…Key Performance Drivers 3Q20 compared to 2Q20 - "***Deposit growth broad-based & primarily noninterest-bearing***." It added, "***Deposits Broad-based growth continued***," "***Average deposits increased $4.5B - +$3.2B noninterest-bearing***," "***Beneficial Deposit Mix – Commercial Noninterest-bearing 41%***." It added "***+$3MM Card fees***."

80. On December 7, 2020, Comerica filed with the SEC a Form 8-K (the "12/7/2020 Form 8-K") signed by Buchanan reiterating an announcement that Defendant Farmer, Defendant Herzog, Chausse, and Sefzik would be presenting on behalf of Comerica at the Goldman Sachs US 2020 Financial Services Conference on December 8, 2020. Comerica also filed as Exhibit 99.1 to the 12/7/2020 Form 8-K presentation slides entitled, "Goldman Sachs 2020 US Financial Services Conference" dated December 8, 2020 (the "12/8/2020 Goldman Sachs Presentation"), which stated, "***Commercial Bank A leading bank for business; developing full, loyal relationships***." It added, "Prepaid card ***- #4 prepaid card issuer in US…Exclusive provider of prepaid debit cards for U.S. Treasury Direct Express Program***." It included 2 charts showing that, "***Card fees went up 6% in 3Q20 compared to 3Q19***" and "***Government Card Deposits went up 113% in 3Q20 compared to 3Q19***." It added, "4Q20 [] Deposit Update" – "***Deposit Trends – QTD***

***average deposits reflect*: *+$577MM noninterest-bearing deposits*.” It added, “3Q20 Results…*deposit growth continued*” and “Key Performance Drivers 3Q20 compared to 2Q20…*Deposits growth broad-based & primarily noninterest-bearing*…*Noninterest income included…continued strong card fees*.” It added, “*Average deposits increased $4.5B…+$3.2B noninterest-bearing*” and “*+$3MM Card fees*.”**

81. On January 19, 2021, Comerica issued a press release in which Defendant Farmer was quoted (the “1/19/2021 Press Release”), which was filed with the SEC as an exhibit to a Form 8-K signed by Buchanan (the “1/19/2021 Form 8-K”). The 1/19/2021 Press Release states, under the heading “Fourth Quarter 2020 Compared to Third Quarter 2020 Overview,” “***Deposits increased $1.5 billion, or 2 percent, to $70.2 billion***” and “***Noninterest-bearing … deposits increased $824 million***.” It added “***Noninterest income increased $13 million to $265 million***.” Further, it stated, under the heading “Full-Year 2020 Compared to Full-Year 2019 Overview,” “***Deposits increased $9.6 billion, or 17 percent, to 65.0 billion***” and there was “Growth in every business line, ***including an increase of $6.4 billion in noninterest-bearing deposits***.” It added there was a ***$13 million increase in card fees***. Additionally, Defendant Farmer is quoted in the press release stating, “Our 2020 results included solid loan performance and ***a record level of deposits***” and in the fourth quarter “***deposits increased nearly $1.5 billion.***”

82. On January 19, 2021, Comerica also held an earnings call (the "1/19/2021 Earnings Call") on which Defendant Farmer and Defendant Herzog participated. In conjunction therewith, Defendants published slides entitled "Comerica Incorporated Fourth Quarter 2020 Financial Review" (the "1/19/2021 Earnings Presentation Slides"), which Comerica filed as Exhibit 99.2 to the 1/19/2021 Form 8-K. In them, Defendants made materially false and misleading misstatements and omissions. In prepared remarks, Defendant Farmer stated, "***Average deposits increased by nearly $1.5 billion to an all time high, with 55% of the growth derived from non-interest bearing accounts***." He added, "***Non-interest income increased $13 million or 5%***, as customer activity continued to rebound." Additionally, he stated that "***Timing of monthly benefit activity in our government prepaid card business increased balances by $2.2 billion at quarter end.***" Defendant Herzog stated in prepared remarks, "***card fees remained very strong due to government card and merchant activity*** spurred by … changes in customer behavior related to the COVID environment." He added, "***Average deposits increased 2% or $1.5 billion to a new record of $70.2 billion***," while referencing 1/19/2021 Earnings Presentation Slide 7, titled "Deposits," ***showing noninterest-bearing deposits increased by $824 million*** as compared to the previous quarter figure. He said, "***The largest driver continues to be non-interest bearing deposits***..." Herzog added, "***Non-Interest income increased $13 million*** …

continuing the positive trend we've seen since post the shutdown of the economy earlier last year" while referring to the 1/19/2021 Earnings Presentation Slide 12, titled "Noninterest Income," which included a chart depicting a noninterest income increased to $265 million from the previous quarter figure of $252 million. He added, "***We expect non-interest income in the first quarter to benefit from higher deposit service charges***, fiduciary and brokerage fees. The 1/19/2021 Earnings Presentation Slide 4, titled "FY20 Results," states under the heading "Key YoY Performance Drivers," "***17% deposit growth; broad-based and primarily noninterest-bearing***" and "***Noninterest income: higher*** ... ***card fees***." The 1/19/2021 Earnings Presentation Slide 5, titled "4Q20 Results," states under the heading "Key Performance Drivers," "Deposits: broad-based growth & ***majority noninterest-bearing***" and "***Noninterest income: increased activity in most categories***." Slide 5 included a chart representing that noninterest income increased to $265 million in Q4 2020 as compared to $252 million in Q3 2020.

83. On February 3, 2021, Comerica published on its website the Comerica Incorporated Investor Presentation (the "2/3/2021 Investor Presentation") which stated, "FY20 Results…***deposit growth***," and Key YoY Performance Drivers - "***17% deposit growth; broad-based & primarily noninterest-bearing***," and "***Noninterest income…card fees***." It added, "4Q20 Results – Key Performance Drivers 4Q20 compared to 3Q20 ***Deposits Broad-based growth & majority***

***noninterest-bearing***," "***Noninterest income: increased activity in most categories***." It added, "***Average deposits increased $1.5B - +$824MM noninterest-bearing***," "***Beneficial Deposit Mix – Commercial Noninterest-bearing 42%***."

84. On February 9, 2021, Comerica filed with the SEC its Form 10-K for the fiscal year ended December 31, 2020 (the "2020 10-K"), signed by Defendant Farmer and SOX certified by Defendants Farmer and Herzog. The 2020 10-K states, under the heading "Full-Year 2020 compared to Full-Year 2019," "***Average deposits increased $9.6 billion, or 17 percent, to a record level of $65.0 billion,***" and "***Average noninterest-bearing deposits increased $6.4 billion, or 24 percent***." The 2020 10-K states, when discussing the Commercial Bank business segment, "***Average deposits increased $7.6 billion, reflecting increases in all deposit categories***" in 2020 as compared to 2019. The 2020 10-K adds, "***Card fees increased $13 million, or 5 percent***" in 2020 as compared to 2019.

85. On March 8, 2021, Comerica filed with the SEC a Form 8-K (the "3/8/2021 Form 8-K") signed by Buchanan, reiterating an announcement that Defendant Herzog would be presenting on behalf of Comerica at the 2021 RBC Capital Markets Financial Institutions Conference on March 9, 2021. Comerica also filed as Exhibit 99.1 to the 3/8/2021 Form 8-K presentation slides entitled, "RBC Capital Markets 2021 Financial Institutions Conference" dated March 9,

2021 (the "3/9/2021 RBC Presentation"), in which it touted Comerica as the "***#4 prepaid card issuer in US,***" and that it was the "***exclusive financial intermediary for US Treasury Direct Express Program***." It included a chart showing, "Prepaid" accounted for 62% of Card Products. It added, "1Q21 [] Deposit Update" - "***Deposit Trends – QTD average deposits reflect***: ***+$210MM noninterest-bearing deposits,***" "***Broad-based growth***." It added, "FY20 Results…***deposit growth***," and Key YoY Performance Drivers - "***17% deposit growth; broad-based & primarily noninterest-bearing***," and "***Noninterest income…card fees***." It added, "4Q20 Results – Key Performance Drivers 4Q20 compared to 3Q20 ***Deposits Broad-based growth & majority noninterest-bearing***," "***Noninterest income: increased activity in most categories***." It added, "***Deposits Reached another record level,***" "***Average deposits increased $1.5B - +$824MM noninterest-bearing***," "***Beneficial Deposit Mix – Commercial Noninterest-bearing 42%***."

86. On March 16, 2021, Comerica filed with the SEC a Proxy Statement and Notice of 2021 Annual Meeting of Shareholders (the "3/16/2021 Proxy Statement") containing a letter to shareholders signed by Defendant Farmer and Comerica's Facilitating Director Barbara R. Smith and a Notice of 2021 Annual Meeting of Shareholders signed by Buchanan. In their address to shareholders, Defendant Farmer and Barbara R. Smith touted Comerica's "***record level of deposits***" in 2020. The 3/16/2021 Proxy Statement also stated, when referencing

noteworthy financial accomplishments in 2020, "***Reached record levels of period-end assets, loans and deposits***" and there was a "***27%, or $15.6 billion, increase in total deposits to a record $72.9 billion, which included $12.0 billion growth in noninterest-bearing deposits***."

87. On April 20, 2021, Comerica issued a press release in which Defendant Farmer was quoted (the "4/20/2021 Press Release"), which was filed with the SEC as Exhibit 99.1 to a Form 8-K signed by Buchanan (the "4/20/2021 Form 8-K"). The 4/20/2021 Press Release states, under the heading "First Quarter 2021 Compared to Fourth Quarter 2020 Overview," "***Deposits increased $1.1 billion, or 2 percent, to $71.4 billion***" and "***Noninterest-bearing … deposits increased $603 million***." It added, "***Noninterest income increased $5 million to $270 million***." Further, it stated, under the heading "First Quarter 2021 Compared to First Quarter 2020 Overview," "***Deposits increased $14.6 billion, or 26 percent***" and "***Noninterest-bearing … deposits increased $10.6 billion***." It added under that heading, "***Noninterest income increased $33 million***" and there were "***Increases in card fees.***"

88. On April 20, 2021, Comerica also held an earnings call (the "4/20/2021 Earnings Call") on which Defendant Farmer and Defendant Herzog participated. In conjunction therewith, Defendants published slides entitled "Comerica Incorporated First Quarter 2021 Financial Review" (the "4/20/2021 Earnings Presentation

Slides"), which Comerica filed as Exhibit 99.2 to the 4/20/2021 Form 8-K. In them, Defendants made materially false and misleading misstatements and omissions. In prepared remarks, Defendant Herzog stated, "***We expect non-interest income in the second quarter to benefit from higher card fees*** …" He added, "***Non-interest income increased $5 million*** … sustaining the positive trend we've seen for the past year" while referring to 4/20/2021 Earnings Presentation Slide 10, titled "Noninterest Income," which included a chart depicting noninterest income increased to $270 million from the previous quarter figure of $265 million. Herzog added, "***Note card fees remain elevated. They were over 20% higher than a year ago due to government card and merchant activity*** spurred by … changes in customer behavior related to the COVID environment." He also stated, "***Average deposits increased 2% or $1.1 billion to a new record***," while referencing 4/20/2021 Earnings Presentation Slide 6, titled "Deposits," which shows that average deposits increased $1.1 billion and including "***$603MM noninterest-bearing***." Defendant Farmer stated in prepared remarks, "Our progress is demonstrated in our results as ***non-interest income has increased in each of the past four quarters. Our robust card platform is a great example.*** It's helped position us for the recent and likely ongoing changes in customer behavior." 4/20/2021 Earnings Presentation Slide 4, titled "1Q21 Results," included a chart representing that noninterest income increased to ***$270 million in Q1 2021 as compared to $265 million in Q4 2020***.

89. On April 28, 2021, Comerica filed with the SEC its Form 10-Q for the period ending March 31, 2021 (the "Q1 2021 10-Q"), signed by Ortiz and SOX certified by Defendants Farmer and Herzog. The Q1 2021 10-Q stated, "***Noninterest income increased $33 million to $270 million for the three months ended March 31, 2021, including an increase in card fees***." It also stated, while discussing the Commercial Bank business segment, "***Noninterest income increased $32 million, primarily reflecting increases in card fees***…" and "***Average deposits increased $10.9 billion, reflecting increases in all deposit categories*** with the exception of time deposits" for the three months ended March 31, 2021 as compared to the same period in 2020. Under the heading titled "First Quarter 2021 Compared to Fourth Quarter 2020," it states, total liabilities were partially offset, in part, by an ***increase of $603 million in noninterest-bearing deposits***.

90. On May 11, 2021, Comerica published on its website the Comerica Incorporated Investor Presentation (the "5/11/2021 Investor Presentation"), which stated "1Q21 Results – Key Performance Drivers 1Q21 compared to 4Q20 ***Deposits: up 2% led by consumer***." It added, "***Deposits Reached another record level with $1B increase in consumer deposits,***" "***Average deposits increased $1.1B - +$603MM noninterest-bearing***," "***Beneficial Deposit Mix – Commercial Noninterest-bearing 42%***." It added, "Noninterest Income Activity continues to

be strong…card fees remained strong," "***Increase of $5MM or 2%***," and "***Increase of $33MM or 14% over 1Q20***."

91. On June 11, 2021, Comerica filed with the SEC a Form 8-K (the "6/11/2021 Form 8-K"), signed by Buchanan, reiterating an announcement that Defendant Herzog and Sefzik would be presenting on behalf of Comerica at the Morgan Stanley US Financials Conference on June 14, 2021. Comerica also filed as Exhibit 99.1 to the 6/11/2021 Form 8-K presentation slides entitled, "Morgan Stanley 2021 US Financials Conference" dated June 14, 2021 (the "6/14/2021 Morgan Stanley Presentation"), in which it touted Comerica as the "***#4 prepaid card issuer in US,***" and that it was the "***exclusive financial intermediary***" for the "***Direct Express Program.***" It added, "2Q21 [] Deposit Update" - "***Deposit Trends – QTD average deposits reflect***: ***+$3.0B noninterest-bearing deposits,***" and "***2Q21 outlook: stable at QTD level***." It added, "1Q21 Results…Key Performance Drivers 1Q21 compared to 4Q20…***Deposits: up 2% led by consumer…Noninterest income: Continued robust activity***." It added, "***Deposits Reached another record level with $1B increase in consumer deposits,***" "***Average deposits increased $1.1B - +$603MM noninterest-bearing***," "***Beneficial Deposit Mix – Commercial Noninterest-bearing 42%***." It added, "***Noninterest Income Activity continues to be strong…Increase of $5MM or 2%...Increase of $33MM or 14% over 1Q20***."

92. On July 21, 2021, Comerica issued a press release in which Defendant Farmer was quoted (the "7/21/2021 Press Release"), which was filed with the SEC as Exhibit 99.1 to a Form 8-K signed by Buchanan (the "7/21/2021 Form 8-K"). The 7/21/2021 Press Release states, under the heading "Second Quarter 2021 Compared to First Quarter 2021 Overview," "***Deposits increased $4.1 billion, or 6 percent, to $75.5 billion***" and "Nearly every business line experienced growth with an ***increase of $3.0 billion in noninterest-bearing deposits***." It added "***Noninterest income increased $14 million to $284 million***" and there were "***Increases of $13 million in card fees***." Further it states, under the heading "Second Quarter 2021 Compared to Second Quarter 2020 Overview," "***Deposits increased $11.2 billion, or 17 percent***" and "***Noninterest-bearing … deposits increased $7.7 billion***." It added, "***Noninterest income increased $37 million***" and there were "***Increases in card fees***" and "service charges on deposit accounts."

93. On July 21, 2021, Comerica also held an earnings call (the "7/21/2021 Earnings Call") on which Defendant Farmer and Defendant Herzog participated. In conjunction therewith, Defendants published slides entitled "Comerica Incorporated Second Quarter 2021 Financial Review" (the "7/21/2021 Earnings Presentation Slides"), which Comerica filed as Exhibit 99.2 to the 7/21/2021 Form 8-K. In them, Defendants made materially false and misleading misstatements and omissions. In prepared remarks, Defendant Farmer stated, "Fee generating activity was again

robust. ***Non-interest income grew 5% with increases in card, commercial lending, and fiduciary income***." He added, "we are focused on delivering a more diversified and balanced revenue base with an emphasis on fee generation. And ***our progress is demonstrated in the consistent increase in non-interest income over the past five quarters.***" In prepared remarks, Defendant Herzog stated, "***Average deposits increased $4.1 billion, climbing to a new record***" and "***Non-interest-bearing deposits accounted for almost 75% of the growth***" while referencing the 7/21/2021 Earnings Presentation Slide 6, titled "Deposits," showing that ***non-interest-bearing deposits increased by $3 billion*** as compared to the previous quarter figure. He added, "***Non-interest income increased $14 million or 5%***...continuing the positive trend we've seen over the last five quarters" while referencing the 7/21/2021 Earnings Presentation Slide 10, titled "Noninterest Income," which included a chart depicting noninterest income increased to $284 million from the previous quarter figure of $270 million. Herzog also added, "***Card fees increased $13 million and are 23% higher than a year ago, primarily due to government card*** and to a lesser extent also merchant consumer and commercial card activity." The 7/21/2021 Earnings Presentation Slide 10 states that ***card fees increased by $13 million*** as compared to the previous quarter figure. In response to an analyst question regarding fee income, Defendant Herzog stated, "We have been very strong in non-interest income, not just in this quarter." He continued, "***we have gradually been increasing***

***every quarter for the last five quarters***" while referencing the 7/21/2021 Earnings Presentation Slide 10. The 7/21/2021 Earnings Presentation Slide 4, titled "2Q21 Results," states under the heading "Key Performance Drivers 2Q21 compared to 1Q21," "***Noninterest income: Robust activity including growth in card,*** commercial lending & fiduciary." Slide 4 included a chart representing that noninterest income increased to $284 million in Q2 2021 as compared to $270 million in Q1 2021.

94. On July 29, 2021, Comerica filed with the SEC its Form 10-Q for the period ending June 30, 2021 (the "Q2 2021 10-Q"), signed by Ortiz and SOX certified by Defendants Farmer and Herzog. The Q2 2021 10-Q states, "***Noninterest income increased $37 million to $284 million for the three months ended June 30, 2021, reflecting an increase in card fees***…" It added, while referencing the six months ended June 30, 2021 as compared to the six months ended June 30, 2020, "***Noninterest income increased $70 million to $554 million, including increases in card fees…***" It also stated, while discussing the Commercial Bank business segment, "***Noninterest income increased $55 million with increases in card fees***" and "***Average deposits increased $9.1 billion, reflecting increases in all deposit categories*** with the exception of time deposits" for the six months ended June 30, 2021 as compared to the same period in 2020. Under the heading titled "Second

Quarter 2021 Compared to Fourth Quarter 2020," it states, "total liabilities were offset, in part, by an ***increase of $1.1 billion in non-interest bearing deposits***."

95. On August 19, 2021, Comerica published on its website the Comerica Incorporated Investor Presentation (the "8/19/2021 Investor Presentation"), which stated, "***Card Fee Income [was] Up 23% from 2Q20 mainly due to higher government card transactions***" and that approximately 60% of the card fees came from Prepaid. It also touted Comerica as the "***#4 prepaid card issuer in US***," and that it was the "***exclusive financial intermediary***" for the "***Direct Express Program***." It added, "1Q21 Results…Key Performance Drivers 1Q21 compared to 4Q20…***Deposits: up 2% led by consumer…Noninterest income: Continued robust activity***." It added, "***Deposits reached another record level with $1B increase in consumer deposits,***" "***Average deposits increased $1.1B - +$603MM noninterest-bearing***," "***Beneficial Deposit Mix – Commercial Noninterest-bearing 42%***." It added, "***Noninterest Income Activity continues to be strong…Increase of $5MM or 2%...Increase of $33MM or 14% over 1Q20***."

96. On August 23, 2021, Comerica issued a press release in which Defendant Farmer was quoted (the "8/23/2021 Press Release"), announcing the release of its 2020 Corporate Responsibility Report sharing Comerica's performance across various topics that include technology; responsible business practices; diversity, equity & inclusion; environmental sustainability; and community support.

The 2020 Corporate Responsibility Report included a signed message by Defendant Farmer where he noted "Comerica's commitment to being a responsible company." In a topic-specific disclosure for "Financial Inclusion," the 2020 Corporate Responsibility Report touted its selection "***by the U.S. Treasury as the Financial Agent for their Direct Express® Debit MasterCard Program®.***" Comerica also explained that "***Not only does the innovative prepaid card program deliver benefits more cost effectively and securely***, it is an on-ramp to financial inclusion for millions of unbanked Americans – giving recipients the tools they need to participate fully in the economy." It went on to say "***Direct Express® transactions are covered by regulations that protect federal benefit recipients, and funds on the cards are FDIC insured***. ***Cardholder satisfaction with the Direct Express® program is high – Comerica has achieved a 92% (or better) cardholder satisfaction rating every year since the program's inception.***" It further states that "***the Direct Express® card protects vulnerable cardholder funds and is one of the most secure prepaid cards in the industry,***" and that "***Direct Express® has a unique partnership with Walmart that allows Direct Express® cardholders to withdraw the full balance on their card*** (up to $1,000) at less than half the cost that Walmart charges other customers for the same service. ***Since 90 percent of our cardholders visit a Walmart at least once a year, this has proven to be a very popular service***."

97. On September 10, 2021, Comerica filed with the SEC a Form 8-K (the "9/10/2021 Form 8-K"), signed by Buchanan, reiterating an announcement that Defendant Farmer, Defendant Herzog and Sefzik would be presenting on behalf of Comerica at the Barclays Global Financial Services Conference on September 13, 2021. Comerica also filed as Exhibit 99.1 to the 9/10/2021 Form 8-K presentation slides entitled, "Barclays Global Financial Services Conference" dated September 13, 2021 (the "9/13/2021 Barclays Presentation"), which stated, "***Card Fees Up 22% 1H21/1H20 mainly due to higher government card transactions***" and included a chart showing 63% of the card fees came from Prepaid. It touted Comerica as the "***#3 prepaid card issuer in US,***" and that it was the "***exclusive provider of prepaid debit cards***" for the "***Direct Express Program***." It added, "3Q21 Deposit Update" - ***QTD average deposits reflect***: ***+$1.1B noninterest-bearing deposits***." It added, "2Q21 Results Strong…revenue growth…Key Performance Drivers 2Q21 compared to 1Q21…***Deposits: up 6%…Noninterest income: Robust activity, including growth in card***." It added, "***Deposits Reached another record level,***" "***Average deposits increased $4.1B - +$3.0B noninterest-bearing***," "***Beneficial Deposit Mix – Commercial Noninterest-bearing 42%***." It added, "***Noninterest Income Activity continues to be strong…Increase of $14MM or 5% (+$13MM Card Fees)...Increase of $37MM or 15% over 2Q20***."

98. On October 20, 2021, Comerica issued a press release in which Defendant Farmer was quoted (the "10/20/2021 Press Release"), which was filed with the SEC as Exhibit 99.1 to a Form 8-K signed by Buchanan (the "10/20/2021 Form 8-K"). The 10/20/2021 Press Release states, under the heading "Third Quarter 2021 Compared to Second Quarter 2021 Overview," "***Deposits increased $3.6 billion, or 5 percent, to $79.1 billion***" and there was "Broad-based growth as … ***noninterest-bearing deposits increased*** … ***$1.6 billion***." Further it states, under the heading "Third Quarter 2021 Compared to Third Quarter 2020 Overview," "***Deposits increased $10.4 billion, or 15 percent***" and "***Noninterest-bearing … deposits increased $6.1 billion***." It added, "***Noninterest income increased $28 million***" and there were increases in "service charges on deposit accounts."

99. On October 20, 2021, Comerica also held an earnings call (the "10/20/2021 Earnings Call") on which Defendant Farmer and Defendant Herzog participated. In conjunction therewith, Defendants published slides entitled "Comerica Incorporated Third Quarter 2021 Financial Review" (the "10/20/2021 Earnings Presentation Slides"), which Comerica filed as Exhibit 99.2 to the 10/20/2021 Form 8-K. In them, Defendants made materially false and misleading misstatements and omissions. In prepared remarks, Defendant Farmer stated, "Fee generating activity remained robust. ***Third quarter non-interest income was up 11% on a year-over-year basis***." He added, "***Average deposits increased 5%, or***

***$3.6 billion to another all-time high***." In prepared remarks, Defendant Herzog stated, "***Deposits continue to grow in nearly every business line, hitting a record***" and "***The majority of our deposits are non-interest bearing***," while referencing 10/20/2021 Earnings Presentation Slide 6, titled "Deposits," showing that ***non-interest-bearing deposits increased by $1.6 billion*** as compared to the previous quarter figure. Herzog added, "As far as fourth quarter non-interest income, ***we expect continued solid performance in several customer driven fee categories such as deposit service charges, card and derivatives.***" Herzog continued, "***We expect 2021 non-interest income will be one of the highest we've ever recorded.***" The 10/20/2021 Earnings Presentation Slide 4, titled "3Q21 Results," states under the heading "Key Performance Drivers 3Q21 compared to 2Q21," "***Noninterest income: remained robust…***"

100. On October 29, 2021, Comerica filed with the SEC its Form 10-Q for the period ending September 30, 2021 (the "Q3 2021 10-Q"), signed by Ortiz and SOX certified by Defendants Farmer and Herzog. The Q3 2021 10-Q states, "***Noninterest income increased $28 million to $280 million*** for the three months ended September 30, 2021." It added, while referencing the nine months ended September 30, 2021 as compared to the nine months ended September 30, 2020, "***Noninterest income increased $98 million to $834 million, including increases in card fees…***" It also states, while discussing the Commercial Bank business

segment, "***Noninterest income increased $89 million with increases in … card fees***" and "***Average deposits increased $8.5 billion, reflecting increases in all deposit categories***" for the nine months ended September 30, 2021 as compared to the same period in 2020.

101. On November 8, 2021, Comerica published on its website the Comerica Incorporated Investor Presentation (the "11/8/2021 Investor Presentation") which stated, "***Card Fee Income Up 15% YTD from 2020 due to government stimulus and higher activity***" and included a chart showing 60% of the card fees came from Prepaid. It touted Comerica as the "***#3 prepaid card issuer in US,***" and that it was the "***exclusive provider of prepaid debit cards***" for the "***Direct Express Program***." It stated "3Q21 Results Revenue growth…Key Performance Drivers 3Q21 compared to 2Q21…***Deposits: up 5%…Noninterest income: remained robust***." It added, "***Deposits Broad-based growth drove deposits to another record,***" "***Average deposits increased $3.6B - +$1.6B noninterest-bearing***," "***Beneficial Deposit Mix – Commercial Noninterest-bearing 43%***."

102. On November 10, 2021, Comerica participated in the BofA Securities 2021 Banking and Financials Conference (the "11/10/2021 BofA Conference"). In connection with the announcement of its participation in the 11/10/2021 BofA Conference, Comerica re-published on its website the 11/8/2021 Investor

Presentation which contained the same false and/or misleading misstatements and omissions as described *supra*.

103. On December 6, 2021, Comerica filed with the SEC a Form 8-K (the "12/6/2021 Form 8-K"), signed by Buchanan, reiterating an announcement that Defendant Farmer, Defendant Herzog and Sefzik would be presenting on behalf of Comerica at the Goldman Sachs 2021 US Financial Services Conference on December 8, 2021. Comerica also filed as Exhibit 99.1 to the 12/6/2021 Form 8-K presentation slides entitled, "Goldman Sachs 2021 US Financial Services Conference" dated December 8, 2021 (the "12/8/2021 Goldman Sachs Presentation"), which stated, "***4Q21 Deposit Update Strong growth continues***" - ***QTD average deposits reflect***: ***+$3.3B noninterest-bearing deposits,***" and "***4Q21 outlook: remain strong***." It added, "***Strong Fee Income Broad-based growth***." It added a chart showing ***Card Fees up 15% YTD 3Q20 to YTD 3Q21***. It stated under "3Q21 Review" "***Driving Shareholder Value by supporting our Customers***." It added, "3Q21 Results Revenue growth…Key Performance Drivers 3Q21 compared to 2Q21…***Deposits: up 5%…Noninterest income: remained robust***." It added, "***Deposits Broad-based growth drove deposits to another record,***" "***Average deposits increased $3.6B - +$1.6B noninterest-bearing***," "***Beneficial Deposit Mix – Commercial Noninterest-bearing 43%***." It added, "***Noninterest Income Strong activity continued***."

104. On January 19, 2022, Comerica issued a press release in which Defendant Farmer was quoted (the "1/19/2022 Press Release"), which was filed with the SEC as Exhibit 99.1 to a Form 8-K signed by Buchanan (the "1/19/2022 Form 8-K"). The 1/19/2022 Press Release states, under the heading "Fourth Quarter 2021 Compared to Third Quarter 2021 Overview," "***Deposits increased $5.4 billion, or 7 percent, to $84.5 billion***" and there was "Broad-based growth as … ***noninterest-bearing deposits increased … $1.4 billion***." It added "***Noninterest income increased $9 million to $289 million***" and there were "***Increases of $13 million in card fees***." It further stated, under the heading "Full-Year 2021 Compared to Full-Year 2020 Overview," "***Deposits increased $12.6 billion, or 19 percent, to $77.7 billion***" and "Nearly every business line experienced growth as ***Noninterest-bearing … deposits increased $8.4 billion***." It added, "***Noninterest income increased $122 million to $1.1 billion***" with ***increases of $28 million in card fees*** and $10 million in service charges on deposit accounts. Additionally, Defendant Farmer is quoted in the 1/19/2022 Press Release stating, while referencing Comerica's 2021 performance, "***Average deposits grew 19 percent***" and "***While net interest income was challenged by ultra-low-rate environment, noninterest income growth was broad-based, increasing 12 percent to an all-time high.***"

105. On January 19, 2022, Comerica also held an earnings call (the "1/19/2022 Earnings Call") on which Defendant Farmer and Defendant Herzog

participated. In conjunction therewith, Defendants published slides entitled "Comerica Incorporated Full Year 2021 & Fourth Quarter 2021 Financial Review" (the "1/19/2022 Earnings Presentation Slides"), which Comerica filed as Exhibit 99.2 to the 1/19/2022 Form 8-K. In them, Defendants made materially false and misleading misstatements and omissions. In prepared remarks, Defendant Farmer stated, "***non-interest income growth was broad-based, increasing 12% to a new record***." In prepared remarks, Defendant Herzog stated, "***average deposits again set a record increasing $5.4 billion with nearly three quarters of the growth derived from non-interest-bearing accounts***," while referencing 1/19/2022 Earnings Presentation Slide 8, titled "Deposits," showing that ***non-interest-bearing deposits increased by $4 billion*** as compared to the previous quarter figure. He added, "***Non-interest income increased $9 million***" while referring to the 1/19/2022 Earnings Presentation Slide 12, titled "Noninterest Income," which included a chart depicting noninterest income increased to $289 million from the previous quarter figure of $280 million. Herzog also added, "***As far as non-interest income 2021 was the highest on record and included very strong performance in nearly every category***." The 1/19/2022 Earnings Presentation Slide 5, titled "FY21 Results," states under the heading "Key Performance Drivers Year over Year," "***Noninterest income up 12% with broad-based growth***." Slide 5 also includes a chart representing that

noninterest income increased to $1.123 billion in 2021 as compared to $1.001 billion in 2020.

106. On February 16, 2022, Comerica filed with the SEC its Form 10-K for the fiscal year ended December 31, 2021 (the "2021 10-K"), signed by Defendant Farmer and SOX certified by Defendants Farmer and Herzog. The 2021 10-K stated, under the heading "Full-Year 2021 compared to Full-Year 2020," "***Average deposits increased $12.6 billion, or 19 percent, to a record $77.7 billion***" and "***Average noninterest-bearing deposits increased $8.4 billion, or 25 percent***." It added, "***Noninterest income increased $122 million to $1.1 billion, reflecting increases in … card fees …*** and service charges on deposit accounts." The 2021 10-K states, when discussing the Commercial Bank business segment, "***Average deposits increased $9.0 billion, reflecting increases in all deposit categories***" and "***Noninterest income increased $108 million, driven by higher … card fees***" in 2021 as compared to 2020.

107. On March 7, 2022, Comerica filed with the SEC a Form 8-K (the "3/7/2022 Form 8-K"), signed by Buchanan, reiterating an announcement that Defendant Herzog would be presenting on behalf of Comerica at the 2022 RBC Capital Markets Financial Institutions Conference on March 8, 2022. Comerica also filed as Exhibit 99.1 to the 3/7/2022 Form 8-K presentation slides entitled, "RBC Capital Markets 2022 Financial Institutions Conference" dated March 8, 2022

(the "3/8/2022 RBC Presentation"), which stated, "***1Q22 Deposit Update Reflects seasonality***" - ***QTD average deposits reflect***: ***+$2.3B noninterest-bearing deposits,***" and "***1Q2[2] outlook: remain strong***." It also touted the "New Direct Express Mobile App" stating it had "***High satisfaction ratings***." It added, "FY21 Results Revenue growth driven by fee income…Key Performance Drivers Year over Year…***Deposits: up 19%; broad-based…Noninterest income up 12% with broad-based growth***." It added, "***4Q21 Results…deposit growth in several businesses; robust fee income…***Key Performance Drivers 4Q21 compared to 3Q21…***Deposits up 7%; broad-based…Noninterest income growth***."

108. On March 15, 2022, Comerica filed with the SEC a Proxy Statement and Notice of 2022 Annual Meeting of Shareholders (the "3/15/2022 Proxy Statement") containing a letter to shareholders signed by Defendant Farmer and Comerica's Facilitating Director Barbara R. Smith and a Notice of 2022 Annual Meeting of Shareholders signed by Buchanan. In their address to shareholders, Defendant Farmer and Barbara R. Smith touted that Comerica's "***Average deposits grew 19 percent***" and "***noninterest income growth was broad-based, increasing 12 percent to an all-time high.***" The 3/15/2022 Proxy Statement also stated, under the heading "2021 Peer Comparisons," "***Achieved record levels of average assets and deposits.***"

109. On April 20, 2022, Comerica issued a press release in which Defendant Farmer was quoted (the "4/20/2022 Press Release"), which was filed with the SEC as Exhibit 99.1 to a Form 8-K signed by Buchanan (the "4/20/2022 Form 8-K"). The 4/20/2022 Press Release states, under the heading "First Quarter 2022 Compared to First Quarter 2021 Overview," "***Deposits increased $7.7 billion, or 11%***" and "Nearly every business line experienced growth as ***noninterest-bearing … deposits increased $6.1 billion***." Additionally, Defendant Farmer is quoted in the press release stating, "***We expect fee income to be more robust as we move through the year.***"

110. On April 20, 2022, Comerica also held an earnings call (the "4/20/2022 Earnings Call") on which Defendant Farmer and Defendant Herzog participated. In conjunction therewith, Defendants published presentation slides entitled "Comerica Incorporated First Quarter 2022 Financial Review" (the "4/20/2022 Earnings Presentation Slides"), which Comerica filed as Exhibit 99.2 to the 4/20/2022 Form 8-K. In them, Defendants made materially false and misleading misstatements and omissions. In prepared remarks, Defendant Herzog stated, "***we believe deposits will remain elevated***, but slowly declined (sic) as the Fed increases interest rates and significantly shrinks its balance sheet," while referencing the 4/20/2022 Earnings Presentation Slide 6, titled "Deposits," showing that deposits were "***[u]p 11% relative to [Q1 2021]***" despite a $5.4 billion decrease from Q4 2021. Defendant

Herzog added "***For the remainder of the year, we expect significant broad-based growth in customer driven fee categories as activity picks up. This includes card***." In response to an analyst question about a decline in deposits, Defendant Farmer said "***We're always going to have a high noninterest-bearing component probably relative to our peer group*** even though we see some mix shift occurring."

111. On April 27, 2022, Comerica filed with the SEC its Form 10-Q for the period ending March 31, 2022 (the "Q1 2022 10-Q"), signed by Ortiz and SOX certified by Defendants Farmer and Herzog. The Q1 2022 10-Q states, while discussing the Commercial Bank business segment, "***Average deposits increased $4.9 billion, reflecting increases in all deposit categories*** with the exception of time deposits" for the three months ended March 31, 2022 as compared to the same period in 2021.

112. On May 5, 2022, Comerica filed with the SEC a Form 8-K (the "5/5/2022 Form 8-K"), signed by Buchanan, announcing that it posted to its website the Comerica Incorporated Investor Presentation (the "5/5/2022 Investor Presentation"), which was filed as Exhibit 99.1 to the 5/5/2022 Form 8-K, and stated "***Deposits reflect seasonality…Up 11% relative to 1Q21.***"

113. On June 10, 2022, Comerica filed with the SEC a Form 8-K (the "6/10/2022 Form 8-K"), signed by Nicole V. Gersch, Senior Vice President and Interim Corporate Secretary, reiterating an announcement that Defendant Herzog

and Megan D. Crespi, Executive Vice President, Chief Enterprise Technology and Operations Services Officer, would be presenting on behalf of Comerica at the 2022 Morgan Stanley US Financials, Payments & CRE Conference on June 13, 2022. Comerica also filed as Exhibit 99.1 to the 6/10/2022 Form 8-K presentation slides entitled, "Morgan Stanley US Financials, Payments & CRE Conference" dated June 13, 2022 (the "6/13/2022 Morgan Stanley Presentation"), which stated "***Beneficial Deposit Mix – Commercial Noninterest-bearing 45%***," "***5/31/22 deposits $77.8B, $171MM increase from 3/31/22***," and "***2Q22 outlook: stable to slightly lower from current QTD level***." It added, "***Deposits reflect seasonality…Up 11% relative to 1Q21***."

114. On July 6, 2022, Comerica issued a press release in which Defendant Farmer was quoted (the "7/6/2022 Press Release"), announcing the release of its 2021 Corporate Responsibility Report detailing advancements made on key environmental and social matters. The 7/6/2022 Press Release quoted Defendant Farmer. The 2021 Corporate Responsibility Report included a signed message by Defendant Farmer where he notes "***the critical importance of corporate responsibility to Comerica and our stakeholders*** and demonstrates the commitment of all our colleagues." As part of the 2021 Corporate Responsibility Report, Comerica set forth ways it purportedly lives its commitment to providing access to capital to underserved communities including the Direct Express program:

"***Comerica Bank is the exclusive issuer of the U.S. Treasury's Direct Express® Debit MasterCard® Program to deliver government benefits electronically to 3.6 million active federal benefit recipients monthly. This prepaid card program delivers benefits cost-effectively and securely and is an on-ramp to financial inclusion for millions of unbanked Americans.***" Within the 2021 Corporate Responsibility Report, in the section on Supplier Diversity, Comerica touted "***Our standard agreement with suppliers and contractors requires that they act in compliance with all applicable laws, including those on*** equal employment opportunity, employment practices, immigration and ***data protection***, and abide by Comerica's non-discrimination and diversity practices. ***As Comerica primarily does business in the United States, we have no significant presence or investment in countries where lack of human rights protection is a known problem***." In the section on Compliance and Ethics, Comerica touted its "commit[ment] to earning the trust and confidence of our customers, colleagues and stakeholders. . . . ***We provide our colleagues, senior leaders and Board of Directors with tools and knowledge to take ownership*** of this commitment ***and to act with integrity and in compliance with all ethical and legal responsibilities.***" It goes on, "***We also require that all suppliers (and/or third parties acting as agents of Comerica) conduct themselves with the same high standards of honesty, fairness and integrity. Suppliers must abide by all applicable federal, state and local laws, rules and***

***regulations while assuring that all services are conducted with a high degree of professionalism and in accordance with the terms and conditions of the relationship.***" In the section on Privacy and Information Security, Comerica said "***Customer privacy and protection and cybersecurity are key topics critical to our business success. Our customers, colleagues and stakeholders trust us to safeguard their privacy, personal information and financial data, and we are committed to maintaining that trust.***"

115. On July 20, 2022, Comerica issued a press release in which Defendant Farmer was quoted (the "7/20/2022 Press Release"), which was filed with the SEC as Exhibit 99.1 to a Form 8-K signed by Comerica's Interim Chief Legal Officer Von E. Hays ("Hays") (the "7/20/2022 Form 8-K"). The 7/20/2022 Press Release states, under the heading "Second Quarter 2022 Compared to First Quarter 2022 Overview," "***Noninterest income increased $24 million to $268 million***." Further it states, under the heading "Second Quarter 2022 Compared to Second Quarter 2021 Overview," "***Deposits increased $2.1 billion, or 3%***" *and* "Most business lines experienced growth as ***noninterest-bearing deposits increased $2.6 billion***."

116. On July 20, 2022, Comerica also held an earnings call (the "7/20/2022 Earnings Call") on which Defendant Farmer and Defendant Herzog participated. In conjunction therewith, Defendants published presentation slides entitled "Comerica Incorporated Second Quarter 2022 Financial Review" (the "7/20/2022 Earnings

Presentation Slides"), which Comerica filed as Exhibit 99.2 to the 7/20/2022 Form 8-K. In them, Defendants made materially false and misleading misstatements and omissions. In prepared remarks, Defendant Herzog said "on a year-over-year basis, ***average deposits were up $2.1 billion***." He added, "***Non-interest income increased $24 million or 10%***," quarter-over-quarter, while referencing the 7/20/2022 Earnings Presentation Slide 10, titled "Noninterest Income," despite a reduction in year-over-year card fees. Defendant Herzog further said "[t]he bulk of our loans are floating rate and ***the majority of our deposits were non-interest-bearing***." The 7/20/2022 Earnings Presentation Slide 6, titled "Deposits," touted Comerica's "***[s]trategic management of deposits*** & businesses utilizing excess liquidity." Slide 6 also explained the distribution of the deposit decrease: $1.0 billion of interest-bearing versus $501 million of noninterest-bearing." The 7/20/2022 Earnings Presentation Slide 15, titled "Key Strengths," touted Comerica's revenue opportunities, including its "***High-caliber, robust Cash Management suite, including Card programs***."

117. On July 28, 2022, Comerica filed with the SEC its Form 10-Q for the period ending June 30, 2022 (the "Q2 2022 10-Q"), signed by Ortiz and SOX certified by Defendants Farmer and Herzog. The Q2 2022 10-Q states, "***Noninterest income increased $24 million to $268 million for the three months ended June 30, 2022.***" It added, while discussing the Commercial Bank business segment,

"***Average deposits increased $2.5 billion, reflecting an increase in noninterest-bearing deposits***" for the six months ended June 30, 2022 as compared to the same period in 2021.

118. On August 15, 2022, Comerica published on its website the Comerica Incorporated Investor Presentation (the "8/15/2022 Investor Presentation"), which stated "Key Strengths" "***Poised to support growth"*** through "Revenue Opportunities - ***High-caliber, robust Cash Management suite, including Card programs***" and "Uniquely Positioned…***Strong deposit base***." It added, "***2Q22 Results Strong revenue growth…***Key Performance Drivers 2Q22 compared to 1Q22…***Deposits reflect prudent management…Strong fee generation***." It added, "***Deposits Strategic management of deposits***," "***Beneficial Deposit Mix; 55% noninterest-bearing – Commercial Noninterest-bearing 45%***." It added "***Noninterest Income Increased 10% with broad-based growth***" and included a graphic showing ***26% of Fee Income to Card Fees***.

119. On September 9, 2022, Comerica filed with the SEC a Form 8-K (the "9/9/2022 Form 8-K"), signed by Hays, Executive Vice President and now-Chief Legal Officer, reiterating an announcement that Defendant Farmer, Defendant Herzog and Sefzik would be presenting on behalf of Comerica at the Barclays Global Financial Services Conference on September 13, 2022. Comerica also filed as Exhibit 99.1 to the 9/9/2022 Form 8-K presentation slides entitled, "Barclays

Global Financial Services Conference" dated September 13, 2022 (the "9/13/2022 Barclays Presentation"), which stated, "***3Q22 Deposit Update Strategically managing relationship deposits.***" It added, "***Enhancing our digital customer experience – Best-in-Class Cash Management Solutions***," and graphically depicted ***Card Fees representing 26% of 2Q22 Noninterest Income***." It added "Well Positioned for the Future – Revenue Growth – ***Strong [] fee income results…Robust product suite to support Payments strategy…Relationship Focus…Strong deposit base***." It added, "***2Q22 Results Strong revenue growth…***Key Performance Drivers 2Q22 compared to 1Q22…***Deposits reflect prudent management…Strong fee generation***." It added, "***Deposits Strategic management of deposits***," "***Beneficial Deposit Mix; 55% noninterest-bearing – Commercial Noninterest-bearing 45%***." It added "***Noninterest Income Increased 10% with broad-based growth***" and included a graphic showing ***26% of Fee Income to Card Fees***.

120. On October 19, 2022, Comerica issued a press release in which Defendant Farmer was quoted (the "10/19/2022 Press Release"), which was filed with the SEC as Exhibit 99.1 to a Form 8-K signed by Hays, now Comerica's Chief Legal Officer (the "10/19/2022 Form 8-K"). The 10/19/2022 Press Release states, under the heading "Third Quarter 2022 Compared to Second Quarter 2022 Overview," "***Noninterest income increased $10 million to $278 million***."

121. On October 19, 2022, Comerica also held an earnings call (the "10/19/2022 Earnings Call") on which Defendant Farmer and Defendant Herzog participated. In conjunction therewith, Defendants published presentation slides entitled "Comerica Incorporated Third Quarter 2022 Financial Review" (the "10/19/2022 Earnings Presentation Slides"), which Comerica filed as Exhibit 99.2 to the 10/19/2022 Form 8-K. In them, Defendants made materially false and misleading misstatements and omissions. In prepared remarks concerning average deposits, Defendant Herzog said, "***Our mix remains favorable at 57% noninterest-bearing, reflecting the relationship and operational nature of our deposits,***" while referencing the 10/19/2022 Earnings Presentation Slide 6, titled "Deposits," which touted Comerica's "[s]trategic management of deposits and businesses utilizing excess liquidity." Slide 6 also explained the distribution of Comerica's quarter-over-quarter deposit decrease: "***$2.5B interest-bearing***" versus "***$1.1B noninterest-bearing***." In response to an analyst question about Comerica's deposit mix, Defendant Herzog said "This was a little bit of a surprise to us, too, ***for the mix to actually improve towards the higher noninterest-bearing***."

122. On October 28, 2022, Comerica filed with the SEC its Form 10-Q for the period ending September 30, 2022 (the "Q3 2022 10-Q"), signed by Ortiz and SOX certified by Defendants Farmer and Herzog. The Q3 2022 10-Q states, "***Noninterest income increased $10 million to $278 million for the three months***

***ended September 30, 2022.*** It added, while discussing the Commercial Bank business segment, that "Average deposits decreased $111 million" which was "partially ***offset by an increase in noninterest-bearing deposits***" for the nine months ended September 30, 2022 as compared to the same period in 2021.

123. On November 1, 2022, Comerica published on its website the Comerica Incorporated Investor Presentation (the "11/1/2022 Investor Presentation"), which stated, "***3Q22 Results Record revenue…***Key Performance Drivers 3Q22 compared to 2Q22…***Deposits reflect prudent management…Continued strong fee generation***." It added, "***Beneficial Deposit Mix; 57% noninterest-bearing – Commercial Noninterest-bearing 46%***." It added "***Noninterest Income Continued strong fee generation***."

124. On December 2, 2022, Comerica filed with the SEC a Form 8-K (the "12/2/2022 Form 8-K"), signed by Hays, reiterating an announcement that Defendant Farmer, Defendant Herzog and Sefzik would be presenting on behalf of Comerica at the Goldman Sachs 2022 US Financial Services Conference on December 6, 2022. Comerica also filed as Exhibit 99.1 to the 12/2/2022 Form 8-K presentation slides entitled, "Goldman Sachs 2022 US Financial Services Conference" dated December 6, 2022 (the "12/6/2022 Goldman Sachs Presentation"), which stated, "***4Q22 Deposit Update Strategically managing relationship deposits***" It added, "***Noninterest Income Investing in comprehensive***

***solutions for customers to drive fee income; 12% growth in 2021***." It added, "***3Q22 Results Record revenue…***Key Performance Drivers 3Q22 compared to 2Q22…***Deposits reflect prudent management…Continued strong fee generation***." It added, "***Beneficial Deposit Mix; 57% noninterest-bearing – Commercial Noninterest-bearing 46%***." It added "***Noninterest Income Continued strong fee generation***."

125. On January 19, 2023, Comerica held an earnings call (the "1/19/2023 Earnings Call") on which Defendant Farmer and Defendant Herzog participated. In conjunction therewith, Defendants published presentation slides entitled "Comerica Incorporated Fourth Quarter 2022 Financial Review" (the "1/19/2023 Earnings Presentation Slides"), which Comerica filed as Exhibit 99.2 to a Form 8-K the same day (the "1/19/2023 Form 8-K") signed by Hays. In them, Defendants made materially false and misleading misstatements and omissions. In prepared remarks, Defendant Farmer said "Average deposits declined 2.6 billion. ***However, balance has stabilized at quarter-end and we began to see some positive trends.***" In prepared remarks concerning deposits, Defendant Herzog said "***Our overall mix remained favorable with 56% of average non-interest bearing deposits,***" while referencing the 1/19/2023 Earnings Presentation Slide 7, titled "Deposits," which touted Comerica's "[s]trategic management of deposits & businesses utilizing excess liquidity." Defendant Herzog went on to say "***Non-interest income on Slide***

***11 was robust at $278 million.***" Defendant Herzog further said, with respect to Comerica's deposit mix forecast for 2023, "we expect to be closer to our historical 50/50 deposit mix ***still very favorable***." The 1/19/2023 Earnings Presentation Slide 11, titled "Noninterest Income," touted Comerica's "***[c]ontinued robust fee generation***," and its "***stable***" noninterest income due in part to a $1 million increase in card fees. The 1/19/2023 Earnings Presentation Slide 14, titled "Management Outlook," showed Comerica's 2023 outlook including an estimated +5% increase in noninterest income driven by "higher risk management income (PA), ***card*** & fiduciary."

126. On February 7, 2023, Comerica published on its website the Comerica Incorporated Investor Presentation (the "2/7/2023 Investor Presentation"), which stated, "***FY22 Results Record revenue…***Key Performance Drivers Year over Year…***Deposits reflect customers utilizing excess cash (following $13B, or 19%, FY21 growth) & strategic pricing initiatives***…***Noninterest income reflects growth in several products, more than offset by noncustomer-related categories***." It added "***Noninterest Income Continued robust fee generation…Remained Stable (+$1MM Card)***."

127. On February 14, 2023, Comerica filed with the SEC its Form 10-K for the fiscal year ended December 31, 2022 (the "2022 10-K"), signed by Defendant Farmer and SOX certified by Defendants Farmer and Herzog. The 2022 10-K states,

under the heading "Full-Year 2022 compared to Full-Year 2021," there was "***an increase in average noninterest bearing-deposits of $577 million, or 1 percent.***"

128. On February 16, 2023, Comerica participated in the 2023 KBW Financial Services Conference (the "2/16/2023 KBW Conference"). In connection with the announcement of its participation in the 2/16/2023 KBW Conference, Comerica re-published on its website the 2/7/2023 Investor Presentation which contained the same false and/or misleading misstatements and omissions as described *supra*.

129. On March 6, 2023, Comerica filed with the SEC a Form 8-K (the "3/6/2023 Form 8-K"), signed by Hays, reiterating an announcement that Defendant Herzog would be presenting on behalf of Comerica at the 2023 RBC Capital Markets Financial Institutions Conference on March 7, 2023. Comerica also filed as Exhibit 99.1 to the 3/6/2023 Form 8-K presentation slides entitled, "RBC Capital Markets Financial Institutions Conference" dated March 7, 2023 (the "3/7/2023 RBC Presentation"), which included a graphic that showed "***Noninterest Income representing 30% of FY22 Revenue***." It added, "***FY22 Results Record revenue…***Key Performance Drivers Year over Year…***Deposits reflect customers utilizing excess cash (following $13B, or 19%, FY21 growth) & strategic pricing initiatives***…***Noninterest income reflects growth in several products, more than offset by noncustomer-related categories***." It added, ***4Q22 Results Record***

***revenue***…Key Performance Drivers 4Q22 compared to 3Q22…***Deposits declined due to…prudent pricing management***…***Noninterest income remained strong***.” It added, “***Strategic management of deposits***.” It added, “***Large, Relationship-oriented Deposit Base Majority noninterest-bearing***…***48% Noninterest-bearing***.” It added, “***Beneficial Deposit Mix; 56% noninterest-bearing – Commercial Noninterest-bearing 45%***.” It added “***Noninterest Income Continued robust fee generation…Remained Stable (+$1MM Card)***.”

130. On April 20, 2023, Comerica issued a press release in which Defendant Farmer was quoted (the “4/20/2023 Press Release”), which was filed with the SEC as an exhibit to a Form 8-K signed by Hays (the “4/20/2023 8-K”). The 4/20/2023 Press Release states, under the heading “First Quarter 2023 Compared to Fourth Quarter 2022 Overview,” “***Noninterest income increased $4 million to $282 million***.” Additionally, Defendant Farmer is quoted in the press release stating, “I feel our strong deposit franchise is now more attractive as ***we retained our favorable noninterest-bearing orientation diversified across multiple businesses and geographies while improving risk characteristics***.”

131. On April 20, 2023, Comerica also held an earnings call (the “4/20/2023 Earnings Call”) on which Defendant Farmer and Defendant Herzog participated. In conjunction therewith, Defendants published presentation slides entitled “Comerica Incorporated First Quarter 2023 Financial Review” (the “4/20/2023 Earnings

Presentation Slides"), which Comerica filed as Exhibit 99.2 the 4/20/2023 Form 8-K. In them, Defendants made materially false and misleading misstatements and omissions. In prepared remarks, Defendant Farmer said "Despite the recent industry disruption, ***we affirm the strength of our core deposit base*** by successfully retaining our relationships. ***While we saw some deposit pressure, it was predominantly localized and very manageable***." Defendant Farmer said further "***We believe our strong deposit franchise is now even more attractive and stable with a lower percentage of uninsured excess deposits and less concentration with price-sensitive customers***." Farmer also said, "Broad-based loan growth and ***robust noninterest income exceeded expectations***, and credit quality remained excellent," while referencing the 4/20/2023 Earnings Presentation Slide 18, titled "Fundamental Strengths," which touted Comerica's "proven business model" and described Comerica's "***[s]trong [Q1 2023]; loans & fee income [which] exceeded expectations***," and its "***[f]ocus on complementary non-interest income***." In prepared remarks, Defendant Herzog said "It is important to note how elevated deposit levels have been since 2020. With that context, ***our current position is much stronger than prior to the pandemic as we have higher overall deposits, a better loan-to-deposit ratio, and a lower percentage of uninsured deposits***," while referencing the 4/20/2023 Earnings Presentation Slide 8, titled "Attractive Deposit Profile," which Herzog said "***highlights the strength of our core deposit franchise.***"

Defendant Herzog also said, "***We feel our market and business diversification, favorable deposit mix***, commercial orientation, and connectivity into our customers' operations ***combined to create greater relative stability in our deposit base.***" Herzog further said "Ultimately, ***our deposit base has always been and continues to be a differentiating strength, and we expect even more stability with a more favorable level of uninsured and a high percentage of operating deposits.***" Herzog also said "***We expect strong noninterest income performance to drive 6% to 7% growth over 2022***. ***Customer-related income is projected to increase, particularly in card due to our payment strategy*** and fiduciary income, which benefits from rates and investments in wealth management." Herzog continued "***With robust overall noninterest income performance in the first quarter exceeding seasonally high fourth quarter results,*** we feel very good about our momentum." In response to an analyst question about the mix of deposits, Defendant Herzog said "***we still expect to have really one of the strongest ratios of noninterest-bearing deposits to total deposits among all our peers, if not well above our closest peers. So, we still feel really good about noninterest-bearing.***"

132. On April 28, 2023, Comerica filed with the SEC its Form 10-Q for the period ending March 31, 2023 (the "Q1 2023 10-Q"), signed by Ortiz and SOX certified by Defendants Farmer and Herzog. The Q1 2023 10-Q states, "***Noninterest income increased $4 million to $282 million for the three months ended March***

***31, 2023***" as compared to the three months ended December 31, 2022. It also states, "***Noninterest income increased $38 million***" for the three months ended March 31, 2023 as compared to the same period in 2022. While discussing the Commercial Bank business segment it states, "***Noninterest income increased $21 million***" for the three months ended March 31, 2023 as compared to the same period in 2022.

133. On May 1, 2023, Comerica published on its website the Comerica Incorporated Investor Presentation (the "5/1/2023 Investor Presentation"), which stated, ***1Q23 Results…fee income***…Key Performance Drivers 1Q23 compared to 4Q22…Deposits declined…***Noninterest income increase***." It added, "***Attractive Deposit Profile Further enhanced our strong deposit franchise…Retained favorable mix of 53% noninterest-bearing***," and "***Commercial Noninterest-bearing 42%***." It added "***Noninterest Income Robust fee generation exceeded seasonally strong 4th quarter 2022…Increased $4MM***."

134. The Business Operations Fraud misrepresentations and omissions, as set forth in the preceding paragraphs in this §V.C.1., were materially false and misleading, because as more fully described in the "Undisclosed, Material, Negative Facts" section *supra*, the "Defendants' Knowledge Or Reckless Disregard" section *infra*, and the CW statements set forth in those sections, and the "Truth Begins To Emerge" section and the *American Banker* article from May 2023 discussed *infra*, throughout the Class Period, Comerica operated the Direct Express

program in violation of the express terms of the FAA and applicable legal standards, including Regulation E. Contrary to the FAA's requirement that work by Comerica and its Contractors / Processors i2c and Conduent on the Direct Express program had to be done within the U.S., i2c handled chargeback and fraud claims work, and otherwise accessed cardholder information, through its offices and employees in Lahore, Pakistan. Contrary to the FAA and applicable laws and regulations, including in particular Regulation E, Comerica and its Contractors / Processors Conduent and i2C did not promptly or properly handle fraud complaints, chargebacks, and account credits.

**2. *Reported Results Fraud***

135. Comerica made a series of filings and public statements reporting its financial metrics relevant to the Direct Express program, including its card fees, interest income, noninterest income, and deposits for the company as a whole as well as its Business Bank segment, without disclosing that they were being generated through, artificially inflated by, and subject to improper practices and undisclosed risks – as pled below. These misstatements violated, *inter alia*, Regulation S-K, Item 303, 17 C.F.R. §§229.303(b)(2)(ii), (c)(1). The "Reported Results Fraud" included the following misstatements and omissions.

136. Comerica announced its Q1 2020 financial results in a series of filings made on April 21-30, 2020, including the following:

(a) On April 21, 2020, Comerica issued a press release in which Defendant Farmer was quoted (the "4/21/2020 Press Release"), which was filed with the SEC as an exhibit to the 4/21/2020 8-K, announcing its financial results and operating metrics for Q1 2020. In it, Comerica reported a net loss for Q1 2020 of $65 million, based partly on net interest income of $513 million, including $380 million from its Business Bank business segment, and "stable" noninterest income of $237 million (compared to Q1 2019), with $59 million attributed to card fees, including $127 million from its Business Bank business segment. The 4/21/2020 Press Release also reported metrics such as "relatively stable" average total deposits of $56.8 billion, which reflected a year-over-year increase of $2.8 billion (an increase of 5%), and "stable" $57.366 billion period-end deposits, which reflected a year-over-year increase of $3.3 billion, all attributable to "higher relationship-based deposits." The $56.8 billion total deposits figure included $26.761 billion in noninterest-bearing deposits and $30.007 billion in interest-bearing deposits. The Business Bank segment accounted for $30.230 billion of the $56.8 billion in total deposits. In light of these stable deposit numbers, Comerica's $93 million year-over-year decrease in net interest income was attributed instead to "the impact of short-term rates on loans." The 4/21/2020 Press Release quoted Defendant Farmer as saying "Our first quarter results reflect a large increase in our credit reserves and, to a much lesser degree, the net impact of the decline in interest rates."

(b) On April 29, 2020, Comerica filed with the Q1 2020 10-Q, signed by Ortiz and SOX certified by Defendants Farmer and Herzog. Like the 4/21/2020 Press Release and the 4/21/2020 Form 8-K, the Q1 2020 10-Q reported a net loss for Q1 2020 of $65 million, based partly on net interest income of $513 million, including $380 million from its Business Bank business segment, and "stable" noninterest income of $237 million (compared to Q1 2019), with $59 million attributed to card fees, including $127 million from its Business Bank business segment. The Q1 2020 10-Q stated Comerica's $127 million in noninterest income for the Business Bank was attributable in part to $49 million in card fees for the quarter, down $4 million from Q1 2019. The Q1 2020 10-Q explained, "Net interest income for each segment reflects the interest income generated by earning assets less interest expense on interest-bearing liabilities plus the net impact from associated internal funds transfer pricing (FTP). The FTP methodology allocates credits to each business segment for deposits and other funds provided as well as charges for loans and other assets being funded." It added that "net interest income for each segment primarily reflects the volume and associated FTP impacts of loan and deposit levels." In that context, the Q1 2020 10-Q reported metrics such as $56.768 billion of average total deposits, which reflected a year-over-year increase of $2.8 billion (an increase of 5%), and $57.366 billion period-end deposits, which reflected a year-over-year increase of $3.3 billion, all attributable to "an increase in relationship-

based interest-bearing deposits." The $56.768 billion total deposits figure included $26.761 billion in noninterest-bearing deposits and $30.007 billion in interest-bearing deposits. The Business Bank segment accounted for $30.230 billion of the $56.768 billion in total deposits.

137. Comerica announced its Q2 2020 financial results in a series of filings made on July 21-31, 2020, including the following:

(a) On July 21, 2020, Comerica issued a press release in which Defendant Farmer was quoted (the "7/21/2020 Press Release"), which was filed with the SEC as an exhibit to a Form 8-K signed by Buchanan (the "7/21/2020 8-K"), announcing its financial results and operating metrics for Q2 2020. In it, Comerica reported a net income for Q2 2020 of $113 million, based partly on net interest income of $471 million, including $402 million from its Commercial Bank business segment, and noninterest income of $247 million, with $68 million attributed to card fees, including $144 million from its Commercial Bank business segment. The 7/21/2020 Press Release also reported metrics such as average total deposits of $64.282 billion, which reflected a year-over-year increase of $9.3 billion (an increase of 17%). The $64.282 billion total deposits figure included $32.686 billion in noninterest-bearing deposits and $31.596 billion in interest-bearing deposits. The Commercial Bank segment accounted for $36,318 billion of the $64.282 billion in total deposits. In light of these deposit numbers, Comerica's $132 million year-over-year decrease in

net interest income was attributed instead to "the net impact of lower interest rates, partially offset by higher loan volumes" The 7/21/2020 Press Release quoted Defendant Farmer as saying "The highlight of the quarter was significant loan and deposit growth, which drove the average balances to record highs and partly the impact of lower interest rates on net interest income."

(b) On July 31, 2020, Comerica filed with the SEC its Form 10-Q for the period ending June 30, 2020 (the "Q2 2020 10-Q"), signed by Ortiz and SOX certified by Defendants Farmer and Herzog. Like the 7/21/2020 Press Release and 7/21/2020 Form 8-K, the Q2 2020 10-Q reported a net income for Q2 2020 of $113 million, based partly on net interest income of $471 million, including $402 million from its Commercial Bank business segment, and noninterest income of $247 million, with $68 million attributed to card fees, including $144 million from its Commercial Bank business segment. The Q2 2020 10-Q stated Comerica's $144 million in noninterest income for the Commercial Bank was attributable in part to $59 million in card fees for the quarter, up $5 million from Q2 2019. The Q2 2020 10-Q explained, "Net interest income for each segment reflects the interest income generated by earning assets less interest expense on interest-bearing liabilities plus the net impact from associated internal funds transfer pricing (FTP). The FTP methodology allocates credits to each business segment for deposits and other funds provided as well as charges for loans and other assets being funded." It added that

"net interest income for each segment primarily reflects the volume and associated FTP impacts of loan and deposit levels." In that context, the Q2 2020 10-Q reported metrics such as $64.282 billion of average total deposits, which reflected a year-over-year increase of $9.3 billion (an increase of 17%). The $64.282 billion total deposits figure included $32.686 billion in noninterest-bearing deposits and $31.596 billion in interest-bearing deposits. The Commercial Bank segment accounted for $36,318 billion of the $64.282 billion in total deposits.

138. Comerica announced its Q3 2020 financial results in a series of filings made on October 20-30, 2020, including the following:

(a) On October 20, 2020, Comerica issued a press release in which Defendant Farmer was quoted (the "10/20/2020 Press Release"), which was filed with the SEC as an exhibit to a Form 8-K signed by Buchanan (the "10/20/2020 8-K"), announcing its financial results and operating metrics for Q3 2020. In it, Comerica reported a net income for Q3 2020 of $211 million, based partly on net interest income of $458 million, including $413 million from its Commercial Bank business segment, and noninterest income of $252 million, with $71 million attributed to card fees, including $135 million from its Commercial Bank business segment. The 10/20/2020 Press Release also reported metrics such as average total deposits of $68.763 billion, which reflected a year-over-year increase of $13.0 billion (an increase of 23%). The $68.763 billion total deposits figure included

$35.934 billion in noninterest-bearing deposits and $32.829 billion in interest-bearing deposits. The Commercial Bank segment accounted for $39.535 billion of the $68.763 billion in total deposits. In light of these deposit numbers, Comerica's $128 million year-over-year decrease in net interest income was attributed instead to "the impact of lower short-term rates" The 10/20/2020 Press Release quoted Defendant Farmer as saying "Our third quarter earnings of $211 million . . . reflected the resiliency of our relationship-focused business model;" "Our customers are acting prudently by conserving cash and adjusting their operations, which resulted in a reduction in loans and continued deposit growth;" and "card fees remained robust and other fee income categories began to recover."

(b) On October 30, 2020, Comerica filed with the SEC its Form 10-Q for the period ending September 30, 2020 (the "Q3 2020 10-Q"), signed by Ortiz and SOX certified by Defendants Farmer and Herzog. Like the 10/20/2020 Press Release and 10/20/2020 Form 8-K, the Q3 2020 10-Q reported a net income for Q3 2020 of $211 million, based partly on net interest income of $458 million, including $413 million from its Commercial Bank business segment, and noninterest income of $252 million, with $71 million attributed to card fees, including $135 million from its Commercial Bank business segment. The Q3 2020 10-Q stated Comerica's $135 million in noninterest income for the Commercial Bank was attributable in part to $60 million in card fees for the quarter, up $5 million from Q3 2019. The Q3 2020

10-Q explained, "Net interest income for each segment reflects the interest income generated by earning assets less interest expense on interest-bearing liabilities plus the net impact from associated internal funds transfer pricing (FTP). The FTP methodology allocates credits to each business segment for deposits and other funds provided as well as charges for loans and other assets being funded." It added that "net interest income for each segment primarily reflects the volume and associated FTP impacts of loan and deposit levels." In that context, the Q3 2020 10-Q reported metrics such as $68.763 billion of average total deposits, which reflected a year-over-year increase of $13.0 billion (an increase of 23%). The $68.763 billion total deposits figure included $35.934 billion in noninterest-bearing deposits and $32.829 billion in interest-bearing deposits. The Commercial Bank segment accounted for $39.535 billion of the $68.763 billion in total deposits.

139. Comerica announced its Q4 2020 quarterly and full year 2020 results in a series of filings made on January 19, 2021 and February 9, 2021, including the following:

(a) On January 19, 2021, Comerica issued a press release in which Defendant Farmer was quoted (the "1/19/2021 Press Release"), which was filed with the SEC as an exhibit to a Form 8-K signed by Buchanan (the "1/19/2021 8-K"), announcing its financial results and operating metrics for Q4 2020 and the full year 2020. In it, Comerica reported a net income for Q4 2020 of $215 million and a net

income of $474 million for the full year, based partly on net interest income of $469 million for the quarter and $1.911 billion for the year, including $413 million in Q4 2020 from its Commercial Bank business segment, and noninterest income of $265 million, with $72 million attributed to card fees, including $149 million from its Commercial Bank business segment. The 1/19/2021 Press Release also reported metrics such as average total deposits of $70.243 billion, which reflected a year-over-year increase of $13.1 billion (an increase of 23%). The $70.243 billion total deposits figure included $36.758 billion in noninterest-bearing deposits and $33.485 billion in interest-bearing deposits. The Commercial Bank segment accounted for $40.256 billion of the $70.243 billion in total deposits. In light of these deposit numbers, Comerica's $428 million decrease in net interest income from 2019 to 2020 was attributed instead to "the impact of lower interest rates on loans" The 1/19/2021 Press Release quoted Defendant Farmer as saying, with respect to Comerica's full year performance, "Our 2020 results included solid loan performance and a record level of deposits, which helped offset the rapid decline in interest rates." And with respect to Comerica's Q4 2020 results, the 1/19/2021 Press Release quoted Farmer as saying "We generated earnings per share of $1.49, a 3 percent increase over the third quarter, driven by revenue growth and strong credit quality. Loan activity was muted, but deposits increased nearly $1.5 billion." The 1/19/2021 Press Release also quoted Farmer as saying "The compassion and tireless

efforts of our colleagues allowed Comerica to persevere and remain in a strong position as we move forward."

(b) On February 9, 2021, Comerica filed with the SEC its Form 10-K for the fiscal year ended December 31, 2020 (the "2020 10-K"), signed by Defendant Farmer and SOX certified by Defendants Farmer and Herzog. Like the 1/19/2021 Press Release and 1/19/2021 Form 8-K, the 2020 10-K reported a net income for Q4 2020 of $215 million and a net income of $474 million for the full year, based partly on net interest income of $469 million for the quarter and $1.911 billion for the year, including $1.608 billion in 2020 from its Commercial Bank business segment, and noninterest income of $265 million for the quarter and $1.001 billion for the year, including $555 million from its Commercial Bank business segment. The 2020 10-K stated Comerica's 2020 $555 million in noninterest income for the Commercial Bank and $1.001 billion in noninterest income for Comerica as a whole was attributable in part to $229 million in card fees for the Commercial Bank and $270 million in card fees for Comerica as a whole in 2020. The 2020 10-K attributed Comerica's "relatively stable" $1.001 billion noninterest income in part to increases in card fees. Card fees increased $13 million, or 5%, which the 2020 10-K attributed to "volume increases in the government card program from stimulus payments under the Coronavirus Aid, Relief, and Economic Security Act, as amended by the Consolidated Appropriations Act of 2021 (CARES Act), resulting in higher

interchange revenue, partially offset by a decrease in commercial and consumer card volumes due to the impact of social distancing restrictions." The 2020 10-K explained, "Card fees comprise interchange and other fee income earned on government card, commercial card, debit/automated teller machine card and merchant payment processing programs. Card fees are presented net of network costs, as performance obligations for card services are limited to transaction processing and settlement with the card network on behalf of the customers. Fees for these services are primarily based on interchange rates set by the network and transaction volume. The Corporation also provides ongoing card program support services, for which fees are based on contractually agreed-upon prices and customer demand for services." The 2020 10-K further explained, "Net interest income for each segment reflects the interest income generated by earning assets less interest expense on interest-bearing liabilities plus the net impact from associated internal funds transfer pricing (FTP). The FTP methodology allocates credits to each business segment for deposits and other funds provided as well as charges for loans and other assets being funded." It added that "net interest income for each segment primarily reflects the volume of loans and other earning assets at the spread over the matched cost of funds, as well as the volume of deposits at the associated FTP crediting rates." In that context, the 2020 10-K reported metrics such as $72.869 billion year-end deposits, which reflected a year-over-year increase of $15.6 billion

(an increase of 27%). The $72.869 billion total year-end deposits figure included $39.420 billion in noninterest-bearing deposits and $33.449 billion in interest-bearing deposits.

140. Comerica announced its Q1 2021 financial results in a series of filings made on April 20-28, 2021, including the following:

(a) On April 20, 2021, Comerica issued a press release in which Defendant Farmer was quoted (the "4/20/2021 Press Release"), which was filed with the SEC as an exhibit to a Form 8-K signed by Buchanan (the "4/20/2021 8-K"), announcing its financial results and operating metrics for Q1 2021. In it, Comerica reported a net income for Q1 2021 of $350 million, based partly on net interest income of $443 million, including $382 million from its Commercial Bank business segment, and noninterest income of $270 million, with $71 million attributed to card fees, including $159 million from its Commercial Bank business segment. The 4/20/2021 Press Release also reported metrics such as average total deposits of $71.392 billion, which reflected a year-over-year increase of $14.6 billion (an increase of 26%). The $71.392 billion total deposits figure included $37.361 billion in noninterest-bearing deposits and $34.031 billion in interest-bearing deposits. The Commercial Bank segment accounted for $41.102 billion of the $71.392 billion in total deposits. In light of these deposit numbers, Comerica's $70 million year-over-year decrease in net interest income was attributed instead to "the impact of lower short-term rates"

The 4/20/2021 Press Release quoted Defendant Farmer as saying "The year is off to a strong start," and "[d]eposits continue to set new records." The 4/20/2021 Press Release further quoted Defendant Farmer as saying "Noninterest income increased 2 percent over our strong fourth quarter results with continued robust fee-generating activity."

(b) On April 28, 2021, Comerica filed with the SEC its Form 10-Q for the period ending March 31, 2021 (the "Q1 2021 10-Q"), signed by Ortiz and SOX certified by Defendants Farmer and Herzog. Like the 4/20/2021 Press Release and 4/20/2021 Form 8-K, the Q1 2021 10-Q reported a net income for Q1 2021 of $350 million, based partly on net interest income of $443 million, including $382 million from its Commercial Bank business segment, and noninterest income of $270 million, with $71 million attributed to card fees, including $159 million from its Commercial Bank business segment. The Q1 2021 10-Q stated Comerica's $159 million in noninterest income for the Commercial Bank was attributable in part to $60 million in card fees for the quarter. The Q1 2021 10-Q explained, "Net interest income for each segment reflects the interest income generated by earning assets less interest expense on interest-bearing liabilities plus the net impact from associated internal funds transfer pricing (FTP). The FTP methodology allocates credits to each business segment for deposits and other funds provided as well as charges for loans and other assets being funded." It added that "net interest income for each segment

primarily reflects the volume of loans and other earning assets at the spread over the matched cost of funds, as well as the volume of deposits at the associated FTP crediting rates." In that context, the Q1 2021 10-Q reported metrics such as $71.392 billion of average total deposits, which reflected a year-over-year increase of $14.6 billion (an increase of 26%). The $71.392 billion total deposits figure included $37.361 billion in noninterest-bearing deposits and $34.031 billion in interest-bearing deposits. The Commercial Bank segment accounted for $41.102 billion of the $71.392 billion in total deposits.

141. Comerica announced its Q2 2021 financial results in a series of filings made on July 21-29, 2021, including the following:

(a) On July 21, 2021, Comerica issued a press release in which Defendant Farmer was quoted (the "7/21/2021 Press Release"), which was filed with the SEC as an exhibit to a Form 8-K signed by Buchanan (the "7/21/2021 8-K"), announcing its financial results and operating metrics for Q2 2021. In it, Comerica reported a net income for Q2 2021 of $328 million, based partly on net interest income of $465 million, including $402 million from its Commercial Bank business segment, and noninterest income of $284 million, with $84 million attributed to card fees, including $167 million from its Commercial Bank business segment. The 7/21/2021 Press Release also reported metrics such as average total deposits of $75.520 billion, which reflected a year-over-year increase of $11.2 billion (an increase of 17%). The

$75.520 billion total deposits figure included $40.340 billion in noninterest-bearing deposits and $35.180 billion in interest-bearing deposits. The Commercial Bank segment accounted for $43.682 billion of the $75.520 billion in total deposits. In light of these deposit numbers, Comerica's $6 million year-over-year decrease in net interest income was attributed instead to "lower loan volumes" The 7/21/2021 Press Release quoted Defendant Farmer as saying "Our second quarter results showed continuation of several positive trends . . . includ[ing] strong deposit growth, robust fee income and excellent credit quality. Revenue increased and we remained focused on expense control as we supported our revenue generating activities."

(b) On July 29, 2021, Comerica filed with the SEC its Form 10-Q for the period ending June 30, 2021 (the "Q2 2021 10-Q"), signed by Ortiz and SOX certified by Defendants Farmer and Herzog. Like the 7/21/2021 Press Release and 7/21/2021 Form 8-K, the Q2 2021 10-Q reported a net income for Q2 2021 of $328 million, based partly on net interest income of $465 million, including $402 million from its Commercial Bank business segment, and noninterest income of $284 million, with $84 million attributed to card fees, including $167 million from its Commercial Bank business segment. The Q2 2021 10-Q stated Comerica's $167 million in noninterest income for the Commercial Bank was attributable in part to $72 million in card fees for the quarter. The Q2 2021 10-Q explained, "Net interest income for each segment reflects the interest income generated by earning assets less

interest expense on interest-bearing liabilities plus the net impact from associated internal funds transfer pricing (FTP). The FTP methodology allocates credits to each business segment for deposits and other funds provided as well as charges for loans and other assets being funded." It added that "net interest income for each segment primarily reflects the volume of loans and other earning assets at the spread over the matched cost of funds, as well as the volume of deposits at the associated FTP crediting rates." In that context, the Q2 2021 10-Q reported metrics such as $75.520 billion of average total deposits, which reflected a year-over-year increase of $11.2 billion (an increase of 17%). The $75.520 billion total deposits figure included $40.340 billion in noninterest-bearing deposits and $35.180 billion in interest-bearing deposits. The Commercial Bank segment accounted for $43.682 billion of the $75.520 billion in total deposits.

142. Comerica announced its Q3 2021 financial results in a series of filings made on October 20-29, 2021, including the following:

(a) On October 20, 2021, Comerica issued a press release in which Defendant Farmer was quoted (the "10/20/2021 Press Release"), which was filed with the SEC as an exhibit to a Form 8-K signed by Buchanan (the "10/20/2021 8-K"), announcing its financial results and operating metrics for Q3 2021. In it, Comerica reported a net income for Q3 2021 of $262 million, based partly on net interest income of $475 million, including $407 million from its Commercial Bank

business segment, and noninterest income of $280 million, with $72 million attributed to card fees, including $169 million from its Commercial Bank business segment. The 10/20/2021 Press Release also reported metrics such as average total deposits of $79.115 billion, which reflected a year-over-year increase of $10.4 billion (an increase of 15%). The $79.115 billion total deposits figure included $41.984 billion in noninterest-bearing deposits and $37.131 billion in interest-bearing deposits. The Commercial Bank segment accounted for $46.632 billion of the $79.115 billion in total deposits. In light of these deposit numbers, Comerica's $17 million year-over-year increase in net interest income was attributed to "higher loan fees driven by PPP loan forgiveness as well as a decrease in deposit costs" The 10/20/2021 Press Release quoted Defendant Farmer as saying "We continued to drive strong deposit growth, robust fee income, and excellent credit quality. Revenue increased quarter over quarter and year over year, despite the low-rate environment."

(b) On October 29, 2021, Comerica filed with the SEC its Form 10-Q for the period ending September 30, 2021 (the "Q3 2021 10-Q"), signed by Ortiz and SOX certified by Defendants Farmer and Herzog. Like the 10/20/2021 Press Release and 10/20/2021 Form 8-K, the Q3 2021 10-Q reported a net income for Q3 2021 of $262 million, based partly on net interest income of $475 million, including $407 million from its Commercial Bank business segment, and noninterest income

of $280 million, with $72 million attributed to card fees, including $169 million from its Commercial Bank business segment. The Q3 2021 10-Q stated Comerica's $169 million in noninterest income for the Commercial Bank was attributable in part to $60 million in card fees for the quarter. The Q3 2021 10-Q explained, "Net interest income for each segment reflects the interest income generated by earning assets less interest expense on interest-bearing liabilities plus the net impact from associated internal funds transfer pricing (FTP). The FTP methodology allocates credits to each business segment for deposits and other funds provided as well as charges for loans and other assets being funded." It added that "net interest income for each segment primarily reflects the volume of loans and other earning assets at the spread over the matched cost of funds, as well as the volume of deposits at the associated FTP crediting rates." In that context, the Q3 2021 10-Q reported metrics such as $79.115 billion of average total deposits, which reflected a year-over-year increase of $10.4 billion (an increase of 15%). The $79.115 billion total deposits figure included $41.984 billion in noninterest-bearing deposits and $37.131 billion in interest-bearing deposits. The Commercial Bank segment accounted for $46.632 billion of the $79.115 billion in total deposits.

143. Comerica announced its Q4 2021 quarterly and full year 2021 results in a series of filings made on January 19, 2022 and February 16, 2022, including the following:

(a) On January 19, 2022, Comerica issued a press release in which Defendant Farmer was quoted (the "1/19/2022 Press Release"), which was filed with the SEC as an exhibit to a Form 8-K signed by Buchanan (the "1/19/2022 8-K"), announcing its financial results and operating metrics for Q4 2021 and the full year 2021. In it, Comerica reported a net income for Q4 2021 of $228 million and a net income of $1.168 billion for the full year, based partly on net interest income of $461 million for the quarter and $1.844 billion for the year, including $386 million in Q4 2021 from its Commercial Bank business segment, and noninterest income of $289 million, with $71 million attributed to card fees, including $168 million from its Commercial Bank business segment. The 1/19/2022 Press Release also reported metrics such as average total deposits of $84.537 billion, which reflected a year-over-year increase of $14.3 billion (an increase of 20%). The $84.537 billion total deposits figure included $45.980 billion in noninterest-bearing deposits and $38.557 billion in interest-bearing deposits. The Commercial Bank segment accounted for $50.816 billion of the $84.537 billion in total deposits. In light of these deposit numbers, Comerica's $67 million decrease in net interest income from 2020 to 2021 was attributed instead to "net impact of lower rates" The 1/19/2022 Press Release quoted Defendant Farmer as saying, with respect to Comerica's full year performance, "Our 2021 financial results were strong as we generated record earnings per share," and "[a]verage deposits grew 19 percent, which supported solid

loan performance in a number of businesses and provided significant excess liquidity to fund future growth. Revenue increased to $3.0 billion. While net interest income was challenged by the ultra-low-rate environment, noninterest income growth was broad-based, increasing 12 percent to an all-time high." And with respect to Comerica's Q4 2021 results, the 1/19/2022 Press Release quoted Farmer as saying "excluding a nearly $1 billion decrease in PPP loans, average loans grew more than $600 million and we continued to drive very strong deposit growth. Robust fee income, exceptional credit quality and continued active capital management were also positive contributors to our performance."

(b) On February 16, 2022, Comerica filed with the SEC its Form 10-K for the fiscal year ended December 31, 2021 (the "2021 10-K"), signed by Defendant Farmer and SOX certified by Defendants Farmer and Herzog. Like the 1/19/2022 Press Release and 1/19/2022 Form 8-K, the 2021 10-K reported a net income for Q4 2021 of $228 million and a net income of $1.168 billion for the full year, based partly on net interest income of $461 million for the quarter and $1.844 billion for the year, including $1.577 billion for the full year 2021 from its Commercial Bank business segment, and noninterest income for Q4 2021 of $289 million and $1.123 billion for the full year, including $663 million from its Commercial Bank business segment. The 2021 10-K stated Comerica's full year $663 million in noninterest income for the Commercial Bank and $1.123 billion for Comerica as a whole was attributable

in part to $250 million in card fees for the Commercial Bank and $298 million in card fees for Comerica as a whole. The 2021 10-K attributed Comerica's $122 million increase in noninterest income to increases in derivative income, card fees, commercial lending fees, fiduciary income and service charges on deposit accounts. Card fees increased $28 million, or 10%, which the 2021 10-K attributed to "volume increases in both merchant payment processing services and government cards mostly related to additional stimulus payments resulting in higher interchange revenue. Additionally, both commercial and consumer card volumes increased as social distancing restrictions were relaxed." The 2021 10-K explained, "Card fees comprise interchange and other fee income earned on government card, commercial card, debit/automated teller machine card and merchant payment processing programs. Card fees are presented net of network costs, as performance obligations for card services are limited to transaction processing and settlement with the card network on behalf of the customers. Fees for these services are primarily based on interchange rates set by the network and transaction volume. The Corporation also provides ongoing card program support services, for which fees are based on contractually agreed-upon prices and customer demand for services." The 2021 10-K further explained, "Net interest income for each segment reflects the interest income generated by earning assets less interest expense on interest-bearing liabilities plus the net impact from associated internal funds transfer pricing (FTP)

funding credits and charges. The FTP methodology allocates credits to each business segment for deposits and other funds provided as well as charges for loans and other assets being funded." It added that "net interest income for each segment primarily reflects the volume of loans and other earning assets at the spread over the matched cost of funds, as well as the volume of deposits at the associated FTP crediting rates." In that context, the 2021 10-K reported metrics such as $82.339 billion year-end deposits, which reflected a year-over-year increase of $9.5 billion (an increase of 13%). The $82.339 billion total year-end deposits figure included $45.800 billion in noninterest-bearing deposits and $36.539 billion in interest-bearing deposits.

144. Comerica announced its Q1 2022 financial results in a series of filings made on April 20-27, 2022, including the following:

(a) On April 20, 2022, Comerica issued a press release in which Defendant Farmer was quoted (the "4/20/2022 Press Release"), which was filed with the SEC as an exhibit to a Form 8-K signed by Buchanan (the "4/20/2022 8-K"), announcing its financial results and operating metrics for Q1 2022. In it, Comerica reported a net income for Q1 2022 of $189 million, based partly on net interest income of $456 million, including $356 million from its Commercial Bank business segment, and noninterest income of $244 million, with $69 million attributed to card fees, including $132 million from its Commercial Bank business segment. The 4/20/2022

Press Release also reported metrics such as average total deposits of $79.103 billion, which reflected a year-over-year increase of $7.7 billion (an increase of 11%). The $79.103 billion total deposits figure included $43.419 billion in noninterest-bearing deposits and $35.684 billion in interest-bearing deposits. The Commercial Bank segment accounted for $46.040 billion of the $79.103 billion in total deposits. In light of these deposit numbers, Comerica's $13 million year-over-year increase in net interest income was attributed to "higher volume of earning assets as well as the residual value adjustment in the lease portfolio during first quarter 2021." The 4/20/2022 Press Release quoted Defendant Farmer as saying "Our first quarter results demonstrate our ability to drive broad-based loan growth while maintaining favorable credit metrics and controlling expenses," and "[d]eposits were impacted by seasonality and customers using balances to fund business activity." The 4/20/2022 Press Release also quoted Defendant Farmer as saying "Noninterest income declined from record levels due to seasonality and normalization of warrant-related activity. We expect fee income to be more robust as we move through the year."

(b) On April 27, 2022, Comerica filed with the SEC its Form 10-Q for the period ending March 31, 2022 (the "Q1 2022 10-Q"), signed by Ortiz and SOX certified by Defendants Farmer and Herzog. Like the 4/20/2022 Press Release and 4/20/2022 Form 8-K, the Q1 2022 10-Q reported a net income for Q1 2022 of $189

million, based partly on net interest income of $456 million, including $356 million from its Commercial Bank business segment, and noninterest income of $244 million, with $69 million attributed to card fees, including $132 million from its Commercial Bank business segment. The Q1 2022 10-Q stated Comerica's $132 million in noninterest income for the Commercial Bank was attributable in part to $58 million in card fees for the quarter. The Q1 2022 10-Q explained, "Net interest income for each segment reflects the interest income generated by earning assets less interest expense on interest-bearing liabilities plus the net impact from associated internal funds transfer pricing (FTP). The FTP methodology allocates credits to each business segment for deposits and other funds provided as well as charges for loans and other assets being funded." It added that "net interest income for each segment primarily reflects the volume of loans and other earning assets at the spread over the matched cost of funds, as well as the volume of deposits at the associated FTP crediting rates." In that context, the Q1 2022 10-Q reported metrics such as $79.103 billion of average total deposits, which reflected a year-over-year increase of $7.7 billion (an increase of 11%). The $79.103 billion total deposits figure included $43.419 billion in noninterest-bearing deposits and $35.684 billion in interest-bearing deposits. The Commercial Bank segment accounted for $46.040 billion of the $79.103 billion in total deposits.

145. Comerica announced its Q2 2022 financial results in a series of filings made on July 20-28, 2022, including the following:

(a) On July 20, 2022, Comerica issued a press release in which Defendant Farmer was quoted (the "7/20/2022 Press Release"), which was filed with the SEC as an exhibit to a Form 8-K signed by Hays (the "7/20/2022 8-K"), announcing its financial results and operating metrics for Q2 2022. In it, Comerica reported a net income for Q2 2022 of $261 million, based partly on net interest income of $561 million, including $399 million from its Commercial Bank business segment, and noninterest income of $268 million, with $69 million attributed to card fees, including $160 million from its Commercial Bank business segment. The 7/20/2022 Press Release also reported metrics such as average total deposits of $77.589 billion, which reflected a year-over-year increase of $2.1 billion (an increase of 3%). The $77.589 billion total deposits figure included $42.918 billion in noninterest-bearing deposits and $34.671 billion in interest-bearing deposits. The Commercial Bank segment accounted for $43.744 billion of the $77.589 billion in total deposits. In light of these deposit numbers, Comerica's $96 million year-over-year increase in net interest income was attributed to "higher short-term rates and volume of earning assets, partially offset by the impact of PPP loans." The 7/20/2022 Press Release quoted Defendant Farmer as saying "loan growth in the second quarter was one of the highest in our history, with increases in nearly every business line."

(b) On July 28, 2022, Comerica filed with the SEC its Form 10-Q for the period ending June 30, 2022 (the "Q2 2022 10-Q"), signed by Ortiz and SOX certified by Defendants Farmer and Herzog. Like the 7/20/2022 Press Release and 7/20/2022 Form 8-K, the Q2 2022 10-Q reported a net income for Q2 2022 of $261 million, based partly on net interest income of $561 million, including $399 million from its Commercial Bank business segment, and noninterest income of $268 million, with $69 million attributed to card fees, including $160 million from its Commercial Bank business segment. The Q2 2022 10-Q stated Comerica's $160 million in noninterest income for the Commercial Bank was attributable in part to $57 million in card fees for the quarter. The Q2 2022 10-Q explained, "Net interest income for each segment reflects the interest income generated by earning assets less interest expense on interest-bearing liabilities plus the net impact from associated internal funds transfer pricing (FTP). The FTP methodology allocates credits to each business segment for deposits and other funds provided as well as charges for loans and other assets being funded." It added that "net interest income for each segment primarily reflects the volume of loans and other earning assets at the spread over the matched cost of funds, as well as the volume of deposits at the associated FTP crediting rates." In that context, the Q2 2022 10-Q reported metrics such as $77.589 billion of average total deposits, which reflected a year-over-year increase of $2.1 billion (an increase of 3%). The $77.589 billion total deposits figure included

$42.918 billion in noninterest-bearing deposits and $34.671 billion in interest-bearing deposits. The Commercial Bank segment accounted for $43.744 billion of the $77.589 billion in total deposits.

146. Comerica announced its Q3 2022 financial results in a series of filings made on October 19-28, 2022, including the following:

(a) On October 19, 2022, Comerica issued a press release in which Defendant Farmer was quoted (the "10/19/2022 Press Release"), which was filed with the SEC as an exhibit to a Form 8-K signed by Hays (the "10/19/2022 8-K"), announcing its financial results and operating metrics for Q3 2022. In it, Comerica reported a net income for Q3 2022 of $351 million, based partly on net interest income of $707 million, including $478 million from its Commercial Bank business segment, and noninterest income of $278 million, with $67 million attributed to card fees, including $169 million from its Commercial Bank business segment. The 10/19/2022 Press Release also reported metrics such as average total deposits of $73.976 billion, which reflected a year-over-year decrease of $5.1 billion (a decrease of 6%). The $73.976 billion total deposits figure included $41.820 billion in noninterest-bearing deposits and $32.156 billion in interest-bearing deposits. The Commercial Bank segment accounted for $41.471 billion of the $73.976 billion in total deposits. In light of these deposit numbers, Comerica's $232 million year-over-year increase in net interest income was attributed to "higher short-term rates and

volume of earning assets, partially offset by the net impact of PPP loans." The 10/19/2022 Press Release quoted Defendant Farmer as saying "Our third quarter results were very strong." The 10/19/2022 Press Release also quoted Defendant Farmer as saying "Deposit levels have trended downward as customers use funds in their businesses and we strategically manage our deposit costs. Our overall results reflect not only the benefit of rising interest rates, but also strategic investments to drive organic growth. We are better positioned to achieve sustainable success in any economic environment."

(b) On October 28, 2022, Comerica filed with the SEC its Form 10-Q for the period ending September 30, 2022 (the "Q3 2022 10-Q"), signed by Ortiz and SOX certified by Defendants Farmer and Herzog. Like the 10/19/2022 Press Release and 10/19/2022 Form 8-K, the Q3 2022 10-Q reported a net income for Q3 2022 of $351 million, based partly on net interest income of $707 million, including $478 million from its Commercial Bank business segment, and noninterest income of $278 million, with $67 million attributed to card fees, including $169 million from its Commercial Bank business segment. The Q3 2022 10-Q stated Comerica's $169 million in noninterest income for the Commercial Bank was attributable in part to $56 million in card fees for the quarter. The Q3 2022 10-Q explained, "Net interest income for each segment reflects the interest income generated by earning assets less interest expense on interest-bearing liabilities plus the net impact from associated

internal funds transfer pricing (FTP). The FTP methodology allocates credits to each business segment for deposits and other funds provided as well as charges for loans and other assets being funded." It added that "net interest income for each segment primarily reflects the volume of loans and other earning assets at the spread over the matched cost of funds, as well as the volume of deposits at the associated FTP crediting rates." In that context, the Q3 2022 10-Q reported metrics such as $73.976 billion of average total deposits, which reflected a year-over-year decrease of $5.1 billion (a decrease of 6%). The $73.976 billion total deposits figure included $41.820 billion in noninterest-bearing deposits and $32.156 billion in interest-bearing deposits. The Commercial Bank segment accounted for $41.471 billion of the $73.976 billion in total deposits.

147. Comerica announced its Q4 2022 quarterly and full year 2022 results in a series of filings made on January 19, 2023 and February 14, 2023, including the following:

(a) On January 19, 2023, Comerica issued a press release in which Defendant Farmer was quoted (the "1/19/2023 Press Release"), which was filed with the SEC as an exhibit to a Form 8-K signed by Hays (the "1/19/2023 8-K"), announcing its financial results and operating metrics for Q4 2022 and the full year 2022. In it, Comerica reported a net income for Q4 2022 of $350 million and a net income of $1.151 billion for the full year, based partly on net interest income of $742

million for the quarter and $2.466 billion for the year, including $521 million in Q4 2022 from its Commercial Bank business segment, and noninterest income of $278 million, with $68 million attributed to card fees, including $146 million from its Commercial Bank business segment. The 1/19/2023 Press Release also reported metrics such as average total deposits of $71.355 billion, which reflected a year-over-year decrease of $13.2 billion (a decrease of 16%). The $71.355 billion total deposits figure included $39.955 billion in noninterest-bearing deposits and $31.400 billion in interest-bearing deposits. The Commercial Bank segment accounted for $39.173 billion of the $71.355 billion in total deposits. In light of these deposit numbers, Comerica's $622 million increase in net interest income from 2021 to 2022 was attributed in part to "[h]igher short-term rates and growth in loans and securities balances." The 1/19/2023 Press Release also noted that "[n]et interest margin increased 81 basis points to 3.02%, driven by higher rates and a decrease in lower-yielding deposits held with the Federal Reserve Bank." The 1/19/2023 Press Release quoted Defendant Farmer as saying, with respect to Comerica's full year performance, "We generated 8% growth in average loans, excluding PPP loan activity (3% growth with PPP), our highest rate of organic growth in well over a decade, as we expanded relationships and won new customers. . . . In summary, a successful performance resulting in our ROE increasing to 18.6% and ROA to 1.3%." And with respect to Comerica's Q4 2022 results, the 1/19/2023 Press

Release quoted Farmer as saying "[w]e ended the year strong with fourth quarter net income of $350 million," and "[a]verage deposits decreased; however, we began to see positive trends resulting from pricing actions."

(b) On February 14, 2023, Comerica filed with the SEC its Form 10-K for the fiscal year ended December 31, 2022 (the "2022 10-K"), signed by Defendant Farmer and SOX certified by Defendants Farmer and Herzog. Like the 1/19/2023 Press Release and 1/19/2023 Form 8-K, the 2022 10-K reported a net income of $1.151 billion for the full year, based partly on net interest income of $2.466 billion for the year, including $1.753 billion for the full year 2022 from its Commercial Bank business segment, and noninterest income for the year of $1.068 billion including $607 million from its Commercial Bank business segment. The 2022 10-K stated Comerica's full year $607 million in noninterest income for the Commercial Bank and $1.068 billion in noninterest income for Comerica as a whole was attributable in part to $227 million in card fees for the Commercial Bank and $273 million in card fees for Comerica as a whole in 2022. The 2022 10-K attributed Comerica's $55 million decrease in noninterest income to decreases in other noninterest income and card fees, partially offset by increases in derivative income, brokerage fees and commercial lending fees. Card fees decreased $25 million, or 8%, which the 2022 10-K attributed to "a decline in government cards due to elevated activity from stimulus payments during 2021. Commercial card and

merchant services increased from higher sales and payment processing volumes, respectively, while ATM surcharge income decreased." The 2022 10-K explained, "Net interest income is the difference between interest earned on assets and interest paid on liabilities. Gains and losses related to risk management interest rate swaps that convert fixed rate debt to a floating rate and qualify as fair value hedges are included in interest expense on medium- and long-term debt." The 2022 10-K also explained "Card fees comprise interchange and other fee income earned on government card, commercial card, debit/automated teller machine card and merchant payment processing programs. Card fees are presented net of network costs, as performance obligations for card services are limited to transaction processing and settlement with the card network on behalf of the customers. Fees for these services are primarily based on interchange rates set by the network and transaction volume. The Corporation also provides ongoing card program support services, for which fees are based on contractually agreed-upon prices and customer demand for services." The 2022 10-K further explained, "Net interest income for each segment reflects the interest income generated by earning assets less interest expense on interest-bearing liabilities plus the net impact from associated internal funds transfer pricing (FTP) funding credits and charges. The FTP methodology allocates credits to each business segment for deposits and other funds provided as well as charges for loans and other assets being funded." It added that "net interest

income for each segment primarily reflects the volume of loans and other earning assets at the spread over the matched cost of funds, as well as the volume of deposits at the associated FTP crediting rates." In that context, the 2022 10-K reported metrics such as $71.397 billion year-end deposits, which reflected a year-over-year decrease of $10.9 billion (a decrease of 13%). The $71.397 billion total year-end deposits figure included $39.945 billion in noninterest-bearing deposits and $31.452 billion in interest-bearing deposits.

148. Comerica announced its Q1 2023 financial results in a series of filings made on April 20-28, 2023, including the following:

(a) On April 20, 2023, Comerica issued a press release in which Defendant Farmer was quoted (the "4/20/2023 Press Release"), which was filed with the SEC as an exhibit to a Form 8-K signed by Hays (the "4/20/2023 8-K"), announcing its financial results and operating metrics for Q1 2023. In it, Comerica reported a net income for Q1 2023 of $324 million, based partly on net interest income of $708 million, including $531 million from its Commercial Bank business segment, and noninterest income of $282 million, with $69 million attributed to card fees, including $153 million from its Commercial Bank business segment. The 4/20/2023 Press Release also reported metrics such as average total deposits of $67.833 billion, which reflected a year-over-year decrease of $11.3 billion (a decrease of 14%). The $67.833 billion total deposits figure included $36.251 billion in noninterest-bearing

deposits and $31.582 billion in interest-bearing deposits. The Commercial Bank segment accounted for $36.396 billion of the $67.833 billion in total deposits. In light of these deposit numbers, Comerica's $34 million quarter-over-quarter decrease in net interest income was attributed to "the net benefit from higher short-term rates and loan growth was more than offset by an increase in borrowings and the impact of two fewer days in the quarter." The 4/20/2023 Press Release quoted Defendant Farmer as saying "I feel our strong deposit franchise is now more attractive as we retained our favorable noninterest-bearing orientation diversified across multiple businesses and geographies while improving risk characteristics, thereby creating an even more consistent funding profile. In fact, relative to pre-pandemic, we have a higher level of deposits, a better loan to deposit ratio and a lower percentage of uninsured deposits. Our business model was tested, and we emerged in a better position for long-term success."

(b) On April 28, 2023, Comerica filed with the SEC its Form 10-Q for the period ending March 31, 2023 (the "Q1 2023 10-Q"), signed by Ortiz and SOX certified by Defendants Farmer and Herzog. Like the 4/20/2023 Press Release and 4/20/2023 Form 8-K, the Q1 2023 10-Q reported a net income for Q1 2023 of $324 million, based partly on net interest income of $708 million, including $531 million from its Commercial Bank business segment, and noninterest income of $282 million, with $69 million attributed to card fees, including $153 million from its

Commercial Bank business segment. The Q1 2023 10-Q stated Comerica's $153 million in noninterest income for the Commercial Bank was attributable in part to $58 million in card fees for the quarter. The Q1 2023 10-Q explained, "Net interest income for each segment reflects the interest income generated by earning assets less interest expense on interest-bearing liabilities plus the net impact from associated internal funds transfer pricing (FTP) funding credits and charges. The FTP methodology allocates credits to each business segment for deposits and other funds provided as well as charges for loans and other assets being funded." It added that "net interest income for each segment primarily reflects the volume of loans and other earning assets at the spread over the matched cost of funds, as well as the volume of deposits at the associated FTP crediting rates." In that context, the Q1 2023 10-Q reported metrics such as $67.833 billion of average total deposits, which reflected a year-over-year decrease of $11.3 billion (a decrease of 14%). The $67.833 billion total deposits figure included $36.251 billion in noninterest-bearing deposits and $31.582 billion in interest-bearing deposits. The Commercial Bank segment accounted for $36.396 billion of the $67.833 billion in total deposits.

149. The foregoing statements in this §V.C.3. were materially false and misleading because they reported financial and operating metrics and results revenues, earnings, card fees, and deposits for Comerica without disclosing that these results were generated through improper practices, unreported operational

setbacks, and undisclosed negative trends, including those detailed by the CW accounts set forth herein in the "Undisclosed, Material, Negative Facts" section *supra* and the "Defendants' Knowledge Or Reckless Disregard" section *infra*. Those sections, along with the "Truth Begins To Emerge" section *infra*, illustrate, *inter alia*, that Comerica was fulfilling its financial agent role overseeing the lucrative Direct Express program in violation of the express terms of the governing U.S. government contract, the FAA, and applicable legal standards, including Regulation E. By processing fraud claims and accessing cardholder data outside the United States in Lahore, Pakistan, Comerica's Contractor/Processor i2c clearly violated the FAA. By wrongly denying and delaying payments to defrauded cardholders whose claims were improperly rejected, Comerica and its Contractors/Processors Conduent and i2c violated both the FAA and applicable legal standards including Regulation E. As such, these misstatements and omissions violated, *inter alia*, Regulation S-K, Item 303, 17 C.F.R. §229.303(a)(3)(i)-(ii) and (b)(2).

### 3. *Internal Controls Fraud*

150. During the Class Period, Defendants also made a series of public statements and filings regarding Comerica's internal controls that were materially false and misleading. Specifically, Defendants Farmer and Herzog signed and SOX

certified quarterly and annual reports by Defendant Comerica, and in doing so, made materially false and misleading statements and omissions.

151. Comerica's 2019 10-K, filed with the SEC on February 11, 2020, was signed and SOX certified by Defendants Farmer and Herzog and stated that the financial information contained in the 2019 10-K was accurate and disclosed any material changes to Comerica's internal control over financial reporting. Specifically, Defendants Farmer and Herzog certified:

> I, [Curtis C. Farmer and James J. Herzog], certify that:
>
> 1. I have reviewed this annual report on Form 10-K for the year ended December 31, 2019 of Comerica Incorporated (the "Registrant");
>
> 2. ***Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;***
>
> 3. ***Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Registrant as of, and for, the periods presented in this report;***
>
> 4. The Registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15(d)-15(f) for the registrant and have:
>
> (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to

the Registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the Registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and;

(d) Disclosed in this report any change in the Registrant's internal control over financial reporting that occurred during the Registrant's most recent fiscal quarter (the Registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the Registrant's internal control over financial reporting; and

5. ***The Registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Registrant's auditors and the audit committee of the Registrant's board of directors (or persons performing the equivalent function):***

(a) ***All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Registrant's ability to record, process, summarize and report financial information; and***

(b) ***Any fraud, whether or not material, that involves management or other employees who have a significant role in the Registrant's internal control over financial reporting.***

152. Defendants Farmer and Herzog signed identical SOX certifications as those accompanying Comerica's 2019 10-K alleged above, certifying that the financial information contained in Comerica's 2020 10-K, filed with the SEC on February 9, 2021, its 2021 10-K, filed with the SEC on February 16, 2022, and its 2022 10-K, filed with the SEC on February 14, 2023, were accurate and disclosed any material changes to Comerica's internal control over financial reporting during those reporting periods

153. On April 29, 2020, Comerica filed the Q1 2020 10-Q, accompanied by SOX certifications signed by Defendants Farmer and Herzog certifying that the financial information contained in Comerica's Q1 2020 10-Q was accurate and disclosed any material changes to Comerica's internal control over financial reporting. Specifically, Defendants Farmer and Herzog certified:

> I, [Curtis C. Farmer and James J. Herzog], certify that:
>
> 1. I have reviewed this report on Form 10-Q for the quarterly period ended March 31, 2020 of Comerica Incorporated (the "Registrant");
>
> 2. ***Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;***
>
> 3. ***Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Registrant as of, and for, the periods presented in this report;***

4. The Registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15(d)-15(f) for the Registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the Registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and;

(d) Disclosed in this report any change in the Registrant's internal control over financial reporting that occurred during the Registrant's most recent fiscal quarter (the Registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the Registrant's internal control over financial reporting; and

5. ***The Registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):***

(a) ***All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Registrant's ability to record, process, summarize and report financial information; and***

(b) ***Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.***

154. Defendants Farmer and Herzog signed identical SOX certifications as those accompanying Comerica's Q1 2020 10-Q alleged above, certifying that the financial information contained in Comerica's Q2 2020 10-Q, filed with the SEC on July 31, 2020, its Q3 2020 10-Q, filed with the SEC on October 30, 2020, its Q1 2021 10-Q, filed with the SEC on April 28, 2021, its Q2 2021 10-Q, filed with the SEC on July 29, 2021, its Q3 2021 10-Q, filed with the SEC on October 29, 2021, its Q1 2022 10-Q, filed with the SEC on April 27, 2022, its Q2 2022 10-Q, filed with the SEC on July 28, 2022, its Q3 2022 10-Q, filed with the SEC on October 28, 2022, and its Q1 2023 10-Q, filed with the SEC on April 28, 2023 were accurate and disclosed any material changes to Comerica's internal control over financial reporting during those reporting periods.

155. The foregoing statements in this §V.C.3. were materially false and misleading because, *inter alia*: (a) the SEC filings in which they were made did, in fact, contain untrue statements of a material fact and omitted to state material facts necessary to make the statements made, in light of the circumstances under which

such statements were made, not misleading with respect to the period covered and (b) the fraud alleged herein involved management and other employees with a significant role in Comerica's internal controls over financial reporting, and yet, it was not disclosed to Comerica's auditors or to the audit committee of Comerica's Board of Directors. As more fully described in the "Undisclosed, Material, Negative Facts" section *supra*, the "Defendants' Knowledge Or Reckless Disregard" section *infra*, and the CW statements set forth in those sections, and the "Truth Begins To Emerge" section *infra*, the undisclosed fraud, and the associated material misstatements and omissions, arose from the blatant violation of Comerica's governing U.S. government contract, the FAA, and applicable legal standards, including Regulation E. By processing fraud claims and accessing cardholder data outside the United States in Lahore, Pakistan, Comerica's Contractor/Processor i2c clearly violated the FAA. By wrongly denying and delaying payments to defrauded cardholders whose claims were improperly rejected, Comerica and its Contractors/Processors Conduent and i2c violated both the FAA and applicable legal standards including Regulation E.

**D. The Truth Begins To Emerge**

156. Defendants' alleged fraud was revealed by the *American Banker* article entitled "Comerica in 'serious violation' of Treasury's Direct Express program," which was published after trading hours on May 29, 2023. Drawn from internal

Comerica documents and statements by Comerica executives, the article exposed ***rampant misconduct*** and ***serious violations of Comerica's FAA*** for the Direct Express program, arising principally from ***i2c's routing of the personally identifiable information of Direct Express cardholders through its Lahore, Pakistan offices and personnel***. Specifically:

(a) The *American Banker* article said that Comerica officials "privately acknowledged significant compliance failures" in their operation of the Direct Express program. Citing internal Comerica documents, it reported that "A Comerica executive said that the Dallas bank faced 'a serious contract violation' for allowing fraud disputes and data on Direct Express cardholders to be handled out of a vendor's office in Lahore, Pakistan."

(b) The *American Banker* article described the issue: "Personally identifiable information on veterans, Social Security and disability recipients were routinely shared and handled by i2c, Inc.…with an office in Lahore, Pakistan – in violation of the government contract, the Comerica executive said." It cited the NAA's provision stating that all services "shall be performed in the United States or its territories."

(c) The *American Banker* quoted from a 2020 email by Nora Arpin, Comerica's then-Senior VP and Director of Government Electronic Solutions:

> The internal documents include a 2020 email from a Comerica executive, who described ***sweeping violations of Regulation E***, which

> governs how a financial institution addresses errors reported by consumers including for theft or fraud. ***Nora Arpin…said the bank was in breach of its Treasury contract but that it was unable to get its third-party vendor to make changes***.
>
> "***Management for Reg E dispute processing is in Lahore which means that cardholder information is being shared with/sent to Lahore, which is a serious contract violation***," Arpin wrote.
>
> * * *
>
> Arpin…listed 13 bullet points describing the practices of i2c. Among the bank's "***serious concerns***," she wrote:
>
> - "***We hare having significant difficulty getting adequate fraud reporting.***"
> - "***We can't get the Call Center statistics we need***."
> - "***Reg E adjudication is an issue***."
> - "***Reporting in general is an issue – we aren't getting the reporting that the [Treasury's Bureau of] Fiscal Services requires.***"
>
> Arpin also wrote in the internal email that ***i2c's CEO Amir Wain "doesn't have plans to fix those issues.***"

(d) The article also cited sealed "court documents, combined with internal documents that *American Banker* received anonymously in the mail" as evidencing the nonpublic scope and duration of Comerica's Direct Express problems and its escalation to the highest levels of company leadership:

> ***Comerica executives were repeatedly warned about vendor oversight, potential breaches of the Treasury contract and deficiencies in the bank's compliance management system***, said sources familiar with the matter who asked to remain anonymous out of fear of retaliation. ***In-house lawyers escalated their concerns to the bank's senior leadership, including Susan Joseph, Comerica's head of compliance; Jay Oberg, senior executive vice president and chief risk officer; and***

> ***Peter L. Sefzik, senior executive vice president and chief banking officer***.

(e) Indeed, the *American Banker* reported that those company documents revealed that Comerica sought to convince regulators that Regulation E, which Comerica was bound to follow under the FAA, did not even apply or did not serve to protect Direct Express program participants:

> [W]ithin a month of Sen. Warren's [2018] inquiry [into the Direct Express program], a ***Comerica*** lawyer ***tried to convince a Texas bank examiner that Regulation E does not apply to the bank or to federal government beneficiaries***, the internal documents show.
>
> The Comerica lawyer was responding to a query from the Texas Department of Banking by ***claiming that the bank was not fully required to abide by the Electronic Fund Transfer Act, which is implemented by Regulation E.*** The regulation sets strict timelines for banks to resolve errors including investigating fraud and reimbursing harmed consumers with provisional credit when money is stolen.
>
> ***"Program customers only get 'Regulation E Lite,' benefits,"*** a ***Comerica executive in the bank's legal department wrote in 2018***…In the email, the Comerica lawyer wrote that "***…neither the Federal Electronic Funds Transfer nor its Regulation E applies to the Comerica Bank under the Program as a 'financial institution.'"***
>
> ***Comerica argued that the Treasury, not the bank, was considered to be the financial institution for Direct Express***, "***which is why we generally state that Program customers are only entitled to 'Regulation E lite' benefits***."
>
> By August 2019, Joseph, the head of compliance, had forwarded the email about 'Reg E Lite.," to another Comerica lawyer.

(f) According to the *American Banker*, the court documents helped quantify the scope of the ongoing Regulation E issues, revealing that in May 2019

alone, Comerica received 15,712 fraud disputes, according to Comerica's Director of National Bankcard Services, who "said in court documents that Comerica did not have any data to identify cardholders that reported fraud, and the bank didn't keep track of money refunded or denied for fraud." It cited an early 2019 supervisory letter from the Federal Reserve Bank of Dallas as identifying program deficiencies and consumer issues, including Comerica lacked any root cause analysis to identify systemic issues and that "Conduent's call centers were not trained in Regulation E and did not tell cardholders who reported fraud that they could receive provisional credit as part of the process of filing a dispute" and did not advise cardholders that they had 10 days to provide documents and a written statement or else they might not receive the credit.

(g) The *American Banker* article quoted Paul Lawrence, former Under Secretary of the Department of Veterans Affairs from 2018 to 2021, who:

> said he was in "***complete shock and disgust***" after being told of the information contained in the internal Comerica documents.
>
> ***"All of these government contracts basically say you have to be in the U.S. and the program has to be run by U.S. citizens," Lawrence***, a longtime government consultant, said in an interview. ***"This has all the makings for a really, really bad situation."***

(h) It also quoted David P. Weber, former FDIC Supervisory Counsel and Enforcement Chief and former SEC Inspector General for investigations, who likewise underscored the severity of the misconduct:

> Weber…said the bank would need to inform its regulator about the activities of third-party service providers.
>
> ***"It was a clear violation of the contract Comerica held with the Department of the Treasury to locate the vendor in a foreign country when part of the consideration for them being awarded this federal contract was to use American employees and vendors,"*** said Weber, who served as special counsel for enforcement for more than 10 years at the Office of the Comptroller of the Currency.
>
> ***"Separate and aside from contract fraud, it is inappropriate for a federally-insured depository institution to locate third-party service provider activities in a foreign nation without informing their regulator, and locating the operations in a country in which there are questions about rule of law, which would make supervisory and exam activities as well as protections of American consumers questionable*."**
>
> * * *
>
> Weber…said ***the bank's legal and compliance obligations far exceed Regulation E.*** He also ***called into question Comerica's third-party risk management and operational risk standards***. …
>
> "It's an operational risk issue if the third-party doesn't have the policies, procedures and controls to identify systemic issues."
>
> * * *
>
> "When evidence indicates that individual officers or directors have made decisions to allow misconduct and violations of the law to occur, it is well past time to not only hold the bank accountable but to hold the individual officers and directors and the entire board personally accountable."

157. On this news, the price of Comerica stock declined by $1.40 per share, or 3.59%, on high trading volume, to close at $37.59 on May 30, 2023. The next day, the price of Comerica stock declined another $1.49 per share, or 3.96%, on high trading volume, to close at $36.10 on May 31, 2023.

158. As a result of Defendants' wrongful acts and omissions, and the drop in the market value of Comerica's stock, Lead Plaintiff and other Class members have suffered significant losses and damages.

**E. Additional Facts Probative Of Scienter**

159. A strong inference of Defendants' scienter is evidenced through a holistic examination of the facts and circumstances.

***1. Defendants' Knowledge Or Reckless Disregard Of Red Flags***

160. The CW statements pled herein establish Defendants' knowledge or reckless disregard of facts rendering their public statements materially false or misleading. CW2 and CW3 made clear that Comerica used "schematics" and SOC 2 Type II reports to carefully track the flow of its data through vendors, which included Conduent and i2c, and had robust risk committee oversight known to the Direct Express program leader, Ms. Arpin. CW4, CW5, CW6, CW7, CW8, and CW9 made clear that i2c's Pakistan employees processed fraud complaints and accessed sensitive cardholder data in Lahore throughout the Class Period, despite creation and staffing of an Omaha call center that was closely watched by Comerica, whose personnel met weekly with i2c, and whose point person, Deborah Srour closely monitored i2c's unsuccessful attempts to end its reliance on Pakistan employees for Direct Express program work. CW6 and CW10 made clear that initial determinations by both i2c and Conduent rejecting fraud claims were wrong

the vast majority of times, and CW10 made clear that often, cardholder complaints were escalated through the AG's office or CFPB to Comerica, over to Conduent, with responses confirming the wrongful denials of fraud claims going back to Comerica, and back to the AG's office and CFPB.

161. All of these facts were corroborated by the *American Banker* article, which drew from internal company documents, including Ms. Arpin's email, sealed court filings by Comerica, and statements made by Comerica's officials.

162. Given the foregoing, Defendants knew that their public misrepresentations and omissions, as pled in herein, would mislead investors or were deliberately reckless as to the danger of misleading investors, which was known to them or was so obvious that they must have been aware of it.

### 2. *Motive And Opportunity To Commit The Fraud*

163. Defendants' scienter is further evidenced by the Individual Defendants' Class Period transactions in McDermott securities, suspicious in timing and amount, by which they reaped millions of dollars in ill-gotten gains during the fraud alleged herein. Such transactions included the following.

(a) Defendant Farmer entered the Class Period with balances of 109,713 Comerica shares, 29,965 options, 13,360 RSUs,[1] and 22,705 PSUs.[2] Defendant Farmer's transactions during the Class Period were as follows:

| Stock Transactions | | | | |
|---|---|---|---|---|
| **Transaction Date** | **Action** | **Shares** | **Price** | **Funds Spent / Gained[3]** |
| 1/24/2020 | Sell | (541) | $64.73 | $35,018 |
| 1/26/2020 | Sell | (498) | $64.73 | $32,235 |
| 1/27/2020 | Sell | (289) | $62.72 | $18,126 |
| 1/28/2020 | RSUs Converted to Shares | 12,865 | $0.00 | $0 |
| 2/25/2020 | Sell | (7,361) | $56.79 | $418,031 |
| 2/25/2020 | PSUs Converted to Shares | 18,705 | $0.00 | $0 |
| 4/28/2020 | Sell | (636) | $35.20 | $22,387 |
| 1/23/2021 | Sell | (728) | $62.16 | $45,252 |
| 1/24/2021 | Sell | (279) | $62.16 | $17,342 |
| 1/26/2021 | Sell | (493) | $60.12 | $29,639 |
| 1/26/2021 | RSUs Converted to Shares | 18,650 | $0.00 | $0 |

[1] As stated in Comerica's 2018 Long-Term Incentive Plan, RSUs "represent an unfunded, unsecured right for the Award Recipient to receive one (1) share of the Company's common stock[.]" Prior to the 2021 awards, "the shares vest 50% in year three, 25% in year four and 25% in year five for all awardees." Per Comerica's Proxy Statement and Notice of 2022 Annual Meeting of Shareholders, "Beginning with the 2021 awards, shares vest 50% in year two, 25% in year three and 25% in year four for all awardees."

[2] As stated in Comerica's Form 8-K dated February 25, 2020, Comerica's PSUs, also called SELTPP units, or senior executive long-term performance plan restricted stock units, are "eligible to vest based on Comerica's average return on common equity excluding certain non-performance items ("ROCE") over a three-year performance period, relative to a goal ROCE established toward the beginning of the performance period, with settlement occurring after the end of the performance period."

[3] All figures in these charts rounded up to the nearest dollar or whole number.

| | | | | |
|---|---|---|---|---|
| 2/23/2021 | Sell | (4,511) | $69.59 | $313,920 |
| 2/23/2021 | PSUs Converted to Shares | 11,463 | $0.00 | $0 |
| 1/22/2022 | Sell | (866) | $89.70 | $77,680 |
| 1/23/2022 | Sell | (364) | $89.70 | $32,650 |
| 1/24/2022 | Sell | (246) | $90.53 | $22,270 |
| 1/25/2022 | RSUs Converted to Shares | 13,610 | $0.00 | $0 |
| 4/23/2022 | Sell | (878) | $80.97 | $71,091 |
| 11/16/2022 | Bona fide gift [4] | (7,200) | $0.00 | $0 |
| 1/22/2023 | Sell | (433) | $69.13 | $29,933 |
| 1/23/2023 | Sell | (365) | $71.96 | $26,265 |
| 1/24/2023 | RSUs Converted to Shares | 21,080 | $0.00 | $0.00 |
| 1/26/2023 | Sell | (3,451) | $72.03 | $248,575 |
| 1/28/2023 | Sell | (2,380) | $72.57 | $172,716 |
| 2/28/2023 | Sell | (14,308) | $70.10 | $1,002,990 |
| 2/28/2023 | PSUs Converted to Shares | 36,360 | $0.00 | $0 |
| 4/23/2023 | Sell | (439) | $43.73 | $19,197 |
| **RSUs Converted to Shares** | | **66,205** | | |
| **PSUs Converted to Shares** | | **66,528** | | |
| **Bona fide gifts** | | **(7,200)** | | |
| **Sales** | | **(39,066)** | **Proceeds:** | **$2,635,326** |

| **Options Transactions** | | | | |
|---|---|---|---|---|
| **Transaction Date** | **Action** | **Shares** | **Price** | **Funds Spent/ Gained** |
| 1/28/2020 | Award of Options | 25,030 | $0.0000 | $0 |
| 1/26/2021 | Award of Options | 20,410[5] | $0.0000 | $0 |
| 1/25/2022 | Award of Options | 16,865 | $0.0000 | $0 |
| 1/24/2023 | Award of Options | 24,400 | $0.0000 | $0 |
| **Sub-Total Awards of Options** | | **86,705** | **Costs** | **$0** |

---

4 The correlating Form 4 denotes, "Reflects the gift of common stock to a charitable donor advised fund."

5 This figure appears in both the Proxy Statement and Notice of 2022 Annual Meeting of Shareholders and Defendant Farmer's SEC Form 4 dated January 26, 2021. Subsequent SEC Form 4s note a quantity of 20,140. Herein, the initially filed figure is used; the difference of 270 options is not materially relevant.

| Sub-Total Exercises of Options | 0 | Proceeds | $0 |
|---|---|---|---|

| RSU Transactions | | | | | |
|---|---|---|---|---|---|
| **Transaction Date** | **Action** | **Units** | **Vesting Date** | **Price** | **Funds Spent/ Gained** |
| 1/28/2020 | Award of RSUs | 12,865 | 1/28/2023 (50%), 1/28/2024 (25%), 1/28/2025 (25%) | $0.0000 | |
| 1/23/2021 | RSUs Converted to Shares | (1,968) | 1/23/2021 | $0.0000 | Converted into 1,968 Shares |
| 1/26/2021 | Award of RSUs | 18,650 | 1/26/2023 (50%), 1/26/2024 (25%), 1/26/2025 (25%) | $0.0000 | |
| 1/22/2022 | RSUs Converted to Shares | (2,340) | 1/22/2022 | $0.0000 | Converted into 2,340 Shares |
| 1/23/2022 | RSUs Converted to Shares | (984) | 1/23/2022 | $0.0000 | Converted into 984 Shares |
| 1/25/2022 | Award of RSUs | 13,610 | 1/25/2024 (50%), 1/25/2025 (25%), 1/25/2026 (25%) | $0.0000 | |
| 4/23/2022 | RSUs Converted to Shares | (2,373) | 4/23/2022 | $0.0000 | Converted into 2,373 Shares |
| 1/22/2023 | RSUs Converted to Shares | (1,170) | 1/22/2023 | $0.0000 | Converted into 1,170 Shares |
| 1/23/2023 | RSUs Converted to Shares | (984) | 1/23/2023 | $0.0000 | Converted into 984 Shares |
| 1/24/2023 | Award of RSUs | 21,080 | 1/24/2025 (50%), 1/24/2026 (25%), 1/24/2026 (25%) | $0.0000 | |
| 1/26/2023 | RSUs Converted to Shares | (9,325) | 1/26/2023 | $0.0000 | Converted into 9,325 Shares |

| | | | | | |
|---|---|---|---|---|---|
| 1/28/2023 | RSUs Converted to Shares | (6,433) | 1/28/2023 | $0.0000 | Converted into 6,433 Shares |
| 4/23/2023 | RSUs Converted to Shares | (1,186) | 4/23/2023 | $0.0000 | Converted into 11,86 Shares |
| **Sub-Total Awards of RSUs** | | **66,205** | | **Costs** | **$0** |
| **Sub-Total Conversions of RSUs** | | **(26,761)** | | **Proceeds** | **26,761 Shares** |

| | | | | | |
|---|---|---|---|---|---|
| **PSU Transactions[6]** | | | | | |
| **Transaction Date** | **Action** | **Units** | **Vesting Date** | **Price** | **Funds Spent/ Gained** |
| 1/28/2020 | Award of PSUs | 33,450 | 2/28/2023 | $0.0000 | $0 |
| 2/25/2020 | PSUs Converted to Shares | (12,470) | 2/25/2020 | $0.0000 | 18,705 shares gained |
| 2/23/2021 | PSUs Converted to Shares | (10,235) | 2/23/21 | $0.0000 | 11,463 shares gained |
| 2/28/2023 | PSUs Converted to Shares | (33,450) | 2/28/2023 | $0.0000 | 36,360 shares gained |
| **Sub-Total Awards of PSUs** | | **33,450** | | **Costs** | **$0** |
| **Sub-Total Conversions of PSUs** | | **(56,155)** | | **Proceeds** | **66,528 Shares** |

| | | | | |
|---|---|---|---|---|
| **Total** | **Shares Sold** | **(39,066)** | **Transaction Proceeds** | **$2,635,326** |
| | **Awards of Options** | **86,705** | **Transaction Proceeds** | **86,705 Options** |
| | **Award of RSUs** | **66,205** | **Transaction Costs** | **$0** |

6 Excludes PSU awards that did not vest due to the performance target not being met.

| | | | | |
|---|---|---|---|---|
| | **Conversion of RSUs** | **(26,761)** | **Transaction Proceeds** | **26,761 Shares** |
| | **Awards of PSUs** | **33,450** | **Transaction Costs** | **$0** |
| | **Conversion of PSUs** | **(56,155)** | **Transaction Proceeds** | **66,528 Shares** |
| | | **Net $ Gain to Defendant Farmer** | | **$2,635,326** |

(b) Defendant Herzog entered the 10(b) Class Period with balances of 7,421 Comerica shares, 3,641 options, 880 RSUs, and 4,540 PSUs, Defendant Herzog's transactions during the 10(b) Class Period were as follows:

| **Stock Transactions** | | | | |
|---|---|---|---|---|
| **Transaction Date** | **Action** | **Shares** | **Price** | **Funds Spent / Gained** |
| 1/24/2020 | Sell | (119) | $64.73 | $7,703 |
| 1/26/2020 | Sell | (119) | $64.73 | $7,703 |
| 1/27/2020 | Sell | (91) | $62.72 | $5,708 |
| 1/28/2020 | RSUs Converted to Shares | 1,285 | $0.00 | $0 |
| 2/25/2020 | PSUs Converted to Shares | 3,990 | $0.00 | $0 |
| 2/25/2020 | Sell | (1,571) | $56.79 | $89,217 |
| 2/25/2020 | RSUs Converted to Shares | 2,095 | $0.00 | $0 |
| 1/23/2021 | Sell | (134) | $62.16 | $8,329 |
| 1/24/2021 | Sell | (59) | $62.16 | $3,667 |
| 1/26/2021 | Sell | (119) | $60.12 | $7,154 |
| 1/26/2021 | RSUs Converted to Shares | 5,165 | $0.00 | $0 |
| 2/23/2021 | PSUs Converted to Shares | 2,105 | $0.00 | $0 |
| 2/23/2021 | Sell | (829) | $69.59 | $57,690 |
| 1/22/2022 | Sell | (163) | $89.70 | $14,621 |
| 1/23/2022 | Sell | (67) | $89.70 | $6,010 |
| 1/24/2022 | Sell | (60) | $90.53 | $5,432 |
| 1/25/2022 | RSUs Converted to Shares | 3,890 | $0.00 | $0 |
| 1/22/2023 | Sell | (82) | $69.13 | $5,669 |
| 1/23/2023 | Sell | (68) | $71.96 | $4,893 |
| 1/24/2023 | RSUs Converted to Shares | 5,480 | $0.00 | $0 |

| | | | | |
|---|---|---|---|---|
| 1/26/2023 | Sell | (956) | $72.03 | $68,861 |
| 1/28/2023 | Sell | (238) | $72.57 | $17,272 |
| 2/25/2023 | Sell | (388) | $70.41 | $27,319 |
| 2/28/2023 | PSUs Converted to Shares | 9,549 | $0.00 | $0 |
| 2/28/2023 | Sell | (3,759) | $70.10 | $263,506 |
| **RSUs Converted to Shares** | | **17,915** | | |
| **PSUs Converted to Shares** | | **15,644** | | |
| **Sell (Tax Withholdings)** | | **(8,822)** | **Proceeds:** | **$600,754** |

**Options Transactions**

| Transaction Date | Action | Shares | Price | Funds Spent/ Gained |
|---|---|---|---|---|
| 1/28/2020 | Award of Options | 2,495 | $0.0000 | 1/28/2020 |
| 2/25/2020 | Award of Options | 4,060 | $0.0000 | 2/25/2020 |
| 1/26/2021 | Award of Options | 5,655 | $0.0000 | 1/26/2021 |
| 1/25/2022 | Award of Options | 4,820 | $0.0000 | 1/25/2022 |
| 1/24/2023 | Award of Options | 6,345 | $0.0000 | 1/24/2023 |
| **Sub-Total Awards of Options** | | **23,375** | **Costs** | **$0** |
| **Sub-Total Conversions/Sales of Options** | | **0** | **Proceeds:** | **$0** |

**RSU Transactions**

| Transaction Date | Action | Units | Vesting Date | Price | Funds Spent/ Gained |
|---|---|---|---|---|---|
| 1/28/2020 | Award of RSUs | 1,285 | 1/28/2023 (50%), 1/28/2024 (25%), 1/28/2025 (25%) | $0.0000 | $0 |
| 2/25/2020 | Award of RSUs | 2,095 | 2/25/2023 (50%), 2/25/2024 (25%), 2/25/2025 (25%) | $0.0000 | $0 |
| 1/23/2021 | RSUs Converted to Shares | (363) | 1/23/2021 | $0.0000 | Converted to 363 Shares |
| 1/26/2021 | Award of RSUs | 5,165 | 1/26/2023 (50%), 1/26/2024 (25%), 1/26/2025 (25%) | $0.0000 | $0 |
| 1/22/2022 | RSUs Converted to Shares | (440) | 1/22/2022 | $0.0000 | Converted to 440 Shares |

| | | | | | |
|---|---|---|---|---|---|
| 1/23/2022 | RSUs Converted to Shares | (181) | 1/23/2022 | $0.0000 | Converted to 181 Shares |
| 1/25/2022 | Award of RSUs | 3,890 | 1/25/2024 (50%), 1/25/2025 (25%), 1/25/2026 (25%) | $0.0000 | $0 |
| 1/22/2023 | RSUs Converted to Shares | (220) | 1/22/2023 | $0.0000 | Converted to 220 Shares |
| 1/23/2023 | RSUs Converted to Shares | (181) | 1/23/2023 | $0.0000 | Converted to 181 Shares |
| 1/24/2023 | Award of RSUs | 5,480 | 1/24/2025 (50%), 1/24/2026 (25%), 1/24/2027 (25%) | $0.0000 | $0 |
| 1/26/2023 | RSUs Converted to Shares | (2,583) | 1/26/2023 | $0.0000 | Converted to 2,583 Shares |
| 1/28/2023 | RSUs Converted to Shares | (643) | 1/28/2023 | $0.0000 | Converted 643 Shares |
| **Sub-Total Awards of RSUs** | | **17,915** | | **Costs** | **$0** |
| **Sub-Total Conversions of RSUs** | | **(4,610)** | | **Proceeds** | **4,610 Shares** |

| **PSU Transactions[7]** | | | | | |
|---|---|---|---|---|---|
| **Transaction Date** | **Action** | **Units** | **Vesting Date** | **Price** | **Funds Spent/ Gained** |
| 2/25/2020 | PSUs Converted to Shares | (2,660) | 2/25/2020 | $0.0000 | 3,990 shares gained |
| 2/23/2021 | PSUs Converted to Shares | (1,880) | 2/23/2021 | $0.0000 | 2,105 shares gained |

[7] Excludes PSU awards that did not vest due to the performance target not being met.

| | | | | | |
|---|---|---|---|---|---|
| 1/28/2020 | Award of PSUs | 8,785 | 2/28/2023 | $0.0000 | $0 |
| 2/28/2023 | PSUs Converted to Shares [8] | (8,785) | 2/28/2023 | $0.0000 | 9,549 shares gained |
| **Sub-Total Awards of PSUs** | | **8,785** | | **Costs** | **$0** |
| **Sub-Total Conversions of PSUs** | | **(13,325)** | | **Proceeds:** | **15,644 Shares** |
| | | | | | |
| | | | | | |

| | | | | |
|---|---|---|---|---|
| **Total** | **Shares Sold** | **(8,822)** | **Transaction Proceeds** | **$600,754** |
| | **Award of Options** | **23,375** | **Transaction Proceeds** | **23,375 Options** |
| | **Award of RSUs** | **17,915** | **Transaction Costs** | **$0** |
| | **Conversion of RSUs** | **(4,610)** | **Transaction Proceeds** | **4,610 Shares** |
| | **Awards of PSUs** | **8,785** | **Transaction Costs** | $0 |
| | **Conversion of PSUs** | **(13,325)** | **Transaction Proceeds** | **15,644 Shares** |
| | | **Net $ Gain to Defendant Herzog** | | **$600,754** |

164. These transactions during the Class Period, while the fraud was raging and the true facts regarding Comerica's business and operations, in particular those regarding the Direct Express program, as alleged herein, remained hidden from investors, yielded the Individual Defendants a combined ***$9,984,700*** ($2,635,326

---

[8] In Defendant Herzog's SEC Form 4 dated February 28, 2023, the quantities noted in Footnote (1) do not equate to the quantities noted in Comerica's *Proxy Statement and Notice of 2023 Annual Meeting of Shareholders*. Herein, the quantities noted in the Proxy statement are used.

for Farmer, $600,754 for Herzog), along with 110,080 additional options (86,705 for Farmer, 23,375 for Herzog) and 113,543 additional shares (93,289 for Farmer, 20,254 for Herzog) acquired at no expense, in net ill-gotten gains from prices inflated by the fraud alleged herein. These transactions and proceeds constitute strong evidence of scienter.

165. These transactions were suspicious in amount, a fact that further supports the scienter inference. For example, Farmer's $2,635,326 in sale proceeds were over 2.5 times his 2020 base salary of $976,154, while Herzog's $600,754 in sale proceeds were larger than his 2020 base salary of $505,596. These transactions were also suspicious in timing vis-à-vis the alleged fraudulent misstatements and the alleged corrective disclosure, a fact that further supports the scienter inference.

### 3. *Comerica Raised Funds During The Fraud*

166. During the Class Period, Comerica raised funds while the price of its securities was inflated by the alleged fraud. In a Form 8-K filed with the SEC on May 26, 2020, Comerica announced that it had raised $394.5 million through issuance of 400,000 callable bonds on May 26, 2020. This offering, which took place during the fraud alleged herein, is evidence of Comerica's corporate scienter.

### 4. *The Fraud Implicated Core Operations*

167. The fraud alleged herein implicates the core operations of Comerica. As a high-profile U.S. government contract, the Direct Express program meant not

only billions of dollars of additional deposit funds for Comerica and hundreds of millions of dollars of direct payment and fee-based revenues, it also carried significant reputational impacts. Any violation of the contract and governing law, let alone one as egregious as set forth herein, put all the foregoing considerations at risk as well as jeopardized Comerica's ability to secure future U.S. government contract work of a similar fiduciary nature.

168. In light of these facts, it is inconceivable that the Individual Defendants and executive management did not know the facts and circumstances of the fraud as alleged herein. Moreover, such knowledge is imputable to Defendants, given the implication of core operations, the Defendants' roles and status within Comerica, and the facts regarding the funneling of information to them and their personal involvement in the key events and circumstances at issue, as alleged herein, including not only their own issuance of the alleged misstatements but also the facts evidenced by the CW statements.

#### 5. *The Individual Defendants Signed, Were Quoted In, Or SOX-Certified The Alleged Misstatements*

169. As the individuals who signed, were quoted in, or orally made the alleged false and misleading statements described herein, Defendants Farmer and Herzog were under an obligation to familiarize themselves with the subject matter of those public statements and to speak truthfully. As alleged herein, they violated such duties.

170. As the individuals who SOX certified SEC filings as described above, Defendants Farmer and Herzog were obligated to inquire and investigate, familiarize themselves with the subject matter of their SOX certifications, and reassure themselves that the certifications were accurate and that they were speaking truthfully in making them. As alleged herein, they violated such duties.

**6. *The Fraud Violated Comerica's Code Of Conduct***

171. Comerica's Code of Business Conduct and Ethics for Employees ("Employees Code of Conduct") and Comerica's Senior Financial Officer Code of Ethics ("Officers Code of Ethics), both published on its website throughout the Class Period, barred all the misconduct detailed by the CW statements and *American Banker* reporting, as set forth above.

172. Comerica's Employees Code of Conduct was described by Defendant Farmer in a message preceding it as "the most important document at Comerica" and the "foundation on which all our business practices at Comerica are constructed," and he makes clear that it was binding upon all employees, stating:

> In the final analysis, at Comerica ***each of us is personally accountable for reading and understanding the Code of Business Conduct and Ethics for Employees***, thinking about the principles on which it is constructed, and ***then incorporating those principles*** into our life."

173. Like the Direct Express program FAA, Comerica's Employees Code of Conduct also requires the safeguarding of sensitive information, stating in relevant part:

> We should deal fairly with customers, suppliers, competitors, and colleagues, and ***should not take unfair advantage of anyone through manipulation, concealment, abuse of confidential or privileged information, misrepresentation of material facts, or any other unfair-dealing practice.***

174. The Employees Code of Conduct mandates legal compliance by all employees, stating "We should conduct our business ***at all times in accordance with all material laws, rules and regulations*** that apply to our business and ***not engage in conduct that violates such laws, rules and regulations***." It added:

> ***We each have responsibilities*** to seek appropriate guidance regarding our actions when necessary and ***to report violations of laws, rules, and regulations that apply to our business***, as well as violations of this Code of Business Conduct and Ethics for Employees and other Comerica policies, to the extent that we know a violation of either has occurred.

175. Comerica's Employees Code of Conduct also prohibited taking advantage of non-public information, *e.g.*, when making securities trades, stating in relevant part, "To protect our shareholders and comply with the requirements of our regulators, ***we must hold "inside information" in confidence and not misuse it.***

176. Last, the Employees Code of Conduct imposed penalties for any violations, stating:

> ***Any violation of this Code of Business Conduct and Ethics for Employees, or any other Comerica policy, may constitute grounds for corrective action, up to and including immediate termination of employment or engagement,*** at Comerica's sole discretion.

177. In addition to the Employees Code of Conduct, the CEO, and Senior Financial Officers, defined as the CFO, CAO, and Treasurer, were also required to adhere to the Officers Code of Ethics, had to acknowledge in writing receipt and understanding of its terms and provisions, and were so deemed to have agreed to observe, perform and keep the terms and provisions.

178. The Officers Code of Ethics made clear that Defendants Farmer and Herzog were responsible for making accurate, full, and fair disclosures in SEC filings, stating:

> ***The Chief Executive Officer and Senior Financial Officers are responsible for full, fair, accurate, timely, and understandable disclosure in the periodic reports required to be filed by Comerica with the Securities and Exchange Commission including Forms 10-K, Forms 10-Q, Forms 8-K, and Proxy Statements.*** Accordingly, the Chief Executive Officer and each Senior Financial Officer shall promptly bring to the attention of the Disclosure Sign-Off Committee any material information of which he or she may become aware that affects the disclosures made by Comerica in its pubic filings and to otherwise assist the Disclosure Sign-Off Committee in fulfilling its responsibilities as specified in Comerica's Disclosure Controls and Procedures.

179. The Officers Code of Ethics also bound Defendants Farmer and Herzog to promptly disclose to multiple Board Committees any deficiencies in internal controls of financial reporting or fraud, stating:

> The Chief Executive Officer and Senior Financial Officers must act at all times in an honest and ethical manner. ***The Chief Executive Officer and each Senior Financial Officer shall promptly bring to the attention of the Disclosure Sign-Off Committee and the Audit Committee*** any information he or she may have concerning ***(a)***

> ***significant deficiencies in the design or operation of internal controls which could adversely affect Comerica's ability to record, process, summarize and report financial data*** or ***(b) any fraud***, whether or not material, ***that involves management or other employees who have a significant role in Comerica's financial reporting, disclosures or internal controls***.

180. Comerica's Employees Code of Conduct and Officers Code of Ethics, as detailed herein, barred the misconduct alleged herein. Defendants' violations of these express corporate policies further buttresses the inference of Defendants' scienter, whether based on their knowledge or of their recklessness.

### 7. *Insider Resignations and Employment Status Changes*

181. Another indicator of Defendants' scienter is the removal of key executives during or shortly after the Class Period. Such resignations and departures, which occurred during the alleged fraud and support the scienter inference, included the following:

(a) In a February 17, 2022 Form 8-K (the "2/17/2022 8-K") signed by Buchanan, while the fraud alleged herein was ongoing, Comerica announced that T. Kevin DeNicola, member of the Comerica Board of Directors since 2006, would not stand for re-election at the 2022 Annual Meeting of Shareholders. The only purported explanation given was that Mr. DeNicola's "decision was not due to any disagreement with Comerica on any matter." Here, rather than electing a new director—who may have uncovered the fraud—the Comerica Board of Directors determined to reduce the size of the Board to eleven directors.

(b) In a May 6, 2022 Form 8-K (the "5/6/2022 8-K") signed by Defendant Herzog—while the fraud alleged herein was ongoing and the *Carnley* litigation was active—Comerica announced that its heretofore signatory for SEC filings, Chief Legal Officer, John D. Buchanan, ceased serving in that role and in his role as Corporate Secretary of Comerica as of that date, and that he would be departing from Comerica in about one month. It claimed that "Mr. Buchanan's departure from Comerica is for personal reasons and not the result of any disagreement or dispute between Mr. Buchanan and Comerica, or the result of any disagreement on any matter related to Comerica's operations, policies or practices."

(c) In a subsequent Form 8-K dated May 12, 2022 (the "5/12/2022 8-K"), Comerica disclosed the terms of Mr. Buchanan's Separation Agreement, pursuant to which he was paid roughly $2.5 million in exchange for general releases and restrictive covenants including general non-disparagement, cooperation, and confidentiality provisions.

(d) In an August 8, 2023 Form 8-K (the "8/8/2023 8-K") signed by Hays, shortly after the fraud alleged herein was revealed, Comerica announced that its Chief Risk Officer, Jay K. Oberg, had announced a plan to retire at the end of 2024. It said that "[i]n preparation for his departure next year, the Company is conducting a search and evaluating candidates to fill the role of Chief Risk Officer." Mr.

Oberg's announced retirement came less than three months after he was named in the *American Banker* article revealing the fraud.

182. In sum, at the height of the alleged fraud, during a period of the Individual Defendants' securities transactions, and in the middle of the pre-existing litigation alleging problems with Comerica's pre-Class Period handling of the Direct Express program, Comerica's Chief Legal Officer departed Comerica and in exchange for general releases on restrictive covenants—and his silence—he was paid roughly $2.5 million. His departure was shortly after a significant insider and Board Member announced he would not seek reelection, and the Board shrunk in size rather than replace him. Comerica's chief risk officer, who was revealed to have known about fraud alleged by the *American Banker* article, also announced his retirement shortly after the fraud was revealed. All the foregoing facts support the inference of scienter, including Comerica's corporate scienter.

## VI. NO SAFE HARBOR

183. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Most, if not all, of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent any statements were labelled as forward-looking, they included statements of then-historical or then-present fact and there were no meaningful cautionary statements

identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Any purported cautionary language warned only of theoretical future risks at times when those risks had already ripened due to Comerica's then-ongoing misconduct. Moreover, the purported cautionary language failed to adjust over time, using the same theoretical tone even after concrete changes of circumstance. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Comerica who knew that those statements were false when made.

184. For all these same reasons, the bespeaks caution doctrine likewise does not apply to shield Defendants from liability.

## VII. THE CLAIMS ARE TIMELY

185. The claims set forth herein were timely filed.

186. The market was not arguably aware until after-market-close on May 29, 2023, at the earliest, that credible allegations existed to the effect that Comerica misrepresented and failed to disclose that its business practices during the Class Period were improper and illegal.

187. It was also not until after-market-close May 29, 2023 that Lead Plaintiff was first presented with any credible evidence that Defendants had made materially false and misleading statements to investors during the Class Period. In the absence of publicly available information prior to then suggesting that Comerica's pronouncements in its SEC filings and other public statements during the Class Period were materially false and/or misleading, Lead Plaintiff was not under any duty to inquire as to the truthfulness of Comerica's public statements. Therefore, Lead Plaintiff's duty in that regard arose no earlier than after-market-close May 29, 2023.

188. Prior to after-market-close May 29, 2023, Lead Plaintiff and Class members could not have been on any inquiry notice of possible claims under the Securities Exchange Act. Even assuming this early date for inquiry notice, Lead Plaintiff's Securities Exchange Act claims against Defendants were brought within two years. Therefore, Lead Plaintiff has complied with the requirements of 28 U.S.C. § 1658(b).

## VIII. LOSS CAUSATION / ECONOMIC LOSS

189. The market for Comerica shares was open, well-developed, and efficient at all relevant times. During the Class Period, as detailed herein, Defendants engaged in a course of conduct and a scheme to deceive the market that artificially inflated Comerica shares and operated as a fraud or deceit on Class

Period purchasers of Comerica shares by misrepresenting the material facts detailed herein. As detailed above, at the end of the Class Period, when Defendants' prior misrepresentations became known to the public, the price of Comerica shares fell precipitously, as the prior artificial inflation came out. As a result of their purchases of Comerica shares during the Class Period, Lead Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

190. During the Class Period, Defendants presented a misleading picture of Comerica's financial condition, revenues, growth, performance, and business prospects. Defendants' false and misleading statements had the intended effect and caused Comerica shares to trade at artificially inflated prices throughout the Class Period and until the truth was revealed to the market.

191. As detailed herein, the price of Comerica shares sharply dropped, on high volume, in response to the issuance of the corrective after-hours report on May 29, 2023. These stock drops, among others, removed inflation from the price of Comerica shares, causing real economic loss to investors who had purchased Comerica shares during the Class Period.

192. These declines were a direct and proximate result of the nature and extent of Defendants' fraud being revealed to investors and the market. The timing and magnitude of the price declines in Comerica shares negate any inference that the loss suffered by Lead Plaintiff and the other Class members was caused by

changed market conditions, macroeconomic factors or Comerica-specific facts unrelated to Defendants' fraudulent conduct.

193. The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and other Class members was a direct and proximate result of Defendants' fraudulent scheme to artificially inflate Comerica share price and the subsequent significant declines in the value of Comerica shares when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## IX. PRESUMPTION OF RELIANCE

194. At all times, the market for Comerica shares was an efficient market, supporting a presumption of reliance under the fraud-on-the-market doctrine, for the following reasons, among others:

(a) Comerica met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market, under the ticker symbol "CMA";

(b) Comerica had approximately 131.5 shares outstanding as of May 29, 2023, such that its stock was liquid. During the Class Period, numerous shares of Comerica stock were traded on a daily basis, with moderate to heavy volume, demonstrating an active and broad market for Comerica stock and permitting a strong presumption of an efficient market;

(c) As a regulated issuer, Comerica filed periodic public reports with the SEC;

(d) Comerica regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(e) Comerica was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period; and

(f) Unexpected material news about Comerica was rapidly reflected and incorporated into Comerica's stock price during the Class Period.

195. As a result of the foregoing, the market for Comerica stock promptly digested current information regarding Comerica from all publicly available sources and reflected such information in the prices of the stock. Under these circumstances, all purchasers of Comerica stock during the Class Period suffered similar injury through their purchase of Comerica stock at artificially inflated prices and a presumption of reliance applies.

196. Alternatively, Lead Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute*

*Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## X. LEAD PLAINTIFF'S CLASS ACTION ALLEGATIONS

197. Lead Plaintiff brings this federal securities action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of a class (the "Class") of all persons and entities, other than Defendants, their family members and their affiliates, who purchased or otherwise acquired the common stock of Comerica (NYSE:CMA) during the Class Period of January 7, 2020 through May 29, 2023, both dates inclusive, seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Exchange Act §§10(b) and 20(a) and Rule 10b-5 promulgated thereunder, against Defendants Comerica, Farmer, and Herzog.

198. Excluded from the Class are Defendants herein, the officers and directors of Comerica at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

199. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Comerica securities were actively traded on the NYSE. While the exact number of Class members is unknown to

Lead Plaintiff at this time and can be ascertained only through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Comerica or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

200. Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

201. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiff has no interests antagonistic to or in conflict with those of the Class.

202. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Comerica;

- whether the Individual Defendants caused Comerica to issue false and misleading financial statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;
- whether the prices of Comerica securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

203. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

204. As alleged herein, Lead Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine insomuch as Defendants made public misrepresentations or failed to disclose material facts during the Class Period; the misrepresentations and omissions were material and would tend to induce a reasonable investor to misjudge the value of Comerica's securities; and Lead Plaintiff and members of the Class purchased or otherwise acquired Comerica securities between the time the Defendants failed to disclose or

misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

## **COUNT I**

**(Against All Defendants for Violations of Section 10(b) and Rule 10b-5 Promulgated Thereunder)**

205. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

206. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

207. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Lead Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Comerica securities;

and (iii) cause Lead Plaintiff and other members of the Class to purchase or otherwise acquire Comerica securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

208. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Comerica securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Comerica's finances and business prospects.

209. Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein, including by virtue of their positions at Comerica, and intended thereby to deceive Lead Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for

the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

210. Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of Comerica securities.

211. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. Defendants' first-hand knowledge is alleged herein. Moreover, as the senior managers and/or directors of Comerica, the Individual Defendants had knowledge of the details of Comerica's operations, business, and internal affairs.

212. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Comerica. As officers and/or directors of a publicly held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Comerica's businesses, operations, financial condition, and prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Comerica securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Comerica's business and

financial condition which were concealed by Defendants, Lead Plaintiff and the other members of the Class purchased or otherwise acquired Comerica securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

213. During the Class Period, Comerica securities were traded on an active and efficient market. Lead Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued, or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Comerica securities at prices artificially inflated by Defendants' wrongful conduct. Had Lead Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Lead Plaintiff and the Class, the true value of Comerica securities was substantially lower than the prices paid by Lead Plaintiff and the other members of the Class. The market price of Comerica securities declined sharply upon public disclosure of the facts alleged herein to the injury of Lead Plaintiff and Class members.

214. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

215. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions, and sales of Comerica's securities during the Class Period, upon the disclosure that Comerica had been disseminating misrepresented financial statements to the investing public.

**COUNT II**

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

216. Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

217. During the Class Period, the Individual Defendants participated in the operation and management of Comerica, and conducted and participated, directly and indirectly, in the conduct of Comerica's business affairs. Because of their senior positions, they knew the adverse non-public information about Comerica's finances, operations, finances, and prospects.

218. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Comerica's business, operations, financial condition, results of

operations, and prospects and to correct promptly any public statements issued by Comerica which had become materially false or misleading.

219. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Comerica disseminated in the marketplace during the Class Period concerning Comerica's business, operations, financial condition, results of operations, and prospects. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Comerica to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Comerica within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Comerica securities.

220. Each of the Individual Defendants, therefore, acted as a controlling person of Comerica. By reason of their senior management positions and/or being directors of Comerica, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Comerica to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations and business of Comerica and

possessed the power to control the specific activities which comprise the primary violations about which Lead Plaintiff and the other members of the Class complain.

221. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Comerica.

## PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Lead Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Lead Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Lead Plaintiff hereby demands a trial by jury.

Dated: February 7, 2024

Respectfully submitted,

*/s/ Jennifer Pafiti*

**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

**POMERANTZ LLP**
Matthew L. Tuccillo (*pro hac vice*)
Jennifer Banner Sobers (*pro hac vice*)
Zachary Denver (*pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
mltuccillo@pomlaw.com
jbsobers@pomlaw.com
zdenver@pomlaw.com

*Counsel for Lead Plaintiff the Nova Scotia Health Employees' Pension Plan and Lead Counsel for the Class*