UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID RAMOS et al.,<br>Plaintiffs,<br>v.<br>COMERICA INCORPORATED et al.,<br>Defendants. | Case No. 2:23-cv-06843-SB-JPR<br><br>ORDER GRANTING DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT [DKT. NO. 49] |

On May 29, 2023, *American Banker* published a news story reporting "significant compliance failures" in a government program run by Comerica Bank, which is owned by Defendant Comerica Incorporated (Comerica). During the next two trading days, Comerica's stock price, which had already declined each of the three previous days, declined further before fully recovering in the following two days. In this putative class action, investors who bought Comerica's stock before May 29, 2023 allege that Comerica and its executives committed securities fraud by hiding compliance problems, such that Comerica's stock was inflated until the *American Banker* article was published. Defendants move to dismiss Plaintiffs' First Amended Complaint (FAC) for failure to state a claim. Dkt. No. 49. The Court held a hearing on April 12, 2024. Because Plaintiffs have not plausibly alleged that any misrepresentations or omissions by Defendants caused a loss to investors, the motion is granted. However, the Court will allow Plaintiffs a further opportunity to show why amendment would not be futile.

I.

In 2008, the U.S. Department of the Treasury, Bureau of the Fiscal Service (Fiscal Service) established the Direct Express program to allow elderly and disabled Americans to receive government benefits electronically using a prepaid

debit card. Dkt. No. 48 ¶ 32 (FAC). The government selected Comerica to serve as the program's financial agent. *Id.* Comerica entered into a financial agency agreement (FAA) with Fiscal Service, and the agreement has been repeatedly renewed, most recently in January 2020 to extend Comerica's role until January 2025. *Id.* Comerica receives direct payments from the government to run the program—allegedly $151 million in 2020—as well as fees from ATM withdrawals and other transactions. *Id.* ¶ 34.

The FAA requires Comerica and its contractors—Conduent and i2c, Inc.—to ensure that all services performed on the Direct Express program and all access to cardholder data occur within the United States and by U.S. citizens or lawful permanent residents. *Id.* ¶¶ 3, 47. Comerica and its contractors are also required to comply with Regulation E, which imposes consumer protections relating to fraud complaints, including the requirement that banks conduct a reasonable investigation within a defined timeframe and correct any errors within one business day of their discovery. *Id.* ¶ 51.

Relying largely on the reports of confidential witnesses and the contents of the *American Banker* article, the FAC alleges that most of the operations of i2c, Inc., one of Comerica's two main contractors on the Direct Express program, were based in Pakistan during the class period; that all the card transaction work performed by i2c was initially done there; and that employees in Pakistan were still involved in some of the work as late as March 2023. *Id.* ¶¶ 53, 57–58. The FAC also alleges noncompliance with Regulation E, asserting that some fraud claims were handled improperly at both i2c and Conduent, resulting in error rates of up to 90–95 percent at least among cases that had been flagged for review. *Id.* ¶¶ 58, 62. On May 29, 2023, *American Banker* published an article titled "Comerica in 'serious violation' of Treasury's Direct Express program," which reported on i2c's office in Pakistan and on "sweeping violations of Regulation E." *Id.* ¶ 156.[1]

---

[1] The Court grants Defendants' unopposed request for judicial notice of the full copy of the *American Banker* article at Dkt. No. 49-3. The article is also properly deemed incorporated by reference into the pleading because it is referenced extensively and central to Plaintiffs' claims. The Court also grants the unopposed requests of both parties to take judicial notice of the historical Comerica stock prices filed at Dkt. Nos. 49-4 and 57-2. *See Okla. Firefighters Pension & Ret. Sys. v. IXIA*, 50 F. Supp. 3d 1328, 1349 (C.D. Cal. 2014) ("Because [a public company's] historical stock prices can be readily ascertained and those prices are not subject to reasonable dispute, courts routinely take judicial notice of them.").

The FAC includes nearly 100 pages of statements made by Comerica between January 2020 and May 29, 2023, about its operations, reported results, and internal controls. *Id.* ¶¶ 65–132. Plaintiffs characterize all these statements as materially false and misleading—not because of what they said, but because they did not disclose that Comerica and its contractors were violating the FAA's requirements and Regulation E. *See id.* ¶¶ 134–35, 149, 155. Plaintiffs allege that because of these false statements, Comerica's stock prices traded at artificially high prices until the truth was revealed to the market by the *American Banker* article. *Id.* ¶¶ 190–91. On May 30, 2023, Comerica's stock price dropped by $1.40 per share, or 3.59%, from its previous closing price to close at $37.59. *Id.* ¶ 157. The following day, it declined a further $1.49 per share, or 3.96%, to close at $36.10. *Id.*[2]

Defendant Curtis Farmer is Comerica's president and chief executive officer. *Id.* ¶ 14. Defendant James Herzog is Comerica's chief financial officer and senior executive vice president. *Id.* ¶ 15. The FAC relies on Farmer and Herzog's sales of Comerica stock during the period from January 2020 to May 2023, along with other circumstantial evidence, to allege that they were aware of the inflated value of the stock prices due to Comerica's statements that failed to disclose its Direct Express compliance problems. *Id.* ¶¶ 159–82.

In August 2023, Plaintiff David Ramos, an individual shareholder in Comerica, filed this putative class action alleging securities violations. Dkt. No. 1. After Ramos published notice of the action, Plaintiff Nova Scotia Health Employees' Pension Plan (NSHEPP), an institutional investor, sought appointment as lead plaintiff. The Court granted NSHEPP's unopposed motion, Dkt. No. 36, and NSHEPP filed the FAC on February 7, 2024, Dkt. No. 48. The FAC alleges two causes of action on behalf of a class of persons who purchased Comerica stock between January 7, 2020 and May 29, 2023: (1) violations of § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 by Comerica, Farmer, and Herzog; and (2) violations of § 20(a) of the Exchange Act by Farmer and Herzog.

---

The remaining requests for judicial notice are denied as moot because they do not affect the Court's analysis.

[2] Although the FAC does not mention it, the stock more than recovered from these losses in the following two days, closing at $38.18 and $40.93, and it stayed above $40 per share for the next few months. Dkt. No. 49-4 at 4–6.

Dkt. No. 48. Defendants move to dismiss the case for failure to state a claim. Dkt. No. 49.[3]

II.

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has "facial plausibility" if the plaintiff pleads facts that "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In resolving a Rule 12(b)(6) motion, a court must accept all well-pleaded factual allegations as true, but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," and courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* (quoting *Twombly*, 550 U.S. at 555). Assuming the veracity of well-pleaded factual allegations, a court must "determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679. There is no plausibility "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Id.*

In addition to these pleading standards, a plaintiff asserting a private securities fraud action must meet the heightened pleading requirements imposed by Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 (PSLRA), which "present no small hurdle for the securities fraud plaintiff." *In re Verifone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012). Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). Similarly, the PSLRA requires that a securities plaintiff plead both falsity and scienter with particularity. 15 U.S.C. §§ 78u–4(b)(1)(B), (b)(2)(A).

---

[3] As Defendants point out in their reply brief, Plaintiffs' opposition slightly exceeded the Court's word limit. After meeting and conferring with Defendants to obtain their consent, Plaintiffs emailed the Court with a proposed amended opposition that removed a few citations to bring it within the word limit. Plaintiffs should have filed their amended opposition rather than emailing the Court. Regardless, the minor edits proposed by Plaintiffs are immaterial, and Defendants are not prejudiced by Plaintiffs' having exceeded the word limit by fewer than 100 words. The Court expects the parties to pay closer attention to its rules in the future, but it will consider the opposition filed at Dkt. No. 56.

III.

To state a claim under § 10(b) of the Exchange Act—and Rule 10b-5, which implements it—a plaintiff must allege (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 413 (9th Cir. 2020). It is undisputed that, for purposes of Defendants' motion, Plaintiffs' claim in Count 2 for control person liability under § 20(a) rises or falls with Plaintiffs' claim in Count 1 because § 20(a) requires a primary securities violation. *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009) ("Section 20(a) claims may be dismissed summarily . . . if a plaintiff fails to adequately plead a primary violation of section 10(b).").

Defendants raise serious arguments that the FAC does not satisfy the PSLRA's demanding standard for alleging either a materially false statement or Defendants' scienter. However, the Court need not address the adequacy of Plaintiffs' allegations on those elements because, as Defendants also argue, the FAC's failure to adequately allege loss causation is fatal to Plaintiffs' claims.

A private litigant alleging a claim under § 10(b) "shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). "The loss causation element of a § 10(b) claim is simply a variant of proximate cause, and the ultimate issue is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1197 (9th Cir. 2021) (cleaned up). Where, as here, the plaintiff's theory is that the defendant's stock prices were artificially inflated because of the defendant's concealment of adverse facts, a drop in the stock price after disclosure may suggest that the fraud had artificially propped up the stock price. *Id.* "The analysis is contextual, and where, for example, a 'modest' drop in the stock price coincides with the disclosure of certain news but then 'recover[s] very shortly after,' the allegation of loss causation may be insufficient." *Id.* (quoting *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064–65 (9th Cir. 2008)). Thus, to adequately allege loss causation on this theory, "the complaint must allege that the defendant's 'share price fell significantly after the truth became known.'" *Metzler*, 540 F.3d at 1062 (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005)).

In *Metzler*, the defendant's stock price dropped by 10 percent after a *Financial Times* article disclosed information that the plaintiff alleged had been fraudulently concealed. The Ninth Circuit found the allegations inadequate to plausibly establish loss causation, in part because the stock recovered within three trading days after "the modest 10% drop." *Id.* at 1059, 1064. The court explained that "[s]o long as there is a drop in a stock's price, a plaintiff will always be able to contend that the market 'understood' a defendant's statement precipitating a loss as a coded message revealing the fraud," but "[l]oss causation requires more." *Id.* at 1064. In light of the quick post-disclosure stock price recovery, the court found that the complaint's inference that the market had understood the *Financial Times* article as a revelation of underlying misconduct was unwarranted. *Id.* at 1065. Thus, the Ninth Circuit affirmed dismissal of the complaint for failure to plausibly allege loss causation. *Id.*

Similarly, in *Wochos*, the defendant's stock dropped from $356.88 to $342.94 (a drop of approximately 4 percent) the day after the relevant disclosure but "immediately rebounded, closing at $355.59 on [the following day] and trading between $350 and $360 over the next week." *Wochos*, 985 F.3d at 1198. Citing *Metzler*, the Ninth Circuit found this inadequate to plausibly allege loss causation, explaining that "[t]he quick and sustained price recovery after the modest . . . drop refutes the inference that the alleged concealment of this particular fact caused any material drop in the stock price." *Id.* Thus, the court affirmed the dismissal with prejudice of the plaintiffs' claim. *Id.*

The FAC's loss causation allegations rely entirely on the May 29, 2023 *American Banker* article, contending that "the price of Comerica shares sharply dropped, on high volume, in response to the issuance of [the article]," which "removed inflation from the price of Comerica shares, causing real economic loss to investors who had purchased Comerica shares during the Class Period." Dkt. No. 48 ¶ 191. Plaintiffs allege that "[t]he timing and magnitude of the price declines in Comerica shares negate any inference that the loss . . . was caused by changed market conditions, macroeconomic factors or Comerica-specific facts unrelated to Defendants' fraudulent conduct." *Id.* ¶ 192.

Plaintiffs overstate the magnitude and significance of the stock drop and the inferences that reasonably can be drawn therefrom. To be sure, Comerica's stock ended trading at $38.99 on May 26, 2023, and dropped by a little less than 4 percent each of the next two trading days, closing at $37.59 and $36.10 on May 30 and 31, respectively. *Id.* ¶ 157. But even considering these two drops together, the combined price drop of 7.4 percent in two days is significantly smaller than the 10

percent drop that the Ninth Circuit characterized as "modest" in *Metzler*. *Cf. Carey Camp v. Qualcomm Inc.*, No. 18-CV-1208, 2020 WL 1157192, at *6 (S.D. Cal. Mar. 10, 2020) ("[S]ecurities complaints tend to be predicated on double digit declines.").

More importantly, the context of the stock drop makes Plaintiffs' inference of causation implausible. A review of Comerica's stock prices from May and June of 2023 shows that 12 of the 43 trading days in those months had price changes of more than 4 percent (i.e. greater than the May 30 and 31 drops), including losses of 12.4 percent and 12.3 percent on May 2 and 4 and gains of 16.8 percent and 12.3 percent on May 5 and 17. Dkt. No. 49-4 at 5–6. Indeed, nine other two-day periods—more than a fifth of the two-day trading periods in May and June—had a price change that was greater than the combined two-day drop on which Plaintiffs focus. Thus, the price drops on May 30 and 31 were unremarkable and well within the typical stock price movement. *See Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657, 665 n.9 (5th Cir. 2004) ("[W]hether a drop in a stock's price is statistically significant will vary depending on the average trading range for that particular stock. A drop of 10% for a volatile stock may not be statistically significant whereas the same drop for a stock with little average movement may be significant."); *Eng v. Edison Int'l*, No. 3:15-CV-01478, 2017 WL 1857243, at *4 (S.D. Cal. May 5, 2017) (finding no plausible allegation of loss causation where declines in stock price were "typical movements for [the defendant's] stock in the days prior and subsequent to the alleged corrective disclosures").

Moreover, the May 30 and 31 stock price drops followed three straight days of price drops, so they do not reflect a sudden change in trajectory. And, most significantly under *Metzler* and *Wochos*, Comerica's stock price fully recovered from the May 30 and 31 drops in the next two days, closing at $40.93 on June 2. This recovery was also sustained—the share price stayed above $40 for the rest of June, as well as all of July and August and most of September. Dkt. No. 49-4 at 4–6. This record is therefore indistinguishable from the "modest" price drop followed by a "quick and sustained price recovery" found insufficient to support a plausible inference of loss causation in *Metzler* and *Wochos*. *Wochos*, 985 F.3d at 1198; *see also Bajjuri v. Raytheon Techs. Corp.*, 641 F. Supp. 3d 735, 769–71 (D. Ariz. 2022) (dismissing claims under *Metzler* and *Wochos* where stock price dropped 7 percent and fully recovered within four trading days).

Plaintiffs' attempts to distinguish *Metzler* and *Wochos* are unavailing. In *Nathanson v. Polycom, Inc.*, the district court found that *Metzler* did not require dismissal where the stock price dropped 15 percent and then recovered within two

months—plainly distinguishable from the facts here and in *Metzler*. 87 F. Supp. 3d 966, 985 (N.D. Cal. 2015). *Brendon v. Allegiant Travel Co.*, on which Plaintiffs relied both in their briefing and at the hearing, found three stock drops ranging from 2 percent to 8.59 percent to be significant and in a single conclusory sentence relied on *Nathanson* to state that "dicta from *Metzler*" did not compel dismissal simply because "the stock price recovered." 412 F. Supp. 3d 1244, 1264 (D. Nev. 2019). *Brendon* did not address the timing of the recovery, and in any event, the losses were greater than those alleged here. The other district court decisions on which Plaintiffs rely are likewise distinguishable. *See, e.g.*, *Jaeger v. Zillow Grp., Inc.*, 644 F. Supp. 3d 857, 875 (W.D. Wash. 2022) (conclusorily citing *Brendon* and *Nathanson* to reject argument that unspecified eventual price recovery precluded loss causation); *Luna v. Marvell Tech. Grp., Ltd.*, No. 15-CV-05447, 2017 WL 4865559, at *3 (N.D. Cal. Oct. 27, 2017) (rejecting defendant's argument that "a stock's eventual recovery from an over forty percent decline means that no recovery is available"); *In re CV Scis., Inc. Sec. Litig.*, No. 2:18-CV-01602, 2019 WL 6718086, at *6 (D. Nev. Dec. 10, 2019) (finding allegation of 52.4 percent price drop in the hours after disclosure adequate to allege loss causation despite price rebound in "subsequent days"); *In re Mattel, Inc. Sec. Litig.*, No. 2:19-CV-10860-MCS, 2021 WL 4704578, at *6 (C.D. Cal. Oct. 6, 2021) (noting in class certification order that "[a]t this stage, the Court cannot conclude Mattel's stock rebounding months after the Class Period completely negates undisputed price impact during the Class Period.").

To be sure, the Ninth Circuit has cautioned that "so long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings when the plaintiff's case can be rejected on evidentiary grounds," such that Rule 12(b)(6) dismissal is inappropriate where loss causation has been plausibly alleged. *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008). Plaintiffs argued at the hearing that the reasons for Comerica's stock price drops require an understanding of context—including the stock market's general performance at the time and other factors that might have affected price changes—that cannot be resolved at the pleading stage. But *Metzler* and *Wochos*, both published decisions issued after *Gilead*, affirmed that dismissal under Rule 12(b)(6) is required when the context of the relevant stock price drops does not support a plausible inference of loss causation, and they did so without examining the additional factors Plaintiffs suggest are necessary to determine causation. Here, as in *Metzler* and *Wochos*, "[t]he quick and sustained price recovery after the modest [May 30 and 31] drop refutes the inference that the alleged concealment of [the information disclosed in the *American Banker* article] caused any material drop in the stock price."

*Wochos*, 985 F.3d at 1198. Accordingly, Plaintiffs have not plausibly alleged loss causation.

IV.

"The court should freely grant leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). Leave may be denied, however, for reasons such as "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment." *Foman v. Davis*, 371 U.S. 178, 182 (1962).

In their opposition, Plaintiffs request leave to amend if the Court grants Defendants' motion to dismiss, asserting that "[a]ny dismissal should be without prejudice, *e.g.*, to plead more partial corrective disclosures / stock drops less vulnerable [to] challenge . . . ." Dkt. No. 56 at 25 n.8. At the hearing, Plaintiffs reiterated their request and described at a high level some of the additional facts they would seek to include in a Second Amended Complaint (SAC)—which Plaintiffs' counsel also stated would be substantially shorter and more focused than the 175-page FAC. Given that (1) the central theme of Plaintiffs' case as presented thus far is that the *American Banker* article disclosed the facts they claim had been fraudulently omitted from all the Defendants' statements over the preceding years, and (2) the Court concludes that the slight stock price drops following the publication of that article are inadequate as a matter of law to support a plausible inference of loss causation, it is not clear that Plaintiffs will be able to allege a plausible claim if given leave to amend. *See Wochos*, 985 F.3d at 1198 (affirming dismissal with prejudice based on futility where plaintiffs had not shown alternative basis for pleading loss causation). However, the Court will give Plaintiffs a further opportunity to demonstrate that amendment would not be futile by filing a noticed motion for leave to amend (after meeting and conferring thoroughly with Defendants), accompanied by Plaintiffs' proposed SAC.

V.

Because Plaintiffs have not plausibly alleged loss causation, Defendants' motion to dismiss is GRANTED, and Plaintiffs' claims are dismissed. No later than May 10, 2024, Plaintiffs may file a noticed motion for leave to amend, accompanied by their proposed SAC, which shall be set for hearing no later than June 7, 2024. If Plaintiffs do not timely seek leave to amend, the dismissal of their

claims will be with prejudice, and the Court will enter final judgment and close the case.

Date: April 12, 2024

Stanley Blumenfeld, Jr.
United States District Judge