POMERANTZ LLP
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Counsel for the Nova Scotia Health Employees' Pension Plan and Proposed Lead Counsel for the Class*

[Additional Counsel on Signature Page]

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID RAMOS, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>COMERICA INCORPORATED, CURTIS C. FARMER, and JAMES J. HERZOG,<br><br>Defendants. | Case No. 2:23-cv-06843-SB-JPR<br><br><u>CLASS ACTION</u><br><br>SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>[*LEAVE GRANTED VIA ECF 74 ON JUNE 10, 2024*]<br><br><u>DEMAND FOR JURY TRIAL</u> |

# TABLE OF CONTENTS


I. NATURE OF THE ACTION ....... 1

II. JURISDICTION AND VENUE ....... 14

III. PARTIES ....... 15

IV. NON-PARTY CONFIDENTIAL WITNESSES ....... 16

V. SUBSTANTIVE ALLEGATIONS ....... 22

A. Comerica's Business & Operations ....... 22

1. Comerica's Business Operations ....... 22

2. The Direct Express Program Is Important To Comerica ....... 23

3. Pre-Class Period Direct Express Program Problems ....... 26

4. Comerica Promised Improvements In Applying For Renewal ....... 29

5. Comerica Is Renewed As The Direct Express Financial Agent ....... 31

B. Undisclosed, Material, Negative Facts ....... 35

C. Materially False and Misleading Statements & Omissions ....... 50

1. Business Operations Fraud ....... 50

2. Reported Results Fraud ....... 77

3. Internal Controls Fraud ....... 85

D. The Truth Begins To Emerge ....... 90

E Additional Facts Probative Of Scienter ....... 110

1. Defendants' Knowledge Or Reckless Disregard Of Red Flags ....... 110

2. Motive And Opportunity To Commit The Fraud ....... 112

3. Comerica Raised Funds During The Fraud ....... 123

4. The Fraud Implicated Core Operations ....... 124

5. The Individual Defendants Signed, Were Quoted In, Or SOX-Certified The Alleged Misstatements ....... 125

6. The Fraud Violated Comerica's Code Of Conduct ....... 125

7. Insider Resignations and Employment Status Changes ....... 128

8. Comerica paid $1.2 million to settle consumer claims ....... 130

VI. NO SAFE HARBOR ....... 130

VII. THE CLAIMS ARE TIMELY ....... 131

VIII. LOSS CAUSATION / ECONOMIC LOSS ....... 132

IX. PRESUMPTION OF RELIANCE ....... 134

X. LEAD PLAINTIFF'S CLASS ACTION ALLEGATIONS ....... 136

COUNT I ....... 139

COUNT II ....... 143

PRAYER FOR RELIEF ....... 145

DEMAND FOR TRIAL BY JURY ....... 146

1. Lead Plaintiff the Nova Scotia Health Employees' Pension Plan ("Lead Plaintiff"), individually and on behalf of all other persons similarly situated, by Lead Plaintiff's undersigned attorneys, for Lead Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Lead Plaintiff and Lead Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Lead Plaintiff's attorneys, which included, among other things, a review of the Defendants' public statements and publicly available documents, presentations and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Comerica Incorporated ("Comerica"), analysts' reports and advisories and other press coverage about Comerica, Comerica's stock chart, Comerica's corporate website, data obtained through news services such as Bloomberg and Yahoo! Finance, interviews with certain witnesses as discussed herein, and information readily obtainable on the Internet. Lead Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

2. This is a federal securities class action on behalf of a class consisting of all persons other than Defendants and other excluded parties (identified below)

who purchased or otherwise acquired Comerica common stock between January 7, 2020, and May 23, 2024, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against Comerica and its Chief Executive Officer, Defendant Curtis C. Farmer, and its Chief Financial Officer, Defendant James J. Herzog.

3. This lawsuit concerns Defendants' public statements and omissions revolving around Comerica's lucrative U.S. government contract to serve as the Financial Agent overseeing the Direct Express program, as well as the operating and financial metrics that Comerica itself repeatedly linked to that program. These alleged misstatements inflated the price of Comerica stock during the Class Period, until the alleged fraud was incrementally revealed, thereby removing the inflation and causing the Lead Plaintiff and the Class members damages.

4. The Direct Express program utilizes prepaid Master Card debit cards to deliver government benefits, on a massive scale, including $3 billion+ monthly from 20+ benefits from nine federal Agencies, as well as state-disbursed Supplemental SSI Payments for at least six states and, during the Class Period, federal COVID-related payments, stimulus, and/or benefits. Comerica reaps large sums in direct government payments, as well as indirect revenue streams from fees charged to

cardholders and the revenues it generates through the additional liquidity of the larger deposit base afforded by the Direct Express funds. Prior to the Class Period, Comerica faced serious backlash for mishandling cardholder data and personal information and failing to prevent fraud on cardholder accounts. These setbacks led to governmental investigations, consumer lawsuits, and imposition of stricter terms in Comerica's renewed Direct Express contract. Entering the Class Period, Comerica, and its contractors Conduent and i2c, were subject to an array of laws, rules, and contractual terms. The handling of fraud complaints by Direct Express enrollees was subject to Section 205.15 of the Electronic Fund Transfer Act ("EFTA"), Federal Reserve Regulation E, and provisions in Comerica's contract, which together imposed important consumer protections. The handling of sensitive materials including cardholder information and account data, was governed by Treasury's Bureau of Fiscal Service's Policy on Personnel Security for Debit Card Services, the Department of Treasury's security directives, and Comerica's Direct Express contract, which among other things, imposed a requirement that data systems handling such information be located in the U.S. and that personnel accessing such information be U.S. citizens or lawful permanent residents of the U.S.

5. The Direct Express program was housed within Comerica's Commercial Bank and was a material contributor to Comerica's financial and

operating results, both within the Commercial Bank and on a consolidated basis. Comerica reaped direct government payments for serving as the Financial Agent of Direct Express, which were $151 million in 2020 alone. It also reaped over $50 million a year in various fees charged to Direct Express cardholders, and benefited by the $3 billion+ in noninterest-bearing deposits generated by the Direct Express program, which fueled some of Comerica's lending revenues. Throughout the Class Period, Comerica itself linked the Direct Express program to specific operating metrics it regularly reported, including noninterest income and card fees, both for Comerica and for its Commercial Bank segment, and noninterest-bearing deposits.

6. Throughout the Class Period, unbeknownst to investors, Comerica operated the Direct Express program in noncompliance with the laws, regulations, and contractual terms under which it was governed. As illustrated by extensive confidential witness ("CW") statements and later reporting by the *American Banker*, Comerica's Contractor, Conduent, mishandled fraud complaints by Direct Express enrollees in noncompliance with Comerica's contract, EFTA §2015.15, and Federal Reserve Regulation E, drawing the ire of state Attorney's General and the federal CFPB, while Comerica's Contractor i2c was in flagrant noncompliance with Comerica's contract, the Fiscal Service's Policy on Personnel Security for Debit Card Services, and Treasury's security directives, due to its use of data systems and

personnel in Lahore, Pakistan to store, access, and use Direct Express cardholder data and personal information.

7. Extensive facts illustrate Defendants' knowledge or reckless disregard of facts that rendered their Class Period statements materially false or misleading. The CW statements evidence Defendants' knowledge or reckless disregard of these undisclosed negative facts. They describe Comerica's use of "schematics" and SOC 2 Type II reports to carefully track the flow of its data through vendors, which included Conduent and i2c, and its robust risk committee oversight that was known to the Direct Express program leader, Ms. Nora Arpin. They establish that i2c's Pakistan employees processed fraud complaints and accessed sensitive cardholder data in Lahore, Pakistan throughout the Class Period, despite weekly meetings between Comerica's U.S.-based employees and their Lahore counterparts at i2c and despite Comerica's point person, Deborah Srour, closely monitoring i2c's unsuccessful attempts to end its reliance on Pakistan employees for Direct Express program work. The CWs also made clear that initial determinations by both i2c and Conduent rejecting fraud claims were wrong the vast majority of times, and that often, cardholder complaints were escalated through an AG's office or the federal CFPB to Comerica, over to Conduent, with responses confirming the wrongful denials of fraud claims going back to Comerica, and then back to the AG's office and CFPB. These facts were also corroborated by reporting by the *American Banker*

in May 2023, drawing from internal company documents, including Ms. Arpin's email, sealed court filings by Comerica, and statements made by Comerica's officials. A CW also detailed the weekly status updates prepared and presented to Comerica's CIO for Technology Bruce Mitchell, using Powerpoint slides with color-coded updates to reflect levels of urgency or severity. These presentations covered every status update, explained the situations and reported on steps to address pressing issues. Comerica VP of Product Technology Padma Sengupta was responsible for the technology side of the Direct Express program in 2020 and made the presentations to Mr. Mitchell, including anything involving Comerica's Direct Express vendors i2c and Conduent, with status notes contributed by Linda Goulet, who was Comerica's liaison with the federal government regarding the Direct Express program. Mr. Mitchell had regular meetings with superiors to provide updates about programs including Direct Express, and he reported to Chief Operations and Technology Officer Megan Crespi, who reported to Defendant Farmer. A CW described a government instruction to Comerica in 2020 to stop migrating accounts to i2c because of its work outside the U.S. and believes anything driving that level of risk "would have been discussed at the highest levels." Beyond the foregoing, suspicious securities transactions by Defendants Farmer and Herzog, a suspicious offering by Comerica, and suspicious resignations of senior executives are among the other facts holistically adding to a strong inference of scienter.

8. Notwithstanding this concealed information, Defendants' public misstatements created a false and misleading impression for investors that Comerica was operating the Direct Express program in line with its contractual obligations, and thus the bank benefited from the card fee income generated by Direct Express and the noninterest-bearing deposits concomitant therewith. On a January 21, 2020 earnings call, Defendant Farmer told analysts "***the U.S. Treasury recently announced that we will continue to be the exclusive financial intermediary for the Direct Express government benefits card program for another five years. The economics of this program include attractive retail deposits that we continue to grow, and our ability to leverage a third-party platform for processing and servicing.***" Thereafter, Defendants often referenced Direct Express and the metrics they linked to the program. For instance, on April 21, 202, Defendant Herzog stated, "***Regarding Direct Express, in my remarks, you might recall that I mentioned that we expect card fees actually to be up in the second quarter***. So, stimulus payments being processed is a component of that." As another example, a 12/8/2020 GS Presentation stated, "Prepaid card ***- #4 prepaid card issuer in US…Exclusive provider of prepaid debit cards for U.S. Treasury Direct Express Program***" and included two charts showing that "***Card fees went up 6% in 3Q20 compared to 3Q19***" and "***Government Card Deposits went up 113% in 3Q20 compared to 3Q19***." Defendants also issued multiple Corporate Responsibility Reports that

touted Comerica's role in the Direct Express program and the security it purportedly offered enrollees, with statements like, It elaborated on the program's purported security, stating, "***Our standard agreement with suppliers and contractors requires that they act in compliance with all applicable laws, including those on… data protection…***," "***As Comerica primarily does business in the United States, we have no significant presence or investment in countries where lack of human rights protection is a known problem***," "***Suppliers must abide by all applicable federal, state and local laws, rules and regulations while assuring that all services are conducted with a high degree of professionalism and in accordance with the terms and conditions of the relationship***," and "***Customer privacy and protection and cybersecurity are key topics critical to our business success. Our customers…and stakeholders trust us to safeguard their privacy, personal information and financial data, and we are committed to maintaining that trust.***" Defendants also made public statements touting their efforts and "***modernizing our core platforms***," including "***major upgrades for our call center technology***" and "***a new wealth management portal***."

9. Defendants also made a series of misleading statements and half-truths in Comerica's 10-Q and 10-K filings with the SEC, reporting on the metrics that Comerica linked to Direct Express metrics - noninterest income and card fees, both for Comerica as a whole and for its Commercial Bank segment, and noninterest-

bearing deposits – while failing to explain, contrary to reporting obligations such those imposed by SEC Regulation S-K, Item 303, 17 C.F.R. §§229.303(b)(2)(ii) and (c)(1), that the reported metrics flowed from, were being generated through, were artificially inflated by, and/or were subject to improper practices and concealed risks, in noncompliance with Comerica's FAA and its legal obligations, including those arising under the Fiscal Service's Policy on Personnel Security for Debit Card Services, Treasury's security directives, EFTA §2015.15, and Federal Reserve Regulation E. These metrics were specifically attributed to Direct Express, government prepaid cards, or Comerica's card platforms. For instance, the 2020 10-K said: (i) Comerica's "***Noninterest income was relatively stable at $1 billion***, reflecting decreases in service charges on deposit accounts and commercial lending fees, partially offset by ***increases in*** securities trading income and ***card fees***"; (ii) "***Card fees consist primarily of interchange and other fee income earned on government prepaid card***, commercial card, debit/Automated Teller Machine (ATM) card and merchant payment processing services"; and (iii) "***Card fees increased $13 million, or 5 percent, driven by volume increases in the government card program*** from stimulus payments under the Coronavirus Aid, Relief, and Economic Security Act, as amended by the Consolidated Appropriations Act of 2021 (CARES Act), resulting in higher interchange revenue…" These statements were

made in noncompliance with SEC Regulation S-K, Item 303, 17 C.F. R. §§229.303(b)(2)(ii) and (c)(1), and are actionable.

10. Defendants Farmer and Herzog also signed and certified under the Sarbanes-Oxley Act of 2002 Comerica's 10-Q and 10-K filings with the SEC. Their certifications attested to the integrity and effectiveness of Comerica's internal controls over financial reporting and its disclosure controls, and reassured investors that Farmer and Herzog disclosed any fraud to Comerica's auditors and the audit committee of its Board. They likewise reassured the market as to the sufficiency of Comerica's internal controls at various Comerica subsidiaries, in the Underwriting Agreement for a significant Comerica public offering on May 26, 2020. However, any reasonable internal controls would have revealed the extended noncompliance of Comerica, Conduent, and i2c, escalated it to senior management, and led to a timely resolution, which did not occur.

11. The truth about Defendants' fraud was incrementally revealed by a series of partial corrective disclosures, which drove declines in Comerica's stock price. The earliest correctives revealed the risk of increased regulatory scrutiny and the weakening of the metrics that Comerica had tied to the Direct Express program. They were typically made through reports by analysts covering Comerica. Such disclosures occurred on February 17, April 20, April 21, and October 19, 2022 and

March 7 and March 23, 2023. Each of these disclosures prompted drops in Comerica's stock.

12. On May 29, 2023, an *American Banker* article more explicitly revealed Comerica's serious contractual and regulatory violations in connection with the Direct Express program. First, despite agreeing that all services in connection with the program would be performed in the United States, the *American Banker* article revealed that a vendor hired to perform the day-to-day operations of the program, i2c Inc. was handling fraud disputes by Direct Express cardholders in its office in Lahore, Pakistan, in noncompliance with Comerica's Direct Express contract. The article also revealed that senior Comerica executives understood that i2c claims practices were both contractual and regulatory violations, but i2c "doesn't have plans to fix those issues." It not only revealed the underlying breach of the agreement, it revealed serious concerns about i2c's performance in general, including Comerica not getting adequate fraud reporting, call center statistics, or other items required by the Treasury's Bureau of Fiscal Service and that Comerica executives were concerned that "fraud prevention is a serious issue." It cited internal documents indicating that a Comerica lawyer tried to convince a Texas bank examiner that Regulation E did not apply to the bank or to federal government beneficiaries; instead, program customers only get "Regulation E Lite" benefits.

13. However, the corrective effects of the *American Banker* article were muted, and the stock price declines, stopped by Defendant Farmer's publication of a letter to the editor in the *American Banker* on June 1, 2023. In it, he made materially false or misleading statements, including, "***The scope of the Direct Express program requires*** coordinating many stakeholders and ***working diligently to ensure that federal regulations are being followed***," and the program helped people "***safely receive their benefits***." In characterizing the issue as pertaining to just one (not both) of Comerica's Direct Express vendors, he said:

> The recent article ignores the fact that ***Comerica took steps to protect Direct Express users when it became aware that a third-party vendor had not followed program protocols for reviewing customer inquiries***." These steps included requiring the vendor in question to engage an independent auditor whose results were shared with the Fiscal Service. ***These steps were taken in cooperation with the Fiscal Service in 2020***.

He continued, "And, ***we continue to perform regular assessments***, including independent audits ***to ensure the program is managed in compliance with applicable requirements*** with ongoing oversight from the Fiscal Service and Treasury Department." He added, "***We…act quickly if we find issues – from addressing individual customer concerns to oversight of vendors***." The CW statements illustrate the false and misleading nature of these statements.

14. On June 12, 2023, as described in a Comerica presentation posted the company's website and as discussed in a series of analyst reports, further

deterioration in the metrics linked with Direct Express had occurred, and the program was specifically referenced as among the causes. On information and belief, because these disclosures concerned building trends in those metrics throughout the quarter that had already been synthesized into presentation format, this information leaked to the market during trading hours before the closing bell, even if the presentation was posted to Comerica's website or filed with the SEC shortly after the market close. This news drove another stock decline. The declines before and after Defendant Farmer's letter to the *American Banker* must be viewed collectively and in the context of the false and misleading nature of his statements that were intended to, and did, mute and reverse the correction that otherwise would have occurred.

15. On May 23, 2024, federal regulators issued a news release and made public an enforcement agreement addressing serious internal controls deficiencies in Comerica's wealth management business, at one of Comerica's subsidiaries listed in its offering underwriting agreement, which was operating with pervasive "unsafe or unsound practices, including those relating to the bank's risk governance framework and internal controls." The enforcement agreement imposed sweeping reforms. These disclosures prompted a significant stock decline. Moreover, analysts noted Comerica's pending Direct Express renewal application and expressed

concern that the enforcement agreement had raised regulatory scrutiny and heightened risks while the application was still pending.

16. Lead Plaintiff and the other Class members suffered losses as a result, which this lawsuit seeks to recover.

17. Relevant facts continue to develop, and more would be revealed through discovery. They include the forthcoming third audit report regarding the Direct Express Debit Card Program, which "will focus on Direct Express's customer service and compliance with regulations impacting cardholders," which was issued to the Fiscal Service in non-public draft form on May 10, 2024, and which will result in a final report being issued in or about July 2024 to Comerica's management, Congressional committees, and the Inspector General's website. Also, the renewal period for Comerica's Direct Express contract is now, with a decision by Fiscal Service expected as early as July 2024 regarding what bank(s) will serve as Direct Express Fiscal Agent with potentially new terms for the next contract starting in January 2025. Analysts have expressed concerns that the OCC Enforcement Agreement has increased regulatory scrutiny and risks to Comerica's still-pending Direct Express renewal application.

## II. JURISDICTION AND VENUE

18. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and SEC Rule 10b-5

promulgated thereunder (17 C.F.R. §240.10b-5).

19. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C. §78aa).

20. Venue is proper in this Judicial District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b). Defendants conduct business in this Judicial District, and a significant portion of Defendants' actions, and the subsequent damages, took place within this Judicial District.

21. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III. PARTIES

22. Lead Plaintiff, as set forth in its prior-filed Certification (ECF 15-3), which is incorporated by reference herein, and the attached updated Certification filed herewith, purchased Comerica common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of Defendants' fraud, as alleged herein.

23. Defendant Comerica is incorporated in Delaware, considers California to be a "primary U.S. location," and has a major office located at 601 South Figueroa Street, Suite 100, Los Angeles, CA 90017. Comerica trades stock in an

efficient market on the New York Stock Exchange ("NYSE") under the ticker symbol "CMA."

24. Defendant Curtis C. Farmer ("Farmer") has served as Comerica's Chief Executive Officer ("CEO") since April 2019. He has also served as Chairman of the Board of Directors since January 1, 2020, and additionally serves as President.

25. Defendant James J. Herzog ("Herzog") has served as Comerica's Chief Financial Officer ("CFO") and Senior Executive Vice President since February 2020.

26. Defendants Farmer and Herzog are collectively referred to herein as the "Individual Defendants."

27. Defendant Comerica and the Individual Defendants collectively referred to herein as "Defendants."

## IV. NON-PARTY CONFIDENTIAL WITNESSES

28. CW1 was a VP of Global Product Management – Card Issuing at i2c from December 2021 to April 2022. CW1 worked remotely and at i2c's headquarters in Redwood City, California. CW1 reported to i2c President Jim McCarthy.

29. CW2 worked at Comerica Bank from March 2013 to November 2021 as an AVP Business Continuity Consultant (March 2013 – March 2018), then a VP

– Risk Analyst (April 2018 – November 2021). CW2 worked at the bank's administrative offices in Auburn Hills, Michigan and most recently reported to Dawn Sawka, who oversaw cybersecurity risk for third-party vendors and whose risk group, in turn, reported to Ron Rechlin, VP – Manager Information Security Risk and Technology Services. CW2 worked on Business Continuity and Disaster Recovery plans and assessments for third-party vendors. Starting in April 2018, CW2's work was put under the umbrella of the cybersecurity group, and CW2 was tasked with helping Comerica close out Matters Requiring Attention (MRAs) regarding oversight of 150+ vendors, including Conduent.

30. CW3 worked at Comerica from September 2012 to September 2021, as an Information Security Senior Risk Analyst – Vice President (September 2012 – September 2016), Information Security Risk Expert – Vice President (September 2016 – March 2018), Cybersecurity Risk Senior Manage – Risk Management and Third-Party Risk Management (March 2018 – September 2021). CW3 was based at the bank's offices in Auburn Hills, Michigan. As a Cybersecurity Risk Senior Manager, CW3 oversaw Comerica's team of third-party risk analysts and their manager who conducted risk assessments of third-party vendors doing work for the bank, both as part of onboarding and regularly thereafter – including vendors who did work on the Direct Express program for Comerica.

31. CW4 worked at i2c from August 2018 to October 2023, as a Customer Service Representative (August 2018 to September 2020) and a Chargeback Analyst (September 2020 to October 2023), in i2c's call center in Omaha, Nebraska. As a Customer Service Representative, CW4 answered calls from Direct Express cardholders looking for general account information and assistance with their cards, such as checking balances, charges, and debits from accounts and reporting fraud complaints. As a Chargeback Analyst, CW4 processed paperwork and customer documents and filed provisional credits in fraud complaints.

32. CW5 worked at i2c in its Omaha, Nebraska callback center from March 2020 to March 2023 as a Customer Service Representative (March 2020 to July 2020), Chargeback Analyst and Financial Operations Analyst (July 2020 to July 2022), Senior Chargeback Analyst and Financial Operations Analyst (July 2022 to March 2023). While in chargebacks, CW5 reported to Catherine Johnson, Chargeback Manager. As a Customer Service Representative, CW5 took incoming calls from Direct Express cardholders and handled basic inquiries and tasks, such as checking account balances and transactions. As a Chargeback Analyst, CW5 processed disputes and fraud allegations from cardholders, from a queue of cases within a dispute management system CW5 provided by Master Card that permits communication with merchants about disputed charges, including submission of information from the cardholder and the merchant, which CW5 reviewed to

determine if a charge was valid. As a Senior Chargeback Analyst, CW5 assigned cases to chargeback analysts, set their schedules, and offered assistance on specific cases. During CW5's time in chargebacks, CW5 also worked in the Financial Operations Department as a FinOps Analyst working on "returns" of money from a cardholder's account (*e.g.*, to pay over to things like Social Security or child support) and on "acuity," which involved submitting a cardholder's balance on the Social Security website.

33. CW6 was a Chargeback Analyst at i2c from May 2021 to September 2022 working at the company's San Antonio call center and reporting to a supervisor named Von, who in turn reported to Kinsi Tracy, a Chargeback Manager located at i2c's Omaha call center, who reported to Sean Wint, the Global Head of Fraud Operations at i2c.

34. CW7 worked at i2c from October 2019 to October 2021 as a Customer Service Representative (October 2019 – March 2020) and a Chargeback Analyst (March 2020 – October 2021). CW7 worked remotely and reported to Kinsi Tracy, a Chargeback Manager located at i2c's Omaha call center. As a Customer Service Representative, CW7 took incoming cardholder calls and assisted with basic requests, such as account balances and transaction information. As a Chargeback Analyst, CW7 worked cardholder dispute cases, from an assigned group of cases, and determined if the cardholder was due a credit for a transaction. CW7 logged

disputed into the system, ensured the cardholder information matched the account information, and uploaded the complaint to the Master Card dispute processing system. Where complaints were about a merchant, CW7 sent the dispute file to the merchant for a response. Thereafter, CW7 would review and determine if the charge was legitimate. CW7 also worked on providing provisional credit to cardholders when disputes were filed.

35. CW8 was the Manager of Fraud and Chargeback Operations at i2c from August to December 2020, reporting to Global Head of Chargebacks Angie Anderson. CW8's job was to hire new employees and ensure they were trained to process disputes and chargebacks. CW8 functioned for a short time as a manager of the chargebacks team.

36. CW9 worked at i2c from August 2018 to August 2021 at the company's Omaha call center, first as a Customer Service Senior Manager until late 2020 or early 2021, when CW9 was asked to fill in as interim Head of Global Chargebacks until leaving the company. While in customer service, CW9 reported to VP of Operations Pam Guinn. While in chargebacks, CW9 reported to EVP Global Client Success Peg Johnson. As a Customer Service Senior Manager, CW9 oversaw customer service representatives in i2c's Omaha call center, who took incoming calls from Direct Express cardholders and assisted them with basic requests like providing account balances and transaction information. As interim Head of Global

Chargebacks, CW9 oversaw the dispute processing and chargeback employees in Omaha and regularly communicated with Comerica about the work.

37. CW10 worked in the Customer Advocacy Group at Conduent from June 2021 to July 2022. CW10 was located at the San Antonio office and reported to Senior Supervisor Veronica McCray. Prior to CW10's tenure at Conduent, CW10 worked as an Escalation Specialist in customer service at i2c in is San Antonio call center, reporting to Ann Graham. At Conduent, CW10 worked in a Customer Advocacy Group and investigated Direct Express cardholder complaints of alleged fraud that escalated to high levels. At i2c, CW10 spoke with Direct Express cardholders who were unsatisfied with the help received from i2c's lower-level customer service representatives and who asked to speak with a manager.

38. CW11 worked at Comerica from November 2015 to June 2023, as a Principal Project Manager from November 2015 to September 2019 and a VP – Product Technology from September 2019 – June 2023. CW11 reported to senior executives in a chain leading to Defendant Farmer. CW11 most recently reported to SVP – Director of Core Platform Ryan Orkwis, who reported to SCP – Chief of Enterprise Platform Engineering John Collinson, who reported to CIO – Technology Bruce Mitchell, who reported to Chief Operations and Technology Officer Megan Crespi, who reported to Defendant Farmer. CW11 managed technology work for debit card processing programs within Comerica's retail bank services, with duties

including keeping tabs on the status of technology issues for various debit card processing programs to ensure they worked properly from the point-of-sale to the mainframe and vice versa. CW11 also oversaw aspects of development of new debit card program features and applications.

# V. SUBSTANTIVE ALLEGATIONS

## A. Comerica's Business & Operations

### 1. *Comerica's Business Operations*

39. Defendant Comerica, founded in August 1849 as Detroit Savings Fund Institute, is a Delaware corporation with its headquarters in Dallas Texas, and offices located in seventeen states including California, one of Comerica's "primary U.S. locations." Comerica maintains a major branch at 601 S Figueroa Street, Los Angeles, CA 90017. It is publicly traded on NYSE under the ticker symbol "CMA."

40. Comerica has three major business segments (plus Finance), which serve different customers with products and services: (i) the Retail Bank, (ii) Wealth Management, and most relevant for this lawsuit, (iii) the Commercial Bank. The Direct Express program at issue is aligned under the Commercial Bank business segment, which Comerica claims meets the needs of small and middle market businesses, multinational corporations and governmental entities through various products and services. Comerica directly or indirectly owns all outstanding common stock of Comerica Bank, a Texas banking association.

41. During the Class Period, the Commercial Bank segment accounted for most of Comerica's net income. Within it, Comerica divides income sources into interest and noninterest income. Interest income largely consists of interest and fees on Comerica-issued loans. Noninterest income includes contract revenue received in exchange for services provided to customers, as well as things like card fees and service charges on deposit accounts.

**2. *The Direct Express Program Is Important To Comerica***

42. The Direct Express Debit MasterCard ("Direct Express") program, which contributes to both interest income and noninterest income, is an important contributor to Comerica's Commercial Bank segment.

43. In 2008, Treasury's Fiscal Service established the Direct Express program to help elderly and disabled Americans and veterans receive benefit payments electronically via a prepaid debit card. Treasury selected Comerica in 2008 to serve as the program's Financial Agent to distribute monthly benefit payments to enrolled recipients. Comerica and Fiscal Service entered into a financial agency agreement ("FAA"), effective January 3, 2008. After one-year extensions in 2013-2014, the FAA was renewed for five-year terms in January 2015 and January 2020, extending Comerica's deal through January 2, 2025.

44. The Direct Express program electronically deposits roughly $3 billion per month into a fiduciary account at Comerica. From this amount, over 4.5 million

people electronically receive Social Security, veterans, and other benefits to Direct Express prepaid debit cards, which for many, constitute their sole source of income that is essential to meet basic living needs. From 2008 to March 2019, Comerica claimed to have opened over 8 million enrollee accounts and loaded over $239 billion in benefits payments onto cards delivered to recipients. As of March 2019, the program included 20+ benefit payments from nine non-Treasury Agencies, which Comerica augments by accepting state-disbursed Supplemental SSI Payments for at least six states: Wisconsin, Pennsylvania, Michigan, Massachusetts, Rhode Island, and New York. During the Class Period, the federal benefits paid through Direct Express expanded to include pandemic-related payments, stimulus, and/or benefits.

45. Comerica reaps extensive financial benefits from the Direct Express program, in at least three ways.

(a) First, it receives direct payments from Treasury to run the program. While the financial terms of the most recent FAA are not public, according to the *American Banker*, Comerica received $151 million in direct payments in 2020.

(b) Second, Comerica's SEC filings report direct income from the Direct Express program and Direct Express Debit Mastercard activities as "card fees," a subcategory of noninterest income within the Commercial Bank business segment. Comerica's application in March 2019 to renew its role as the Direct Express

program's Financial Agent and the December 2019 renewal agreement (both define and discussed *infra*) included a litany of card fees and revenue sources. They include an ATM withdrawal fee of $0.85 per transaction (after one free per card), with a projected 280 million transactions over the 5-year contract period, which would mean up to $252 million in such fees ($50.4 million per year). Other fees include a $2.00 fee for new enrollments, $0.75 / month for paper statements, $1.50 / transfer to transfer funds to a U.S. personal banking account, a $0.85 Walmart Cash Out Option, $4.00 for replacement cards (after one free), $13.50 to expedite delivery of a replacement card, $3.00 plus 3% of the amount withdrawn for ATM withdrawals outside the U.S., 3% of the purchase amount charges for merchant purchases outside the U.S., and a $50 Legal Process fee for deceased cardholders.

(c) Third, Comerica also benefits from increased liquidity afforded by $3 billion monthly in low-cost, noninterest-bearing deposits of government funds that the Direct Express program funnels to it. The Fiscal Service maintains a fiduciary account at Comerica that receives direct deposit of the federal funds on the recipients' behalf. Within it, individual, noninterest-bearing cardholder accounts are maintained, FDIC insured, linked to the Direct Express debit cards, and used by recipients in their normal monthly spending. The steady, resulting liquidity within its Commercial Bank segment enhances Comerica's base of deposits, at no interest

cost to the bank. Comerica uses the noninterest-bearing deposits to generate interest income, *e.g.* via mortgage lending, attributable to the Commercial Bank.

### 3. *Pre-Class Period Direct Express Program Problems*

46. Prior to the Class Period, Comerica struggled to prevent fraud in connection with the Direct Express program.

47. In August 2017, Comerica introduced the Cardless Benefit Access Service feature to all Direct Express cardholders, allowing them to have the funds transferred to a MoneyGram location for pick up. Shortly thereafter, Treasury received reports that criminals used cardholder data and personally identifiable information ("PII") to impersonate Direct Express cardholders, which allowed them to exploit the program and empty some cardholder beneficiary accounts. As a result, in August 2018, Comerica suspended the Cardless Benefit Access Service. Comerica reported after its own investigation that it did not find evidence of a data breach; instead, cardholders were vulnerable from the start because their PII was stolen from non-related entities and Comerica's fraud-prevention systems were not robust enough to satisfactorily prevent or reduce the risks.

48. Senator Elizabeth Warren responded to fraud complaints by Direct Express beneficiaries with her own investigation into the program's failings, prompting Comerica to identify 480 cases of fraud associated with the Cardless Benefit Access Service resulting in confirmed loss of $459,998.75 starting in

August 2017. Comerica identified the fraud in mid-2018 and thereafter trained its customer service representatives to ask for more verifiers for use of the Cardless Benefit Access Service. Despite that purported training, in August 2018, Comerica experienced 244 more fraud cases of this kind, but did not inform the Social Security Administration or the Veterans Administration, neither of which became aware of the fraud until Comerica suspended the service in August 2018.

49. In 2019, Direct Express cardholders brought a class action consumer lawsuit concerning Comerica's response to the fraud: *Carnley v. Conduent Business Services, LLC*, Case No. 1:19-cv-01075 (W.D. Tex.). It alleges that Comerica and Conduent Business Services ("Conduent"), a Comerica subcontractor that manages the Direct Express call center and processes claim disputes, misrepresented the Direct Express debit card program as completely safe despite knowing the cards were vulnerable to fraud, the card-related systems were rife with fraudulent transactions, and Comerica and Conduent denied refunds to cardholders who alleged fraud. As of April 22, 2024, the Court granted preliminary approval of a settlement, but almost all filings during the litigation were docketed under seal, until June 7, 2024, when the *American Banker* reported on the terms of settlement. Comerica agreed to pay a $1.2 million, with a separate additional payment for attorneys' fees, to settle the lawsuit.

50. On June 18, 2018, Treasury's Office of Inspector General ("OIG") started an audit to review the Fiscal Service's corrective actions to address prior OIG report recommendations about the Comerica FAA. On July 29, 2019, OIG released an interim update titled "Matters for Consideration Prior to Fiscal Service's Selection of the Direct Express Debit Card Program Financial Agent" ("First Audit Update"), which said it was provided because OIG believed it important for Fiscal Service's "consideration prior to the selection of the financial agent expected to be announced later this summer." The First Audit Update proposed that, if Comerica was selected, its compensation should be cut due to poor performance. On March 2, 2020, OIG released another update titled "Corrective Action Verification for Two Prior OIG Reports: (1) Fiscal Service Needs to Improve Program Management of Direct Express (OIG-14-031) and (2) Direct Express Bid Evaluation Documentation Requires Improvement (OIG-17-034)" (the "Second Audit Update"). The Second Audit Update explains that "This report is the second in the series of three planned reports on Direct Express initiated in June 2018. The first report was issued on July 29, 2019." It stated that the planned third report "will focus on Direct Express' customer service and compliance with regulations impacting cardholders." That third report recently was issued to the Fiscal Service as a non-public, formal draft on May 10, 2024, with the expectation of public release in final form by the Office of Audit in July 2024.

### 4. *Comerica Promised Improvements In Applying For Renewal*

51. On March 8, 2019, Comerica submitted its application ("2019 Application") to Treasury's Fiscal Service to be renewed as the Direct Express program's Financial Agent. It said Comerica was partnering with two vendors, Conduent and i2c, Inc. ("i2c"), to administer Direct Express, which reached over 474 million financial transactions by over 4 million enrollees in 2018, with 100,000 new enrollments monthly.

52. The 2019 Application described Comerica's Direct Express customer service. It said that if cardholders needed help beyond Comerica's mobile app and website, *e.g.*, further inquiry into a transaction, they could receive it by phone from a customer service representative ("CSR"), and "the caller is forwarded to a CSR." It described Comerica's Customer Service Center ("CSC") network as having four centers in Texas, Kentucky, Nebraska, and Puerto Rico, which handled ~270 million calls and ~17 million customer interactions. The 2019 Application claimed, "***All of our CSCs for Direct Express are staffed by U.S. citizens or lawful permanent residents; all are based within the United States***." It claimed Comerica employed 600+ customer CSRs on disbursement days and 750+ CSRs on double payment days across its four CSCs, "with additional CSCs available through trusted third party vendors to support if needed." It also accounted for situations that could not be resolved by CSRs, adding, "Other dispute related issues may require

additional research and are then referred to our back office team for investigation and resolution. We have a separate team to assist cardholders through these more difficult transaction and dispute issues with a focus on first call issue resolution."

53. The 2019 Application provided reassurances regarding the customer service personnel staffed to the Direct Express program, stating:

> We continue to recruit individuals who have either direct call center experience or a combination of customer service and experience in a job that requires significant interaction with the general public. Candidates must have the ability to speak clearly and concisely and to be able to articulate the content of required call responses. Bilingual capability is also highly valued. Additionally, as required by the Fiscal Service's (formerly, FMS) Policy on Personnel Security for Debit Card Services dated October 11, 2007, all new hires must undergo and pass a criminal background check, ***be a U.S. citizen or lawful permanent resident***, and successfully pass drug screening prior to being accepted for employment.

54. Comerica's 2019 Application also touted its compliance, as a member of the Federal Reserve Bank, with Treasury's security requirements as specified in Treasury's security directives, including by purportedly "***assigning and employing staff who are documented U.S. citizens or lawful permanent residents***" and "***continuously monitor[ing] our partners' security compliance, including SOC reviews, onsite visits, and self-testing***."

55. Comerica's 2019 Application also expressly stated, "***Full Regulation E protection applies to each cardholder account. The Direct Express program is fully compliant with Regulation E, specifically Section 205.15 of the Electronic***

***Fund Transfer Act (EFTA), which pertain to government programs.***" It added, "***Comerica assumes all responsibility for Regulation E compliance and any payment liability or loss.***" It added that "***[A]s part of implementing the second processor, i2c***, we have taken the time to refresh and refine how we train CSR personnel. In doing so, ***we developed training materials that are exhaustive in nature***…[and] include sessions on topics such as…***Compliance*** (*e.g.* ***AML, ID Theft, etc.***), ***Regulation E***,… and Mock Calls." These representations were material, given, among other things, that i2c is a California-based banking and payment services vendor with a presence in Lahore, Pakistan.

### 5. *Comerica Is Renewed As The Direct Express Financial Agent*

56. Despite the pre-Class Period issues, based on Comerica's 2019 Application and its representations, the Fiscal Service selected Comerica as the Direct Express Financial Agent for a five-year extended term in a renewed FAA, effective January 2020. The renewal signaled to the market that Comerica's remedial actions and assurances to the Fiscal Service sufficed and that it had resolved its past problems.

57. The importance to Comerica of continuing the Direct Express program cannot be overstated. While the fiscal terms of the most recent FAA are not publicly available, the *American Banker* reported that in 2020 Comerica was paid $151

million to operate Direct Express and that it had received roughly $770 million in total gross revenue from the program over a six-year period from 2015 to 2020.

58. As part of the renewal, the Fiscal Service entered into a new FAA with Comerica dated December 20, 2019, signed by Defendant Farmer on behalf of Comerica. In the renewed FAA, Comerica retained Conduent to handle day-to-day Direct Express customer service and claim dispute operations for existing customers and retained i2c to handle the same services for new customers.

59. The new FAA imposed more rigorous customer and reporting requirements, in line with the Audit Update's suggestions. It mandated as follows:

> ***Location of Services***. Except as prohibited by law, the Financial Agent is hereby authorized to provide Debit Card services to cardholders within and outside of the United States as necessary to facilitate the use of Debit Cards by cardholders anywhere in the world. ***All other services provided under this FAA***, including the development, operation and maintenance of systems and applications performed specifically and exclusively on behalf of the Treasury, ***shall be performed in the United States or its territories unless specifically authorized otherwise in writing***. … Except as necessary for benefit payment access, ***the Financial Agent will also ensure that all employees with access to systems, applications or other media that exclusively contain Treasury Information are United States citizens or lawful permanent residents unless specifically authorized otherwise in writing***.

60. The FAA added, "Management of Contractors. The Financial Agent is responsible for the supervision and management of any Contractor retained to assist in the performance of services under this FAA. The Financial Agent shall

remove and replace any Contractor that fails to perform satisfactorily." It expressly listed Conduent and i2c as Contractors and Processors, subject to this provision.

61. The FAA required the safeguarding of information, by both Comerica and its Contractors Conduent and i2c. It stated that Comerica, as Financial Agent, faced liability to both Fiscal Service and any affected agency or individual "for any costs, expenses or damages which result from the fraud, theft, willful misuse or negligence of the Financial Agent or its employees or Contractors with respect to the handling and maintenance of sensitive information." It also imposed duties to safeguard sensitive information on Comerica, Conduent, and i2c. For instance:

> ***Financial Agents should safeguard all sensitive information obtained or maintained by the Financial Agent or its employees or Contractors to accomplish Fiscal Service-required services***. In handling sensitive information, ***Financial Agents should, at a minimum, comply with the procedures for the protection of customer information set forth in the Federal banking agencies' "Joint Interagency Guidelines Establishing Information Security Standards,"*** as may be amended from time to time. ***The Financial Agent may disclose sensitive information only to those employees of the Financial Agent who have a legitimate need to know the information to assist in the proper performance of Fiscal Service-required services***. Furthermore, ***any Contractor used by the Financial Agent to provide services under this agreement must agree in writing to the required safeguarding obligations consistent with those of the Financial Agent***.

62. The FAA also stated, "Comerica Bank commits to adding dedicated legal counsel to the Direct Express program. Such legal counsel will have subject matter expertise in the laws and regulations which may apply to the program…."

63. One such applicable and governing regulation is Regulation E issued by the Federal Reserve as an implementation of the Electronic Fund Transfer Act, which outlines rules and procedures for electronic funds transfers and provides guidelines for sellers and issuers of electronic debit cards. Regulation E allows consumers to dispute unauthorized or fraudulent electronic fund transfers ("EFTs") and requires banks to promptly investigate a fraudulent transfer claim, complete its investigation within 10 days (or 45 days if a provisional credit is provided in the amount of the alleged fraud), report the results to the Federal Reserve and to the consumer, and correct the error within one business day after determining an error occurred. 12 CFR 1005.11(c)(1). The investigation must be reasonable, including a reasonable review of relevant information within the institution's own records. If the bank determines the error was the result of an unauthorized EFT, consumers are not fully liable for the losses, and the bank must refund the rest. 12 CFR 1005.6.

64. Under the FAA, Conduent and i2c handle Comerica's Regulation E dispute processing when Direct Express customers report errors or issues, including potential theft or fraud of the kind that had impacted the program in 2017-2018. This setup, including the addition of i2c as an additional Contractor and Processor, was presented as ensuring compliant operations.

**B. Undisclosed, Material, Negative Facts**

65. CW1 described i2c's work with U.S. financial institutions, based on CW1's work on its partnership with American Express, which had contracted with i2c to process credit card transactions. CW1 described i2c's technology used in card transaction processing. CW1 described how when a cardholder swipes a credit or debit card to make a purchase, the information is sent from the point of purchase to i2c's cloud-based software platform, which instantly checks the cardholder's account, determines if it has enough cash or credit to make the purchase, then authorizes or declines it. CW1 added that i2c's platform also calculates interest charges, implements late fees, and processes customer payments. CW1 made clear that most of i2c's operations are based in Lahore, Pakistan, where 200-300 employees were located, including all of i2c's tech and IT employees and specifically "all of the IT folks who worked on that [cloud-based] system." By contrast, CW1 said i2c's U.S. headquarters in Redwood City, California, where i2c's Pakistani founder and CEO Amir Wain currently works, was for executive employees only, and i2c had under 50 employees in the U.S. CW1 said no tech or IT employees worked at Redwood City, and no card transaction work was done there. CW1 said any promises by i2c to only use U.S.-based employees to process card transactions "would have surprised" CW1, because CW1 believes all that work was done in Lahore, Pakistan.

66. CW2, a Comerica VP – Risk Analyst, said that Comerica had a risk group, at least partly under the Cybersecurity risk group overseen by Dawn Sawka, that obtained the "schematics" of a third-party vendor's data centers that documented the flow of the bank's data from Comerica through the vendor's systems and databases and that identified data center locations. CW2 said that as part of an initial risk assessment of a third-party vendor, Comerica's cybersecurity and technology risk group would obtain a SOC 2 Type II report that is supposed to be an independent audit of how the vendor manages security of its data and systems and that would be part of the vendor's risk assessment file in Comerica's digital records. CW2 confirmed that Nora Arpin, Comerica SVP of Government Electronic Services, was responsible for overseeing the Direct Express program and was aware of Comerica's hierarchy of risk committees, one of which was chaired by Kim Fraley, which are supposed to review things like third-party vendor concerns falling outside acceptable risk levels. CW2 said that certain issues involving "damage control" at Comerica were handled at the "executive, c-suite level," with a risk analyst quietly tapped to assist with an investigation while few others at that lower level would be informed. CW2 was tasked in the spring of 2018 with helping Comerica close out a 2015 federal government Matter Requiring Attention (MRA) concerning its oversight of third-party vendors, including Conduent. CW2 said that Conduent had at least one serious problem that got high-level executive attention,

including monthly site visits from Ron Rechlin and other executives. CW2 said the problem involved money deposits not posting to cardholder's cards and prompted Comerica to seek a second vendor to work on the Direct Express program.

67. As a Cybersecurity Risk Senior Manager, CW3 oversaw Comerica's team of third-party risk analysts and their manager who conducted risk assessments of third-party vendors who did work on the Direct Express program for Comerica. Yet, CW3 was surprised to learn when interviewed of the 2020 internal email from Comerica SVP of Government Electronic Solutions Nora Arpin – revealed by the *American Banker* in a May 2023 article discussed below – describing the bank's concerns about i2c's use of employees in Pakistan for the Direct Express program. CW3 confirmed that use of foreign workers on the Direct Express program would have been "a big issue" because it was a violation of the U.S. government contract, which expressly stated that the work must be done in the U.S. As a senior cybersecurity and third-party risk manager, CW3 should have been made aware of this type of high risk because it involved third-party cybersecurity and technology risks, and if Comerica's procedures were properly followed CW3's group would have been informed by the risk committees and instructed as to what steps to take. As CW3 explained, each risk division, including CW3's division regarding cybersecurity and technology, had a hierarchy of risk committees through which identified risks are escalated up to the Board of Directors. In the case of CW3's

division, it was the information technology risk committee, then the technology risk committee, then the operational risk committee, which assessed risks and deemed them within or not within the bank's risk tolerance, and if not, actions would be taken to reduce the risk or make it compliant. Yet, CW3 was confident that CW3 was not made aware of this concern, has no recollection of it coming to CW3's division or the two risk committees (information technology and technology risk) with which CW3 worked, and has no recollection of hearing about a Direct Express vendor who was doing work in Pakistan – despite the fact that the Direct Express program had special requirements and prompted sensitive attention from the risk group. CW3's lack of knowledge as to the concern over i2c using employees in Pakistan, as well as the other concerns outlined in the Arpin email reported by the *American Banker* in May 2023, makes CW3 question whether Comerica procedures concerning these risks were properly followed. CW3 added that i2c's significant operations in Pakistan should have been raised from a technological concern of where the Direct Express cardholder data would be stored and the access to that data and that a tech team would have had to grant access to such data in order for i2c employees in Pakistan to access it. CW3 also said that as part of the initial risk review and onboarding, the third-party technology risk group requested independent technological audits called SOC 2 Type II reports. CW3 does not recall any such risk review of i2c, nor of an Omaha call center opened in August 2018, which should

have triggered a more in-depth onsite technology risk review because it was untested. CW3 confirmed that the bank's concerns about i2c not providing necessary data reports about fraud allegations, as described in the Arpin email, would have been a big, "significant" risk. CW3 said that Comerica used Archer, a software system designed for risk management, to store all documentation of risk reviews, which would create a document trail of risk concerns, risk assessments, who looked at what and when, and any approvals of high-risk concerns by risk committees.

68. CW4 was among the first nine people hired for i2c's Omaha call center when it opened in 2018. CW4 said that the Omaha call center was for handling cardholder issues in the Direct Express program, and employees there worked on other i2c clients' projects only for training purposes. CW4 said that the Omaha employees were trained by people at i2c's Pakistan location. CW4 said that the transition of work to the Omaha center from Pakistan took "a couple of years, especially in the chargeback area." CW4 was one of the first additional employees at Omaha trained as chargeback analysts in September 2020. CW4 described how only two i2c employees in the Omaha center processed chargebacks, including processing provisional payments in fraud allegations, which was "not enough to handle the volume." CW4 said that fraud complaints started as soon as new Direct Express cards processed by i2c went out to customers. CW4 had heard that there

was some pressure to transition the work to Omaha because of the security concern of the Pakistan employees being overseas.

69. When CW5 was asked to train as a Chargeback Analyst in or about July 2020, CW5 was aware that i2c's then-current chargeback analysts were in Pakistan. CW5 was one of about 10 Customer Service Representatives in i2c's Omaha call center asked to train as the first U.S. chargeback analysts, with the training done by i2c's employees in Pakistan, who had been processing disputes and chargebacks there, under the head trainer in Pakistan named Hamza Butt. CW5 had heard that pressure from Comerica in 2020 had prompted i2c to begin the training and that i2c's use of employees in Pakistan violated i2c's contract with Comerica. CW5 confirmed that employees in Pakistan were still training chargeback analysts when CW5 left in March 2023. CW5 said that by that point, while the Omaha location was handling routine dispute and chargeback cases for the most part, for difficult cases, assistance from employees in Pakistan would be requested. Indeed, CW5 said, "I stopped working there in March 2023, and there was still some processing being done over there (in Pakistan). When (Omaha) had bigger issues that we couldn't solve, the managers would have daily meetings with Pakistan, and they'd go over major problems, and they (Pakistan) would look into it." CW5 said that to work on those cases, Pakistan employees were given access to the cardholder accounts. CW5 said that Pakistan employees used card reference numbers (CRNs) to do background

work in the accounts, process the settlement of money in the accounts, and look into the settlement of money in the accounts. CW5 also described "daily huddle" meetings between Omaha and Pakistan employees about chargeback department activities, which were attended by Catherine Johnson, Sean Suitor, and Kinsi Tracy in Omaha. CW5 said that during these meetings, Omaha employees regularly asked Pakistan employees for help with chargeback issues and for help with issues that arose after calls with Comerica.

70. CW6 confirmed that, even having trained the Omaha location employees to do chargeback work, i2c employees in Pakistan were still doing work on Direct Express during CW6's tenure. In roughly March 2022 (six months prior to CW6's departure), i2c told its chargeback staff that it was transitioning another part of the dispute processing work from Pakistan to U.S. employees, as discussed in a meeting that CW6 attended with CW6's managers and Sean Wint. CW6 said that, at that time, Pakistan employees were still responsible for the first stage of processing a cardholder dispute, meaning inputting it into the system to be formally processed as a dispute so work could be done on it and creating a spreadsheet of all disputes and fraud complaints, which included cardholder information, card numbers, and information about the dispute. CW6 said the spreadsheet was used to assign cases to chargeback analysts and the fraud review team in the U.S. CW6 said that from October to December 2021, CW6 participated in a special project at i2c to

"re-investigate" hundreds, if not more than a thousand, fraud cases that were handled by employees in Pakistan dating back to 2019. CW6 described the project as a "red flag re-investigation" to "re-evaluate previously worked cases in which account takeover red flags were present to determine if it was adjudicated appropriately." CW6 said an account takeover (ATO) is when someone other than a cardholder has fraudulently gained access and/or control of an account to steal money. CW6 said the list of cases was not randomly generated, but rather one where the "cases were deemed to be worked incorrectly" the first time, such that they "were suspected to have been wrong." CW6 explained that most of the cases were cardholder fraud complaints that had been deemed "non-fraud" by i2c employees in Pakistan, so that the cardholder was not compensated or credited back the money at issue. CW6 said that 90% to 95% of the cases CW6 re-reviewed had actually been fraud with evident red flags in the card transactions – such as IP addresses, transaction locations and other technical footprints – and that some of the cases revealed cardholders who had been victimized by ongoing fraud with their cards for six months or more. CW6 said that when the cardholder continued to submit complaints and to file a dispute, "it just got closed," meaning that "it was ongoing fraud, and they weren't getting help." CW6 understood that the Pakistan employees were more focused on meeting processing numbers than on fully investigating fraud complaints. CW6 said that the project resulted in cases where prior dismissals of fraud were overturned and

attempts were made to belatedly return money to the cardholders, some of whom could not be found or had died, as many cardholders are from vulnerable populations like the elderly, disabled, and homeless. CW6 said the tight timeline imposed on the re-investigation project resulted in a rushed job. CW6 said that the re-investigation project involved writing a standard operating procedure for handling account takeovers, with which CW6 assisted, and CW6 confirmed that no SOP had existed prior.

71. CW7 said that around March 2020, i2c announced that it was transitioning the dispute processing work from employees in Pakistan to employees in Omaha. CW7 was among the first group of U.S. employees trained to become Chargeback analysists, with the training done by i2c employees in Pakistan under lead Pakistani trainer Hamza Butt. CW7 stated that within a year of the transition, most day-to-day dispute processing was done by employees at i2c's Omaha or San Antonio locations. However, CW7 said that i2c's Pakistan employees stayed closely involved in the work even to the time of CW7's departure in October 2021. CW7 recalled weekly or biweekly meetings that Pakistan chargeback analysts had to sit in on, and CW7 said, "I don't think they ever fully transferred over." CW7 said that Pakistan employees were still working on cases on which U.S. employees needed help, and when CW7 spoke to Pakistan employees, they had access to cardholder accounts and could go into those accounts to see the same information that CW7 was

looking at in the U.S. to address whatever issue CW7 was having. CW7 said that the chargeback department managers, Kinsi Tracy and Catherine Johnson, were meeting weekly with Comerica employees and would afterwards tell CW7 and CW7's co-workers what Comerica wanted from them. CW7 said that the system used at i2c was able to generate reports showing how many cases were worked, how many were pending, how many were closed, how many were fraud, etc.

72. CW8 understands that i2c had told Comerica that its transition of dispute processing work from Pakistan to Omaha would be completed in mid-2020, but i2c was behind schedule when CW8 begin work in August 2020. CW8 interacted directly with Comerica personnel, including the lead point person on the Direct Express program, Deborah Srour, who was closely monitoring i2c's progress in transitioning dispute processing work to Omaha from Pakistan. CW8 said that an employee in Pakistan was the person preparing and providing data about the Direct Express program to Comerica, and that Ms. Srour spoke directly with that Pakistani employee. CW8 said, "I can confidently say Deb knew the work was in Pakistan, and they (Comerica) knew (i2c) were moving the work to Omaha. I have no doubt in my mind Deb knew." When CW8 left in December 2020, employees in Pakistan were still processing disputes and had access to cardholder accounts. CW8 said that, at that time, about 15-20 employees in Omaha had been hired and were handling disputes, but the number was insufficient to handle the full volume of disputes,

which meant that the Pakistan employees were still needed to do it. CW8's efforts to build the U.S. based dispute processing team were frustrated by a lack of system access to information in cardholder accounts that only the employees in Pakistan had. CW8 explained that the ability of Omaha employees to use their computer terminals to access more sensitive levels of account data in the Direct Express card processing system was more limited than the access level enjoyed by Pakistan employees, who could access cardholder account information and activities that Omaha employees lacked permission to access. CW8 said that Pakistan employees conducted all the training of U.S. employees. When CW8 left i2c in December 2020, it still did not have a written, finalized set of standard operating procedures (SOPs) for processing disputes in Omaha.

73. CW9 knew that i2c's contract with Comerica prohibited the use of employees outside the U.S. and that the Omaha call center was established to address that requirement. CW9 understood that Comerica was aware that most of i2c's employees were in Pakistan. CW9 said that when the Omaha call center first began operations on Direct Express in late 2018 or early 2019, i2c only had one chargeback person in Omaha, and it took six to eight months to get a second one. CW9 said that, at the same time, i2c had three to five chargeback analysts in Pakistan when it began handling Direct Express cardholder disputes. CW9 said that as card issuances increased, by 2020, i2c had 10 to 15 chargeback analysts in Pakistan processing

Direct Express cardholder disputes, while in Omaha, i2c only had three chargeback analysts. CW9 said that an entire team in Lahore, Pakistan worked 12 to 14-hour days on dispute processing, the majority of which was dispute operations. CW9 said i2c took three years to create a chargeback team, with effort beginning in the summer of 2020. CW9 said that the first Global Head of Chargebacks, Angie Anderson, left after a few months because she was unhappy with the job, leading CW9 to take it over on an interim basis, despite the fact that CW9 said "I didn't know shit about chargebacks." CW9 said that by mid-2021, most of the day-to-day work of processing disputes was done by U.S. based i2c employees, but when CW9 left in August 2021, employees in Pakistan were still working on some cases and still accessing cardholder accounts. CW9 said that Comerica did not start doing quality assurance audits of i2c's internal quality assurance audits until 2021.

74. At Conduent, CW10 worked in the nine-person Customer Advocacy Group, which was created to address the large number of customer complaints that were escalating to high levels and/or official channels like the Attorney General's Office or Consumer Financial Protection Bureau (CFPB). CW10 received a dozen or more escalated complaints each day and had about three days to complete them, by reviewing the complaint allegations, customer transaction history, alleged fraudulent transaction information, and digital footprints of the transaction. CW10 determined if each fraud claim was legitimate and wrote a detailed report of the

findings, which was submitted to Comerica and maintained in Conduent's system. All of the cases that CW10 investigated were customer allegations of fraudulent activity on their cards that Conduent had previously determined did not meet the criteria for fraud, such that they were not eligible for a credit to cover the transaction values. The complaints funneled to CW10's group came from cardholders who refused to accept Conduent's denial of fraud and continued to press, either through Conduent or other channels like the AG's Office or the CFPB, which require a response from the financial institution, or political representatives or the media. CW10 said that typically an AG or CFPB went to Comerica first, which then sent them on to Conduent. CW10 also confirmed that Comerica had access to Conduent's computer systems and were able to look in the complaint files and disputes, including the results of investigations. CW10 overturned Conduent's earlier decision denying a customer's fraud allegation between 80% and 90% of the time, meaning those cardholders were owed a credit for the value of the fraudulent transactions. In doing so, CW10 saw the notes related to the earlier denials, which often included invalid reasons for the denial or "cut and pasted" investigative notes from other files that had nothing to do with the claim, leading CW10 to understand that the prior Conduent employees, who were required to process 60 to 75 cases a day, had simply tried to close out the cases as fast as possible to meet deadlines for completion. CW10 said that, every day, about 36 complaint came from Comerica

to the Conduent Customer Advocacy Group, which was required to promptly investigate and provide a response back to Comerica, which then submitted it to the AG's Office or CFPB. Consequently, CW10 said that Comerica knew the large number of customer complaints with respect to which Conduent was erroneously denying the fraud allegations. CW10 said, "They definitely know what was going on as far as high complaint levels of high-level complaints. They knew all the complaints they were receiving."

75. CW11 said that a reason that i2c was added to the Direct Express program was that Conduent's technology was outdated, whereas i2c had newer technology and infrastructure. CW11 said that the plan was for card holder accounts to be migrated from Conduent to i2c over time. CW11 said that in late 2020 a colleague, who CW11 believes was Linda Goulet, who was Comerica's liaison with the federal government regarding the Direct Express program and who reported to Comerica SVP of Government Electronic Services Nora Arpin, informed CW11 on an internal call that the federal government had instructed Comerica to stop migrating Direct Express card holder accounts to i2c, because i2c was operating outside the U.S. CW11 said that product technology managers, including CW11, presented weekly status updates about the programs under their purview to Comerica's CIO for Technology Bruce Mitchell, using Powerpoint slides with color-coded updates to reflect levels of urgency or severity. In their

presentations, each product manager had to go through each status update, explain the situations, and report on what was being done to address pressing issues. CW11 said that VP of Product Technology Padma Sengupta was responsible for the technology side of the Direct Express program in 2020 and presented about Direct Express to Mr. Mitchell. CW11 said that Ms. Sengupta's reports included updates about anything going on with Comerica's Direct Express vendors, i2c and Conduent, and that Ms. Goulet contributed status notes to the Direct Express reports. CW11 knew that Mr. Mitchell had regular meetings with his superiors to provide updates about the various technology programs and products under his responsibility, including Direct Express. Mr. Mitchell reported directly to Chief Operations and Technology Officer Megan Crespi, who reported to Defendant Farmer. CW11 also believes that the federal government's instructions regarding i2c would have "absolutely" reached the highest levels of the company on the business side through Ms. Goulet and/or Ms. Arpin. CW11 said, "The Direct Express program was – at the time I was there – a very critical program for the bank because of the revenue aspect of it and because of the fact that you're looking at five million cards. Because of the size, I'd call it a very prestigious program to have. Anything that happened with that program caused all sort of attention." CW11 described Comerica as focused on risks identified regarding its contracts

and, regarding the instruction to stop migrating accounts to i2c, said, "Anything that drove any kind of risk would have been discussed at the highest levels."

76. These CW statements are corroborated by, and corroborative of, the *American Banker* article published in May 2023 and the sources it cites, as discussed in §V.D., *supra*.

**C. Materially False and Misleading Statements & Omissions**

77. During the Class Period, Defendants made materially false and misleading statements and omissions that can be organized into three primary threads of the alleged fraud: (i) the Business Operations Fraud; (ii) the Reported Results Fraud; and (iii) the Internal Controls Fraud.

***1. Business Operations Fraud***

78. During the Class Period, Defendants made frequent public statements in SEC filings, presentations, and earnings calls, discussing the Direct Express program and its impacts on Comerica, either by name or by reference to things like "government" benefits / payments work or its "card" programs or platforms. These public statements made connections between Comerica's involvement in the Direct Express program and certain specific operating metrics, including noninterest income and card fees, both for Comerica and for its Commercial Bank segment, and noninterest-bearing deposits. At times, Defendants touted Comerica's investments and advancements in technology and platforms more broadly, including in

Comerica's Wealth Management segment. Defendants' statements were materially false or misleading, as follows.

79. On January 21, 2020, Comerica held an earnings call (the "1/21/2020 Earnings Call") on which Defendants Farmer and Herzog participated, supported by slides entitled "Comerica Incorporated Fourth Quarter 2019 and Full-Year 2019 Financial Review" ("1/21/2020 Earnings Slides") that Comerica filed as Exhibit 99.2 to a Form 8-K signed by Comerica's Chief Legal Officer John D. Buchanan ("Buchanan") (the "1/21/2020 Form 8-K"). Defendant Farmer stated, "Of note, ***the U.S. Treasury recently announced that we will continue to be the exclusive financial intermediary for the Direct Express government benefits card program for another five years. The economics of this program include attractive retail deposits that we continue to grow, and our ability to leverage a third-party platform for processing and servicing***." Defendants Farmer and Herzog went on to discuss noninterest income items, which Direct Express impacts. Defendant Farmer said that "***non-interest income growth***" ***was a positive contributor to Comerica's performance*** referencing Slide 5 ("***Noninterest income up over 3%***"). Slide 4 stated, "***Noninterest income growth led by strong card fees***." He added that "***deposit growth was robust***" "***with over 40% coming from non-interest bearing deposits***" and noted "***[a] $10 million increase in non-interest income***." Defendant Herzog said, "***Non-interest income increased $10 million***" referencing

Slide 11 (“***4Q19 Noninterest Income Increased $10MM, over 3%***”). He added, “***Non-interest bearing deposits increased over 600 million***” referencing Slide 7 (“+***$615MM noninterest-bearing***” and “***Beneficial Deposit Mix – Commercial Noninterest-bearing 39%***”). He added, “***As far as non-interest income, we expect growth of about 1% led by card [] fees***.” Defendant Herzog responded to a question by saying, “[W]e actually do have some good core growth in a number of line items in 2021. ***One of those is card income.*** And of course, we have associated outside processing fees with that…***we just saw the strong card year, and we will have some outside processing fees associated with that.***” In response to an analyst question regarding the amount and focus of technology spending, Defendant Farmer answered, in relevant part, “In the last 12 months that has included…***major upgrades for our call center technology***. And then for 2020 a number of key areas of focus and items that will be coming online related to…the new portal for our wealth management clients.”

80. On April 21, 2020, Comerica held an earnings call (the “4/21/2020 Earnings Call”) on which Defendant Farmer and Defendant Herzog participated, supported by slides entitled “Comerica Incorporated First Quarter 2020 Financial Review” (“4/21/2020 Earnings Slides”) that Comerica filed as Exhibit 99.2 to a Form 8-K signed by Buchanan (the “4/21/2020 Form 8-K”). Defendant Herzog tied card fees and noninterest income to additional government benefits payments,

stating, "***We expect non-interest income to benefit from an increase in card fees with higher transaction volume as customers receive the government stimulus funds***." He added, "We have ample access to multiple funding sources, ***with 75% of our funding coming from relationship-oriented deposits, of which nearly half are non-interest bearing deposits***," referencing Slide 14 ("Primarily Funded with Relationship Deposits – ***Noninterest-bearing Deposits 36%***"). In response to an analyst question about the effect on the stimulus package on the Direct Express program, Defendant Herzog stated, "***Regarding Direct Express, in my remarks, you might recall that I mentioned that we expect card fees actually to be up in the second quarter***. So, stimulus payments being processed is a component of that. So, we have factored that in."

81. On October 20, 2020, Comerica held an earnings call (the "10/20/2020 Earnings Call") on which Defendant Farmer and Defendant Herzog participated, supported by slides entitled "Comerica Incorporated Third Quarter 2020 Financial Review" ("10/20/2020 Earnings Slides"), which Comerica filed as Exhibit 99.2 to a Form 8-K signed by Buchanan ("10/20/2020 Form 8-K"). Defendant Farmer stated, "Non-interest income increased as customer activity began to rebound including ***continued strong contribution from our card platform***." Defendant Herzog said, "[C]ard fees remained very strong ***and increased $3 million due to higher consumer volumes and merchant activity***," and Slide 12 stated "***+$3MM Card Fees***." Slide

3, titled "3Q20 Results," stated under the heading "Key Performance Drivers," "Deposit growth broad-based & primarily noninterest-bearing" and "***Noninterest income included*** growth in deposit service charges, … & ***continued strong card fees***" and included a chart showing a noninterest income increase to $252 million in Q3 2020 from $247 million in Q2 2020. Slide 16, titled "Key Strengths," touted Comerica's "***High-caliber, robust Cash Management suite, including Card programs***."

82. On December 7, 2020, Comerica filed with the SEC a Form 8-K ("12/7/2020 Form 8-K") signed by Buchanan announcing that Defendants Farmer and Herzog would present at the Goldman Sachs US 2020 Financial Services Conference on December 8, 2020, and attaching as Exhibit 99.1 presentation slides titled "Goldman Sachs 2020 US Financial Services Conference" and dated December 8, 2020 ("12/8/2020 GS Presentation"). The 12/8/2020 GS Presentation stated, "Prepaid card ***- #4 prepaid card issuer in US…Exclusive provider of prepaid debit cards for U.S. Treasury Direct Express Program***" and included two charts showing that "***Card fees went up 6% in 3Q20 compared to 3Q19***" and "***Government Card Deposits went up 113% in 3Q20 compared to 3Q19***." It added, "4Q20 [] Deposit Update" – "***Deposit Trends – QTD average deposits reflect***: ***+$577MM noninterest-bearing deposits***." It added, "3Q20 Results…***deposit growth continued***" and "Key Performance Drivers 3Q20 compared to

2Q20…***Deposits growth broad-based & primarily noninterest-bearing***… ***Noninterest income included… continued strong card fees***." It added, "***Average deposits increased $4.5B… +$3.2B noninterest-bearing***" and "***+$3MM Card fees***."

83. On January 19, 2021, Comerica held an earnings call ("1/19/2021 Earnings Call") on which Defendants Farmer and Herzog participated, supported by slides entitled "Comerica Incorporated Fourth Quarter 2020 Financial Review" (the "1/19/2021 Earnings Slides"), which Comerica filed as Exhibit 99.2 to a Form 8-K signed by Buchanan ("1/19/2021 Form 8-K"). Defendant Farmer stated, "***Timing of monthly benefit activity in our government prepaid card business increased balances by $2.2 billion at quarter end***" and "***Average deposits increased by nearly $1.5 billion to an all time high, with 55% of the growth derived from non-interest bearing accounts***." He added, "***Non-interest income increased $13 million or 5%***…." Defendant Herzog stated, "***[C]ard fees remained very strong due to government card and merchant activity***…." He added, "***Average deposits increased 2% or $1.5 billion to a new record of $70.2 billion***," while referencing Slide 7, titled "Deposits," ***showing noninterest-bearing deposits increased by $824 million*** compared to the prior quarter. He said, "***The largest driver continues to be non-interest bearing deposits***..." Herzog added, "***Non-Interest income increased $13 million***" while referencing Slide 12, titled "Noninterest Income," which

included a chart showing a noninterest income increase to $265 million from the prior quarter figure of $252 million. Slide 4, titled "FY20 Results," states under the heading "Key YoY Performance Drivers," "***17% deposit growth; broad-based and primarily noninterest-bearing***" and "***Noninterest income: higher … card fees***." In response to an analyst question regarding changes in Comerica's investments in technology, Defendant Farmer addressed technology and customer information across Comerica's broader operations, stating, "***We've done a lot around just how we leverage data and push data to our employees in terms of customer information***. We're making a number of enhancements to our treasury management platform. And then ***we've been going through some upgrades in our wealth management business line and new trust platform and a new wealth management portal***, sort of single sign-on portal for our wealth management clients."

84. On March 8, 2021, Comerica filed with the SEC a Form 8-K (the "3/8/2021 Form 8-K") signed by Buchanan, announcing Defendant Herzog would present at the 2021 RBC Capital Markets Financial Institutions Conference on March 9, 2021, and attaching as Exhibit 99.1 presentation slides entitled, "RBC Capital Markets 2021 Financial Institutions Conference" dated March 9, 2021 ("3/9/2021 RBC Presentation"). The 3/9/2021 RBC Presentation touted Comerica as the "***#4 prepaid card issuer in US***" and the "***exclusive financial intermediary for US Treasury Direct Express Program***," with a chart showing "***Prepaid***"

accounted for ***62% of Card Products***. It said, "1Q21 [] Deposit Update" - "***Deposit Trends – QTD average deposits reflect***: ***+$210MM noninterest-bearing deposits***." It added, "FY20 Results…***deposit growth***," and Key YoY Performance Drivers - "***17% deposit growth; broad-based & primarily noninterest-bearing***," and "***Noninterest income…card fees***."

85. On April 20, 2021, Comerica held an earnings call (the "4/20/2021 Earnings Call") on which Defendants Farmer and Herzog participated, supported by slides entitled "Comerica Incorporated First Quarter 2021 Financial Review" ("4/20/2021 Earnings Slides"), which Comerica filed as Exhibit 99.2 to a Form 8-K signed by Buchanan ("4/20/2021 Form 8-K"). Defendant Herzog stated, "***Non-interest income increased $5 million***" while referencing Slide 10, titled "Noninterest Income," which showed noninterest income increased to $270 million from the prior quarter figure of $265 million. He added, "***Note card fees remain elevated. They were over 20% higher than a year ago due to government card and merchant activity***…." He added, "***Average deposits increased 2% or $1.1 billion to a new record***," while referencing Slide 6, titled "Deposits," which showed that average deposits increased $1.1 billion, including "***$603MM noninterest-bearing***." Defendant Farmer stated, "***[N]on-interest income has increased in each of the past four quarters. Our robust card platform is a great example.***"

86. On June 11, 2021, Comerica filed with the SEC a Form 8-K ("6/11/2021 Form 8-K"), signed by Buchanan, announcing that Defendant Herzog would present at the Morgan Stanley US Financials Conference on June 14, 2021, supported by slides entitled, "Morgan Stanley 2021 US Financials Conference" dated June 14, 2021 (the "6/14/2021 MS Presentation"), which Comerica filed as Exhibit 99.1 to the 6/11/2021 Form 8-K. The 6/14/2021 MS Presentation touted Comerica as the "***#4 prepaid card issuer in US,***" and the "***exclusive financial intermediary***" for the "***Direct Express Program.***" It added, "2Q21 [] Deposit Update" - "***Deposit Trends – QTD average deposits reflect***: ***+$3.0B noninterest-bearing deposits***." It added, "1Q21 Results…Key Performance Drivers 1Q21 compared to 4Q20…***Deposits: up 2% led by consumer…Noninterest income: Continued robust activity***" and "***Average deposits increased $1.1B - +$603MM noninterest-bearing***." It added, "***Noninterest Income Activity continues to be strong…Increase of $5MM or 2%...Increase of $33MM or 14% over 1Q20***."

87. On July 21, 2021, Comerica held an earnings call (the "7/21/2021 Earnings Call") on which Defendants Farmer and Herzog participated, supported by slides entitled "Comerica Incorporated Second Quarter 2021 Financial Review" ("7/21/2021 Earnings Slides"), which Comerica filed as Exhibit 99.2 to a Form 8-K signed by Buchanan ("7/21/2021 Form 8-K"). Defendant Herzog stated, "***Non-interest income increased $14 million or 5%***…" while referencing Slide 10, titled

"Noninterest Income," which showed noninterest income increased to $284 million from the prior quarter figure of $270 million. He added, "***Card fees increased $13 million and are 23% higher than a year ago, primarily due to government card*** and to a lesser extent also merchant consumer and commercial card activity." Slide 4, titled "2Q21 Results," states under the heading "Key Performance Drivers 2Q21 compared to 1Q21," "***Noninterest income: Robust activity including growth in card,*** commercial lending & fiduciary." He added, "***Average deposits increased $4.1 billion, climbing to a new record***" and "***Non-interest-bearing deposits accounted for almost 75% of the growth***" while referencing Slide 6, titled "Deposits," showing that ***non-interest-bearing deposits increased by $3 billion*** as compared to the previous quarter figure.

88. On August 19, 2021, Comerica published on its website the Comerica Incorporated Investor Presentation ("8/19/2021 Investor Presentation"), which touted Comerica as the "***exclusive financial intermediary***" for the "***Direct Express Program***," making it the "***#4 prepaid card issuer in US***." It added that "***Card Fee Income [was] Up 23% from 2Q20 mainly due to higher government card transactions***" and that ~60% of card fees came from Prepaid. It added, "Key Performance Drivers 1Q21 compared to 4Q20…***Deposits: up 2% led by consumer***" and "***Noninterest Income Activity continues to be strong…Increase of $5MM or 2%...Increase of $33MM or 14% over 1Q20***." It also said, "***Average deposits***

***increased $1.1B - +$603MM noninterest-bearing***," "***Beneficial Deposit Mix – Commercial Noninterest-bearing 42%***."

89. On August 23, 2021, Comerica issued a press release in which Defendant Farmer was quoted ("8/23/2021 Press Release"), announcing release of its 2020 Corporate Responsibility Report ("2020 CRR"), which was published on Comerica's corporate website. The 2020 CRR touted Comerica's selection "***by the U.S. Treasury as the Financial Agent for their Direct Express® Debit MasterCard Program®***," saying that "***…the innovative prepaid card program deliver[s] benefits more cost effectively and securely***…." It added, "***Direct Express® transactions are covered by regulations that protect federal benefit recipients***…" and "***the Direct Express® card protects vulnerable cardholder funds and is one of the most secure prepaid cards in the industry***."

90. On September 10, 2021, Comerica filed with the SEC a Form 8-K ("9/10/2021 Form 8-K"), signed by Buchanan, announcing that Defendants Farmer and Herzog would present at the Barclays Global Financial Services Conference on September 13, 2021, and attaching as Exhibit 99.1 slides entitled "Barclays Global Financial Services Conference" dated September 13, 2021 ("9/13/2021 Barclays Presentation"), which touted Comerica as the "***exclusive provider of prepaid debit cards***" for the "***Direct Express Program***" and the "***#3 prepaid card issuer in US***." It stated, "***Card Fees Up 22% 1H21/1H20 mainly due to higher government card***

***transactions***" with a chart showing 63% of card fees came from Prepaid. It added, "Key Performance Drivers 2Q21 compared to 1Q21…***Deposits: up 6%… Noninterest income: Robust activity, including growth in card***" and "***Increase of $14MM or 5% (+$13MM Card Fees)...Increase of $37MM or 15% over 2Q20***." It added, "***QTD average deposits reflect***: ***+$1.1B noninterest-bearing deposits***."

91. On November 8, 2021, Comerica published on its website the Comerica Incorporated Investor Presentation ("11/8/2021 Investor Presentation") which stated, "***Card Fee Income Up 15% YTD from 2020 due to government stimulus and higher activity***" with a chart showing 60% of the card fees came from Prepaid. It touted Comerica as the "***exclusive provider of prepaid debit cards***" for the "***Direct Express Program***" and the "***#3 prepaid card issuer in US***." It added, "Key Performance Drivers 3Q21 compared to 2Q21…***Deposits: up 5%… Noninterest income: remained robust***" and "***[a]verage deposits increased $3.6B - +$1.6B noninterest-bearing***."

92. On January 19, 2022, Comerica held an earnings call (the "1/19/2022 Earnings Call") on which Defendants Farmer and Herzog participated, supported by slides entitled "Comerica Incorporated Full-Year 2021 & Fourth Quarter 2021 Financial Review" ("1/19/2022 Earnings Slides") that Comerica filed as Exhibit 99.2 to a Form 8-K signed by Comerica's Chief Legal Officer Buchanan (the "1/19/2022 Form 8-K"). During the call, Defendant Farmer stated, "[M]ore than

ever, technology plays a major role in delivering the services our customers and colleagues require. Currently ***we are in the process of modernizing our core platforms*** to drive greater operational excellence and empower our colleagues to serve our customers better."

93. On March 7, 2022, Comerica filed with the SEC a Form 8-K ("3/7/2022 Form 8-K"), signed by Buchanan, announcing that Defendant Herzog present on behalf of Comerica at the 2022 RBC Capital Markets Financial Institutions Conference on March 8, 2022 and attaching as Exhibit 99.1 slides titled "RBC Capital Markets 2022 Financial Institutions Conference" dated March 8, 2022 ("3/8/2022 RBC Presentation"), which touted the "***New Direct Express Mobile App***" claiming it had "***High satisfaction ratings***." It added, "***QTD average deposits reflect***: ***+$2.3B noninterest-bearing deposits,***" "Key Performance Drivers Year over Year…***Deposits: up 19%;… Noninterest income up 12% with broad-based growth***," and "Key Performance Drivers 4Q21 compared to 3Q21…***Deposits up 7%; broad-based…Noninterest income growth***."

94. On July 6, 2022, Comerica issued a press release quoting Defendant Farmer ("7/6/2022 Press Release"), announcing release of its 2021 Corporate Responsibility Report ("2021 CRR"), which Comerica published on its corporate website. The 2021 CRR touted the Direct Express program:

> ***Comerica Bank is the exclusive issuer of the U.S. Treasury's Direct Express® Debit MasterCard® Program to deliver government***

> ***benefits electronically to 3.6 million active federal benefit recipients monthly. This prepaid card program delivers benefits cost-effectively and securely…***

It elaborated on the program's purported security, stating, "***Our standard agreement with suppliers and contractors requires that they act in compliance with all applicable laws, including those on… data protection…***" It added, "***As Comerica primarily does business in the United States, we have no significant presence or investment in countries where lack of human rights protection is a known problem***." The 2021 CRR stated, "***We also require that all suppliers (and/or third parties acting as agents of Comerica) conduct themselves with the same high standards of honesty, fairness and integrity.***" It added, "***Suppliers must abide by all applicable federal, state and local laws, rules and regulations while assuring that all services are conducted with a high degree of professionalism and in accordance with the terms and conditions of the relationship.***" It also stated, "***Customer privacy and protection and cybersecurity are key topics critical to our business success. Our customers…and stakeholders trust us to safeguard their privacy, personal information and financial data, and we are committed to maintaining that trust.***"

95. On September 9, 2022, Comerica filed with the SEC a Form 8-K ("9/9/2022 Form 8-K"), signed by EVP / Chief Legal Officer Hays, announcing that Defendants Farmer and Herzog would present at the Barclays Global Financial

Services Conference on September 13, 2022, and attaching as Exhibit 99.1 presentation slides titled "Barclays Global Financial Services Conference" dated September 13, 2022 (9/13/2022 Barclays Presentation"). Slide 10 discussed "***Enhancing our digital customer experience***" through "***Customer First Digital Delivery***" including the "***Upgraded Mobile App***." The same slide said that "***Card Fees [were] 26%***" of "***2Q22 Noninterest Income***."

96. On March 6, 2023, Comerica filed with the SEC a Form 8-K (the "3/6/2023 Form 8-K"), signed by Hays, announcing that Defendant Herzog would present at the 2023 RBC Capital Markets Financial Institutions Conference on March 7, 2023, and attaching as Exhibit 99.1 presentation slides titled "RBC Capital Markets Financial Institutions Conference" dated March 7, 2023 ("3/7/2023 RBC Presentation"). The slides showed "***Noninterest Income representing 30% of FY22 Revenue***," "***4Q22 Results Record revenue***…Key Performance Drivers 4Q22 compared to 3Q22… ***Noninterest income remained strong***," and "***Noninterest Income Continued robust fee generation…Remained Stable (+$1MM Card)***." It also said, "***FY22 Results Record revenue…***Key Performance Drivers Year over Year…***Deposits reflect customers utilizing excess cash (following $13B, or 19%, FY21 growth)…***," adding, "***Beneficial Deposit Mix; 56% noninterest-bearing – Commercial Noninterest-bearing 45%***."

97. On June 1, 2023, Defendant Farmer published a letter to the editor in the *American Banker* ("6/1/2023 *AB* Letter"), in response to the 5/29/2023 *AB* Article (defined and discussed *infra*) that sought to reverse, and did reverse, the stock price declines that the 5/29/2023 *AB* Article had caused. The letter discussed the Direct Express program and Comerica's role as its Fiscal Agent and claimed that the 5/29/2023 *AB* Article "included excerpts of internal communications about the [Direct Express] program without context, failing to provide a complete picture of how the program is managed and issues are addressed." It stated, "***The scope of the Direct Express program requires*** coordinating many stakeholders and ***working diligently to ensure that federal regulations are being followed***," and the program helped people "***safely receive their benefits***." It continued, describing purported actions to rectify issues with one vendor (singular):

> The recent article ignores the fact that ***Comerica took steps to protect Direct Express users when it became aware that a third-party vendor had not followed program protocols for reviewing customer inquiries***." These steps included requiring the vendor in question to engage an independent auditor whose results were shared with the Fiscal Service. ***These steps were taken in cooperation with the Fiscal Service in 2020***.

The 6/1/2023 *AB* Letter continued, "And, ***we continue to perform regular assessments***, including independent audits ***to ensure the program is managed in compliance with applicable requirements*** with ongoing oversight from the Fiscal

Service and Treasury Department." It emphasized, "***We…act quickly if we find issues – from addressing individual customer concerns to oversight of vendors***."

98. The foregoing Business Operations Fraud misstatements all concerned the Direct Express program and/or key related operating metrics - noninterest income and card fees, both for Comerica and for its Commercial Bank segment, and noninterest-bearing deposits (which generate revenue through lending activities) – either by expressly discussing Direct Express by name or by reference to Comerica's "government" benefits / payments / prepaid cards or to its "card" programs and platforms. All were materially false or misleading when made and thus actionable, given the concealed, negative, contemporaneous facts detailed by the CW statements set forth in the "Undisclosed, Material, Negative Facts" section *supra* and "Defendants' Knowledge Or Reckless Disregard" section *infra* and by the revelations in the "Truth Begins To Emerge" section *infra*. Specifically:

(a) Defendants boasted of the Direct Express program's security, *e.g.*, stating that the "Direct Express Debit Mastercard Program" "deliver[s] benefits more cost effectively and securely" and that "the Direct Express card protects vulnerable cardholder funds and is one of the most secure prepaid cards in the industry." *See* 2020 CRR; 2021 CRR. Defendant Farmer wrote that Direct Express helped people "safely receive their benefits." *See* 6/1/2023 *AB* Letter. These statements were materially false or misleading, *inter alia*, due to the concealed facts

regarding Comerica's and Conduent's mishandling of fraud complaints by Direct Express enrollees in noncompliance with Comerica's FAA, EFTA §2015.15, and Federal Reserve Regulation E, and due to Comerica's and i2c's reliance on data systems and personnel in Lahore, Pakistan to store, access, and use Direct Express cardholder data and PII, in noncompliance with Comerica's FAA, the Fiscal Service's Policy on Personnel Security for Debit Card Services, and Treasury's security directives. This sustained pattern of noncompliant, improper, and unlawful conduct during the Class Period caused undisclosed risks to Comerica's status as the sole Financial Agent of the Direct Express program during the current FAA and to its chances of remaining in that role or being replaced during the next renewal cycle that is now ongoing for the new contract term beginning in January 2025.

(b) Defendants specifically highlighted the legal framework that applies to Direct Express, *e.g.*, by stating "Direct Express transactions are covered by regulations that protect benefit recipients." *See* 2020 CRR. Defendant Farmer wrote, "The scope of the Direct Express program requires…working diligently to ensure that federal regulations are being followed." *See* 6/1/2023 *AB* Letter. These statements were materially misleading half-truths due, *inter alia*, to the concealed facts about Comerica's, Conduent's, and i2c's ongoing conduct in noncompliance with EFTA §2015.15, Federal Reserve Regulation E, and Comerica's FAA, due to Comerica's and Conduent's mishandling of fraud complaints by Direct Express

enrollees and in noncompliance with Comerica's FAA, the Fiscal Service's Policy on Personnel Security for Debit Card Services, and Treasury's security directives, and due to Comerica's and i2c's reliance on data systems and personnel in Lahore, Pakistan to store, access, and use Direct Express cardholder data and PII. This sustained pattern of noncompliant, improper, and unlawful conduct during the Class Period caused undisclosed risks to Comerica's status as the sole Financial Agent of the Direct Express program during the current FAA and to its chances of remaining in that role or being replaced during the next renewal cycle that is now ongoing for the contract term beginning in January 2025.

(c) Defendants touted Comerica's ability to rely on its Contractors, i2c and Conduent, *e.g.*, by stating, "The economics of this program include…our ability to leverage a third-party platform for processing and servicing." *See* 1/21/2020 Earnings call. Defendant Farmer wrote that when an issue arose, it "require[ed] the vendor in question to engage an independent auditor whose results were shared with the Fiscal Service. These steps were taken in cooperation with the Fiscal Service in 2020." *See* 6/1/2023 *AB* Letter. These statements were materially misleading because, *inter alia*, the "third-party platform" in question refers to i2c's software and technology, which was based in Lahore, Pakistan, in contravention of Comerica's obligations under its FAA, the Fiscal Service's Policy on Personnel Security for Debit Card Services, and Treasury's security directives. Alternatively,

that term referred to i2c and Conduent more generally, in which case it was materially misleading, among other reasons, for concealing that Conduent was mishandling and wrongly denying Direct Express enrollee fraud complaints while i2c was mishandling enrollee account data and PII by storing, accessing, and using it in Lahore, Pakistan. This sustained pattern of noncompliant, improper, and unlawful conduct during the Class Period caused undisclosed risks to Comerica's status as the sole Financial Agent of the Direct Express program during the current FAA and to its chances of remaining in that role or being replaced during the next renewal cycle that is now ongoing for the contract term beginning in January 2025, and consequently, to Comerica's ability to capitalize on the Direct Express program's "economics."

(d) Defendants highlighted the contractual and legal obligations purportedly imposed on Comerica's Contractors, i2c and Conduent, thereby conveying to investors that there was compliance, *e.g.*, by stating, "Our standard agreement with suppliers and contractors requires that they act in compliance with all applicable laws, including those on…data protection…" *See* 2021 CRR. Defendant Farmer wrote, "The scope of the Direct Express program requires coordinating many stakeholders and working diligently to ensure that federal regulations are being followed." *See* 6/1/2023 *AB* Letter. These statements were materially misleading half-truths due, *inter alia*, to the concealed facts indicating

that Comerica and Conduent were mishandling and wrongly delaying and denying fraud complaints by Direct Express enrollees in noncompliance with Comerica's FAA, EFTA §2015.15, and Federal Reserve Regulation E, and that Comerica and i2c were mishandling and wrongly storing and accessing Direct Express enrollee account data and PII, by using electronic storage, software, and personnel based in Lahore, Pakistan in noncompliance with Comerica's FAA, the Fiscal Service's Policy on Personnel Security for Debit Card Services, and Treasury's security directives. This sustained pattern of noncompliant, improper, and unlawful conduct during the Class Period caused undisclosed risks to Comerica's status as the sole Financial Agent of the Direct Express program during the current FAA and to its chances of remaining in that role or being replaced during the next renewal cycle that is now ongoing for the contract term beginning in January 2025.

(e) Defendants gave reassurances that Comerica's operations were based in the U.S., *e.g.*, by stating, "As Comerica primarily does business in the U.S., we have no significant presence or investment in countries where lack of human rights protection is a known problem." *See* 2021 CRR. Particularly given the 2019 Application's representations and the FAA's requirements regarding use of U.S.-based customer service centers and personnel, who must also be U.S. citizens or lawful permanent U.S. residents, these statements were materially false or misleading, because throughout the Class Period, Comerica, through its Contractor

i2c, conducted extensive, significant operations in support of the Direct Express program in Lahore, Pakistan, involving Pakistan-based electronic storage and software, as well as Pakistani account, chargeback, and training personnel based in Pakistan. This sustained pattern of Class Period conduct was improper, unlawful, and noncompliant with Comerica's FAA, the Fiscal Service's Policy on Personnel Security for Debit Card Services, and Treasury's security directives, causing undisclosed risks to Comerica's status as the sole Financial Agent of the Direct Express program during the current FAA and to its chances of remaining in that role or being replaced during the next renewal cycle that is now ongoing for the contract term beginning in January 2025.

(f) Defendants said regarding Direct Express that "The economics of this program include attractive retail deposits that we continue to grow…" *See* 1/21/2020 Form 8-K. They thereafter discussed noninterest-bearing deposit metrics and growth in statements also discussing Direct Express or "government" benefits or stimulus funds. *See* 1/21/2020 Form 8-K; 1/21/2020 Earnings Slides; 1/20/2020 Earnings Call; 4/21/2020 Form 8-K; 4/21/2020 Earnings Slides; 4/21/2020 Earnings Call; 12/7/2020 Form 8-K; 12/8/2020 GS Presentation; 1/19/2021 Form 8-K; 1/19/2021 Earnings Slides; 1/19/2021 Earnings Call; 3/8/2021 Form 8-K; 3/9/2021 RBC Presentation; 4/20/2021 Form 8-K; 4/20/2021 Earnings Slides; 4/20/2021 Earnings Call; 6/11/2021 Form 8-K; 6/14/2021 MS Presentation;

7/21/2021 Form 8-K; 7/21/2021 Earnings Slides; 7/21/2021 Earnings Call; 8/19/2021 Investor Presentation; 9/10/2021 Form 8-K; 9/13/2021 Barclays Presentation; 11/8/2021 Investor Presentation; 3/7/2022 Form 8-K; 3/8/2022 RBC Presentation; 3/6/2023 Form 8-K; 3/7/2023 RBC Presentation. These statements were materially misleading half-truths, because in overseeing "this program," *i.e.*, Direct Express, during the Class Period, Comerica and Conduent were mishandling and wrongly delaying and denying fraud complaints by Direct Express enrollees in noncompliance with Comerica's FAA, EFTA §2015.15, and Federal Reserve Regulation E, while Comerica and i2c were mishandling and wrongly storing and accessing Direct Express enrollee account data and PII, by using electronic storage, software, and personnel based in Lahore, Pakistan in noncompliance with Comerica's FAA, the Fiscal Service's Policy on Personnel Security for Debit Card Services, and Treasury's security directives. This sustained pattern of noncompliant, improper, and unlawful conduct during the Class Period caused undisclosed risks to Comerica's status as the sole Financial Agent of the Direct Express program during the current FAA and to its chances of remaining in that role or being replaced during the next renewal cycle that is now ongoing for the contract term beginning in January 2025, and consequently, to Comerica's ability to capitalize on the Direct Express program's "economics," specifically jeopardizing Comerica's continued access to Direct Express as a significant source

of $3 billion+ of monthly noninterest-bearing deposit funding in the form of government benefits received through the program.

(g) Often expressly referencing the Direct Express program, the payment of "government" benefits or stimulus funds, "government prepaid cards," or the "card platform" or "card programs," Defendants discussed noninterest income metrics and growth, and the impact thereon by "card fees," "card income," and "[card] processing fees." *See* 1/21/2020 Form 8-K; 1/21/2020 Earnings Slides; 1/20/2020 Earnings Call; 4/21/2020 Form 8-K; 4/21/2020 Earnings Slides; 4/21/2020 Earnings Call; 10/20/2020 Earnings Call; 10/20/2020 Earnings Slides; 10/20/2020 Earnings Call; 12/7/2020 Form 8-K; 12/8/2020 GS Presentation; 1/19/2021 Earnings Call; 1/19/2021 Form 8-K; 1/19/2021 Earnings Slides; 3/8/2021 Form 8-K; 3/9/2021 RBC Presentation; 4/20/2021 Form 8-K; 4/20/2021 Earnings Slides; 4/20/2021 Earnings Call; 6/11/2021 Form 8-K; 6/14/2021 MS Presentation; 7/21/2021 Form 8-K; 7/21/2021 Earnings Slides; 7/21/2021 Earnings Call; 8/19/2021 Investor Presentation; 9/10/2021 Form 8-K; 9/13/2021 Barclays Presentation; 11/8/2021 Investor Presentation; 3/7/2022 Form 8-K; 3/8/2022 RBC Presentation; 9/9/2022 Form 8-K; 9/12/2022 Barclays Presentation; 3/6/2023 Form 8-K; 3/7/2023 RBC Presentation. These statements were materially misleading half-truths, *inter alia*, because Comerica's card fees, which were a significant part of noninterest income for both its Commercial Bank segment and the whole

organization, were metrics impacted by Comerica's and Conduent's mishandling of fraud complaints by Direct Express enrollees in noncompliance with EFTA §2015.15, Federal Reserve Regulation E, and Comerica's FAA. Fraudster-incurred card fees in thousands of compromised Direct Express accounts and cards, some of them for up to six months, were reversible or refundable, while all disruptions in account or card usage, due to delays in resolving fraud reports, cost Comerica legitimate card-based revenue streams, including card fees. At the same time, Comerica and i2c were mishandling and wrongly storing and accessing Direct Express enrollee account data and PII, by using electronic storage, software, and personnel based in Lahore, Pakistan in noncompliance with Comerica's FAA, the Fiscal Service's Policy on Personnel Security for Debit Card Services, and Treasury's security directives. This sustained pattern of noncompliant, improper, and unlawful conduct during the Class Period caused undisclosed risks to Comerica's status as the sole Financial Agent of the Direct Express program during the current FAA and to its chances of remaining in that role or being replaced during the next renewal cycle that is now ongoing for the contract term beginning in January 2025, and consequently, to Comerica's ability to continue to reap card fees and related revenues from the Direct Express program, thus jeopardizing a major component of reported income.

(h) When the 5/29/2023 *AB* Article's publication drove declines in Comerica's stock price, Defendant Farmer made extensive false or misleading statements to reverse those declines, creating the false impression that the Direct Express program issues were limited to a single vendor, were a surprise to Comerica, and were resolved in 2020. He wrote, "Comerica took steps to protect Direct Express users when it became aware that a third-party vendor had not followed program protocols for reviewing customer inquiries. These steps included requiring the vendor in question to engage an independent auditor whose results were shared with the Fiscal Service. These steps were taken in cooperation with the Fiscal Service in 2020." *See* 6/1/2023 *AB* Letter. He added, "[W]e continue to perform regular assessments, including independent audits to ensure the program is managed in compliance with applicable requirements with ongoing oversight from the Fiscal Service and Treasury Department." *Id.* He added, "We…act quickly if we find issues – from addressing individual customer concerns to oversight of vendors." *Id.* These statements were materially false or misleading, *inter alia*, due to the concealed facts regarding Comerica's two (not one) Contractors for the Direct Express program, *i.e.*, Comerica's and Conduent's mishandling of fraud complaints by Direct Express enrollees in noncompliance with Comerica's FAA, EFTA §2015.15, and Federal Reserve Regulation E, and Comerica's and i2c's reliance on data systems and personnel in Lahore, Pakistan to store, access, and use Direct

Express cardholder data and PII, in noncompliance with Comerica's FAA, the Fiscal Service's Policy on Personnel Security for Debit Card Services, and Treasury's security directives. The CWs make clear that this misconduct was not rectified in 2020, and instead occurred throughout the Class Period, and that Comerica did not act "quickly," but rather engaged in a years-long, collaborative, passive engagement both with i2c while it continued work in Pakistan during a very slow transition of work from there to the U.S. and with Conduent while they collaborated on responses to various AG office and CFPB investigatory questions concerning Direct Express accounts. This sustained pattern of noncompliant, improper, and unlawful conduct during the Class Period caused undisclosed risks to Comerica's status as the sole Financial Agent of the Direct Express program during the current FAA and to its chances of remaining in that role or being replaced during the next renewal cycle that is now ongoing for the contract term beginning in January 2025, and it jeopardized Comerica's continued access to the noninterest-bearing deposits, card fees, and noninterest income that Comerica reaped from the Direct Express program.

(i) Defendants repeatedly touted Comerica's technology spending and improvements as part of its "modernizing our core platforms," including "major upgrades for our call center technology" and the "new portal for our wealth management clients." *See* 1/21/2020 Earnings Call; 1/19/2021 Earnings Call;

1/19/2022 Earnings Call. These statements were materially misleading half-truths, *inter alia*, because i2c's Omaha call center remained deficient during the Class Period, causing Comerica and i2c to continue to rely upon technology and personnel based in Lahore, Pakistan to perform their Direct Express functions. Moreover, Comerica's technology upgrades to its wealth management portal were so deficient, exposing serious breakdowns in risk management, third party oversight, and internal controls within Comerica's wealth management business, that federal regulators imposed the OCC Enforcement Agreement, as detailed below, which drew increased regulatory scrutiny on Comerica while its application for renewal as the Direct Express Financial Agent is pending under review, causing analysts to note increased risks and to express concerns.

**2. *Reported Results Fraud***

99. During the Class Period, Defendants also gave quarterly and annual reports of these same operating metrics - noninterest income and card fees, both for Comerica as a whole and for its Commercial Bank segment, and noninterest-bearing deposits – that Comerica had tied and continued to tie to the Direct Express program, its "government" benefits / payments work, and its "card" programs or platforms. Far from pure omissions, these reports were affirmative statements that conveyed misleading half-truths, by failing to explain, contrary to reporting obligations such those imposed by SEC Regulation S-K, Item 303, 17 C.F.R.

§§229.303(b)(2)(ii) and (c)(1), that the reported metrics flowed from, were being generated through, were artificially inflated by, and/or were subject to improper practices and concealed risks, in noncompliance with Comerica's FAA and its legal obligations, including those arising under the Fiscal Service's Policy on Personnel Security for Debit Card Services, Treasury's security directives, EFTA §2015.15, and Federal Reserve Regulation E.

100. Specifically, Defendants' SEC filings publicly reported the following:

(a) Comerica's Q1 2020 10-Q, filed April 29, 2020, which SVP and Chief Accounting Officer Mauricio A. Ortiz ("Ortiz") signed and Defendants Farmer and Herzog SOX-certified, reported "stable" noninterest income of $237 million ($59 million from card fees), including $127 million from its Commercial Bank (then called its Business Bank) ($47 million from card fees), and $26.761 billion in noninterest-bearing deposits.

(b) Comerica's Q2 2020 10-Q, filed July 31, 2020, which Ortiz signed and Defendants Farmer and Herzog SOX-certified, reported noninterest income of $247 million ($68 million from card fees), including $144 million from the Commercial Bank ($59 million from card fees), and $32.686 billion in noninterest-bearing deposits.

(c) Comerica's Q3 2020 10-Q, filed October 30, 2020, which Ortiz signed and Defendants Farmer and Herzog SOX-certified, reported noninterest income of

$252 million ($71 million from card fees), including $135 million from the Commercial Bank ($60 million from card fees), and $35.934 billion in noninterest-bearing deposits.

(d) Comerica's 2020 10-K, filed February 9, 2021, which Defendant Farmer signed and Defendants Farmer and Herzog SOX-certified, reported "relatively stable" noninterest income of $1.001 billion ($270 million from card fees), $265 million of it from Q4 2020, including $555 million from the Commercial Bank ($229 million from card fees), and $39.420 billion in noninterest-bearing deposits.

(e) Comerica's Q1 2021 10-Q, filed April 28, 2021, which Ortiz signed and Defendants Farmer and Herzog SOX-certified, reported noninterest income of $270 million ($71 million from card fees), including $159 million from the Commercial Bank ($60 million from card fees), and $37.361 billion in noninterest-bearing deposits.

(f) Comerica's Q2 2021 10-Q, filed July 29, 2021, which Ortiz signed and Defendants Farmer and Herzog SOX-certified, reported noninterest income of $284 million ($84 million from card fees), including $167 million from the Commercial Bank ($72 million from card fees), and $40.340 billion in noninterest-bearing deposits.

(g) Comerica's Q3 2021 10-Q, filed October 29, 2021, which Ortiz signed and Defendants Farmer and Herzog SOX-certified, reported noninterest income of $280 million ($72 million from card fees), including $169 million from the Commercial Bank ($60 million from card fees), and $41.984 billion in noninterest-bearing deposits.

(h) Comerica's 2021 10-K, filed February 16, 2022, which Defendant Farmer signed and Defendants Farmer and Herzog SOX-certified, reported noninterest income of $1.123 billion ($298 million from card fees), $289 million of it from Q4 2021, including $663 million from the Commercial Bank ($250 million from card fees), and $45.8 billion in noninterest-bearing deposits.

(i) Comerica's Q1 2022 10-Q, filed April 27, 2022, which Ortiz signed and Defendants Farmer and Herzog SOX-certified, reported noninterest income of $244 million ($69 million from card fees), including $132 million from the Commercial Bank ($58 million from card fees), and $43,419 billion in noninterest-bearing deposits.

(j) Comerica's Q2 2022 10-Q, filed July 28, 2022, which Ortiz signed and Defendants Farmer and Herzog SOX-certified, reported noninterest income of $268 million ($69 million from card fees), including $160 million from the Commercial Bank ($57 million from card fees), and $42.918 billion in noninterest-bearing deposits.

(k) Comerica's Q3 2022 10-Q, filed October 28, 2022, which Ortiz signed and Defendants Farmer and Herzog SOX-certified, reported noninterest income of $278 million ($67 million from card fees), including $169 million from the Commercial Bank ($56 million from card fees), and $41.820 billion in noninterest-bearing deposits.

(l) Comerica's 2022 10-K, filed February 14, 2023, which Defendant Farmer signed and Defendants Farmer and Herzog SOX-certified, reported noninterest income of $1.068 billion ($273 million from card fees), including $607 million from the Commercial Bank ($227 million from card fees), and $39.945 billion in noninterest-bearing deposits.

(m) Comerica's Q1 2023 10-Q, filed April 28, 2023, which Ortiz signed and Defendants Farmer and Herzog SOX-certified, reported noninterest income of $282 million ($69 million from card fees), including $153 million from the Commercial Bank ($58 million from card fees), and $36.251 billion in noninterest-bearing deposits.

101. As detailed *supra*, Defendants had linked these and related metrics to the Direct Express program, through references to the Direct Express program by name and by reference, *e.g.*, to Comerica's work with "government" benefits payments and prepaid cards and its "card" platforms. That connection continued in the quarterly and annual filings. For instance, the 2020 10-K said: (i) Comerica's

"***Noninterest income was relatively stable at $1 billion***, reflecting decreases in service charges on deposit accounts and commercial lending fees, partially offset by ***increases in*** securities trading income and ***card fees***"; (ii) "***Card fees consist primarily of interchange and other fee income earned on government prepaid card***, commercial card, debit/Automated Teller Machine (ATM) card and merchant payment processing services"; and (iii) "***Card fees increased $13 million, or 5 percent, driven by volume increases in the government card program*** from stimulus payments under the Coronavirus Aid, Relief, and Economic Security Act, as amended by the Consolidated Appropriations Act of 2021 (CARES Act), resulting in higher interchange revenue…" Regarding noninterest-bearing deposits, the Q1 2021 10-Q stated, "***The decrease in noninterest-bearing deposits included a $1.8 billion decrease in National Card Services primarily due to the timing of deposits by the U.S. Treasury***, ***which typically fund a government card program*** on the first day of each month." The Q2 2021 10-Q said, "***Noninterest income increased $37 million to $284 million…reflecting an increase in card fees as a result of higher activity including from stimulus payments***" and that "***[t]he increase in card fees resulted from higher activity mostly related to stimulus payments***" from the government. The Q2 2021 10-Q similarly attributed a $98 million increase in noninterest income in part to "***increases in card fees***" and said, "***The increase in card fees resulted from higher activity mostly related to stimulus***

***payments*** and merchant processing services…" Similarly, the 2021 10-K attributed the 10% rise in card fees of $28 million to "***volume increases in*** both merchant payment processing services and ***government cards*** mostly related to additional stimulus payments resulting in higher interchange revenue." Likewise, the 2022 10-K attributed the 8% decrease in card fees of -$25 million to "***a decline in government cards*** due to elevated activity from stimulus payments during 2021. Commercial card and merchant services increased from higher sales and payment processing volumes, respectively, while ATM surcharge income decreased."

102. These Class Period reports were materially misleading, actionable half-truths in that they updated investors as to the operating metrics that Defendants themselves linked to the Direct Express program, its "government" benefits / payments work and prepaid cards, and its "card" products and platforms, including through contemporaneous attributions, while failing to explain that they arose, at least in material part, from contractually and legally noncompliant actions by Comerica and its Contractors, Conduent and i2c. Specifically, Comerica's entitlement to the $3 billion+ of government benefits funds that it received into noninterest-bearing deposits each month, which bolstered its reported noninterest-bearing deposits (which, in turn, were used in income-generating lending activities), was contingent upon its compliance with its FAA and legal obligations. By relying on data systems and personnel in Lahore, Pakistan to store, access, and use Direct

Express cardholder data and PII, Comerica and i2c were noncompliant with, *inter alia*, the FAA, the Fiscal Service's Policy on Personnel Security for Debit Card Services, and Treasury's security directives – creating undisclosed risks that jeopardized its continued access to that significant source of noninterest-bearing deposit funding about which Defendants chose to speak. Moreover, Comerica's card fees, which were a material component of noninterest income for both the Commercial Bank segment and the entire consolidated organization, were among the metrics impacted by Comerica's and Conduent's mishandling of fraud complaints by Direct Express enrollees in noncompliance with EFTA §2015.15, Federal Reserve Regulation E, and Comerica's FAA. Card fees incurred by fraudsters in using thousands of Direct Express accounts and cards that were compromised, some of them for up to six months, were reversible or refundable, and all disruptions in account or card usage, due to delays in resolving fraud reports, cost Comerica legitimate card-based revenue streams, including card fees. These concealed facts, too, jeopardized Comerica's compliance with the FAA and thus, its standing as the sole Financial Agent for Direct Express. Consequently, Comerica's concealment of the negative trends and undisclosed facts detailed by the CW statements set forth in the "Undisclosed, Material, Negative Facts" section *supra* and "Defendants' Knowledge Or Reckless Disregard" section *infra* and by the revelations in the "Truth Begins To Emerge" section *infra*, not only

demonstrated noncompliance with SEC Regulation S-K, Item 303, 17 C.F. R. §§229.303(b)(2)(ii) and (c)(1), but also rendered actionable their alleged Reported Results statements.

### 3. *Internal Controls Fraud*

103. During the Class Period, Defendants Farmer and Herzog signed and SOX-certified Comerica's quarterly and annual reports, and in doing so, made materially false and misleading statements and omissions regarding the sufficiency of Comerica's internal controls.

104. Defendants Farmer and Herzog signed and SOX-certified Comerica's 2020 10-K filed on February 9, 2021, its 2021 10-K filed on February 16, 2022, and its 2022 10-K filed on February 14, 2023. In doing so, they attested to their review of the 10-K, their responsibility for establishing and maintaining Comerica's "disclosure controls" as defined in Exchange Act Rules 13a-15(e) and its "internal controls over financial reporting" as defined in Exchange Act Rules13a-15(f), and their review and disclosure therein of the effectiveness of those controls. They further certified that:

> Based on my knowledge, ***this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading*** with respect to the period covered by this report;
>
> Based on my knowledge, ***the*** financial statements, and ***other financial information included in this report, fairly present in all material***

> ***respects the*** financial condition, ***results of operations*** and cash flows ***of the Registrant*** as of, and for, the periods presented in this report;
>
> * * * * *
>
> ***The Registrant's other certifying officer and I have disclosed***, based on our most recent evaluation of internal control over financial reporting, ***to the Registrant's auditors and the audit committee of the Registrant's board of directors*** (or persons performing the equivalent function):
>
> * * * * *
>
> ***Any fraud, whether or not material, that involves management or other employees who have a significant role in the Registrant's internal control over financial reporting.***

105. Defendants Farmer and Herzog also signed and SOX-certified Comerica's 10-Q filings during the Class Period, including its Q1 2020 10-Q filed April 29, 2020, Q2 2020 10-Q filed July 31, 2020, Q3 2020 10-Q filed October 30, 2020, Q1 2021 10-Q filed April 28, 2021, Q2 2021 10-Q filed July 29, 2021, Q3 2021 10-Q filed October 29, 2021, Q1 2022 10-Q filed April 27, 2022, Q2 2022 10-Q filed July 28, 2022, Q3 2022 10-Q filed October 28, 2022, and Q1 2023 10-Q filed April 28, 2023. In doing so, they attested to their review of the 10-Q, their responsibility for establishing and maintaining Comerica's "disclosure controls" as defined in Exchange Act Rules 13a-15(e) and its "internal controls over financial reporting" as defined in Exchange Act Rules13a-15(f), and their review and disclosure therein of the effectiveness of those controls. They further certified:

> Based on my knowledge, ***this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under***

> ***which such statements were made, not misleading*** with respect to the period covered by this report;
>
> Based on my knowledge, ***the*** financial statements, and ***other financial information included in this report, fairly present in all material respects the*** financial condition, ***results of operations*** and cash flows ***of the Registrant*** as of, and for, the periods presented in this report;
>
> * * * * *
>
> ***The Registrant's other certifying officer and I have disclosed***, based on our most recent evaluation of internal control over financial reporting, ***to the Registrant's auditors and the audit committee of the registrant's board of directors*** (or persons performing the equivalent functions):
>
> * * * * *
>
> > ***Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.***

106. In addition, in connection with its sale of 400,000 depository shares on May 26, 2020, Comerica entered into an Underwriting Agreement, signed by Defendant Herzog and dated May 20, 2020 (the "5/20/2020 Underwriting Agreement"), which was filed as Exhibit 1.1 to a Form 8-K signed by Defendant Herzog and filed with the SEC on May 26, 2020 ("5/26/2020 Form 8-K"). The 5/20/2020 Underwriting Agreement included an Annex C listing subsidiaries, including Comerica Bank & Trust, National Association, and stated, in relevant part:

> (x) *Disclosure Controls*. ***The Company and its subsidiaries maintain an effective system of "disclosure controls and procedures"*** (as such term is defined in Rule 13a-15(e) under the Exchange Act) that complies with the requirements of the Exchange Act and that has been designed to ensure that information required to be disclosed by the Company in reports that it files or submits under

the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the Commission's rules and forms, including controls and procedures designed to ensure that such information is accumulated and communicated to the Company's management as appropriate to allow timely decisions regarding required disclosure.

(y) *Internal Controls*. ***The Company maintains a system of internal control over financial reporting*** (as such term is defined in Rule 13a-15(f) under the Exchange Act) designed by, or under the supervision of, the Company's principal executive officer and principal financial officer to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles in the United States. The Company's internal control over financial reporting was effective as of December 31, 2019, and the Company was not aware of any material weaknesses in its internal control over financial reporting at such time.

107. Given the concealed, negative, contemporaneous facts detailed by the CW statements set forth in the "Undisclosed, Material, Negative Facts" section *supra* and "Defendants' Knowledge Or Reckless Disregard" section *infra* and by the revelations in the "Truth Begins To Emerge" section *infra*, the foregoing Internal Controls Fraud statements were materially false and/or misleading when made because, *inter alia*: (a) Comerica's "disclosure controls" as defined in Exchange Act Rules 13a-15(e) and its "internal controls over financial reporting" as defined in Exchange Act Rules 13a-15(f) were deficient and led to material reporting and public disclosure failures; (b) Comerica's 10-Ks and 10-Qs, at minimum, did omit to state material facts necessary to make the statements made, in light of the

circumstances, not misleading; and (c) the fraud alleged herein involved management and employees with a significant role in Comerica's internal controls over financial reporting – *i.e.*, Defendants Farmer and Herzog, at minimum – but was not disclosed to Comerica's auditors or to Board's Audit Committee. During the Class Period, when the Internal Controls Fraud statements were made, Comerica and Conduent were mishandling and wrongly delaying and denying fraud complaints by Direct Express enrollees in noncompliance with Comerica's FAA, EFTA §2015.15, and Federal Reserve Regulation E, drawing the ire of the CFPB and various AG's offices, while Comerica and i2c were mishandling and wrongly storing and accessing Direct Express enrollee account data and PII, by using electronic storage, software, and personnel based in Lahore, Pakistan in noncompliance with Comerica's FAA, the Fiscal Service's Policy on Personnel Security for Debit Card Services, and Treasury's security directives. This sustained pattern of noncompliant, improper, and unlawful conduct during the Class Period caused undisclosed risks to Comerica's status as the sole Financial Agent of the Direct Express program during the current FAA and to its chances of remaining in that role or being replaced during the next renewal cycle that is now ongoing for the contract term beginning in January 2025, thus jeopardizing Comerica's continued access to lucrative card fees and valuable noninterest-bearing deposits that arise from the Direct Express program. Any reasonable "disclosure controls" and

"internal controls over financial reporting," as defined by Exchange Act rules, would have identified these serious deficiencies and noncompliant actions, escalated them to senior management and the Board, and led to their timely rectification while ensuring fulsome, accurate disclosures to Comerica's investors. Moreover, during the Class Period, Comerica had operated its wealth management business with "unsafe or unsound practices, including those relating to the Bank's risk governance framework and internal controls," prompting federal regulators to impose the OCC Enforcement Agreement, as described below, and analysts to express concerns that Comerica had prompted increased regulatory scrutiny and risks to its still-pending renewal application to serve as the Direct Express Financial Agent.

### D. The Truth Begins To Emerge

108. Defendants' alleged fraud as pled herein was incrementally revealed by a series of partial corrective disclosures and events, each of which partially removed fraud-related inflation from Comerica's stock. The earlier correctives primarily concerned the risk of increased government scrutiny for Comerica couple with deterioration of the metrics that Defendants repeatedly had linked to the Direct Express program – noninterest income and card fees, both for Comerica as a whole and for its Commercial Bank segment, and noninterest-bearing deposits – while the later correctives increasingly concerned the Direct Express program itself. Each of the alleged correctives drove a decline in Comerica's stock price, as follows.

109. The first signs of red flags arose on February 17, 2022, when a Barclays analyst report maintained an "***Underweight***" rating and discussed the potential for Comerica to be subject to enhanced regulatory standards because of total assets approaching $100 billion. It noted, "***Should CMA cross the $100bn asset threshold, it will be subject to additional and more stringent regulation***" and that "[i]f CMA becomes subject to enhanced [Dodd-Frank Act] prudential standards, ***it will face more stringent requirements or limitations on its business***, as well as increased compliance costs, and, depending on its levels of capital and liquidity, stress test results and other factors ***may be limited in the types of activities it may conduct and be limited as to how it utilizes capital***. Further, CMA may be subject to heightened expectations, which ***could result in additional regulatory scrutiny, higher penalties, and more severe consequences*** if it is unable to meet those expectations." Given Comerica's past, pre-Class Period problems operating Direct Express in compliance with Regulation E, increased regulatory scrutiny signaled a threat to derail the profitable and prestigious, but historically poorly-run, program.

110. On this news, Comerica's stock price fell $3.70, from its $100.49 closing price on February 16, 2022 to a closing price of $96.79 on February 17, 2022, a 3.68% single day decline, on high volume.

111. A series of analyst reports published on April 20, 2022 revealed deterioration in the metrics that Comerica linked to Direct Express. A Compass

Point Research & Trading, LLC ("Compass") analyst report noted Comerica's ***miss*** on "***core non-interest income*** ex. deferred comp-related income" and its "***modest miss*** vs. our ***core EPS est. primarily reflecting the miss on core non-interest income***," as compared to Compass's estimates, and attributed Comerica's "***decreasing***" ***non-interest income*** attributable in part to "***decrease in*** warrant, ***card***, derivatives . . . , and def comp. income…" A J.P. Morgan analyst report noted, "Underlying the PTPP income miss was a ***sharp decline in fee income***, which was reported $34mm below forecast," and its FY22 Outlook (vs. FY21) included a ***"decline in card" that would impact "non-interest income***." It also noted a higher-than-expected 25.7% annual decrease in deposits, with the quarter over quarter ***decrease in deposits*** "***driven by lower*** money market/NOW and ***non-interest bearing deposits***." A Wells Fargo report discussed Comerica's miss on earnings per share "***reflecting weaker fees***," noting "***Fees were down 16% QoQ*** [quarter-over-quarter] (***down 10% YoY*** [year-over-year])," and added that Comerica's "***Avg. deposits decreased 6% QOQ*** [quarter-over-quarter]—interest bearing (-7%) and ***non-int. bearing (-6%)***." A Piper Sandler report noted Comerica's miss on earnings per share compared to estimates, including ***a $0.21/share miss on fees*** relative to expectations, stating, "Big [net interest margin], solid underlying loan growth, good cost control, and strong credit were offset by ***surprisingly weak fees and heavy deposit run-off***" and predicting the fee weakness could make its stock "a little

weak." A second Piper Sandler report lowered earnings estimates, noting that positive news was "***offset by*** pretty steep AEA & ***deposit contraction*** (which limited NII improvement despite the higher NIM), as well as ***a surprising fee shortfall***," and stating, "***We're most focused on the deposit contraction and fee issues***." It said that the ***lower deposits*** "***run contrary to the flatter or growing balances we are seeing from most others***. At a minimum, ***the magnitude of decline makes CMA's trends here look company-specific***." As for the fees miss, which it called "noteworthy" for Comerica, it said, "[W]e were caught a little off guard when ***a big fee shortfall*** generated a large PPNR miss…" It added, "***CMA's fee shortfall was an unlooked-for negative surprise*** that now turns into a 'show me' for the remainder of the year. If fees weren't in the discussion before, they are now, and a recovery here will be necessary to help support #s going forward." A UBS report noted that "misses among several fee lines worse than expected and tone of fees relative to '21 performance also lower," stated that ***noninterest-bearing deposits*** were over 50% of total deposits and "***most at risk of outright runoff*** or shift to IB with higher rates," and said, "Reduced asset sensi, ***weaker deposits & fees*** & opex pressure ***should pressure CMA***."

112. On this news, Comerica's stock price fell $2.96, from its closing price of $90.06 on April 19, 2022 to a closing price of $87.10 on April 20, 2022, a 3.29% single-day decline, on high volume.

113. On April 21, 2022, analysts continued to raise concerns over the metrics that Comerica had linked to the Direct Express program. A Jefferies report observed that "***fees missed in 1Q***" and said, "***Fees are still expected to decline for the FY*** given the elevated 2021 performance, and ***we model a 6% Y-Y decline***." A J.P. Morgan report noted Comerica's earnings per share missed its estimates "***tied to a sharp decline in fee income***" and attributed negative market reaction as "likely owing to the ***sharper than expected fee income decline*** coupled with questions around the impact of the company's actions to reduce the asset sensitivity of its balance sheet…" It observed, "Revenue $31mm below forecast. Revenue fell at a 26.7% ann. pace, which was a larger decline than our forecast of a 10.1% ann. decrease. ***The q/q decrease was driven by fee income declining 62.3% ann.***…" It also noted "***a higher than expected decrease in deposits driven by lower*** money market/NOW and ***non-interest bearing deposits***." In charting "Management Outlook for 2022 Trends," it noted "***Decline in card***" as impacting "Noninterest income." It lowered earnings per share estimates and its "FY22 Outlook (vs. FY21)" included "***Fee income: down y/y***."

114. On this news, Comerica's stock fell another $4.37, from its closing price of $87.10 on April 20, 2022 to a closing price of $82.73 on April 21, 2022, a single-day decline of 5.02%, on high volume.

115. Another series of analyst reports was published on October 19, 2022. A Barclays report noted as "key takeaways" that Comerica's average noninterest-bearing deposits declined by $1.1 billion or 2.6% and that its overall fee increase ***was partially offset by a $2 million reduction in card fees***. A J.P. Morgan report noted that notwithstanding Comerica's earnings per share beat, it "reported that ***average non-interest bearing deposits declined at a 10% annualized pace*** (modestly above our projection for an 8% annualized decline)" contributing to "average deposits declining at an 18.6% annualized pace." It added that ***non-interest income***" had a 3% decrease from the prior quarter and a 6% projected decline for the full year.

116. On this news, Comerica's stock price fell $6.69, from its closing price of $74.34 on October 18, 2022 to a closing price of $67.65 on October 19, 2022, a 9.00% single day decline, on high volume.

117. More analyst reports were published on March 7, 2023. J.P. Morgan report noted, "Average deposit balances decreased by $2.4B (or -3.4% unannualized QTD) to $69.0B, which is slightly below our full-quarter expectation of $69.4B. The ***decline so far in 1Q23 is driven by a $2.9B decrease in non-interest bearing deposits*** partially offset by a $0.6B increase in interest bearing deposits." A D.A. Davidson & Co. report stated that Comerica's "***Deposits remain under pressure***," and the "***Deposit pressure is from noninterest-bearing deposits, down $2.9B***."

118. On this news, Comerica's stock price fell $2.55, from its closing price of $69.15 on March 6, 2023 to a closing price of $66.60 on March 7, 2023, a 3.69% single day decline, on high volume.

119. On March 23, 2023, Truist Securities published an analyst report, which *Bloomberg* reported, that made clear how deeply Comerica's deteriorating metrics had impacted its outlook, relative to peers. Truist cut the price target on Comerica from $78 to $54, the second-steepest cut it made amongst over two dozen banks, and it omitted Comerica from its listing of banks with "conservative credit cultures," "strong balance sheets," and "most relative near term upside."

120. On this news, Comerica's stock price fell $3.82, from its closing price of $44.52 on March 22, 2023 to a closing price of $40.70 on March 23, 2022, an 8.58% single-day decline, on high volume.

121. On May 29, 2023, after trading hours, the *American Banker* published an article titled "Comerica in 'serious violation' of Treasury's Direct Express program" ("5/29/2023 *AB* Article"). Drawn from internal Comerica documents and statements by Comerica executives, it exposed ***rampant misconduct*** and ***serious violations of Comerica's FAA*** for the Direct Express program, arising principally from ***i2c's routing of the personally identifiable information of Direct Express cardholders through its Lahore, Pakistan offices and personnel***. Specifically:

(a) The 5/29/2023 *AB* Article said that Comerica officials "privately acknowledged significant compliance failures" in their operation of the Direct Express program. Citing internal Comerica documents, it reported that "A Comerica executive said that the Dallas bank faced 'a serious contract violation' for allowing fraud disputes and data on Direct Express cardholders to be handled out of a vendor's office in Lahore, Pakistan."

(b) The 5/29/2023 *AB* Article described the issue: "Personally identifiable information on veterans, Social Security and disability recipients were routinely shared and handled by i2c, Inc.…with an office in Lahore, Pakistan – in violation of the government contract, the Comerica executive said." It cited the NAA's provision stating that all services "shall be performed in the United States or its territories."

(c) The *American Banker* quoted from a 2020 email by Nora Arpin, Comerica's then-Senior VP and Director of Government Electronic Solutions:

> The internal documents include a 2020 email from a Comerica executive, who described ***sweeping violations of Regulation E***, which governs how a financial institution addresses errors reported by consumers including for theft or fraud. ***Nora Arpin…said the bank was in breach of its Treasury contract but that it was unable to get its third-party vendor to make changes***.
>
> "***Management for Reg E dispute processing is in Lahore which means that cardholder information is being shared with/sent to Lahore, which is a serious contract violation***," Arpin wrote.
>
> * * *
>
> Arpin…listed 13 bullet points describing the practices of i2c. Among the bank's "***serious concerns***," she wrote:

- "***We hare having significant difficulty getting adequate fraud reporting.***"
- "***We can't get the Call Center statistics we need***."
- "***Reg E adjudication is an issue***."
- "***Reporting in general is an issue – we aren't getting the reporting that the [Treasury's Bureau of] Fiscal Services requires.***"

Arpin also wrote in the internal email that ***i2c's CEO Amir Wain "doesn't have plans to fix those issues.***"

(d) The 5/29/2023 *AB* Article also cited sealed "court documents, combined with internal documents that *American Banker* received anonymously in the mail" as evidencing the nonpublic scope and duration of Comerica's Direct Express problems and its escalation to the highest levels of company leadership:

> ***Comerica executives were repeatedly warned about vendor oversight, potential breaches of the Treasury contract and deficiencies in the bank's compliance management system***, said sources familiar with the matter who asked to remain anonymous out of fear of retaliation. ***In-house lawyers escalated their concerns to the bank's senior leadership***, ***including Susan Joseph, Comerica's head of compliance; Jay Oberg, senior executive vice president and chief risk officer; and Peter L. Sefzik, senior executive vice president and chief banking officer***.

(e) Indeed, the 5/29/2023 *AB* Article reported that those company documents revealed that Comerica sought to convince regulators that Regulation E, which Comerica was bound to follow under the FAA, did not even apply or did not serve to protect Direct Express program participants:

> [W]ithin a month of Sen. Warren's [2018] inquiry [into the Direct Express program], a ***Comerica*** lawyer ***tried to convince a Texas bank examiner that Regulation E does not apply to the bank or to federal government beneficiaries***, the internal documents show.
>
> The Comerica lawyer was responding to a query from the Texas Department of Banking by ***claiming that the bank was not fully required to abide by the Electronic Fund Transfer Act, which is implemented by Regulation E.*** The regulation sets strict timelines for banks to resolve errors including investigating fraud and reimbursing harmed consumers with provisional credit when money is stolen.
>
> ***"Program customers only get 'Regulation E Lite,' benefits," a Comerica executive in the bank's legal department wrote in 2018***…In the email, the Comerica lawyer wrote that "***…neither the Federal Electronic Funds Transfer nor its Regulation E applies to the Comerica Bank under the Program as a 'financial institution.'"***
>
> ***Comerica argued that the Treasury, not the bank, was considered to be the financial institution for Direct Express***, "***which is why we generally state that Program customers are only entitled to 'Regulation E lite' benefits***."
>
> By August 2019, Joseph, the head of compliance, had forwarded the email about 'Reg E Lite.," to another Comerica lawyer.

(f) According to the *American Banker*, the court documents helped quantify the scope of the ongoing Regulation E issues, revealing that in May 2019 alone, Comerica received 15,712 fraud disputes, according to Comerica's Director of National Bankcard Services, who "said in court documents that Comerica did not have any data to identify cardholders that reported fraud, and the bank didn't keep track of money refunded or denied for fraud." 5/29/2023 *AB* Article cited an early 2019 supervisory letter from the Federal Reserve Bank of Dallas as identifying

program deficiencies and consumer issues, including Comerica lacked any root cause analysis to identify systemic issues and that "Conduent's call centers were not trained in Regulation E and did not tell cardholders who reported fraud that they could receive provisional credit as part of the process of filing a dispute" and did not advise cardholders that they had 10 days to provide documents and a written statement or else they might not receive the credit.

(g) The 5/29/2023 *AB* Article quoted Paul Lawrence, former Under Secretary of the Department of Veterans Affairs from 2018 to 2021, who:

> said he was in "***complete shock and disgust***" after being told of the information contained in the internal Comerica documents.
>
> ***"All of these government contracts basically say you have to be in the U.S. and the program has to be run by U.S. citizens," Lawrence***, a longtime government consultant, said in an interview. ***"This has all the makings for a really, really bad situation."***

(h) The 5/29/2023 *AB* Article also quoted David P. Weber, former FDIC Supervisory Counsel and Enforcement Chief and former SEC Inspector General for investigations, who likewise underscored the severity of the misconduct:

> Weber…said the bank would need to inform its regulator about the activities of third-party service providers.
>
> ***"It was a clear violation of the contract Comerica held with the Department of the Treasury to locate the vendor in a foreign country when part of the consideration for them being awarded this federal contract was to use American employees and vendors,"*** said Weber, who served as special counsel for enforcement for more than 10 years at the Office of the Comptroller of the Currency.

> ***"Separate and aside from contract fraud, it is inappropriate for a federally-insured depository institution to locate third-party service provider activities in a foreign nation without informing their regulator, and locating the operations in a country in which there are questions about rule of law, which would make supervisory and exam activities as well as protections of American consumers questionable.***"
>
> * * *
>
> Weber…said ***the bank's legal and compliance obligations far exceed Regulation E.*** He also ***called into question Comerica's third-party risk management and operational risk standards***. …
>
> "It's an operational risk issue if the third-party doesn't have the policies, procedures and controls to identify systemic issues."
>
> * * *
>
> "When evidence indicates that individual officers or directors have made decisions to allow misconduct and violations of the law to occur, it is well past time to not only hold the bank accountable but to hold the individual officers and directors and the entire board personally accountable."

122. On this news, the price of Comerica stock declined by $1.40 per share, or 3.59%, on high trading volume, to close at $37.59 on May 30, 2023. The next day, the price of Comerica stock declined another $1.49 per share, or 3.96%, on high trading volume, to close at $36.10 on May 31, 2023.

123. The corrective impact of the 5/29/2023 *AB* Article was muted, and the resulting price declines reversed, by Defendant Farmer's 6/1/2023 *AB* Letter, which as alleged *supra*, contained materially false or misleading statements regarding, *inter alia*, the extent of misconduct by Comerica and its vendors, the number and identity of the implicated vendors, and whether the misconduct had been remedied

in 2020 or continued long after. The intent and effect of the 6/1/2023 *AB* Letter was to halt and reverse the correctiveness of the 5/29/2023 *AB* Article, which it wrongly achieved through the alleged false or misleading statements.

124. On June 12, 2023, negative news emerged regarding Direct Express's contributions to Comerica's non-interest bearing deposits. This information appeared in a slide deck that Comerica posted on its corporate website in advance of a Morgan Stanley conference the next day. A UBS report discussed Comerica's ***noninterest bearing deposit mix decreasing to 46%***, "***well below both us and consensus of 49%-50%***," noting that "***[t]he largest drivers of lower NIIBs [noninterest bearing deposits] are $600mn tied to Direct Express payments***…" It predicted, "***[T]his figure***, along with a lack of updated deposit guidance, ***will grab headlines and potentially drive underperformance in shares tomorrow given the [net interest income] pressure it should lead to***." A J.P. Morgan report similarly noted a decrease in Comerica's average deposit balances to $64.4 billion, below J.P. Morgan's expectation, and noted that quarter-end deposits were flat quarter-over-quarter, "***driven by a $3.5B decrease in non-interest bearing deposits*** (***$600mm of decline related to timing of Direct Express payments***)." On information and belief, because these disclosures concerned building trends in non-interest bearing deposits throughout the quarter that had already been synthesized into presentation format leading up to the Morgan Stanley conference, rather than

an abrupt event, this information leaked to the market during trading hours before the closing bell, even if the presentation was posted to Comerica's website or filed with the SEC shortly after the market close.

125. On this news, Comerica's stock price fell $1.05, from its closing price of $42.08 on June 9, 2023 to a closing price of $41.03 on June 12, 2023, a 2.50% single day decline, on high volume.

126. On May 23, 2024, the Office of the Comptroller of the Currency ("OCC") issued a news release (ECF 73-2) ("5/23/2024 OCC Release") disclosing an enforcement action and formal agreement with Comerica Bank & Trust, N.A. – one of the Comerica subsidiaries listed in the 5/20/2020 Underwriting Agreement – for "unsafe or unsound practices, including those relating to the bank's risk governance framework and internal controls." The same day, OCC released the 21-page agreement (ECF 73-3) ("OCC Enforcement Agreement"), which was signed by Defendant Herzog and said, "***The Comptroller of the Currency ("Comptroller") has found unsafe or unsound practices, including those relating to the Bank's risk governance framework and internal controls***." It imposed sweeping reforms:

(a) The OCC Enforcement Agreement imposed a Compliance Committee, with a majority being non-employee directors, to "monitor and oversee the Bank's compliance with the provisions of this Agreement," by, among other things, meeting at least quarterly and submitting post-quarterly progress reports to the

Board of Directors (and via the Board to the Assistant Deputy Comptroller ("ADC")) listing corrective actions needed and taken, and the status and results.

(b) It requires the Bank to submit to the ADC for review and no-objection determination numerous programs and written policies, and thereafter to establish policies, procedures, and practices and to engage a qualified, independent third party to validate the actions required thereunder. They include:

- A Board Oversight and Corporate Governance Program for "overall direction, oversight, and corporate governance of the Bank" that clearly delineates corporate governance roles, responsibilities, reporting, and delegation; ensures Board receipt and review of information sufficient to permit oversight; creates appropriate risk management and compliance systems; creates processes to ensure management adequately responds to audit, compliance, and regulatory criticisms; and creates procedures to ensure Board oversight and management accountability, adequate internal controls and accountability, and periodic evaluation of the Board's makeup to fulfill these tasks.

- A "written plan to improve the Bank's asset management internal controls" that must implement sufficient controls to address self-identified risks and control gaps/weaknesses or document the Board's reasons for not doing so; ensure compliance with federal regulations and strengthen oversight over third

parties; eliminate manual processes or document why doing so was not feasible; and do a comprehensive assessment of staffing and technology.

- A Data Management Information Systems Plan that ensures information systems that accurately capture and report all fiduciary transactions; quality control/review processes to ensure the Bank timely identifies, investigates, monitors, and resolves errors; and processing and delivery of account statements upon data error remediation.

- A Financial Accounting Plan that establishes and maintains separate Bank general ledger accounts and enhanced cash reconciliation controls and quality control processes to ensure the Bank timely identifies, investigates, monitors, and resolves variances and errors.

- A Financial Reporting Program including "policies and procedures for the Bank's collection of financial data and preparation of regulatory reports"; clear roles and responsibilities for regulatory reporting, quality control, and escalation of related concerns; qualified staffing and periodic training.

- A Third-Party Risk Management Program outlining the "Bank's strategy for third-party relationships," identifying "the inherent risks" of third party activities, and detailing how third parties are selected, assessed, and overseen; addressing "proper due diligence in selecting third parties; monitoring of third-party activities, performance, and service standards; contingency planning for

terminating third parties; setting clear oversight and risk management roles and responsibilities regarding third parties; requiring robust documentation and reporting to permit Board and management oversight, with independent reviews.

- An Internal Audit Program that complies with federal regulations and appropriate standards of safety and soundness and that provides objective, "independent review and evaluation of the Bank's activities, internal controls, and management information systems"; adopts an annual risk assessment and an adequate risk-based internal audit plan; requires Audit Committee approval of third parties doing internal audit work; evaluates the "reliability, adequacy, and effectiveness of the Bank's internal controls system," identifies root causes of any deficiency, and assesses whether the system results in prompt, accurate transactions recording and safeguards assets; establishes standards for documenting internal audits and distributing them to the Audit Committee; and requires management to timely and appropriately address control deficiencies and audit report recommendations and to report validated progress to the Audit Committee. It must also require the Board to verify management's staffing, actions to address material weaknesses, and compliance with the law.

- A program addressing end-of-life information technology ("IT") risk identification, assessment, mitigation, and Board approval.

(c) It also requires the Board to ensure timely adoption and implementation of all corrective actions; ensure sufficient processes, management, personnel, training, control systems, and risk governance; require Bank management reporting and accountability; and timely address noncompliance.

127. Analyst reports expressed concerns. A Well Fargo report stated:

> Our Call: ***The new regulatory formal agreement with Comerica Bank reinforces our view that CMA is structurally challenged*** in an industry where increasingly "Goliath is Winning." ***We lower our PT [price target] and have a downward bias to our ests [estimates]***. Reiterate Underweight.
>
> ***This line reflects most of the concern to us. The OCC found "unsafe or unsound practices" at the bank related to deficiencies in its risk governance framework and internal controls***. As with other banks that have been in this position, the result is likely much higher-than-expected expenses and management diversion than initially planned. To boot, CMA has among the highest CRE exposure among large banks.
>
> Lower price target to $48. ***We lower CMA's PT to $48 from $52 due to a higher discount rate due to regulatory uncertainty***. … [F]ailure to satisfy the Agreement could subject Comerica to additional enforcement actions by the OCC and expense, which could create a downward bias to consensus estimates.

Another Wells Fargo report called Comerica "structurally disadvantaged," said that the "new OCC agreement puts CMA on notice" and is "a microcosm of its broader strategic challenges," and observed that "other banks have seen OCC orders get transformed at the Fed and/or lead to other reg actions. Moreover, an action such as this can mean a 'once over' for all controls firmwide. Risk mgmt. issues in one

area can reflect broader governance." A Compass Point report explained, "This action likely stemmed from the subpar conversion of the primary operating system for Comerica's trust platform, which took place April / May 2023," "Management is taking this agreement very seriously," and "***investors… expect there could be more to this, similar to the cockroach theory***." It added, "Our assessment is that this provides some incremental amount of uncertainty until expense impacts are better understood… and until it becomes clear that the cockroach theory is not valid, which might take a bit more time to assess. ***We acknowledge that we cannot count out the possibility that the Regulators opt to take a 'closer look' at the other parts of the overall organization*** given the contents of this order…." An Evercore report said that a "platform change led to reconciliation issues, duplicate ACHs, late statements and potential write-downs" for trust clients and concurred that "***bleed across of regulatory scrutiny to other areas of the company is always a risk***, particularly amid elevated regulatory pressure for the sector as a whole."

128. On this news, Comerica's stock price fell $3.02, from its closing price of $53.26 on May 22, 2024 to a closing price of $50.24 on May 23, 2024, a 5.67 % single day decline, on high volume. As the stock remained down, analysts expressed concerns that the enforcement action could signal negative impacts to Comerica's role in the Direct Express program. For instance, noting that "CMA

came under scrutiny with certain compliance failures last year in Direct Express" and "[t]he contract comes up for renewal in January 2025," D.A. Davidson stated:

> Comerica Bank & Trust entered into an enforcement action with the OCC over unsafe and unsound practices. Although the enforcement action is somewhat limited in scope as it applies to the asset management division, and not the holding company, plus no fines, it is not a good look for the management team in an environment where there is increased regulatory oversight on banks. There will likely lead to higher expenses than forecast. ***Plus a risk the Federal Reserve takes a more in depth look at all of CMA's risk management controls and Treasury's Direct Express Program is up for bid that CMA manages***.

129. As noted above, as a result of Defendants' wrongful acts and omissions, and the drop in the market value of Comerica's stock, Lead Plaintiff and other Class members have suffered significant losses and damages.

130. Relevant facts continue to develop, and more would be revealed through discovery, which may impact the foregoing allegations. For instance, according to Treasury's Office of the Inspector General, the Office of Audit issued to the Fiscal Service on May 10, 2024 a formal, non-public draft of the third audit report regarding the Direct Express Debit Card Program, which "will focus on Direct Express's customer service and compliance with regulations impacting cardholders" and will result in a final report being issued in or about July 2024 to Comerica's management and the Congressional committees of jurisdiction and posted to the Office of the Inspector General's website, in accordance with 5 U.S.C. 404(e)(2) and 5 U.S.C. §420(b). Also, on June 7, 2024, the *American Banker*

reported that Comerica had earlier reached a settlement, agreeing to pay $1.2 million to settle the consumer class action lawsuit that had alleged that Comerica had mishandled fraud claims, failed to reimburse customers, and did not properly oversee its third party vendors, including Conduent, handling the Direct Express program. Comerica's FAA is up for renewal, which means a new cycle of application(s) by Comerica and perhaps other banks is ongoing, which will result in the Fiscal Service's decision as early as July 2024 regarding what bank(s) will fill serve as Direct Express Fiscal Agent, with the next contract, potentially under new terms, becoming effective in January 2025. Analysts have expressed concerns that the OCC Enforcement Agreement has prompted increased regulatory scrutiny and risks to Comerica's still-pending application.

### E. Additional Facts Probative Of Scienter

131. A strong inference of Defendants' scienter is evidenced through a holistic examination of the facts and circumstances.

#### 1. *Defendants' Knowledge Or Reckless Disregard Of Red Flags*

132. The CW statements pled herein establish Defendants' knowledge or reckless disregard of facts rendering their public statements materially false or misleading. CW2 and CW3 made clear that Comerica used "schematics" and SOC 2 Type II reports to carefully track the flow of its data through vendors, which included Conduent and i2c, and had robust risk committee oversight known to the

Direct Express program leader, Ms. Arpin. CW4, CW5, CW6, CW7, CW8, and CW9 made clear that i2c's Pakistan employees processed fraud complaints and accessed sensitive cardholder data in Lahore throughout the Class Period, despite creation and staffing of an Omaha call center that was closely watched by Comerica, whose personnel met weekly with i2c, and whose point person, Deborah Srour closely monitored i2c's unsuccessful attempts to end its reliance on Pakistan employees for Direct Express program work. CW6 and CW10 made clear that initial determinations by both i2c and Conduent rejecting fraud claims were wrong the vast majority of times, and CW10 made clear that often, cardholder complaints were escalated through the AG's office or CFPB to Comerica, over to Conduent, with responses confirming the wrongful denials of fraud claims going back to Comerica, and back to the AG's office and CFPB.

133. All of these facts were corroborated by the 5/29/2023 *AB* Article, which drew from internal company documents, including Ms. Arpin's email, sealed court filings by Comerica, and statements made by Comerica's officials.

134. In addition, CW11 detailed the weekly status updates prepared and presented to Comerica's CIO for Technology Bruce Mitchell, using Powerpoint slides with color-coded updates to reflect levels of urgency or severity. CW11 said that these presentations covered each status update, explained the situations and reported on what was being done to address pressing issues. CW11 said that VP of

Product Technology Padma Sengupta was responsible for the technology side of the Direct Express program in 2020 and made the presentations to Mr. Mitchell, including anything going on with Comerica's Direct Express vendors i2c and Conduent, with status notes contributed by Linda Goulet, who was Comerica's liaison with the federal government regarding the Direct Express program. CW11 said that Mr. Mitchell had regular meetings with his superiors to provide updates about technology programs, including Direct Express, and that Mr. Mitchell reported to Chief Operations and Technology Officer Megan Crespi, who reported to Defendant Farmer. CW11 described a government instruction to Comerica in 2020 to stop migrating accounts to i2c because of its work outside the U.S. and believes anything driving that level of risk "would have been discussed at the highest levels."

135. Given the foregoing, Defendants knew that their public misrepresentations and omissions, as pled in herein, would mislead investors or were deliberately reckless as to the danger of misleading investors, which was known to them or was so obvious that they must have been aware of it.

### 2. *Motive And Opportunity To Commit The Fraud*

136. Defendants' scienter is further evidenced by the Individual Defendants' Class Period transactions in McDermott securities, suspicious in

timing and amount, by which they reaped millions of dollars in ill-gotten gains during the fraud alleged herein. Such transactions included the following.

(a) Defendant Farmer entered the Class Period with balances of 109,713 Comerica shares, 29,965 options, 13,360 RSUs,[1] and 22,705 PSUs.[2] Defendant Farmer's transactions during the Class Period were as follows:

| Stock Transactions | | | | |
|---|---|---|---|---|
| **Transaction Date** | **Action** | **Shares** | **Price** | **Funds Spent / Gained[3]** |
| 1/24/2020 | Sell | (541) | $64.73 | $35,018 |
| 1/26/2020 | Sell | (498) | $64.73 | $32,235 |
| 1/27/2020 | Sell | (289) | $62.72 | $18,126 |
| 2/25/2020 | Sell | (7,361) | $56.79 | $418,031 |
| 2/25/2020 | PSUs Converted to Shares | 18,705 | $0.00 | $0 |
| 4/28/2020 | Sell | (636) | $35.20 | $22,387 |
| 1/23/2021 | RSUs Converted to Shares | 1,968 | $0.00 | $0 |

---

[1] As stated in Comerica's 2018 Long-Term Incentive Plan, RSUs "represent an unfunded, unsecured right for the Award Recipient to receive one (1) share of the Company's common stock[.]" Prior to the 2021 awards, "the shares vest 50% in year three, 25% in year four and 25% in year five for all awardees." Per Comerica's Proxy Statement and Notice of 2022 Annual Meeting of Shareholders, "Beginning with the 2021 awards, shares vest 50% in year two, 25% in year three and 25% in year four for all awardees."

[2] As stated in Comerica's Form 8-K dated February 25, 2020, Comerica's PSUs, also called SELTPP units, or senior executive long-term performance plan restricted stock units, are "eligible to vest based on Comerica's average return on common equity excluding certain non-performance items ("ROCE") over a three-year performance period, relative to a goal ROCE established toward the beginning of the performance period, with settlement occurring after the end of the performance period."

[3] All figures in these charts rounded up to the nearest dollar or whole number.

| | | | | |
|---|---|---|---|---|
| 1/23/2021 | Sell | (728) | $62.16 | $45,252 |
| 1/24/2021 | Sell | (279) | $62.16 | $17,342 |
| 1/26/2021 | Sell | (493) | $60.12 | $29,639 |
| 2/23/2021 | Sell | (4,511) | $69.59 | $313,920 |
| 2/23/2021 | PSUs Converted to Shares | 11,463 | $0.00 | $0 |
| 1/22/2022 | RSUs Converted to Shares | 2,340 | $0.00 | $0 |
| 1/22/2022 | Sell | (866) | $89.70 | $77,680 |
| 1/23/2022 | RSUs Converted to Shares | 984 | $0.00 | $0 |
| 1/23/2022 | Sell | (364) | $89.70 | $32,650 |
| 1/24/2022 | Sell | (246) | $90.53 | $22,270 |
| 4/23/2022 | RSUs Converted to Shares | 2,373 | $0.00 | $0 |
| 4/23/2022 | Sell | (878) | $80.97 | $71,091 |
| 11/16/2022 | Bona fide gift [4] | (7,200) | $0.00 | $0 |
| 1/22/2023 | RSUs Converted to Shares | 1,170 | $0.00 | $0 |
| 1/22/2023 | Sell | (433) | $69.13 | $29,933 |
| 1/23/2023 | RSUs Converted to Shares | 984 | $0.00 | $0 |
| 1/23/2023 | Sell | (365) | $71.96 | $26,265 |
| 1/26/2023 | RSUs Converted to Shares | 9,325 | $0.00 | $0 |
| 1/26/2023 | Sell | (3,451) | $72.03 | $248,575 |
| 1/28/2023 | RSUs Converted to Shares | 6,433 | $0.00 | $0 |
| 1/28/2023 | Sell | (2,380) | $72.57 | $172,716 |
| 2/28/2023 | Sell | (14,308) | $70.10 | $1,002,990 |
| 2/28/2023 | PSUs Converted to Shares | 36,360 | $0.00 | $0 |
| 4/23/2023 | RSUs Converted to Shares | 1,186 | $0.00 | $0 |
| 4/23/2023 | Sell | (439) | $43.73 | $19,197 |
| 1/22/2024 | RSUs Converted to Shares | 1,170 | $0.00 | $0 |
| 1/22/2024 | Sell | (433) | $53.67 | $23,239 |
| 1/25/2024 | RSUs Converted to Shares | 6,805 | $0.00 | $0 |
| 1/25/2024 | Sell | 2,518 | $54.97 | $138,414 |
| 1/26/2024 | RSUs Converted to Shares | 3,403 | $0.00 | $0 |
| 1/26/2024 | Sell | 2,915 | $54.92 | $160,092 |
| 1/28/2024 | RSUs Converted to Shares | 3,216 | $0.00 | $0 |
| 2/26/2024 | PSUs Converted to Shares | 55,950 | $0.00 | $0 |
| 2/26/2024 | Sell | 22,017 | $48.97 | $1,078,172 |
| 4/23/2024 | RSUs Converted to Shares | 1,186 | $0.00 | $0 |

[4] The correlating Form 4 denotes, "Reflects the gift of common stock to a charitable donor advised fund."

| | | | | |
|---|---|---|---|---|
| 4/23/2024 | Sell | 440 | $52.64 | $23,162 |
| **RSUs Converted to Shares** | | **42,543** | | |
| **PSUs Converted to Shares** | | **122,478** | | |
| **Bona fide gifts** | | **(7,200)** | | |
| **Sales** | | **(67,389)** | **Proceeds:** | **$4,058,405** |

**Options Transactions**

| **Transaction Date** | **Action** | **Shares** | **Price** | **Funds Spent/ Gained** |
|---|---|---|---|---|
| 1/28/2020 | Award of Options | 25,030 | $0.0000 | $0 |
| 1/26/2021 | Award of Options | 20,410[5] | $0.0000 | $0 |
| 1/25/2022 | Award of Options | 16,865 | $0.0000 | $0 |
| 1/24/2023 | Award of Options | 24,400 | $0.0000 | $0 |
| 1/23/2024 | Award of Options | 29,660 | $0.0000 | $0 |
| **Sub-Total Awards of Options** | | **116,365** | **Costs** | **$0** |
| **Sub-Total Exercises of Options** | | **0** | **Proceeds** | **$0** |

**RSU Transactions**

| **Transaction Date** | **Action** | **Units** | **Vesting Date** | **Price** | **Funds Spent/ Gained** |
|---|---|---|---|---|---|
| 1/28/2020 | Award of RSUs | 12,865 | 1/28/2023 (50%), 1/28/2024 (25%), 1/28/2025 (25%) | $0.0000 | |
| 1/23/2021 | RSUs Converted to Shares | (1,968) | 1/23/2021 | $0.0000 | Converted into 1,968 Shares |
| 1/26/2021 | Award of RSUs | 18,650 | 1/26/2023 (50%), 1/26/2024 (25%), 1/26/2025 (25%) | $0.0000 | |

[5] This figure appears in both the Proxy Statement and Notice of 2022 Annual Meeting of Shareholders and Defendant Farmer's SEC Form 4 dated January 26, 2021. Subsequent SEC Form 4s note a quantity of 20,140. Herein, the initially filed figure is used; the difference of 270 options is not materially relevant.

| | | | | | |
|---|---|---|---|---|---|
| 1/22/2022 | RSUs Converted to Shares | (2,340) | 1/22/2022 | $0.0000 | Converted into 2,340 Shares |
| 1/23/2022 | RSUs Converted to Shares | (984) | 1/23/2022 | $0.0000 | Converted into 984 Shares |
| 1/25/2022 | Award of RSUs | 13,610 | 1/25/2024 (50%), 1/25/2025 (25%), 1/25/2026 (25%) | $0.0000 | |
| 4/23/2022 | RSUs Converted to Shares | (2,373) | 4/23/2022 | $0.0000 | Converted into 2,373 Shares |
| 1/22/2023 | RSUs Converted to Shares | (1,170) | 1/22/2023 | $0.0000 | Converted into 1,170 Shares |
| 1/23/2023 | RSUs Converted to Shares | (984) | 1/23/2023 | $0.0000 | Converted into 984 Shares |
| 1/24/2023 | Award of RSUs | 21,080 | 1/24/2025 (50%), 1/24/2026 (25%), 1/24/2026 (25%) | $0.0000 | |
| 1/26/2023 | RSUs Converted to Shares | (9,325) | 1/26/2023 | $0.0000 | Converted into 9,325 Shares |
| 1/28/2023 | RSUs Converted to Shares | (6,433) | 1/28/2023 | $0.0000 | Converted into 6,433 Shares |
| 4/23/2023 | RSUs Converted to Shares | (1,186) | 4/23/2023 | $0.0000 | Converted into 1,186 Shares |
| 1/22/2024 | RSUs Converted to Shares | (1,170) | 1/22/2024 | $0.0000 | Converted into 1,170 Shares |
| 1/23/2024 | Award of RSUs | 29,190 | 1/31/2026 (50%), 1/31/2027 (25%), 1/31/2028 (25%) | $0.0000 | |
| 1/25/2024 | RSUs Converted to Shares | (6,805) | 1/25/2024 | $0.0000 | Converted into 6,805 Shares |

| | | | | | |
|---|---|---|---|---|---|
| 1/26/2024 | RSUs Converted to Shares | (3,403) | 1/26/2024 | $0.0000 | Converted into 3,403 Shares |
| 1/28/2024 | RSUs Converted to Shares | (3,216) | 1/28/2024 | $0.0000 | Converted into 3,216 Shares |
| 4/23/2024 | RSUs Converted to Shares | (1,186) | 4/23/2024 | $0.0000 | Converted into 1,186 Shares |
| **Sub-Total Awards of RSUs** | | **95,395** | | **Costs** | **$0** |
| **Sub-Total Conversions of RSUs** | | **(42,543)** | | **Proceeds** | **42,543 Shares** |

| **PSU Transactions[6]** | | | | | |
|---|---|---|---|---|---|
| **Transaction Date** | **Action** | **Units** | **Vesting Date** | **Price** | **Funds Spent/ Gained** |
| 1/28/2020 | Award of PSUs | 33,450 | 2/28/2023 | $0.0000 | $0 |
| 2/25/2020 | PSUs Converted to Shares | (12,470) | 2/25/2020 | $0.0000 | 18,705 shares gained |
| 2/23/2021 | PSUs Converted to Shares | (10,235) | 2/23/21 | $0.0000 | 11,463 shares gained |
| 2/28/2023 | PSUs Converted to Shares | (33,450) | 2/28/2023 | $0.0000 | 36,360 shares gained |
| 2/26/2024 | PSUs Converted to Shares | (37,300) | 2/26/2024 | $0.0000 | 55,950 shares gained |
| **Sub-Total Awards of PSUs** | | **33,450** | | **Costs** | **$0** |
| **Sub-Total Conversions of PSUs** | | **(93,455)** | | **Proceeds** | **122,478 Shares** |

[6] Excludes PSU awards that did not vest due to the performance target not being met.

| | | | | |
|---|---|---|---|---|
| **Total** | **Shares Sold** | **(67,389)** | **Transaction Proceeds** | **$4,058,405** |
| | **Awards of Options** | **116,365** | **Transaction Proceeds** | **116,365 Options** |
| | **Award of RSUs** | **95,395** | **Transaction Costs** | **$0** |
| | **Conversion of RSUs** | **(42,543)** | **Transaction Proceeds** | **42,542 Shares** |
| | **Awards of PSUs** | **33,450** | **Transaction Costs** | **$0** |
| | **Conversion of PSUs** | **(93,455)** | **Transaction Proceeds** | **122,478 Shares** |
| | | **Net $ Gain to Defendant Farmer** | | **$4,058,405** |

(b) Defendant Herzog entered the 10(b) Class Period with balances of 7,421 Comerica shares, 3,641 options, 880 RSUs, and 4,540 PSUs, Defendant Herzog's transactions during the 10(b) Class Period were as follows:

| **Stock Transactions** | | | | |
|---|---|---|---|---|
| **Transactio n Date** | **Action** | **Shares** | **Price** | **Funds Spent / Gained** |
| 1/24/2020 | Sell | (119) | $64.73 | $7,703 |
| 1/26/2020 | Sell | (119) | $64.73 | $7,703 |
| 1/27/2020 | Sell | (91) | $62.72 | $5,708 |
| 2/25/2020 | PSUs Converted to Shares | 3,990 | $0.00 | $0 |
| 2/25/2020 | Sell | (1,571) | $56.79 | $89,217 |
| 1/23/2021 | RSUs Converted to Shares | 363 | $0.00 | $0 |
| 1/23/2021 | Sell | (134) | $62.16 | $8,329 |
| 1/24/2021 | Sell | (59) | $62.16 | $3,667 |
| 1/26/2021 | Sell | (119) | $60.12 | $7,154 |
| 2/23/2021 | PSUs Converted to Shares | 2,105 | $0.00 | $0 |
| 2/23/2021 | Sell | (829) | $69.59 | $57,690 |
| 1/22/2022 | RSUs Converted to Shares | 440 | $0.00 | $0 |
| 1/22/2022 | Sell | (163) | $89.70 | $14,621 |
| 1/23/2022 | RSUs Converted to Shares | 181 | $0.00 | $0 |
| 1/23/2022 | Sell | (67) | $89.70 | $6,010 |

| | | | | |
|---|---|---|---|---|
| 1/24/2022 | Sell | (60) | $90.53 | $5,432 |
| 1/22/2023 | RSUs Converted to Shares | 220 | $0.00 | $0 |
| 1/22/2023 | Sell | (82) | $69.13 | $5,669 |
| 1/23/2023 | RSUs Converted to Shares | 181 | $0.00 | $0 |
| 1/23/2023 | Sell | (68) | $71.96 | $4,893 |
| 1/26/2023 | RSUs Converted to Shares | 2,583 | $0.00 | $0 |
| 1/26/2023 | Sell | (956) | $72.03 | $68,861 |
| 1/28/2023 | RSUs Converted to Shares | 643 | $0.00 | $0 |
| 1/28/2023 | Sell | (238) | $72.57 | $17,272 |
| 2/25/2023 | RSUs Converted to Shares | 1,048 | $0.00 | $0 |
| 2/25/2023 | Sell | (388) | $70.41 | $27,319 |
| 2/28/2023 | PSUs Converted to Shares | 9,549 | $0.00 | $0 |
| 2/28/2023 | Sell | (3,759) | $70.10 | $263,506 |
| 1/22/2024 | RSUs Converted to Shares | 220 | $0.00 | $0 |
| 1/22/2024 | Sell | (82) | $53.67 | $4,401 |
| 1/25/2024 | RSUs Converted to Shares | 1,945 | $0.00 | $0 |
| 1/25/2024 | Sell | (720) | $54.97 | $39,578 |
| 1/26/2024 | RSUs Converted to Shares | 1,291 | $0.00 | $0 |
| 1/26/2024 | Sell | (597) | $54.92 | $32,787 |
| 1/28/2024 | RSUs Converted to Shares | 321 | $0.00 | $0 |
| 2/23/2024 | Sell | (116) | $49.54 | $5,747 |
| 2/25/2024 | RSUs Converted to Shares | 524 | $0.00 | $0 |
| 2/26/2024 | PSUs Converted to Shares | 15,495 | $0.00 | $0 |
| 2/26/2024 | Sell | (6,098) | $48.97 | $298,619 |
| **RSUs Converted to Shares** | | **9960** | | |
| **PSUs Converted to Shares** | | **31,139** | | |
| **Sell (Tax Withholdings)** | | **(16,435)** | **Proceeds:** | **$981,886** |

| **Options Transactions** | | | | |
|---|---|---|---|---|
| **Transaction Date** | **Action** | **Shares** | **Price** | **Funds Spent/ Gained** |
| 1/28/2020 | Award of Options | 2,495 | $0.0000 | $0 |
| 2/25/2020 | Award of Options | 4,060 | $0.0000 | $0 |
| 1/26/2021 | Award of Options | 5,655 | $0.0000 | $0 |
| 1/25/2022 | Award of Options | 4,820 | $0.0000 | $0 |
| 1/24/2023 | Award of Options | 6,345 | $0.0000 | $0 |
| 1/24/2024 | Award of Options | 7,910 | $0.0000 | $0 |
| **Sub-Total Awards of Options** | | **31,285** | **Costs** | **$0** |
| **Sub-Total Conversions/Sales of Options** | | **0** | **Proceeds:** | **$0** |

| RSU Transactions | | | | | |
|---|---|---|---|---|---|
| **Transaction Date** | **Action** | **Units** | **Vesting Date** | **Price** | **Funds Spent/ Gained** |
| 1/28/2020 | Award of RSUs | 1,285 | 1/28/2023 (50%), 1/28/2024 (25%), 1/28/2025 (25%) | $0.0000 | $0 |
| 2/25/2020 | Award of RSUs | 2,095 | 2/25/2023 (50%), 2/25/2024 (25%), 2/25/2025 (25%) | $0.0000 | $0 |
| 1/23/2021 | RSUs Converted to Shares | (363) | 1/23/2021 | $0.0000 | Converted to 363 Shares |
| 1/26/2021 | Award of RSUs | 5,165 | 1/26/2023 (50%), 1/26/2024 (25%), 1/26/2025 (25%) | $0.0000 | $0 |
| 1/22/2022 | RSUs Converted to Shares | (440) | 1/22/2022 | $0.0000 | Converted to 440 Shares |
| 1/23/2022 | RSUs Converted to Shares | (181) | 1/23/2022 | $0.0000 | Converted to 181 Shares |
| 1/25/2022 | Award of RSUs | 3,890 | 1/25/2024 (50%), 1/25/2025 (25%), 1/25/2026 (25%) | $0.0000 | $0 |
| 1/22/2023 | RSUs Converted to Shares | (220) | 1/22/2023 | $0.0000 | Converted to 220 Shares |
| 1/23/2023 | RSUs Converted to Shares | (181) | 1/23/2023 | $0.0000 | Converted to 181 Shares |
| 1/24/2023 | Award of RSUs | 5,480 | 1/24/2025 (50%), 1/24/2026 (25%), 1/24/2027 (25%) | $0.0000 | $0 |
| 1/26/2023 | RSUs Converted to Shares | (2,583) | 1/26/2023 | $0.0000 | Converted to 2,583 Shares |

| | | | | | |
|---|---|---|---|---|---|
| 1/28/2023 | RSUs Converted to Shares | (643) | 1/28/2023 | $0.0000 | Converted 643 Shares |
| 2/25/2023 | RSUs Converted to Shares | (1,048) | 2/25/2023 | $0.0000 | Converted 1,048 Shares |
| 1/23/2024 | Award of RSUs | 7,785 | 1/31/2026 (50%), 1/31/2027 (25%), 1/31/2028 (25%) | $0.0000 | $0 |
| 1/25/2024 | RSUs Converted to Shares | (1,945) | 1/25/2024 | $0.0000 | Converted 1,945 Shares |
| 1/26/2024 | RSUs Converted to Shares | (1,291) | 1/26/2024 | $0.0000 | Converted 1,291 Shares |
| 1/28/2024 | RSUs Converted to Shares | (321) | 1/28/2024 | $0.0000 | Converted 321 Shares |
| 2/25/2024 | RSUs Converted to Shares | (524) | 2/25/2023 | $0.0000 | Converted 524 Shares |
| **Sub-Total Awards of RSUs** | | **25,700** | | **Costs** | **$0** |
| **Sub-Total Conversions of RSUs** | | **(9,740)** | | **Proceeds** | **9,740 Shares** |

| **PSU Transactions**[7] | | | | | |
|---|---|---|---|---|---|
| **Transaction Date** | **Action** | **Units** | **Vesting Date** | **Price** | **Funds Spent/ Gained** |
| 1/28/2020 | Award of PSUs | 3,335 | 2/28/2023 | $0.0000 | $0 |
| 2/25/2020 | Award of PSUs | 5,450 | 2/28/2023 | $0.0000 | $0 |
| 2/25/2020 | PSUs Converted to Shares | (2,660) | 2/25/2020 | $0.0000 | 3,990 shares gained |

[7] Excludes PSU awards that did not vest due to the performance target not being met.

| | | | | | |
|---|---|---|---|---|---|
| 2/23/2021 | PSUs Converted to Shares | (1,880) | 2/23/2021 | $0.0000 | 2,105 shares gained |
| 2/28/2023 | PSUs Converted to Shares [8] | (8,785) | 2/28/2023 | $0.0000 | 9,549 shares gained |
| 2/26/2024 | PSUs Converted to Shares | (10,330) | 2/26/2024 | $0.0000 | 15,495 shares gained |
| **Sub-Total Awards of PSUs** | | **8,785** | | **Costs** | **$0** |
| **Sub-Total Conversions of PSUs** | | **(23,655)** | | **Proceeds:** | **31,139 Shares** |

| | | | | |
|---|---|---|---|---|
| **Total** | **Shares Sold** | **(16,435)** | **Transaction Proceeds** | **$981,886** |
| | **Award of Options** | **31,285** | **Transaction Proceeds** | **31,285 Options** |
| | **Award of RSUs** | **25,700** | **Transaction Costs** | **$0** |
| | **Conversion of RSUs** | **(9,740)** | **Transaction Proceeds** | **9,740 Shares** |
| | **Awards of PSUs** | **8,785** | **Transaction Costs** | $0 |
| | **Conversion of PSUs** | **(23,655)** | **Transaction Proceeds** | **31,139 Shares** |
| | | **Net $ Gain to Defendant Herzog** | | **$981,886** |

137. These transactions during the Class Period, while the fraud was raging and the true facts regarding Comerica's business and operations, in particular those

[8] In Defendant Herzog's SEC Form 4 dated February 28, 2023, the quantities noted in Footnote (1) do not equate to the quantities noted in Comerica's *Proxy Statement and Notice of 2023 Annual Meeting of Shareholders*. Herein, the quantities noted in the Proxy statement are used.

regarding the Direct Express program, as alleged herein, remained hidden from investors, yielded the Individual Defendants a combined ***$5,040,291*** ($4,058,405 for Farmer, $981,886 for Herzog), along with 147,650 additional options (116,365 for Farmer, 31,285 for Herzog) and 205,900 additional shares (165,021 for Farmer, 40,879 for Herzog) acquired at no expense, in net ill-gotten gains from prices inflated by the fraud alleged herein. These transactions and proceeds constitute strong evidence of scienter.

138. These transactions were suspicious in amount, a fact that further supports the scienter inference. For example, Farmer's $4,058,405 in sale proceeds were over four times his 2020 base salary of $976,154, while Herzog's $981,886 in sale proceeds were nearly double his 2020 base salary of $505,596. As illustrated in Appendix 1 hereto, these transactions were also suspicious in timing vis-à-vis the alleged fraudulent misstatements, the alleged corrective disclosures, and other relevant developments, a fact that further supports the scienter inference.

### 3. *Comerica Raised Funds During The Fraud*

139. During the Class Period, Comerica raised funds while the price of its securities was inflated by the alleged fraud. In a Form 8-K filed with the SEC on May 26, 2020, Comerica announced that it had raised $394.5 million through issuance of 400,000 callable bonds on May 26, 2020. This offering, which took

place during the fraud alleged herein and was made pursuant to the 5/20/2020 Underwriting Agreement, is evidence of Comerica's corporate scienter.

### 4. *The Fraud Implicated Core Operations*

140. The fraud alleged herein implicates the core operations of Comerica. As a high-profile U.S. government contract, the Direct Express program meant not only billions of dollars of additional deposit funds for Comerica and hundreds of millions of dollars of direct payment and fee-based revenues, it also carried significant reputational impacts. Any violation of the contract and governing law, let alone one as egregious as set forth herein, put all the foregoing considerations at risk as well as jeopardized Comerica's ability to secure future U.S. government contract work of a similar fiduciary nature.

141. In light of these facts, it is inconceivable that the Individual Defendants and executive management did not know the facts and circumstances of the fraud as alleged herein. Moreover, such knowledge is imputable to Defendants, given the implication of core operations, the Defendants' roles and status within Comerica, and the facts regarding the funneling of information to them and their personal involvement in the key events and circumstances at issue, as alleged herein, including not only their own issuance of the alleged misstatements but also the facts evidenced by the CW statements.

### 5. *The Individual Defendants Signed, Were Quoted In, Or SOX-Certified The Alleged Misstatements*

142. As the individuals who signed, were quoted in, or orally made the alleged false and misleading statements described herein, Defendants Farmer and Herzog were under an obligation to familiarize themselves with the subject matter of those public statements and to speak truthfully. As alleged herein, they violated such duties.

143. As the individuals who SOX certified SEC filings as described above, Defendants Farmer and Herzog were obligated to inquire and investigate, familiarize themselves with the subject matter of their SOX certifications, and reassure themselves that the certifications were accurate and that they were speaking truthfully in making them. As alleged herein, they violated such duties.

### 6. *The Fraud Violated Comerica's Code Of Conduct*

144. Comerica's Code of Business Conduct and Ethics for Employees ("Code of Conduct") and its Senior Financial Officer Code of Ethics ("Officers Code of Ethics), both published on its website throughout the Class Period, barred all misconduct detailed above.

145. Defendant Farmer called the Code of Conduct "the most important document at Comerica." Like Comerica's Direct Express program FAA, the Code of Conduct requires safeguarding of sensitive information:

> We should deal fairly with customers, suppliers, competitors, and colleagues, and ***should not take unfair advantage of anyone through manipulation, concealment, abuse of confidential or privileged information, misrepresentation of material facts, or any other unfair-dealing practice.***

146. The Code of Conduct mandates legal compliance by all employees, stating "We should conduct our business ***at all times in accordance with all material laws, rules and regulations*** that apply to our business and ***not engage in conduct that violates such laws, rules and regulations***." It added:

> ***We each have responsibilities*** to seek appropriate guidance regarding our actions when necessary and ***to report violations of laws, rules, and regulations that apply to our business***, as well as violations of this Code of Business Conduct and Ethics for Employees and other Comerica policies, to the extent that we know a violation of either has occurred.

147. Comerica's Code of Conduct also prohibited taking advantage of non-public information, *e.g.*, when making securities trades, stating in relevant part, "To protect our shareholders and comply with the requirements of our regulators, ***we must hold "inside information" in confidence and not misuse it.***

148. Defendants Farmer and Herzog, and other senior management, were subject to the Officers Code of Ethics, had to acknowledge in writing receipt and understanding of its terms, and were so deemed to have agreed to observe, perform and keep the terms and provisions. It set requirements for Defendants Farmer and Herzog to make accurate, full, and fair disclosures in SEC filings, stating:

> ***The Chief Executive Officer and Senior Financial Officers are responsible for full, fair, accurate, timely, and understandable disclosure in the periodic reports required to be filed by Comerica with the Securities and Exchange Commission including Forms 10-K, Forms 10-Q, Forms 8-K, and Proxy Statements.*** Accordingly, the Chief Executive Officer and each Senior Financial Officer shall promptly bring to the attention of the Disclosure Sign-Off Committee any material information of which he or she may become aware that affects the disclosures made by Comerica in its pubic filings and to otherwise assist the Disclosure Sign-Off Committee in fulfilling its responsibilities as specified in Comerica's Disclosure Controls and Procedures.

149. The Officers Code of Ethics also bound Defendants Farmer and Herzog to promptly disclose any deficiencies in internal controls, stating:

> The Chief Executive Officer and Senior Financial Officers must act at all times in an honest and ethical manner. ***The Chief Executive Officer and each Senior Financial Officer shall promptly bring to the attention of the Disclosure Sign-Off Committee and the Audit Committee*** any information he or she may have concerning ***(a) significant deficiencies in the design or operation of internal controls which could adversely affect Comerica's ability to record, process, summarize and report financial data*** or ***(b) any fraud***, whether or not material, ***that involves management or other employees who have a significant role in Comerica's financial reporting, disclosures or internal controls***.

150. Comerica's Code of Conduct and Officers Code of Ethics, as detailed herein, barred the misconduct alleged herein. Defendants' violations of these express corporate policies further buttresses the inference of Defendants' scienter, whether based on their knowledge or of their recklessness.

### 7. *Insider Resignations and Employment Status Changes*

151. Defendants' scienter is further supported by the removal of key executives during or shortly after the Class Period, including:

(a) In a February 17, 2022 Form 8-K (the "2/17/2022 8-K") signed by Buchanan, while the fraud alleged herein was ongoing, Comerica announced that T. Kevin DeNicola, a member of the Comerica Board of Directors since 2006, would not stand for re-election at the 2022 Annual Meeting of Shareholders. The only purported explanation given was that Mr. DeNicola's "decision was not due to any disagreement with Comerica on any matter." Here, rather than electing a new Director—who may have uncovered the fraud—the Comerica Board of Directors reduced its size to eleven Directors.

(b) In a May 6, 2022 Form 8-K (the "5/6/2022 8-K") signed by Defendant Herzog—while the fraud alleged herein was ongoing and the *Carnley* litigation was active—Comerica announced that its SEC filings signatory, Chief Legal Officer and Corporate Secretary John D. Buchanan, ceased serving in those roles as of that date and would depart Comerica in a month. It claimed that purportedly "Mr. Buchanan's departure from Comerica is for personal reasons and not the result of any disagreement or dispute between Mr. Buchanan and Comerica, or the result of any disagreement on any matter related to Comerica's operations, policies or

practices." However, his outsized departing pay package, announced shortly after, signaled otherwise.

(c) In a Form 8-K dated May 17, 2022 (the "5/17/2022 8-K") signed by SVP and Interim Corporate Secretary Nicole V. Gersch, Comerica disclosed the terms of Mr. Buchanan's Separation Agreement dated May 12, 2022, pursuant to which he was paid roughly $2.5 million in exchange for general releases and restrictive covenants, including general non-disparagement, cooperation, and confidentiality provisions.

(d) In an August 8, 2023 Form 8-K (the "8/8/2023 8-K") signed by EVP / Chief Legal Officer Hays, shortly after the fraud alleged herein was revealed, Comerica announced that its Chief Risk Officer, Jay K. Oberg, had announced a plan to retire at the end of 2024. It said that "[i]n preparation for his departure next year, the Company is conducting a search and evaluating candidates to fill the role of Chief Risk Officer." Mr. Oberg's announced retirement came less than three months after he was named in the 5/29/2023 *AB* Article revealing the fraud.

152. In sum, at the height of the alleged fraud, during a period of the Individual Defendants' securities transactions, and in the middle of the pre-existing litigation alleging problems with Comerica's pre-Class Period handling of the Direct Express program, Comerica's Chief Legal Officer departed Comerica and in exchange for general releases on restrictive covenants—and his silence—he was

paid roughly $2.5 million. His departure was shortly after a significant insider and Board Member announced he would not seek reelection, and the Board shrunk in size rather than replace him. Comerica's Chief Risk Officer, who was revealed to have known about fraud alleged by the 5/29/2023 *AB* Article, also announced his retirement shortly after the fraud was revealed. All the foregoing facts support the inference of scienter, including Comerica's corporate scienter.

### 8. *Comerica paid $1.2 million to settle consumer claims*

153. The *American Banker* reported in early June 2024 that Comerica has agreed to pay $1.2 million to settle consumer class action litigation alleging that it had mishandled Direct Express enrollees' fraud claims, failed to reimburse Direct Express customers, and did not properly oversee its third party vendors, including Conduent, handling the Direct Express program. The settlement agreement set forth Defendants' position that Comerica was unable to identify which Direct Express enrollees had submitted fraud claims, without intensive file-by-file review, underscoring the degree to which Comerica and Conduent had mishandled Direct Express enrollees' accounts and claims of fraud.

## VI. NO SAFE HARBOR

154. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements alleged herein. Most, if not all, of the specific statements pleaded herein were not

identified as "forward-looking statements" when made. To the extent any were so labelled, they included statements of then-historical or then-present fact, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Any purported cautionary language warned only of theoretical future risks at times when those risks had already ripened due to Comerica's then-ongoing misconduct. Moreover, the purported cautionary language failed to adjust over time, using the same theoretical tone even after concrete changes of circumstance. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false or misleading forward-looking statements because at the time each of them was made, the particular speaker knew that the forward-looking statement was false or misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of Comerica who knew that those statements were false or misleading when made.

155. For all these same reasons, the bespeaks caution doctrine likewise does not apply to shield Defendants from liability.

## VII. THE CLAIMS ARE TIMELY

156. The claims set forth herein were timely filed.

157. The market was not arguably aware until February 17, 2022, at the earliest, that credible allegations existed as to misconduct concerning the Direct Express program and as to deterioration of the metrics that Comerica linked to the Direct Express program.

158. It was also not until February 17, 2022 that Lead Plaintiff was first presented with any credible evidence that Defendants had made materially false and misleading statements to investors during the Class Period. In the absence of publicly available information prior to then suggesting that Comerica's pronouncements in its SEC filings and other public statements during the Class Period were materially false and/or misleading, Lead Plaintiff was not under any duty to inquire as to the truthfulness of Comerica's public statements. Therefore, Lead Plaintiff's duty in that regard arose no earlier than February 17, 2022.

159. Prior to February 17, 2022, Lead Plaintiff and Class members could not have been on any inquiry notice of possible claims under the Securities Exchange Act. Even assuming this early date for inquiry notice, Lead Plaintiff's Securities Exchange Act claims against Defendants were brought within two years. Thus, Lead Plaintiff has complied with the requirements of 28 U.S.C. § 1658(b).

## VIII. LOSS CAUSATION / ECONOMIC LOSS

160. The market for Comerica shares was open, well-developed, and efficient at all relevant times. During the Class Period, as detailed herein,

Defendants engaged in a course of conduct and a scheme to deceive investors that artificially inflated Comerica shares and operated as a fraud or deceit on Class Period purchasers or acquirors of its shares by misrepresenting the material facts alleged herein. As detailed above, at the Class Period end, when Defendants' prior misrepresentations became known to the public, the price of Comerica shares fell, as the artificial inflation came out. As a result of their purchases or acquisitions of Comerica shares during the Class Period, Lead Plaintiff and the Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

161. During the Class Period, Defendants presented a misleading picture of Comerica's financial condition, revenues, growth, performance, and business prospects, including as regards the Direct Express program and certain metrics that Comerica linked to Direct Express. Defendants' false and misleading statements had the intended effect and caused Comerica shares to trade at artificially inflated prices throughout the Class Period and until the truth was revealed to the market.

162. As detailed herein, the price of Comerica shares dropped, on high volume, in response to the issuance of each of the corrective disclosures alleged herein. These stock drops removed inflation from the price of Comerica shares, causing real economic loss to investors who had purchased or acquired Comerica shares during the Class Period.

163. These declines were a direct and proximate result of the nature and extent of Defendants' fraud being revealed to investors and the market. The timing and magnitude of the price declines in Comerica shares – at least some of which was muted and/or reversed by Defendant Farmer's 6/1/2023 *AB* Letter that is alleged herein to have been materially false and misleading – negate any inference that the loss suffered by Lead Plaintiff and the other Class members was caused by changed market conditions, macroeconomic factors or Comerica-specific facts unrelated to Defendants' fraudulent conduct.

164. The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and other Class members was a direct and proximate result of Defendants' fraudulent scheme to artificially inflate Comerica's share price and the subsequent declines in the value of Comerica shares when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## IX. PRESUMPTION OF RELIANCE

165. At all times, the market for Comerica shares was an efficient market, supporting a presumption of reliance under the fraud-on-the-market doctrine, for the following reasons, among others:

(a) Comerica met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market, under the ticker symbol "CMA";

(b) Comerica had approximately 131.5 shares outstanding as of May 29, 2023, such that its stock was liquid. During the Class Period, numerous shares of Comerica stock were traded on a daily basis, with moderate to heavy volume, demonstrating an active and broad market for Comerica stock and permitting a strong presumption of an efficient market;

(c) As a regulated issuer, Comerica filed periodic public reports with the SEC;

(d) Comerica regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(e) Comerica was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period; and

(f) Unexpected material news about Comerica was rapidly reflected and incorporated into Comerica's stock price during the Class Period.

166. As a result of the foregoing, the market for Comerica stock promptly digested current information regarding Comerica from all publicly available sources and reflected such information in the prices of the stock. Under these

circumstances, all purchasers of Comerica stock during the Class Period suffered similar injury through their purchase of Comerica stock at artificially inflated prices and a presumption of reliance applies.

167. Alternatively, Lead Plaintiff and the Class members are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## X. LEAD PLAINTIFF'S CLASS ACTION ALLEGATIONS

168. Lead Plaintiff brings this federal securities action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all persons and entities, other than Defendants, their family members and their affiliates, who purchased or otherwise acquired the common stock of Comerica (NYSE:CMA) during the Class Period of January 7, 2020 through May 23, 2024, both dates inclusive, seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Exchange Act §§10(b) and 20(a) and Rule 10b-5 promulgated thereunder, against Defendants Comerica, Farmer, and Herzog.

169. Excluded from the Class are Defendants, the officers and directors of Comerica at all relevant times, members of their immediate families and their legal

representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

170. The Class members are so numerous that joinder of them all is impracticable. Throughout the Class Period, Comerica securities were actively traded on the NYSE. While the exact number of Class members is unknown to Lead Plaintiff at this time and can be ascertained only through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Comerica or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

171. Lead Plaintiff's claims are typical of the claims of the Class members as Class members are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

172. Lead Plaintiff will fairly and adequately protect the interests of the Class members and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiff has no interests antagonistic to or in conflict with those of the Class.

173. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Comerica;
- whether the Individual Defendants caused Comerica to issue false and misleading financial statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;
- whether the prices of Comerica securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the Class members have sustained damages and, if so, what is the proper measure of damages.

174. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

175. As alleged herein, Lead Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine insomuch as Defendants made public misrepresentations or failed to disclose material facts during the Class Period; the misrepresentations and omissions were material and would tend to induce a reasonable investor to misjudge the value of Comerica's securities; and Lead Plaintiff and the Class member purchased or otherwise acquired Comerica securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

## COUNT I

### (Against All Defendants for Violations of Section 10(b) and Rule 10b-5 Promulgated Thereunder)

176. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

177. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

178. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon Lead Plaintiff and the other Class members; made various

untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Comerica securities; and (iii) cause Lead Plaintiff and other Class members to purchase or otherwise acquire Comerica stock and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions pled herein.

179. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Comerica securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Comerica's finances and business prospects.

180. Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein, including by virtue of

their positions at Comerica, and intended thereby to deceive Lead Plaintiff and the other Class members, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

181. Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of Comerica securities.

182. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. Defendants' first-hand knowledge is alleged herein. Moreover, as the senior managers and/or directors of Comerica, the Individual Defendants had knowledge of the details of Comerica's operations, business, and internal affairs.

183. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Comerica. As officers and/or directors of a

publicly held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Comerica's businesses, operations, financial condition, and prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Comerica securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Comerica's business and financial condition that were concealed by Defendants, Lead Plaintiff and the other Class members purchased or otherwise acquired Comerica securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

184. During the Class Period, Comerica securities were traded on an active and efficient market. Lead Plaintiff and the other Class members, relying on the materially false and misleading statements described herein, which the Defendants made, issued, or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired Comerica securities at prices artificially inflated by Defendants' wrongful conduct. Had Lead Plaintiff and the other Class members known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by

Lead Plaintiff and the Class members, the true value of Comerica securities was substantially lower than the prices paid by Lead Plaintiff and the other Class members. The market price of Comerica securities declined upon public disclosure of the facts alleged herein to the injury of Lead Plaintiff and Class members.

185. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

186. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other Class members suffered damages in connection with their respective purchases, acquisitions, and sales of Comerica's securities during the Class Period, upon the disclosure that Comerica had been disseminating misrepresented financial and operational reports to the investing public.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)

187. Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

188. During the Class Period, the Individual Defendants participated in the operation and management of Comerica, and conducted and participated, directly and indirectly, in the conduct of Comerica's business affairs. Because of their senior positions, they knew the adverse non-public information about Comerica's

finances, operations, finances, and prospects, including the Direct Express program and the metrics that Comerica linked to it.

189. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Comerica's business, operations, financial condition, results of operations, and prospects and to correct promptly any public statements issued by Comerica which had become materially false or misleading.

190. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Comerica disseminated in the marketplace during the Class Period concerning Comerica's business, operations, financial condition, results of operations, and prospects. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Comerica to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Comerica within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Comerica securities.

191. Each of the Individual Defendants, therefore, acted as a controlling person of Comerica. By reason of their senior management positions and/or being

Directors of Comerica, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Comerica to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations and business of Comerica and possessed the power to control the specific activities which comprise the primary violations about which Lead Plaintiff and the other Class members complain.

192. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Comerica.

## PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Lead Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Lead Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Lead Plaintiff hereby demands a trial by jury.

Dated: June 28, 2024

Respectfully submitted,

*/s/ Matthew L. Tuccillo*

**POMERANTZ LLP**
Matthew L. Tuccillo (*pro hac vice*)
Jennifer Banner Sobers (*pro hac vice*)
Zachary Denver (*pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
mltuccillo@pomlaw.com
jbsobers@pomlaw.com
zdenver@pomlaw.com

**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Counsel for Lead Plaintiff the Nova Scotia Health Employees' Pension Plan and Lead Counsel for the Class*

***Ramos v. Comerica, Inc.*, No. 2:23-cv-06843-SB-JPR**

# Appendix 1

## To Lead Plaintiff's Second Amended Complaint

### Alleged Misstatements, Corrective Events / Disclosures, Employee Resignations, Defendant Transactions, Company Offerings

| Alleged Misstatements | Alleged Corrective Events / Disclosures | Suspiciously Timed Defendant / Insider Actions | | | |
|---|---|---|---|---|---|
| | | RSU & PSU Transactions | Options Transactions | Stock Transactions | Company Offerings & Insider Resignation |
| 1/21/2020 Form 8-K (¶79)<br>1/21/2020 Earnings Call / Presentation Slides (¶79) | | Farmer (¶136(a))<br>1/28/2020 RSUs awarded (12,865)<br>1/28/2020 PSUs awarded (33,450)<br>2/25/2020 PSUs converted to shares (12,470)<br><br>Herzog (¶136(b))<br>1/28/2020 RSUs awarded (1,285)<br>1/28/2020 PSUs awarded (3,335)<br>2/25/2020 PSUs awarded (5,450)<br>2/25/2020 RSUs awarded (2,095)<br>2/25/2020 PSUs converted to shares (2,660) | Farmer (¶136(a))<br>1/28/2020 award of options (25,030)<br><br>Herzog (¶136(b))<br>1/28/2020 award of options (2,495)<br>2/25/2020 award of options (4,060) | Farmer (¶136(a))<br>1/24/2020 shares sold (541)<br>1/26/2020 shares sold (498)<br>1/27/2020 shares sold (289)<br>2/25/2020 shares sold (7,361)<br>2/25/2020 shares coverted from PSUs (18,705)<br><br>Herzog (¶136(b))<br>1/24/2020 shares sold (119)<br>1/26/2020 shares sold (119)<br>1/27/2020 shares sold (91)<br>2/25/2020 shares converted from PSUs (3,990)<br>2/25/2020 shares sold (1,571) | |
| 4/21/2020 Form 8-K / Press Release (¶80)<br>4/21/2020 Earnings Call / Presentation Slides (¶80)<br>4/29/2020 Q1 2020 10-Q (¶¶100(a), 105)<br>5/20/2020 Underwriting Agreement (¶106)<br>7/31/2020 Q2 2020 10-Q (¶¶100(b), 105) | | | | Farmer (¶136(a))<br>4/28/2020 shares sold (636) | 5/26/2020 -$394.5 million bond offering announced and closed (¶139) |
| 10/20/2020 Form 8-K / Press Release (¶81)<br>10/20/2020 Earnings Call / Presentation Slides (¶81)<br>10/30/2020 Q3 2020 10-Q (¶¶100(c), 105)<br>12/7/2020 Form 8-K / 12/8/2020 Goldman Sachs Presentation (¶82)<br>1/19/2021 Form 8-K / Press Release (¶83)<br>1/19/2021 Earnings Call / Presentation Slides (¶83) | | Farmer (¶136(a))<br>1/23/2021 RSUs converted to shares (1,968)<br>1/26/2021 RSUs awarded (18,650)<br><br>Herzog (¶136(b))<br>1/23/2021 RSUs converted to shares (363)<br>1/26/2021 RSUs awarded (5,165) | Farmer (¶136(a))<br>1/26/2021 award of options (20,410)<br><br>Herzog (¶136(b))<br>1/26/2021 award of options (5,655) | Farmer (¶136(a))<br>1/23/2021 shares coverted from RSUs (1,968)<br>1/23/2021 shares sold (728)<br>1/24/2021 shares sold (279)<br>1/26/2021 shares sold (493)<br><br>Herzog (¶136(b))<br>1/23/2021 shares converted from RSUs (363)<br>1/23/2021 shares sold (134)<br>1/24/2021 shares sold (59)<br>1/26/2021 shares sold (119) | |
| 2/9/2021 2020 10-K (¶¶100(d), 104)<br>3/8/2021 Form 8-K / 3/9/2021 RBC Presentation (¶84)<br>4/20/2021 Form 8-K / Press Release (¶85)<br>4/20/2021 Earnings Call / Presentation Slides (¶85)<br>4/28/2021 Q1 2021 10-Q (¶¶100(e), 105) | | Farmer (¶136(a))<br>2/23/2021 PSUs converted to shares (10,235)<br><br>Herzog (¶136(b))<br>2/23/2021 PSUs converted to shares (1,880) | | Farmer (¶136(a))<br>2/23/2021 shares converted from PSUs (11,463)<br>2/23/2021 shares sold (4,511)<br><br>Herzog (¶136(b))<br>2/23/2021 shares converted from PSUs (2,105)<br>2/23/2021 shares sold (829) | |

***Ramos v. Comerica, Inc.*, No. 2:23-cv-06843-SB-JPR**

# Appendix 1

## To Lead Plaintiff's Second Amended Complaint

**Alleged Misstatements, Corrective Events / Disclosures, Employee Resignations, Defendant Transactions, Company Offerings**

| Alleged Misstatements | Alleged Corrective Events / Disclosures | Suspiciously Timed Defendant / Insider Actions | | | |
|---|---|---|---|---|---|
| | | RSU & PSU Transactions | Options Transactions | Stock Transactions | Company Offerings & Insider Resignation |
| 6/11/2021 Form 8-K / 6/14/2021 Morgan Stanley Presentation (¶86)<br>7/21/2021 Form 8-K / Press Release (¶87)<br>7/21/2021 Earnings Call / Presentation Slides (¶87)<br>7/29/2021 Q2 2021 10-Q (¶¶100(f), 105)<br>8/19/2021 Investor Presentation (¶88)<br>8/23/2021 Press Release / 2020 Corporate Responsibility Report (¶89)<br>9/10/2021 Form 8-K / 9/13/2021 Barclays Presentation (¶90)<br>10/29/2021 Q3 2021 10-Q (¶¶100(g), 105)<br>11/8/2021 Investor Presentation (¶91)<br>1/19/2022 Earnings Call / Presentation Slides (¶92)<br>2/16/2022 2021 10-K (¶¶100(h), 104) | 2/17/2022 Corrective: Analyst report on potential for additional regulation identified in 2021 10-K (¶¶109-110) | Farmer (¶136(a))<br>1/22/2022 RSUs converted to shares (2,340)<br>1/23/2022 RSUs converted to shares (984)<br>1/25/2022 RSUs awarded (13,610)<br><br>Herzog (¶136(b))<br>1/22/2022 RSUs converted to shares (440)<br>1/23/2022 RSUs converted to shares (181)<br>1/25/2022 RSUs awarded (3,890) | Farmer (¶136(a))<br>1/25/2022 award of options (16,865)<br><br>Herzog (¶136(b))<br>1/25/2022 award of options (4,820) | Farmer (¶136(a))<br>1/22/2022 shares converted from RSUs (2,340)<br>1/22/2022 shares sold (866)<br>1/23/2022 shares converted from RSUs (984)<br>1/23/2022 shares sold (364)<br>1/24/2022 shares sold (246)<br><br>Herzog (¶136(b))<br>1/22/2022 shares converted from RSUs (440)<br>1/22/2022 shares sold (163)<br>1/23/2022 shares converted from RSUs (181)<br>1/23/2022 shares sold (67)<br>1/24/2022 shares sold (60) | 2/17/2022 Anounced Director DeNicola to leave Board (¶151(a)) |
| 3/7/2022 Form 8-K / 3/8/2022 RBC Presentation (¶93)<br>4/27/2022 Q1 2022 10-Q (¶¶100(i), 105) | 4/20/2022 Corrective: Analyst reports concerning negative metrics (¶¶111-112)<br>4/21/2022 Corrective: Analyst reports concerning negative metrics (¶¶113-114) | Farmer (¶136(a))<br>4/23/2022 RSUs converted to shares (2,373) | | Farmer (¶136(a))<br>4/23/2022 shares converted from RSUs (2,373)<br>4/23/2022 shares sold (878) | 5/6/2022 Chief Legal Officer / Secretary Buchanan resigned (¶¶151(b-(c)) |
| 7/6/2022 Press Release / 2021 Corporate Responsibility Report (¶94)<br>7/28/2022 Q2 2022 10-Q (¶¶100(j), 105)<br>9/9/2022 Form 8-K / 9/13/2022 Barclays Presentation (¶95)<br>10/28/2022 Q3 2022 10-Q (¶¶100(k), 105) | 10/19/2022 Corrective: Analyst reports concerning negative metrics (¶¶115-116) | | | Farmer (¶136(a))<br>11/16/2022 shares gifted (7,200) | |
| 2/14/2023 2022 10-K (¶¶100(l), 104)<br>3/6/2023 Form 8-K / 3/7/2023 RBC Presentation (¶96) | 3/7/2023 Corrective: Analyst reports concerning 3/6/2023 Form 8-K + 3/7/2023 RBC Presentation (¶¶117-118)<br>3/23/2023 Corrective: Analyst report concerning Comerica's deteriorating metrics (¶¶119-120) | Farmer (¶136(a))<br>1/22/2023 RSUs converted to shares (1,170)<br>1/23/2023 RSUs converted to shares (984)<br>1/24/2023 RSUs awarded (21,080)<br>1/26/2023 RSUs converted to shares (9,325)<br>1/28/2023 RSUs converted to shares (6,433)<br>2/28/2023 PSUs converted to shares (33,450)<br><br>Herzog (¶136(b))<br>1/22/2023 RSUs converted to shares (220)<br>1/23/2023 RSUs converted to shares (181)<br>1/24/2023 RSUs awarded (5,480)<br>1/26/2023 RSUs converted to shares (2,583)<br>1/28/2023 RSUs converted to shares (643)<br>2/25/2023 RSUs converted to shares (1,048)<br>2/28/2023 PSUs converted to shares (8,785) | Farmer (¶136(a))<br>1/24/2023 award of options (24,400)<br><br>Herzog (¶136(b))<br>1/24/2023 award of options (6,345) | Farmer (¶136(a))<br>1/22/2023 shares converted from RSUs (1,170)<br>1/22/2023 shares sold (433)<br>1/23/2023 shares converted from RSUs (984)<br>1/23/2023 shares sold (365)<br>1/26/2023 shares converted from RSUs (9,325)<br>1/26/2023 shares sold (3,451)<br>1/28/2023 shares converted from RSUs (6,433)<br>1/28/2023 shares sold (2,380)<br>2/28/2023 shares converted from PSUs (36,360)<br>2/28/2023 shares sold (14,308)<br><br>Herzog (¶136(b))<br>1/22/2023 shares converted from RSUs (220)<br>1/22/2023 shares sold (82)<br>1/23/2023 shares converted from RSUs (181)<br>1/23/2023 shares sold (68)<br>1/26/2023 shares converted from RSUs (2,583)<br>1/26/2023 shares sold (956)<br>1/28/2023 shares converted from RSUs (643)<br>1/28/2023 shares sold (238)<br>2/25/2023 shares converted from RSUs (1,048)<br>2/25/2023 shares sold (388)<br>2/28/2023 shares converted to PSUs (9,549)<br>2/28/2023 shares sold (3,759) | |

***Ramos v. Comerica, Inc.*, No. 2:23-cv-06843-SB-JPR**

# Appendix 1

## To Lead Plaintiff's Second Amended Complaint

**Alleged Misstatements, Corrective Events / Disclosures, Employee Resignations, Defendant Transactions, Company Offerings**

| Alleged Misstatements | Alleged Corrective Events / Disclosures | Suspiciously Timed Defendant / Insider Actions | | | |
|---|---|---|---|---|---|
| | | RSU & PSU Transactions | Options Transactions | Stock Transactions | Company Offerings & Insider Resignation |
| 4/28/2023 Q1 2023 10-Q (¶¶100(m), 105)<br>6/1/2023 American Banker Letter (¶97) | 5/29/2023 Corrective: American Banker article (¶¶121-122)<br>6/12/2023 Corrective: Negative news about deteriorating metrics (¶¶124-125) | Farmer (¶136(a))<br>4/23/2023 RSUs converted to shares (1,186) | | Farmer (¶136(a))<br>4/23/2023 shares sold (439)<br>4/23/2023 shares converted from RSUs (1,186) | 8/8/2023 Announced Chief Risk Officer Oberg departure (¶151(d)) |
| | 5/23/2024 Corrective: OCC Enforcement Agreement (¶¶126-128) | Farmer (¶136(a))<br>1/22/2024 RSUs converted to shares (1,170)<br>1/23/2024 RSUs awarded (29,190)<br>1/25/2024 RSUs converted to shares (6,805)<br>1/26/2024 RSUs converted to shares (3,403)<br>1/28/2024 RSUs converted to shares (3,216)<br>2/26/2024 PSUs converted to shares (37,300)<br>4/23/2024 RSUs converted to shares (1,186)<br><br>Herzog (¶136(b))<br>1/23/2024 RSUs awarded (7,785)<br>1/25/2024 RSUs converted to shares (1,945)<br>1/26/2024 RSUs converted to shares (1,291)<br>1/28/2024 RSUs converted to shares (321)<br>2/25/2024 RSUs converted to shares (524)<br>2/26/2024 PSUs converted to shares (10,330) | Farmer (¶136(a))<br>1/23/2024 award of options (29,660)<br><br>Herzog (¶136(b))<br>1/24/2024 award of options (7,910) | Farmer (¶136(a))<br>1/22/2024 shares converted from RSUs (1,170)<br>1/22/2024 shares sold (433)<br>1/25/2024 shares converted from RSUs (6,805)<br>1/25/2024 shares sold (2,518)<br>1/26/2024 shares converted from RSUs (3,403)<br>1/26/2024 shares sold (2,915)<br>1/28/2024 shares converted from RSUs (3,216)<br>2/26/2024 shares converted from PSUs (55,950)<br>2/26/2024 shares sold (22,017)<br>4/23/2024 shares converted from RSUs (1,186)<br>4/23/2024 shares sold (440)<br><br>Herzog (¶136(b))<br>1/22/2024 shares converted from RSUs (220)<br>1/22/2024 shares sold (82)<br>1/25/2024 shares converted from RSUs (1,945)<br>1/25/2024 shares sold (720)<br>1/26/2024 shares converted from RSUs (1,291)<br>1/26/2024 shares sold (597)<br>1/28/2024 shares converted from RSUs (321)<br>2/23/2024 shares sold (116)<br>2/25/2024 shares converted from RSUs (524)<br>2/26/2024 shares converted from PSUs (15,495)<br>2/26/2024 shares sold (6,098) | |