UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID RAMOS et al.,<br>Plaintiffs,<br>v.<br>COMERICA INCORPORATED et al.,<br>Defendants. | Case No. 2:23-cv-06843-SB-JPR<br><br>ORDER GRANTING MOTION TO DISMISS THIRD AMENDED COMPLAINT [DKT. NO. 90] |

Lead Plaintiff Nova Scotia Health Employees' Pension Plan (NSHEPP) is an investor in Defendant Comerica Incorporated (Comerica). Comerica Bank administers the federal government's Direct Express program, providing debit cards to beneficiaries of government programs. In a prior pleading, NSHEPP alleged that Comerica Bank violated the governing regulations and contractual requirements for the Direct Express program and that Comerica and its executives committed securities fraud by hiding the violations. NSHEPP alleged that the fraud was revealed through the May 29, 2023 publication of a news article in *American Banker*. The Court dismissed NSHEPP's claims, finding that the small stock price drop after publication of the *American Banker* article, which was immediately followed by a sustained recovery, was insufficient to establish loss causation under controlling Ninth Circuit precedent. In its Third Amended Complaint (TAC), NSHEPP now alleges that numerous other stock drops over a two-year period were related to other partial disclosures of the fraud. Defendants again move to dismiss for failure to state a claim. Dkt. No. 90. The Court issued a tentative order granting the motion and held a hearing on September 27, 2024. Because NSHEPP still has not plausibly alleged that any misrepresentations or omissions by Defendants caused a loss to investors, the Court dismisses the TAC.

I.

As explained in the Court's order dismissing NSHEPP's First Amended Complaint (FAC), the U.S. Department of the Treasury, Bureau of the Fiscal Service (Fiscal Service) established the Direct Express program to allow elderly and disabled Americans to receive government benefits electronically using prepaid debit cards. Dkt. No. 87 ¶ 44 (TAC). The government selected Comerica to serve as the program's financial agent. *Id.* Comerica entered into a financial agency agreement (FAA) with Fiscal Service, and the agreement was repeatedly renewed, most recently in January 2020 to extend Comerica's role until January 2025. *Id.* Comerica receives direct payments from the government to run the program—allegedly $151 million in 2020—as well as tens of millions of dollars each year from various fees associated with the cards. *Id.* ¶¶ 5, 46.

The FAA requires Comerica and its contractors—Conduent and i2c, Inc.—to ensure that all services performed in connection with the Direct Express program and all access to cardholder data occur within the United States and by U.S. citizens or lawful permanent residents. *Id.* ¶¶ 4, 60. Comerica and its contractors are also required to comply with Regulation E, which imposes consumer protections relating to fraud complaints, including the requirement that banks conduct a reasonable investigation of fraudulent transfer claims within a defined timeframe and correct any errors within one business day of their discovery. *Id.* ¶ 64.

Relying largely on the reports of confidential witnesses and the contents of the *American Banker* article, the TAC—like the earlier complaints—alleges that most of the operations of i2c, Inc., one of Comerica's two main contractors on the Direct Express program, were based in Pakistan during the class period; that all the card transaction work performed by i2c was initially done there; and that employees in Pakistan were still involved in some of the work as late as March 2023. *Id.* ¶¶ 66, 69–74. The TAC also alleges noncompliance with Regulation E, asserting that some fraud claims were handled improperly at both i2c and Conduent, resulting in error rates of up to 90–95 percent, at least among cases that had been flagged for review. *Id.* ¶¶ 71, 75.

On May 29, 2023, *American Banker* published an article titled "Comerica in 'serious violation' of Treasury's Direct Express program," which reported on i2c's office in Pakistan and on "sweeping violations of Regulation E." *Id.* ¶ 130. The following day, Comerica's stock price dropped by $1.40 per share, or 3.59 percent, to close at $37.59. *Id.* ¶ 131. The stock price declined a further $1.49 per share, or

3.96 percent, to close at $36.10 the following day, May 31. *Id.* On June 1, Comerica's president and chief executive officer, Defendant Curtis Farmer, wrote a letter responding to the *American Banker* article. *Id.* ¶ 98.[1] The letter included statements that, according to NSHEPP, misleadingly minimized the misconduct and falsely suggested that it had been remedied:

> The scope of the Direct Express program requires coordinating many stakeholders and working diligently to ensure that federal regulations are being followed. The recent article ignores the fact that Comerica took steps to protect Direct Express users when it became aware that a third-party vendor had not followed program protocols for reviewing customer inquiries. These steps included requiring the vendor in question to engage an independent auditor whose results were shared with the Fiscal Service. These steps were taken in cooperation with the Fiscal Service in 2020. And, we continue to perform regular assessments, including independent audits to ensure the program is managed in compliance with applicable requirements with ongoing oversight from the Fiscal Service and Treasury Department. We invest resources into making the program successful and act quickly if we find issues — from addressing individual customer concerns to oversight of vendors.

---

[1] The Court grants Defendants' unopposed request for judicial notice of the full copies of the *American Banker* article at Dkt. No. 91-1 and Farmer's response at Dkt. No. 91-3; both documents are incorporated by reference into the TAC because they are quoted extensively and central to NSHEPP's claims. *See United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) (documents forming the basis of the plaintiff's claim or extensively referenced in the complaint may be considered under incorporation-by-reference doctrine). The Court also grants the unopposed requests of both parties to take judicial notice of the historical Comerica stock prices filed at Dkt. Nos. 91-2 and 95-2. *See Okla. Firefighters Pension & Ret. Sys. v. IXIA*, 50 F. Supp. 3d 1328, 1349 (C.D. Cal. 2014) ("Because [a public company's] historical stock prices can be readily ascertained and those prices are not subject to reasonable dispute, courts routinely take judicial notice of them."). The remaining requests for judicial notice—and objections thereto—are denied as moot because they do not affect the Court's analysis. NSHEPP's separate request for judicial notice of the audit report published on September 18 by the Treasury's Office of Inspector General is addressed further in connection with leave to amend.

Dkt. No. 91-3 at 4. NSHEPP alleges that Farmer's misleading statements muted the corrective impact of the May 29 article. Dkt. No. 87 ¶ 132. On June 1 and 2, 2023, Comerica's stocks closed at $38.18 and $40.93, fully erasing the previous days' losses. Dkt. No. 91-2 at 2.

The TAC includes nearly 60 pages of statements made by Comerica between January 2020 and July 2024 about its operations, reported results, and internal controls. *Id.* ¶¶ 78–116. NSHEPP characterizes all these statements as materially false and misleading principally because they did not disclose that Comerica and its contractors were violating the FAA's requirements and Regulation E. *See id.* ¶¶ 106–107, 110, 116. NSHEPP alleges that because of these false statements, Comerica's stock prices traded at artificially high prices until the truth was revealed to the market by the *American Banker* article and a series of other disclosures identified in the TAC. *Id.* ¶¶ 171–74. Most of those alleged corrective disclosures were analyst reports published throughout the class period that made no mention of the Direct Express program but were followed by small price drops. *E.g., id.* ¶¶ 118–129. The most significant disclosure came on July 19, 2024, when Comerica revealed that the Treasury Department had preliminarily notified Comerica that it had not been selected to continue serving as the financial agent for the Direct Express program after the contract expiration in 2025. *Id.* ¶ 138. Following this disclosure, Comerica's stock price dropped by more than 10 percent, from $56.44 to $50.42—the largest decline in more than a year. *Id.* ¶ 139.[2]

During the period from January 2020 to July 2024, Farmer and Defendant James Herzog, Comerica's chief financial officer and senior executive vice president, each sold or converted various stock-related benefits. *Id.* ¶ 147. The TAC relies on these transactions, along with other circumstantial evidence, to allege that Farmer and Herzog were aware that Comerica's statements failing to disclose its Direct Express compliance problems had inflated its stock prices. *Id.* ¶¶ 142–63.

In August 2023, Plaintiff David Ramos, an individual shareholder in Comerica, filed this putative class action alleging securities violations. Dkt. No. 1. After Ramos published notice of the action, NSHEPP, an institutional investor, sought appointment as lead plaintiff. The Court granted NSHEPP's unopposed motion, Dkt. No. 36, and NSHEPP filed its FAC, Dkt. No. 48. The Court granted

[2] Comerica's stock price rebounded over the following month, ending August at just over $57. Dkt. No. 95-2 at 3.

Defendants' motion to dismiss the FAC, holding that it did not plausibly allege loss causation based on the brief stock drop following publication of the *American Banker* article. Dkt. No. 65. Over Defendants' objections, the Court permitted NSHEPP to amend the pleadings twice—first to add additional corrective disclosures and then, after Defendants had moved to dismiss the Second Amended Complaint, to add allegations about Fiscal Service's preliminary decision not to renew Comerica's contract. Dkt. Nos. 74, 85. The TAC, like the earlier complaints, alleges claims for (1) violations of § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 by Comerica, Farmer, and Herzog; and (2) violations of § 20(a) of the Exchange Act by Farmer and Herzog. Dkt. No. 87. Defendants move to dismiss the TAC for failure to state a claim. Dkt. No. 90.

II.

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has "facial plausibility" if the plaintiff pleads facts that "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In resolving a Rule 12(b)(6) motion, a court must accept all well-pleaded factual allegations as true, but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," and courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* (quoting *Twombly*, 550 U.S. at 555). Assuming the veracity of well-pleaded factual allegations, a court must "determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679. There is no plausibility "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Id.*

In addition to these pleading standards, a plaintiff asserting a private securities fraud action must meet the heightened pleading requirements imposed by Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 (PSLRA), which "present no small hurdle for the securities fraud plaintiff." *In re Verifone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012). Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). Similarly, the PSLRA requires that a securities plaintiff plead both falsity and scienter with particularity. 15 U.S.C. §§ 78u–4(b)(1)(B), (b)(2)(A).

III.

To state a claim under § 10(b) of the Exchange Act—and Rule 10b-5, which implements it—a plaintiff must allege (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 413 (9th Cir. 2020). It is undisputed that NSHEPP's claim in Count 2 for control person liability under § 20(a) rises or falls with its claim in Count 1 because § 20(a) requires a primary securities violation. *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009) ("Section 20(a) claims may be dismissed summarily . . . if a plaintiff fails to adequately plead a primary violation of section 10(b)."). As with the FAC, Defendants raise serious arguments that the TAC does not satisfy the PSLRA's demanding standard for alleging either a materially false statement or Defendants' scienter. However, the Court again declines to adjudicate the adequacy of NSHEPP's allegations on those elements because the TAC still does not plausibly allege loss causation, and that failure is fatal to NSHEPP's claims.

A private litigant alleging a claim under § 10(b) "shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). "The loss causation element of a § 10(b) claim is simply a variant of proximate cause, and the ultimate issue is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1197 (9th Cir. 2021) (cleaned up). Where, as here, the plaintiff's theory is that the defendant's stock prices were artificially inflated because of the defendant's concealment of adverse facts, a drop in the stock price after disclosure of those facts may suggest that the fraud had artificially propped up the stock price. *Id.* "The analysis is contextual, and where, for example, a 'modest' drop in the stock price coincides with the disclosure of certain news but then 'recover[s] very shortly after,' the allegation of loss causation may be insufficient." *Id.* (quoting *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064–65 (9th Cir. 2008)). Thus, to adequately allege loss causation on this theory, "the complaint must allege that the defendant's 'share price fell significantly after the truth became known.'" *Metzler*, 540 F.3d at 1062 (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005)).

"The most common way for plaintiffs to prove that 'the truth became known'" for purposes of establishing loss causation based on a market fraud theory "is to identify one or more corrective disclosures." *In re BofI Holding, Inc. Sec.*

*Litig.*, 977 F.3d 781, 790 (9th Cir. 2020). "A corrective disclosure occurs when 'information correcting the misstatement or omission that is the basis for the action is disseminated to the market.'" *Id.* (quoting 15 U.S.C. § 78u-4(e)(1)). "[A] corrective disclosure need not reveal the full scope of the defendant's fraud in one fell swoop; the true facts concealed by the defendant's misstatements may be revealed over time through a series of partial disclosures." *Id.*

In dismissing the FAC, the Court concluded that the modest two-day drop in Comerica's stock price after the publication of the *American Banker* article, which was immediately followed by even larger gains in the next two days, could not support a finding of loss causation as a matter of law under *Wochos* and *Metzler*. Dkt. No. 65 at 6–9; *see Metzler*, 540 F.3d at 1063–65 (finding no plausible allegation of loss causation where stock recovered from "modest 10% drop" within three days); *Wochos*, 985 F.3d at 1198 ("The quick and sustained price recovery after the modest . . . drop refutes the inference that the alleged concealment of this particular fact caused any material drop in the stock price."). In its TAC, NSHEPP now relies on nine additional "partial corrective disclosures" that each "partially removed fraud-related inflation from Comerica's stock." Dkt. No. 87 ¶ 117. NSHEPP's attempt to salvage its claims presents an increasingly sprawling theory that lacks coherence. In any event, the nine new partial disclosures identified in the TAC do not support NSHEPP's claims.

A.

The first six newly alleged "partial corrective disclosures" are analyst reports published before the *American Banker* article: (1) a February 17, 2022 Barclays report; (2) a series of reports published by a variety of analysts on April 20, 2022; (3) an April 21, 2022 Jeffries report; (4) reports by Barclays and J.P. Morgan on October 19, 2022; (5) J.P. Morgan and D.A. Davidson & Co. reports on March 7, 2023; and (6) a March 23, 2023 report by Truist Securities. Dkt. No. 87 ¶¶ 118–29. It is undisputed that none of these reports even mentioned the Direct Express program, much less revealed the allegedly concealed information—namely, that Comerica and its contractors were not complying with the FAA and Regulation E. NSHEPP nevertheless contends that these reports were "red flags" because they discussed the possibility of enhanced regulations and declines related to fees, cards, and non-interest income, all of which are relevant to the Direct Express program.

This argument is, to say the least, tenuous. It appears that NSHEPP has merely searched through more than a year of stock fluctuations to find six

occasions when Comerica's stock price dropped the day after an analyst mentioned fees, cards, or regulations. NSHEPP has not plausibly alleged that the market understood these reports, which never reference the Direct Express program, to be disclosing the fact that i2c had employees in Pakistan, that Conduent and i2c were not properly investigating fraud complaints, or that Comerica had committed securities fraud by hiding those facts and their possible impact on the Direct Express program. NSHEPP evidently did not understand the reports to have disclosed the purported fraud when it filed its FAC and argued that Comerica's stock prices were artificially inflated "until the truth was revealed" through the *American Banker* article. Dkt. No. 48 ¶¶ 189–90; Dkt. No. 56 at 11, 22. Even viewing the TAC in the light most favorable to NSHEPP, these pre-*American Banker* article analyst reports have no relation to the alleged fraud and offer no support to NSHEPP's allegations of loss causation. *Cf. BofI*, 977 F.3d at 790 ("A corrective disclosure occurs when 'information correcting the misstatement or omission that is the basis for the action is disseminated to the market.'") (quoting 15 U.S.C. § 78u-4(e)(1)).

B.

NSHEPP also relies on a May 23, 2024 news release by the Office of the Comptroller of the Currency (OCC), which disclosed an enforcement action and formal agreement with a Comerica subsidiary based on the OCC's finding of unsafe or unsound practices related to risk governance and internal controls. Dkt. No. 87 ¶ 135. The TAC does not allege that the subsidiary at issue had any involvement in the Direct Express program, nor that the OCC release on May 23 made any reference to the Direct Express program or Comerica Bank's noncompliance with the FAA or Regulation E. NSHEPP alleges that analysts "expressed concerns" as a result of the OCC release, citing excerpts of reports issued the same day that reference structural challenges and regulatory scrutiny but do not mention the Direct Express program. *Id.* ¶ 136.[3] As with the earlier "partial

---

[3] The TAC quotes from a D.A. Davidson analyst report issued at some unspecified time after the OCC release, which stated that even though the scope of the OCC action was limited, it was "not a good look for the management team in an environment where there is increased regulatory oversight on banks" and noted "a risk the Federal Reserve takes a more in depth look at all of CMA's risk management controls and Treasury's Direct Express Program is up for bid that CMA manages." Dkt. No. 87 ¶ 137. NSHEPP does not allege that this report was a corrective disclosure, or that Comerica's stock price dropped after its issuance. That an analyst expressed concern about renewal of the Direct Express contract

corrective disclosures," it is implausible that the May 23, 2024 OCC news release and analyst reports—none of which even referenced the Direct Express program—disclosed to the market that Comerica was covering up regulatory violations by its contractors in the administration of the Direct Express program.

C.

The TAC's next alleged partial disclosure does contain references to Direct Express. On June 12, 2023, Comerica posted on its corporate website and filed with the Securities and Exchange Commission a slide deck that referenced a decrease in noninterest-bearing deposits tied to Direct Express payments. *Id.* ¶ 133. It is undisputed that these materials were not published until after the close of trading on June 12, and the next day, Comerica's stock price rose by more than 6 percent, from $41.03 to $43.65. Dkt. No. 91-2 at 2. NSHEPP alleges on information and belief, however, that the information was "leaked to the market during trading hours before the closing bell" on June 12, resulting in a 2.5 percent decline from the previous day's close (from $42.08 to $41.03). Dkt. No. 87 ¶¶ 133–34; Dkt. No. 91-2 at 2.

Defendants challenge NSHEPP's "information and belief" pleading, noting that NSHEPP originally assumed that the information was published before the market closed and added its allegation about leaking only when Defendants pointed out the mistake. The alleged basis for NSHEPP's belief that the information was leaked to the market early on June 12 is "because these disclosures concerned building trends in noninterest-bearing deposits throughout the quarter that had already been synthesized into presentation format leading up to the Morgan Stanley conference, rather than an abrupt event." Dkt. No. 87 ¶ 133. It is not clear that this reasoning supports the belief that information was leaked on June 12, and NSHEPP appears to lack any evidence to suggest that it was. But even assuming that the TAC plausibly alleges a leak on June 12, it still does not support a viable claim for two reasons.

First, although the slide deck references the decline of noninterest-bearing deposits in connection with the Direct Express program, it does not mention any fraud or noncompliance with the FAA or Regulation E. Simply put, there is no

---

based on closer regulatory scrutiny does not disclose that Comerica was covering up its contractors' noncompliance with the FAA and Regulation E.

disclosure of the information that Defendants are alleged to have fraudulently concealed.

Second, even if the information did constitute a partial corrective disclosure, the 2.5 percent stock price drop on June 12 was followed by a 6.4 percent increase the next day—the first trading day after the information was published. Under these circumstances, it is not plausible to infer that the information, even if leaked before the close of trading on June 12, caused a negative correction to the market. *See Metzler*, 540 F.3d at 1063–65 (stock price recovery three days after "modest 10% drop" precluded plausible loss causation).

D.

Finally, the most significant newly alleged disclosure is the July 19, 2024 announcement that Comerica Bank's contract to serve as the Direct Express financial agent would not be renewed. Dkt. No. 87 ¶ 138. On this news, Comerica's stock price dropped by as much as 13.5 percent and closed the day down approximately 10.5 percent. *Id.* ¶ 139. Analysts attributed the drop to the news about Comerica Bank's nonrenewal, along with Comerica's reduction of net interest income. *Id.*

While the termination of Comerica Bank's Direct Express contract is relevant to the claims in this case, NSHEPP has not plausibly alleged that its announcement on July 19 revealed hidden fraud. The TAC does not allege that Defendants ever promised that the Comerica contract would be renewed. To the contrary, the TAC alleges that Defendants repeatedly acknowledged that "Comerica's contract with the U.S. Treasury expires early 2025." *Id.* ¶¶ 99, 101(b).[4] Comerica's occasional truthful references to its history of renewals cannot be plausibly construed as a guarantee of further renewal. And NSHEPP itself understood long before July 2024, based on public information, the risk that the contract would not be renewed—not only because renewal was not guaranteed as a general matter but also because the misconduct alleged in this case threatened

[4] Defendants ask the Court to take judicial notice of transcripts of two presentations in which Farmer and Comerica's chief banking officer stated that the bidding process was ongoing and that Comerica did not know if the contract would be renewed. Dkt. No. 91-34 at 10; Dkt. No. 91-35 at 9. NSHEPP does not dispute the accuracy of these exhibits but correctly argues that Defendants have not shown they are properly subject to judicial notice or incorporated by reference into the pleadings. Accordingly, the Court does not rely on these exhibits.

renewal. NSHEPP's FAC, filed in February 2024, alleged that "[a]ny violation of the contract and governing law, let alone one as egregious as set forth herein, put [all the benefits of the Direct Express program] at risk as well as jeopardized Comerica's ability to secure future U.S. government contract work of a similar fiduciary nature." Dkt. No. 48 ¶ 167. NSHEPP does not identify any information previously hidden from the market by Comerica that was disclosed by the July 19, 2024 announcement, nor any prior representation by Comerica that was disclosed to be false or misleading. Put differently, NSHEPP does not identify any alleged misstatement by Comerica that NSHEPP believed was true before July 19, 2024, but learned was false on July 19.[5]

Defendants argue that the July 19 release also disclosed downwardly revised forward guidance unrelated to the Direct Express program that contributed to the stock drop. But even disregarding that additional negative information, the allegations in the TAC provide an obvious explanation unrelated to fraud for the drop in Comerica's stock price after the July 19, 2024 disclosures: Comerica's role in the Direct Express program brought in hundreds of millions of dollars each year, and that role was coming to an end. Indeed, the TAC alleges that the Direct Express program "was a material contributor to Comerica's financial and operating results, both within the Commercial Bank and on a consolidated basis," with direct payments of more than $150 million in 2020 and more than $50 million a year in fees. Dkt. No. 87 ¶ 5. The TAC also alleges that "Comerica strongly benefitted by the $3 billion+ in noninterest-bearing deposits generated by Direct Express (over 13% of such deposits), which fueled some of Comerica's lending revenues." *Id.* NSHEPP has not explained why the stock price drop following the July 2024 disclosure supports an inference that the market understood unspecified fraud was being disclosed rather than the much more obvious explanation—that Comerica had just lost a lucrative contract. *See Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014) (explaining that plaintiff must "allege that the decline in the defendant's stock price was proximately caused by a revelation of fraudulent activity rather than by changing market conditions, changing investor expectations, or other unrelated factors").

---

[5] When asked at the hearing to identify what information about the risk of losing the Direct Express contract was unknown to the market before July 19, NSHEPP raised the migration of vendors from I2C to Conduent, which was disclosed in mid-August, after the market already had learned that Comerica's contract would not be renewed. Information not disclosed until August was not, of course, revealed to the market through the July 19 announcement.

Indeed, NSHEPP admits in its opposition that "Treasury's decision to cut Comerica loose after 17 years as DE Financial Agent, carrying significant reputational and financial impacts, dropped its stock by . . . -10.49%." Dkt. No. 96. This is consistent with the TAC's allegation, emphasized by NSHEPP at the hearing, that analysts considered that "[t]he negative surprise" in the July 19 disclosures "was that Comerica would lose the Direct Express program and the related ~$3 bil. in [noninterest-bearing] deposits." Dkt. No. 87 ¶ 138. Even if NSHEPP could plausibly allege that the reason Comerica's contract was not renewed was because the Treasury was concerned about noncompliance with the FAA and Regulation E, that would not suffice to establish loss causation if—as NSHEPP effectively concedes—the market's response was to the loss of the Direct Express contract rather than to the disclosure of fraud. *See In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 392 (9th Cir. 2010) (rejecting argument that plaintiffs "should be able to prove loss causation by showing that the market reacted to the purported 'impact' of the alleged fraud . . . rather than to the fraudulent acts themselves").[6]

At the hearing, NSHEPP argued that the Court applied too stringent a standard because a securities plaintiff need only allege a plausible theory of loss causation—not the most probable theory. But, as explained above, NSHEPP has not identified any fraud that was revealed by the July 19 disclosures. The Court is not weighing its own conclusion that Comerica's loss of the Direct Express program caused its stock drop against an allegation that the stock drop was instead caused by a disclosure that prior statements by Comerica were false. Rather, the Court accepts NSHEPP's own argument that Comerica's nonrenewal caused the stock drop and finds that NSHEPP has not identified anything in the July 19 disclosures that revealed that any prior statement by Comerica was false or misleading. Even with the benefit of the Court's tentative opinion and a hearing,

---

[6] As NSHEPP pointed out at the hearing, *Oracle* was decided on summary judgment. But the Ninth Circuit's analysis was grounded in its defense of the rule in *Metzler*, a Rule 12(b)(6) decision. The panel framed the plaintiffs' argument as "tak[ing] issue with our opinion in *Metzler*" and cited *Metzler* and *Dura*—another case addressing loss causation at the pleading stage—in rejecting the argument. *Oracle*, 627 F.3d at 392. Moreover, as the Court explained in its order dismissing the FAC, the Ninth Circuit in both *Meztler* and *Wochos* found dismissal for failure to state a claim appropriate—indeed, required—when the context of the relevant stock price drops does not support a plausible inference of loss causation. Dkt. No. 65 at 8.

NSHEPP remains unable to point to any allegedly fraudulent statement by Comerica that was shown to be false by the July 19 disclosures.

Viewing the allegations in the TAC in the light most favorable to NSHEPP, NSHEPP has not plausibly alleged that Comerica's July 2024 stock price drop represents the removal of fraud from the market rather than a reaction to the loss of hundreds of millions of dollars in revenue that Comerica otherwise might have received from the Direct Express program. Thus, the July 2024 announcement was not a corrective disclosure that supports an inference of loss causation.

E.

Having concluded that the newly alleged disclosures do not plausibly support an inference that Defendants' alleged fraud caused a loss to investors, the Court returns to the *American Banker* article on which it previously focused. NSHEPP effectively asks the Court to reconsider its prior ruling that the brief stock drop following that article's publication was insufficient to plausibly allege loss causation. NSHEPP contends that Farmer's letter to the editor on June 1, 2023 "muted" the price drop and caused the resulting losses to reverse by making additional misrepresentations. Dkt. No. 87 ¶ 132. This argument, too, fails for multiple reasons.

First, it is not clear that any of the challenged statements in Farmer's letter are false. NSHEPP takes issue with parts of five sentences from a single paragraph of Farmer's letter:

- "The scope of the Direct Express program requires coordinating many stakeholders and working diligently to ensure that federal regulations are being followed."
- "Comerica took steps to protect Direct Express users when it became aware that a third-party vendor had not followed program protocols for reviewing customer inquiries."
- "These steps were taken in cooperation with the Fiscal Service in 2020."
- "[W]e continue to perform regular assessments, including independent audits to ensure the program is managed in compliance with applicable requirements with ongoing oversight from the Fiscal Service and Treasury Department."

- "We . . . act quickly if we find issues — from addressing individual customer concerns to oversight of vendors."

*Id.* ¶ 98. The first is undisputedly a true statement of what the Direct Express program requires; NSHEPP's contention is that Defendants failed to meet those requirements. As for the next two statements, NSHEPP has not alleged facts showing that Comerica did not take steps to protect users or that it did not cooperate with Fiscal Service when doing so; instead, NSHEPP contends that the steps Comerica took were inadequate. NSHEPP likewise has not alleged facts suggesting that Comerica does not perform regular assessments of its programs as stated in the letter. Finally, the statement that Comerica "act[s] quickly" when it finds issues appears to be the sort of vague "puffing" that courts in the Ninth Circuit find to be "not actionable material misrepresentations under federal securities laws because no reasonable investor would rely on such statements." *In re Fusion-io, Inc. Sec. Litig.*, No. 13-CV-05368, 2015 WL 661869, at *14 (N.D. Cal. Feb. 12, 2015) (Koh, J.) (cleaned up) (collecting cases). And in any event, NSHEPP has not alleged facts plausibly showing that Comerica does not act quickly when it finds problems; NSHEPP's contention is that Comerica's response to its contractors' violations of Regulation E and the FAA was inadequate, not that it was untimely.

Second, even if Farmer's letter were plausibly alleged to be misleading, the TAC does not explain how the letter could again conceal from investors the facts that had been disclosed by the *American Banker* article two days earlier. Both the original plaintiff in this action and NSHEPP filed complaints alleging that the *American Banker* article disclosed longstanding problems with the Direct Express program that had been fraudulently concealed by Defendants until then. NSHEPP, at least, was aware of Farmer's response but did not hesitate to allege securities fraud based on the information already disclosed. NSHEPP has not plausibly alleged that other investors would disbelieve or forget the information disclosed in the *American Banker* article—namely, that i2c used employees in Pakistan and that Conduent and i2c had improperly handled fraud complaints—because they read Farmer's letter. Nor does the suggestion that Farmer's response had a mitigating or "muting" effect on the disclosures in the *American Banker* article account for the subsequent trading history: Comerica's stock not only fully reversed the post-disclosure losses but within two days after the losses traded higher than it had before the article was published—and stayed higher for months. *See* Dkt. No. 91-2 at 2–4 (stock price closed at $38.99 before the *American Banker* article issued on May 29, 2023, rebounded to $40.93 by June 2, and stayed above $40 through late

September 2023). That history does not suggest even a "muted" loss to investors as a result of the *American Banker* disclosures.

Third, if NSHEPP could establish that Farmer's letter reintroduced fraud into the market, the TAC does not identify any subsequent disclosure revealing the falsity of Farmer's statements. As the Court noted in its order dismissing the FAC, the "central theme" of the complaint was "that the *American Banker* article disclosed the facts . . . fraudulently omitted from all the Defendants' statements over the preceding years," but the stock drop that followed was insufficient to support a finding of loss causation as a matter of law. Dkt. No. 65 at 9. The 171-page TAC attempts to salvage NSHEPP's claims by adding a litany of other alleged disclosures, but none of them discusses the FAA and Regulation E violations revealed by the *American Banker* article. The TAC therefore lacks a coherent theory as to when the market allegedly discovered the fraud and corrected itself, if not in the days following the *American Banker* article.

NSHEPP identifies no cases finding plausible allegations of loss causation under similar circumstances.[7] The Court remains bound by *Metzler* and *Wochos*, and the TAC provides no basis to depart from the Court's earlier ruling that "[h]ere, as in *Metzler* and *Wochos*, '[t]he quick and sustained price recovery after the modest [May 30 and 31] drop refutes the inference that the alleged concealment of [the information disclosed in the *American Banker* article] caused any material drop in the stock price.'" Dkt. No. 65 at 8 (quoting *Wochos*, 985 F.3d at 1198). Accordingly, the TAC, like the FAC, fails to plausibly allege loss causation, requiring dismissal of NSHEPP's claims.

IV.

"The court should freely grant leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). Leave may be denied, however, for reasons such as "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to

[7] In *In re CV Scis., Inc. Sec. Litig.*, on which NSHEPP relies, a company's stock price dropped by 52.4 percent in the hours after the alleged fraud was revealed, and the court found that a rebound of the stock price "in subsequent days" did not require dismissal on loss causation grounds. No. 2:18-CV-01602, 2019 WL 6718086, at *6 (D. Nev. Dec. 10, 2019). This case presents no similarly large stock drop at any time.

the opposing party by virtue of allowance of the amendment, [or] futility of amendment." *Foman v. Davis*, 371 U.S. 178, 182 (1962).

In its opposition, NSHEPP once again requests that if the motion to dismiss is granted, "leave to further amend should be given, *e.g.*, to plead OIG's third DE audit report and address Court guidance on falsity and/or scienter." Dkt. No. 96 at 29. The TAC anticipated that the Treasury's Office of Inspector General (OIG) would release a final audit report on the Direct Express program shortly. Dkt. No. 87 ¶ 18. On September 18, after the close of briefing, the OIG published its anticipated audit report, and NSHEPP filed a request for the Court to take judicial notice of it, referencing the possibility of amending the pleadings to further address the OIG report. Dkt. No. 99 at 10 n.3 ("If the Court determines the Third DE Audit Report is not incorporated into the TAC, and dismisses the pleading without considering the report, Lead Plaintiff respectfully requests leave to plead its contents in a further amended pleading."). Defendants object to the extensive briefing included in NSHEPP's request but do not object to the Court reviewing the OIG report. Dkt. No. 100.

The OIG report has no material impact on NSHEPP's loss causation allegations or the Court's analysis. The report reviewed 42 complaints from customers who contacted the OIG in 2018 and 2019 (before the class period), focusing on Comerica and Conduent's compliance with Regulation E's requirements for a timely investigation. Dkt. No. 99-1. The OIG found compliance with Regulation E in 41 of the 42 cases and found that in the last case, Conduent closed the case one day late. *Id.* Given that the TAC already alleges widespread noncompliance, the single additional example of minor noncompliance found by the OIG is immaterial. And even if other newly disclosed information in the report might have some bearing on NSHEPP's claims,[8] it cannot cure the TAC's failure to establish loss causation, since any new information revealed on

---

[8] NSHEPP argued at the hearing that the Court had misunderstood the import of the OCC audit report, contending that Fiscal Service's August 19, 2024 letter in response to the OIG audit—which was attached as an exhibit to the audit—is significant because it demonstrates Fiscal Service's concerns about Comerica's compliance and reveals that Comerica had not resolved earlier problems. NSHEPP also sought to draw from the audit report additional inferences of wrongdoing relating to Comerica's relationship with Conduent and i2c. At best, these inferences may bolster NSHEPP's allegations as to elements of their claims other than loss causation.

September 18 could not have removed fraud from the market before the disclosure. Moreover, the Court takes judicial notice of the fact that Comerica's stock price rose on September 18—the day the OIG report was published—as well as the next two days. *See* https://seekingalpha.com/symbol/ CMA/historical-price-quotes (last visited September 26, 2024); *Okla. Firefighters Pension*, 50 F. Supp. 3d at 1349. Thus, as NSHEPP conceded at the hearing, it would be futile to allege that the OIG report was yet another partial corrective disclosure that itself disclosed fraud to the market, resulting in loss to shareholders.

Nor is a fourth amended complaint otherwise justified. NSHEPP has already amended the pleadings three times, requiring Defendants to file three lengthy motions to dismiss. When the Court granted leave to file the TAC, it noted that "[t]he Court cannot continue to allow Lead Plaintiff to amend its pleadings . . . every time new facts develop" and cautioned that "[a]bsent extraordinary circumstances giving rise to good cause, Lead Plaintiff should not expect any further amendments." Dkt. No. 85 at 2–3.

No such circumstances are apparent. This case was filed well over a year ago. The Court has twice found that NSHEPP's claims fail as a matter of law because NSHEPP cannot establish loss causation. The alleged fraud on which NSHEPP relies has already been disclosed to the market, so any loss has already occurred. Given the nonrenewal of Comerica Bank's role in the Direct Express program, it is not clear that any future disclosures relating to past misconduct in administering that program are likely to have a material impact. Moreover, while the Court does not adjudicate Defendants' other arguments for dismissal, it appears that the TAC fails to establish material falsity or scienter, at least as to the majority of its allegations.

Because NSHEPP, despite multiple opportunities, still has not plausibly alleged loss causation, and amendment to try again would be futile, the Court declines to allow yet another opportunity to amend.

## V.

Defendants' motion to dismiss the TAC is granted, and NSHEPP's claims are dismissed on the merits with prejudice.

A final judgment will be entered separately.

Date: October 11, 2024

Stanley Blumenfeld, Jr.
United States District Judge